JUDGE SWEET

11 CV 2420

George S. Canellos
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 400
New York, New York 10281-1022
(212) 336-1100

RECEIVED
APR 08 2011
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,       :       11 Civ. ____ ( )

                Plaintiff,                        :

                                   :       **COMPLAINT**

                v.                              :

PERRY A. GRUSS,                            :

                Defendant.                      :

---

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Perry A. Gruss ("Gruss" or "Defendant"), alleges as follows:

## SUMMARY

1.     This action arises out of Gruss' actions while he was the Chief Financial Officer of D.B. Zwirn & Co., L.P. ("DBZCO"), a now defunct investment adviser that, at various times during the period 2002 through 2009, managed five hedge funds including the D.B. Zwirn Special Opportunities Fund, Ltd. (the "Offshore Fund") and D.B. Zwirn Special Opportunities Fund, L.P. (the "Onshore Fund"), along with several managed accounts. The Offshore Fund and the Onshore Fund were separate entities with largely distinct pools of investors.

2. During the period March 2004 through July 2006, Gruss knowingly misused the signatory and approval authority he had over funds held in client accounts and directed and/or authorized more than $870 million in improper transfers of client cash, both between client funds and from client funds to the investment adviser and third parties.

3. The improper transfers directed and/or approved by Gruss included: (i) $576 million in transfers between March 2004 and July 2006 from the Offshore Fund to the Onshore Fund or directly to third parties to fund Onshore Fund investments; (ii) $273 million in transfers between June 2005 and May 2006 from the Offshore Fund to repay the revolving credit facility of the Onshore Fund; (iii) $22 million in management fees due to DBZCO that were improperly withdrawn between May 2004 and March 2006 from accounts of client hedge funds before due and payable in order to cover DBZCO's operating cash shortfalls; and (iv) a total of $3.8 million taken from the Onshore Fund and a managed account in September 2005 to fund a portion of the $17.95 million purchase price of a Gulfstream IV aircraft purchased by DBZCO's managing partner.

4. The improper transfers were not permitted by the offering documents or the management agreements and were not disclosed to clients until after Gruss was terminated in October 2006.

## VIOLATIONS

5. By virtue of the conduct described herein, Defendant, directly and indirectly, has engaged, and may again engage, in acts, practices and courses of business, that constitute aiding and abetting DBZCO's violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

6. Unless the Defendant is permanently restrained and enjoined, he will continue to engage in the acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7. The Commission brings this action pursuant to the authority conferred upon it by Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] and seeks a judgment permanently restraining and enjoining the Defendant from engaging in the acts, practices and courses of business alleged herein.

8. In addition to the injunctive relief recited above, the Commission seeks: (i) final judgment ordering Gruss to disgorge any ill-gotten gains with prejudgment interest thereon; (ii) final judgment ordering Defendant to pay civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and (iii) such other relief as the Court deems just and appropriate.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

10. Venue is proper in the Southern District of New York pursuant to 28 U.S.C § 1391. The Defendant, directly and indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails and wires, in connection with the transactions, acts, practices, and courses of business alleged in this complaint. A substantial part of the events comprising Defendant's fraudulent activities giving rise to the Commission's claims occurred in the Southern District of New York, including, among other things, the approval and implementation of the transactions described herein. DBZCO also had its headquarters in New York, New York, and Gruss' principal office was located therein.

## THE DEFENDANT

11.   **Perry A. Gruss ("Gruss")**, age 43, is a resident of Manalapan, New Jersey. Gruss was DBZCO's chief financial officer at all times during the period March 1, 2004 through October 4, 2006, when, faced with termination, he resigned. Gruss had also been a DBZCO partner since January 1, 2006. Gruss is currently employed in a marketing capacity at another investment adviser which is currently in liquidation.

## FACTS

### Overview

12.   From its founding in October 2001 through October 2006, DBZCO grew its assets under management from $0 to approximately $5 billion. DBZCO also expanded from a single office in New York with less than ten dedicated employees to more than ten offices across the globe with over 200 employees. DBZCO delivered consistent positive returns for its clients, accumulating forty-nine consecutive months of positive returns through October 2006.

13.   During the period March 1, 2004 through October 4, 2006, DBZCO had no written accounting policies or procedures. The *de facto* policy was that all transfers of cash of any size had to be expressly approved by Gruss. (While the managing partner also had signatory authority over the accounts, his approval was not sought in practice.) Gruss' approval was effectuated by his affirmative response to emails sent to him by members of the finance department or by Gruss personally signing or authorizing his signature to be affixed to hard copy wire transfer requests.

**Misappropriation of Offshore Funds for Onshore Investments**

14. DBZCO's Onshore Fund faced a chronic cash shortage. Its investment opportunities exceeded available funds, threatening its ability to fulfill existing capital commitments and fund new investment opportunities.

15. In contrast, DBZCO's Offshore Fund had more cash than investment opportunities due to its inability to make investments or loans directly in a U.S. trade or business without being subject to a U.S. tax liability. DBZCO's intent to conduct the business of the Offshore Fund in a manner "such that the Fund should not be deemed to be engaged in a U.S. trade or business" was stated in the Fund's offering documents.

16. Because of the cash shortage in the Onshore Fund, Gruss instructed his staff to take cash from the Offshore Fund to make investments for the benefit of the Onshore Fund. Gruss knew that Offshore Fund cash was being used for these investments because the wire transfer request emails were explicit in that regard. Such transfers occurred at least eighty-five times and, in total, $576 million was transferred from the Offshore Fund to make investments for the benefit of the Onshore Fund (the "Inter-fund Transfers"). No loan agreements were created to document the transfers. After periods ranging from two days to 285 days, and an average of sixty-six days outstanding, the Onshore Fund repaid the Offshore Fund for the cash transfers but with no interest at that time.

17. The amount of Inter-fund Transfers outstanding between the Onshore and Offshore Funds grew to as much as $148 million in December 2005. At December 31, 2005, the net assets of the Offshore Fund were approximately $1.4 billion.

18. The practice began when a senior member of DBZCO's accounting staff ("Accountant 1") received a request for funding of an investment by the Onshore Fund that the

Onshore Fund did not have the money to fund. Accountant 1 then went to Gruss, who provided instruction to use cash from the Offshore Fund which would eventually be repaid when new investor capital came into the Onshore Fund.

19. Thereafter, a practice developed of using cash from the Offshore Fund to fund Onshore Fund investments. Gruss typically conveyed his approval to these transfers by responding positively to an email requesting the transfer sent from someone in DBZCO's accounting department to individuals at the bank serving as the custodian of both the Onshore and Offshore Funds' cash. The emails included requests to transfer amounts of cash "from the LTD account #721600" to third parties and, less frequently, to the Onshore Fund and then third parties. Gruss knew that "LTD account #721600" was for the Offshore Fund because it was one of the accounts most frequently used at the custodian bank and was the shorthand way the accounting team referred to accounts.

**Gruss' Staff Expressed Concern Over the Inter-fund Transfers**

20. Both Accountant 1 and another accountant ("Accountant 2"), repeatedly expressed concern to Gruss about the practice of transferring cash between funds, and each resigned from DBZCO in part due to the practice.

21. As the size of the transfers began to grow, Accountant 1 became concerned they could not be repaid. Accountant 1 also grew increasingly uncomfortable with the practice and told Gruss it was improper. Accountant 1 repeatedly threatened to quit over the Inter-fund Transfers. Accountant 1 also communicated concern over the Inter-fund Transfer practice to Accountant 2. Accountant 2 told Gruss that if he wanted Accountant 1 to stay, the practice would have to stop. When the practice did not stop, Accountant 1 resigned.

22.     Accountant 2 also raised concerns about the practice with Gruss. In an email exchange between Accountant 2 and Gruss on April 18, 2005, Accountant 2 asked if a particular Onshore Fund deal should be funded from the "Ltd" – the Offshore Fund. Gruss responded "Yes pls." Accountant 2 responded "[I]s there a game plan? Or is this something that the [DBZCO] backoffice must 'learn to accept'?" Gruss ultimately responded in another email "What's our altwrnatives [sic]."

23.     Responding to Gruss's request for alternatives, Accountant 2 suggested getting "all the partners/top mgmt in the loop (i.e. REALITY) . . . then have them make a joint mgmt decision." Gruss did not inform DBZCO's managing partner or any of the other DBZCO partners of the Inter-fund Transfer practice.

24.     As the Inter-fund Transfers continued, the balance due from the Onshore Fund to the Offshore Fund continued to grow. In November 2005, Accountant 2 provided Gruss with a spreadsheet which detailed, by investment, the amounts that were due from and to the clients managed by DBZCO. Accountant 2 discussed this spreadsheet in a late-2005 meeting with Gruss as DBZCO tried to clear as many receivables and payables as possible before the December 31 year-end to avoid inquiries from the auditors. As a result of this meeting, certain amounts were repaid.

25.     In meetings with Gruss, Accountant 2 also expressed her concern that the inter-fund transfers constituted commingling of funds, were not documented, and did not involve payment of interest to the Offshore Fund for the use of the money at that time.

26.     In June 2006, Accountant 2 resigned and, in discussing the resignation with Gruss, specifically cited concerns about the Inter-fund Transfers which Accountant 2 had concluded were inappropriate.

27. In early 2006, DBZCO's treasurer questioned Gruss about the Inter-fund Transfers and whether a loan existed. Gruss informed the treasurer that there was no loan because the Offshore Fund could not make loans to the Onshore Fund because of the tax issues.

**Misappropriation of Offshore Fund's Cash for Credit Facility Repayment**

28. The Onshore Fund had a revolving credit facility whose terms required full repayment every seventy-five days. Beginning in June 2005 and continuing until May 2006, Gruss approved four transfers totaling $273 million from the Offshore Fund to the Onshore Fund to enable the Onshore Fund to repay its outstanding obligations under the credit facility. While the credit facility was available to each fund, each fund was solely liable for its own debt, so the Offshore Fund had no obligation (or business purpose) to assist the Onshore Fund in paying down the Onshore Fund's credit line. No loan agreements were created to document the transfers.

29. In June 2005, $78 million was transferred from the Offshore Fund to the Onshore Fund so that the Onshore Fund could repay $80 million outstanding under its credit facility.

30. On June 13, 2005, Gruss authorized the $78 million transfer by replying to an email sent by Accountant 1 to the Offshore Fund's bank. The details of the email showed that the transfer was for payment to the provider of the revolving credit facility, and that the cash would move from the Offshore Fund to the Onshore Fund and then to the provider of the credit facility.

31. The Onshore Fund did not repay the $78 million to the Offshore Fund until five months later via five wire transfers at the end of 2005, leaving no amount due between the Funds at December 31, 2005 related to the credit facility. No interest was paid to the Offshore Fund for the use of the $78 million over those five months at that time.

32. In 2006, Gruss authorized via email three more transfers totaling $195 million for repayment of the credit facility. Wire transfers for $125 million, $50 million and $20 million were authorized by Gruss on January 9, March 3 and May 26, 2006, respectively. Gruss authorized each wire transfer via email.

33. Although $87 million had been repaid by the Onshore Fund to the Offshore Fund by the time this practice was discovered in October 2006, $108 million still remained outstanding at that time.

**Misappropriation of Client Cash for Early Management Fee Withdrawals**

34. From May 2004 through March 2006, DBZCO withdrew a total of $22.5 million in management fees from client accounts before the funds were due to DBZCO. DBZCO's bank records show that, without the funds provided by the early withdrawal of management fees, DBZCO would have faced severe liquidity constraints and might have been unable to fund its cash disbursements for its operating expenses.

35. The Management Agreements between DBZCO and the funds under its management during the period from May 2004 through March 2006 specifically provided that "[t]he monthly Management Fee shall be accrued monthly and payable quarterly . . . ." Gruss was aware of the payment terms in the Management Agreements and recognized that the early withdrawals amounted to loans of fund money to DBZCO.

36. Nevertheless, Gruss approved an early withdrawal on June 21, 2004, nine days before the fees were payable. Gruss repeated his approval for early withdrawals at least nineteen times through March 2006, for total withdrawals of $22.5 million. Numerous withdrawals were made thirty days or more before the fees were payable. No loan agreements were created to

9

document the advance use of cash by DBZCO and no interest was paid to DBZCO's clients for the use of funds at that time.

37. Without the early withdrawals, DBZCO would have had insufficient cash to fund the payments it made in each of the months in which it withdrew the management fees before they were due. DBZCO's fee withdrawals were most significant in September 2005, December 2005 and March 2006 where, were it not for the Management Fee Withdrawals, DBZCO would have been overdrawn in its operating account at month-end by $1.9 million, $4.0 million and $9.5 million, respectively.

**Misappropriation of Client Cash for Aircraft Purchase**

38. In April 2005, DBZCO's managing partner tasked the chief operating officer ("COO") with acquiring a Gulfstream IV aircraft. The aircraft was to be purchased by a single member LLC owned by DBZCO's managing partner with certain purchase related expenses paid for by DBZCO as advances on the managing partner's partnership distributions. Gruss frequently received emails from the COO and the managing partner about the purchase and from the COO when cash was needed to make payments related to the aircraft.

39. By mid-September 2005, the COO had requested payment of five invoices related to the aircraft purchase, all of which were paid by DBZCO, and had copied Gruss on the email instructions which clearly identified the expenses as related to DBZCO.

40. The total purchase price of the aircraft was $17.95 million, and DBZCO was faced with a $3.8 million shortfall in available funds to close on the purchase, including additional cash due to the seller, collateral for a letter of credit to secure certain non-recourse financing, other fees and closing costs. The funds needed were as follows:

**Funds Needed by DBZCO to Complete Aircraft Purchase**

| | |
|---|---:|
| Additional cash due to seller (after financing) | $1,681,350 |
| Collateral for $1.9 million letter of credit | 1,900,000 |
| Financing fees | 80,250 |
| Closing costs to aircraft broker | 112,575 |
| Total DBZCO funds needed to close | $3,774,175 |

41. During the relevant period, DBZCO never had more than $827,000 available in its operating account – far less than the $3.8 million needed to complete the aircraft purchase.

42. The closing on the aircraft purchase went ahead in late September 2005. The COO sent four email requests for wire transfers to Accountant 2, with copies to Gruss, to provide for the funds.

43. Accountant 2 set up wires to take the funds, as directed by Gruss, from accounts belonging to DBZCO's clients – the Onshore Fund and a managed account. Gruss approved all of the transfers.

44. The information contained on the face of the hard copy and email wire requests approved by Gruss provided clear identification of the Offshore Fund and one of DBZCO's managed accounts as the source of the funds and that the funds were to be used for the aircraft purchase. Despite these indications, Gruss approved the following transfers:

**Client Cash Used for Aircraft Purchase**

| Date | Amount of Wire | Paid by DBZCO Client | Payee |
|---|---:|---|---|
| 9/28/05 | $1,900,000 | Managed account | DBZCO cash collateral account at bank |
| 9/28/05 | 80,250 | Managed account | Bank providing financing |
| 9/29/05 | 1,681,350 | Onshore Fund | Escrow agent |
| 9/30/05 | 112,575 | Onshore Fund | Aircraft broker |
| Total | $3,774,175 | | |

11

**Gruss Received Post-Purchase Notice of Use of Client Funds**

45. On November 4, 2005, a working capital facility closed and $8.1 million was made available to DBZCO by its bank. On November 9, 2005, Gruss received an email from the Accountant 2 with a detail of cash available, including the working capital loan received from the bank. The detailed information in the email included $3.8 million to "[r]epay LP fund for airplane wires." Also, on November 10, 2005, Accountant 2 emailed Gruss a request to "send $3.77mm from the new account where we recvd the 8.1mm loan back to the LP fund for reimbursement of the airplane wires." The managed account was subsequently repaid.

46. Despite receiving notice of the use of client funds, Gruss did not inform any of his superiors or anyone outside of DBZCO's accounting group that client funds had been used for the aircraft purchase.

47. By November 23, 2005, the amounts taken from client accounts were reimbursed. The amounts taken from the clients were not documented as loans and no interest was paid to the clients at that time.

## CLAIM FOR RELIEF

(Violations of Section 206(1) and 206(2) of the Advisers Act)

48. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47, of this Complaint.

49. DBZCO was an investment advisor under Section 202(a)(11) of the Advisers Act [15 U.S.C. §§ 80b-2(a)(11)].

50. As DBZCO's CFO during all relevant time periods, and as a DBZCO partner from January 1, 2006 through October 4, 2006, Gruss was a person associated with an investment adviser under Section 202(a)(17) of the Advisers Act [15 U.S.C. §§ 80b-2(a)(17)].

51. As a result of the transfers authorized by Gruss herein described, DBZCO directly or indirectly through the use of the mails or any means or instrumentality of interstate commerce: (a) employed devices, schemes, and artifices to defraud any client or prospective client; or (b) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon any client or prospective client in violation of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

52. Gruss, while associated with DBZCO, an investment adviser, knowingly provided substantial assistance to DBZCO's violations.

53. By reason of the foregoing, Gruss aided and abetted, and unless enjoined, will continue to aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

1. Permanently enjoining Defendant, from, directly or indirectly, aiding and abetting violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)]; and

2. Ordering Defendant to disgorge any ill-gotten gains, plus prejudgment interest;

3. Ordering Defendant to pay a civil money penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. §80b-9]; and

4. Granting such other and further relief as the Court deems appropriate.

Dated: April 8, 2011
New York, New York

Respectfully Submitted,

George S. Canellos
ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
Regional Director
New York Regional Office
Three World Financial Center, Suite 400
New York, NY  10281-1022
Tel. (212) 336-0149

Of Counsel:

Andrew M. Calamari
Steven G. Rawlings
Todd Brody
Peter Altenbach III