UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,                    :        11 Civ. 2420 (RWS)

                                Plaintiff,                    :        ECF CASE

                                        v.                    :

PERRY A. GRUSS,                    :

                           Defendant.                    :

---

**<u>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

SECURITIES AND EXCHANGE COMMISSION
Todd D. Brody
Senior Trial Counsel
New York Regional Office
3 World Financial Center
New York, NY 10281
(212) 336-0080

# TABLE OF CONTENTS

TABLE OF AUTHORITIES

PRELIMINARY STATEMENT                                                                    1

THE ALLEGATIONS IN THE AMENDED COMPLAINT                                                 3

ARGUMENT                                                                                 5

I.    THE STANDARD FOR A MOTION TO DISMISS UNDER RULES 12(B)(6),
      8(A), AND 9(B)                                                                     5

II.   THE SUPREME COURT'S DECISION IN *MORRISON* DOES NOT LIMIT THE
      SEC'S ABILITY TO SUE GRUSS, THE CFO OF A DOMESTIC INVESTMENT
      ADVISER                                                                           7

A.    The Advisers Act Applies to DBZCO and Gruss                                       9

B.    Even if the "Client" is the Focus of the Advisers Act, Gruss Aided and
      Abetted a Fraud on a Domestic Client and may be Sued by the SEC                   14

III.  THE ALLEGATIONS IN THE AMENDED COMPLAINT ARE NOT
      CONTRADICTED BY THE OFFERING DOCUMENTS, WHICH DO NOT
      CONTEMPLATE SUCH TRANSFERS                                                        17

A.    The Offering Documents did not Allow the Transfers Between the Funds             17

B.    The Improper Transfers Between the Funds were not Disclosed                       21

IV.   GRUSS' 9(B) ARGUMENT IS SIMILARLY UNAVAILING                                      23

CONCLUSION                                                                              24

# TABLE OF AUTHORITIES

## CASES

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ............................................................. 23

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ...................................................... 5-6

*ATSI Communications, Inc. v. The Shaar Fund, Ltd*, 493 F.3d 87 (2d Cir. 2007) ............................ 5

*Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F. Supp. 1084, 1089 (S.D.N.Y. 1988) ..................... 10

*Bangkok Crafts Corp. v. Capitolo di San Pietro*, 03 Civ. 0015, 2006 U.S. Dist. LEXIS
    49161 (S.D.N.Y. July 18, 2006) ................................................................................................ 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) .................................................................. 5-6

*Bell v. Leakas*, 1993 U.S. Dist. LEXIS 3352 at *22-23 (S.D.N.Y. Mar. 18, 1993) ............................ 8

*Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007) ............................................... 12

*Burkina Wear, Inc. v. Campagnolo, S.R.L.*, 07 Civ. 3610, 2008 U.S. Dist. LEXIS 29031
    (S.D.N.Y. April 9, 2008) ......................................................................................................... 23

*Burns v. Del. Charter Guar. & Trust Co. ,* 10 Civ. 4534, 2011 U.S. Dist. LEXIS 61375
    (S.D.N.Y. June 8, 2011) ........................................................................................................ 5, 7

*Clark v. Nevis Capital Mgmt., LLC,* 04 Civ. 2702, 2005 U. S. Dist. LEXIS 3158
    (S.D.N.Y. March 3, 2005) ....................................................................................................... 12

*Cohen v. Stevanovich*, 722 F. Supp. 2d 416 (S.D.N.Y. 2010) ......................................................... 5

*Cort v. Ash*, 422, U.S. 66 (1975) .................................................................................................. 13

*Fairport, P. & E.R. Co. v. Meredith*, 292 U.S. 589 (1934) ............................................................ 10

*Hernandez v. GPSDC (New York), Inc.*, 04 Civ. 127, 2008 U.S. Dist. LEXIS 5516
    (S.D.N.Y. Jan. 28, 2008) ........................................................................................................ 18

*Houbigant, Inc. v. ACB Mercantile*, 914 F. Supp. 964 (S.D.N.Y. 1995) .......................................... 9

*I.B.M. v. U.S.*, 480 F.2d 293, 296 (2d Cir.), *cert. den.*, 416 U.S. 979 (1973) ............................... 10

*In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405 (S.D.N.Y. 2007), *aff'd,* 573 F.3d 98 (2d Cir. 2009) ..... 12

*Inter-American Dev. Bank v. NextG Telecom Ltd.*, 503 F. Supp.2d 687 (S.D.N.Y. 2007) ............................ 18

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) ................... 5

*Lehman Bros. Commer. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, No. 94 Civ.
    8301, 1995 WL 608323 *3 (S.D.N.Y. Oct. 16, 1995) ................................................................ 6

*Lindsay v. Ass'n of Prof'l Flight Attendants*, 581 F.3d 47 (2d Cir. 2009), *cert. den.*,
    130 S.Ct. 3513 (2010) ........................................................................................................... 12

*Long Island Lighting Co. v. IMO Indus.*, 6 F.3d 876 (2d Cir. 1993) ............................................... 18

*Morris v. Wachovia Secs., Inc.*, 277 F. Supp.2d 622 (E.D. Va. 2003) ............................................ 15

*Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869 (U.S. 2010) ................................... passim

*Ohio Bureau of Workers' Compensation v. MDL Active Duration Fund, Ltd.*, No. 2:05-cv-0673, 2006 U.S.
    Dist. LEXIS 35448 (S.D. Ohio June 1, 2006) ........................................................................... 16

*Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429 (2d Cir. 2002) ................................. 12

*Owens v. Samkle Auto, Inc.*, 425 F.3d 1318 (11th Cir. 2005) ................................................... 10

*Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ................................................................... 6

*Ross v. Bolton*, 904 F.2d 819 (2d Cir. 1990) ................................................................................. 7

*SEC v. Blavin*, 706 F.3d 706, 711 (6th Cir. 1985) .................................................................. 15

*SEC v. Bolla*, 401 F. Supp.2d 43, 67 (D.D.C. 2005) ................................................................. 18

*SEC v. Capital Gains Research Bureau, Inc*, 375 U.S. 180 (1963) ....................................... 6, 14, 22

*SEC v. DiBella*, 587 F.3d 553 (2d Cir. 2009) ............................................................................. 6

*SEC v. Gold*, 05-CV-4713, 2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006) ..................................... 6

*SEC v. Goldman Sachs & Co.*, No. 10 Civ. 3229, 2011 WL 2305988 (S.D.N.Y. June 10, 2011) .................... 12

*SEC v. Mannion*, 1:10-cv-3374, 2011 U.S. Dist. LEXIS 63621 (N.D. Ga. June 1, 2011) .............................. 15

*SEC v. Moran*, 922 F. Supp. 867 (S.D.N.Y. 1996) ............................................................. 6, 13

*SEC v. Power*, 525 F. Supp. 2d 415 (S.D.N.Y. 2007) ............................................................. 6

*SEC v. Rana Research*, 8 F.3d 1358 (9th Cir. 1993) ............................................................. 18

*SEC v. Treadway*, 430 F. Supp. 2d 293 (S.D.N.Y. 2006) ...................................................... 6

*SEC v. Wash. Inv. Network*, 475 F.3d 392 (D.C. Cir.), *reh'g den.*, 2007
    U.S. App. LEXIS 9984 (D.C. Cir. April 4, 2007) .................................................... 14-15

*Sheldon Co. Profit Sharing Plan & Trust v. Smith*, 828 F. Supp.2d 1262 (W.D. Mich. 1993) .................. 15

*Siepel v. Bank of America, N.A.*, 239 F.R.D. 558 (E.D. Mo. 2006), *vacated on other*
    *grounds*, 2007 U.S. Dist. LEXIS 14430 (E.D. Mo. March 1, 2007) ...................................... 16

*SSH Co. v. Shearson Lehman Bros., Inc.*, 678 F. Supp. 1055 (S.D.N.Y. 1987). ............................... 12

*Stickle v. City-Wide Sec. Servs.*, 839 F. Supp. 207 (S.D.N.Y. 2003) .................................... 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...................................... 5

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11 (1979) ................................ 13

*United States v. Young*, 580 F.3d 373 (6th Cir.), *reh'g den., 2009 U.S. App. LEXIS 23705*
    *(6th Cir. Oct. 26, 2009), and cert. den.*, 130 S.Ct. 1723 (2010) .................................... 10

*United States v. Elliot*, 62 F.3d 1304 (9th Cir. 1995) ................................................ 11

*Wash. Water Power Co. v. Fed. Energy Reg. Com.*, 775 F.2d 305 (D.C. Cir. 1985) ...................... 10

*Wellington Int'l Commerce Corp. v. Retelny*, 727 F. Supp. 843 (S.D.N.Y. 1989) ...................... 12

## FEDERAL STATUTES AND RULES

Fed. R. Civ. Pro. 9(b) ............................................................................. 1, 5-7, 23

Fed. R. Civ. Pro. 12(b)(6) ........................................................................ 1

Fed. R. Civ. Pro. 8(a) ............................................................................ 1, 5-6

Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j ................................ 7-8

Rule 10b-5, 17 CFR § 240.10b-5 ................................................................... 7-8

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q ......................................... 12

Section 201 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 .......................... 10-11, 16

Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6 ............................ passim

## OTHER

SEC Rel. No. IA-3222, 17 CFR Part 275, at p. 103 n. 415 (June 22, 2011) ................................ 1

*Gim-Seong Sow*, 1987 SEC No-Act. LEXIS 2789 ................................................... 11

*Operadora Internacional, S.A.*, 1990 SEC No-Act. LEXIS 31 .................................... 11

S.Rep. No. 1775, 76th Cong., 3d Sess. 21 (1940). ........................................................................ 11

Stanley B. Judd, International Investment Advisers, 19 Rev. of Sec. & Comm. Reg. 1, 4 (Jan 8, 1986)..1, 11

Vol. 6 A.A. Sommer, Jr., Securities Laws Techniques, Ch. 84, § 84.02(3)(a) (Matthew Becker) ................ 11

Plaintiff, Securities and Exchange Commission ("SEC" or "Commission"), through its attorneys, submits this memorandum of law in opposition to Defendant Perry A. Gruss' ("Gruss" or "Defendant") Motion to Dismiss the Amended Complaint pursuant to Fed. R. Civ. Pro. 12(b)(6), 8(a), and 9(b).

## PRELIMINARY STATEMENT

One commentator has aptly noted that it "would be invidious to assume that Congress intended to protect residents but not non-residents from fraud by U.S. resident advisers."[1] This is exactly what Gruss would have this Court do. Notwithstanding that: (1) DB Zwirn & Co. L.P. ("DBZCO") was a United States investment adviser with its principle place of business in New York; (2) that Gruss, the CFO of DBZCO, was located in the United States and all of his wrongful actions took place in New York; and (3) that the transactions at issue – i.e. the wrongful transfers between the funds – all took place in the United States, Gruss argues that the SEC has no ability to sue him because Section 206 of the Investment Advisers Act of 1940 ("the Advisers Act"), 15 U.S.C. § 80b-6, was not intended to cover frauds on foreign funds. Gruss' argument misses the mark. First, he cites no case for the proposition that Section 206 does not apply in this instance. Instead, he attempts to draw an analogy from the recent Supreme Court decision in *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869 (U.S. 2010), where the Court held that private causes of action brought under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder had to concern either a transaction in a security listed on a U.S. securities exchange or a purchase or sale in the United States. If *Morrison* applies to this action, however, it would suggest that the SEC can sue any domestic investment adviser, regardless of the location of the defrauded client or prospective client.[2] Second, even if *Morrison* required that the defrauded fund be located in the United States, Gruss ignores that one of the defrauded clients in this case was a domestic

---

[1] Stanley B. Judd, International Investment Advisers, 19 Rev. of Sec. & Comm. Reg. 1, 4 (Jan 8, 1986).

[2] The SEC does not address in this memorandum whether and under what circumstances it would be able to sue a non-U.S. investment adviser under Section 206. The SEC has recently stated that "whether a non-U.S. adviser with no place of business in the United States and no U.S. clients would be subject to registration depends on whether there is sufficient use of U.S. jurisdictional means." SEC Rel. No. IA-3222, 17 CFR Part 275, at p. 103 n. 415 (June 22, 2011), available at http://www.sec.gov/rules/final/2011/ia-3222.pdf

hedge fund. While Gruss may argue that the domestic hedge fund was not injured, the SEC does not have to prove injury in a case brought under Section 206. Finally, Gruss ignores that even the offshore fund in this case was managed and operated in the U.S., used a U.S. address for contact purposes, and had numerous U.S. investors. To suggest that the Offshore Fund was "foreign" for *Morrison* purposes, ignores reality. For all of these reasons, the Court should find that Section 206 applies to this case.

In addition to arguing that Section 206 does not apply, Gruss argues that the Amended Complaint fails to state a claim because the wrongful conduct alleged – the transfers of cash from the Offshore Fund to the Onshore Fund – was expressly permitted by the offering memoranda for the Offshore Fund and was disclosed in the Offshore Fund's financial statements. As described in detail below, the offering memoranda do not mention or contemplate the transfers described in the Amended Complaint. More important, however, as alleged in the Amended Complaint, the only people who understood these transfers were Gruss and the accountants who worked under him. DBZCO's managing director did not authorize such transfers. And Gruss, notwithstanding the pleas of his subordinates to do so, did not inform the partners or senior management of these transactions. If, as suggested by Gruss, such transfers were allowed and done in the normal course of business, someone who was making investment decisions should have known of their existence. Finally, the disclosures in the financial statements are themselves misleading because while some amounts owed to the Offshore Fund are disclosed, the disclosures state that it was for a different reason – not because the Offshore Fund was transferring money to pay the Onshore Fund's obligations.

For the reasons described more fully below, Plaintiff respectfully requests that the Court deny Gruss' Motion to Dismiss the Amended Complaint.

2

**THE ALLEGATIONS IN THE AMENDED COMPLAINT**

As alleged in the Amended Complaint, DBZCO, a New York based limited partnership and unregistered investment adviser, managed five hedge funds during the period 2002 through 2009, including the D.B. Zwirn Special Opportunities Fund, Ltd. (the "Offshore Fund") and the D.B. Zwirn Special Opportunities Fund, L.P. (the "Onshore Fund"). (Amended Complaint at ¶1). During the period March 2004 through July 2006, Gruss knowingly misused the signatory and approval authority that he had over the funds' accounts and directed and/or authorized more than $870 million in improper transfers of client cash between the funds and from the funds to the investment adviser and third parties. (*Id*. at ¶2). These transfers included: (a) at least 85 transfers totally $576 million from the Offshore Fund to the Onshore Fund or directed to third parties to fund Onshore Fund investments and; (b) $273 million in transfers from the Offshore Fund to repay the Onshore Fund's revolving credit facility. (*Id*. at ¶3). The Amended Complaint makes clear that these transfers were not investments by the Offshore Fund in the Onshore Fund. DBZCO's managing partner, who approved all investments, did not approve any investment in the Onshore Fund by the Offshore Fund. (*Id*. at ¶¶22, 26). Indeed, as alleged in the Amended Complaint, Gruss did not even inform DBZCO's managing partner or any of the other DBZCO partners of the practice of transferring money between the funds. (*Id*. at ¶34). While these transfers look like loans (in that money transferred was ultimately repaid), no loan agreements were created to document such transfers. (*Id*. at ¶26). And no interest was paid by the Onshore Fund to the Offshore Fund (even though these transfers were outstanding for an average of 66 days and ranged up to 285 days). (*Id*.) These transfers of funds were not documented as loans for good reason: the Offshore Fund was prohibited for tax reasons from making loans to U.S. businesses, as Gruss himself acknowledged. (*Id*. at ¶¶25, 38). This was simply an undisclosed and unapproved means that Gruss used to address the fact that the Onshore Fund did not have sufficient cash to make investments and to repay its loan facility and the Offshore Fund had that cash. (*Id*. at ¶¶24, 26).

3

The transfers to fund the Onshore Fund's investments typically were accomplished in the following manner: cash would be transferred from the Offshore Fund's U.S. bank account into a third party's U.S. bank account. (*Id.* at ¶¶29-30). The third party – the company receiving the loan or investment – was in many cases a U.S. entity. (*Id.* at ¶30). The transfers to repay the Onshore Fund's revolving credit facility typically were accomplished in the following manner: cash was moved between accounts for each of the funds at a bank in the U.S. and then on to the U.S. bank account of the provider of the credit facility. (*Id.* at ¶41).

The Amended Complaint further alleges that Gruss knew that the practice of transferring cash between the funds was inappropriate. (*Id.* at ¶¶31-37). Two of the accountants who worked under Gruss in New York repeatedly expressed concern about the practice of transferring cash between funds, informed him that the practice was inappropriate, and requested that Gruss make the partners aware of the practice so a joint management decision could be made (a request Gruss ignored). (*Id.*) Ultimately, when the practice did not stop, both accountants resigned from DBZCO. (*Id.* at ¶¶32, 37).

Separate from these transfers from the Offshore Fund to the Onshore Fund, the Amended Complaint also alleges that Gruss approved $22 million of early withdrawals of management fees from the accounts of the funds in order to cover DBZCO's operating cash shortfalls. (*Id.* at ¶45). The Amended Complaint alleges that without the funds provided by the early withdrawal of management fees, DBZCO would have faced severe liquidity constraints and might have been unable to fund its cash disbursements for its operating expenses. (*Id.*) Specifically, but for the early management fee withdrawals, DBZCO would have been overdrawn in its operating account at month-end by $1.9 million (Sept. 2005), $4.0 million (December 2005), and $9.5 million (March 2006). (*Id.* at ¶48). Gruss was aware of the payment terms in the management agreements and recognized that the early withdrawals amounted to loans of money to fund DBZCO. (*Id.* at ¶46). The Amended Complaint also alleges that Gruss authorized that $3.8 million be taken from the Onshore Fund and a managed account in

4

September 2005 to fund a portion of the purchase of an aircraft by DBZCO's managing partner. (*Id*. at ¶¶49, 51, 43). And despite knowing that money from the Onshore Fund and a managed account had been used to purchase the plane, Gruss did not inform any of his supervisors or anyone outside of the accounting group that funds had been used for this purpose. (*Id*. at ¶57).

## ARGUMENT

### I. THE STANDARD FOR A MOTION TO DISMISS UNDER RULES 12(B)(6), 8(A), AND 9(B)

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court should construe the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) (applying *Twombly* standard to securities fraud complaint). Therefore, to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Cohen v. Stevanovich*, 772 F. Supp. 2d 416 (S.D.N.Y. 2010) (Sweet, J) (quoting *Iqbal*, 129 S. Ct. at 1949). As described by this Court in *Burns v. Del. Charter Guar. & Trust Co.*, 10 Civ. 4534, 2011 U.S. Dist. LEXIS 61375, *5 (S.D.N.Y. June 8, 2011) (Sweet, J.), Fed. R. Civ. P. 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."

Rule 9(b) of the Federal Rules of Civil Procedure provides additional pleading requirements in fraud cases (including SEC enforcement actions), providing that "(i)n alleging fraud or mistake, a party

5

must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." While Rule 9(b) applies to the SEC's Section 206(1) claim, it does not apply to the SEC's claim under Rule 206(2), which is not scienter based and can be based on a showing of negligence. *See SEC v. Capital Gains Research Bureau, Inc*, 375 U.S. 180, 200-201 (1963); *SEC v. DiBella*, 587 F.3d 553, 567 (2d Cir. 2009) ("the government need not show intent to make out a section 206(2) violation"); *SEC v. Treadway*, 430 F. Supp. 2d 293, 338 (S.D.N.Y. 2006) ("Section 206(2) requires only negligence"); *SEC v. Moran*, 922 F. Supp. 867, 897 (S.D.N.Y. 1996).

In *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004), the Second Circuit Court of Appeals explained the purpose of Rule 9(b): The particularity requirement of Rule 9(b) serves to "<u>provide a defendant with fair notice of a plaintiff's claim</u>, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." (emphasis added). Indeed, the primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim. *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990) ("(t)he <u>primary purpose</u> of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based") (emphasis added). *SEC v. Power*, 525 F. Supp. 2d 415, 423 (S.D.N.Y. 2007) (citing *Lehman Bros. Commer. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, No. 94 Civ. 8301, 1995 WL 608323 *3 (S.D.N.Y. Oct. 16, 1995) ("Rule 9(b) 'is not intended to be an 'insurmountable hurdle for [claimants] to overcome, but was designed to afford defendants fair notice of the fraud alleged against them.'"). "Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map. Nor should the word 'particularity' be used as a talisman to dismiss any but a finely detailed fraud allegation brought in a federal court." *Bangkok Crafts Corp. v. Capitolo di San Pietro*, 03 Civ. 0015, 2006 U.S. Dist. LEXIS 49161 at *13 (S.D.N.Y. July 18, 2006) (Sweet, J.). "The . . . question is: Do the defendants know what the United States is claiming?" *SEC v. Gold*, 05-CV-4713, 2006 WL 3462103 *3 (E.D.N.Y. Aug. 18, 2006).

Much of Gruss' motion to dismiss concerns his incorrect interpretation of the offering memoranda for the Offshore Fund, which are Exhibits A-C to the Gruss Declaration.  At best, the offering memoranda raise factual disputes, which are inappropriate for resolution on a motion to dismiss.  *See, e.g., Burns*, 2001 U.S. Dist. LEXIS 61375 at *22.  (Sweet, J.) (claims that party complied with contractual obligations along with the interpretation of ambiguous contract provisions inappropriate for motion to dismiss); *Bell v. Leakas*, 1993 U.S. Dist. LEXIS 3352 at *22-23 (S.D.N.Y. Mar. 18, 1993) ("(T)here are at least two rational interpretations of the May 1990 Document.  At this early stage, the meaning ascribed to the text by Plaintiffs will be taken as true for purposes of the present motion.  Accordingly, Defendants' motion to dismiss Plaintiffs' breach of contract claim is denied.") (cited favorably by *Houbigant, Inc. v. ACB Mercantile*, 914 F. Supp. 964, 987 (S.D.N.Y. 1995)(Sweet, J.)).

## II.    THE SUPREME COURT'S DECISION IN *MORRISON* DOES NOT LIMIT THE SEC'S ABILITY TO SUE GRUSS, THE CFO OF A DOMESTIC UNREGISTERED INVESTMENT ADVISER

The primary argument made by Gruss is that Commission has no ability to bring a suit against a domestic investment adviser who defrauds a foreign investment fund.  Gruss claims that this argument is supported by the Supreme Court's recent decision in *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869 (U.S. 2010).  In *Morrison*, the Supreme Court held that a private right of action under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") could only be maintained by foreign plaintiffs where one of two conditions was met:  (1) the security was listed on an American stock exchange or (2) the purchase or sale took place in the United States.

On its face, *Morrison* is inapplicable.  First, the instant case is not brought by private plaintiffs – it is an enforcement action brought by the Securities and Exchange Commission.[3]  Second, this is not a case brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, or Rule 10b-5, 17 CFR § 240.10b-

---

[3] *Morrisson* at 130 S. Ct. at 2895 n. 12 (Stevens, J., Ginsberg, J. concur) ("The Court's opinion does not, however, foreclose the Commission from bringing enforcement actions in additional circumstances, as no issue concerning the Commisison's authority is presented by this case.")

5, thereunder – it is brought under Section 206(1)-(2) of the Advisers Act whose purpose is to regulate those providing investment advice as opposed to the Exchange Act whose purpose is to regulate the purchase or sale of securities transactions registered on a national securities exchange. Third, unlike *Morrison*, a so-called "foreign-cubed" case involving claims of foreign investors against foreign issuers to recover losses from purchases on foreign exchanges, this is a case brought against the chief financial officer of a United States investment advisor, who was based in the United States, whose conduct occurred in the United States, and where the fraudulent transactions at issue, including bank transfers between the funds and the banks, took place in the United States. Finally, the fraud in this case was perpetrated against a domestic fund as well as an offshore fund. And even the offshore fund was managed and operated in the United States. Even its address was stated to be in New York in certain documents. For these reasons, Gruss' argument based on the *Morrison* decision must be denied.

As a preliminary matter, however, it should be clear to the Court that this argument of Gruss applies only to the fraudulent transfers of cash made by Offshore Fund to the Onshore Fund to fund investments and to repay the Onshore Fund's revolving credit facility. This argument does not address the use of money from the Onshore Fund to purchase a private plane for DBZCO's managing partner as the Amended Complaint identifies the specific dates and wire amounts paid by the Onshore Fund for the aircraft purchase. (Amended Complaint ¶ 55). Likewise, this argument does not address the early withdrawals of management fees, which came from all of DBZCO's client accounts and not just the account of the Offshore Fund. (Amended Complaint ¶¶ 45-47).[4]

---

[4] Gruss complains that because the Amended Complaint does not specifically state which client account the fees were taken out of, it should be presumed that such money only came from the offshore accounts. This argument is belied by the fact that Amended Complaint describes that such withdrawals violated all of the management agreements between DBZCO "and the funds under its management . . . ." (Amended Complaint ¶46) (emphasis added). Moreover, a presumption that money was only taken from foreign accounts makes no sense given the allegation in the Amended Complaint that "[w]ithout the funds provided by the early withdrawal of management fees, DBZCO would have faced severe liquidity constraints and might have been unable to fund its cash disbursements for its operating expenses." *Id.* at ¶ 45. Indeed, Gruss knows that this is not the case as he testified that management fees were withdrawn early from the Onshore Fund. The SEC believes that the Amended

8

## A.    The Advisers Act Applies to DBZCO and Gruss

Assuming, arguendo, that the Exchange Act does not have extraterritorial application, the SEC may still sue Gruss because DBZCO is a domestic investment adviser.  This is not a case, like *Morrison*, where the Court stated that "(w)e know of no one who thought that the [Exchange] Act was intended to 'regulat[e]' *foreign* securities exchanges . . . ."  130 S. Ct. at 2884.  Rather, the SEC in the instant case is asserting its authority over a domestic investment adviser, which is precisely the purpose for which the Advisers Act was intended.  *Morrison*, 130 S. Ct. at 2878 ("we must presume it is primarily concerned with domestic conditions") (internal quotations omitted).

In determining the extraterritorial applicability of Section 10(b) and Rule 10b-5, the Supreme Court in *Morrison* looked at the focus of the Exchange Act as demonstrated by its terms.

> [W]e think the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States.  Section 10(b) does not punish deceptive conduct but only deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered."  Those purchase-and-sale transactions are the objects of the statute's solicitude.  It is those transactions that the statute seeks to "regulate;" it is parties or prospective parties to those transactions that the statute seeks to "protect(t).  And it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.

*Morrison*, 130 S. Ct. at 2884 (Citations omitted).

Post-*Morrison*, there have been no cases where courts have addressed the impact of the Supreme Court's decision on claims brought under Section 206 of the Advisers Act.  Gruss states that the focus of the Advisers Act is the client.  Consequently, he argues that if the client is located outside of the United States, the SEC cannot sue even if the adviser is located in the United States and even if the fraudulent transaction took place in the United States.  Gruss is wrong.  As indicated by its very title, the focus of the Advisers Act is the adviser itself.  *See Fairport, P. & E.R. Co. v. Meredith*, 292 U.S. 589, 594

Complaint was clear on this issue.  However, to the extent that the Court believes otherwise, that defect could be corrected by a short amendment.

(1934) ("Very likely, the primary purpose in the mind of Congress was to protect employes and passengers. So much is indicated by the title – "An act to promote the safety of employes and travelers upon railroads . . . ."); *I.B.M. v. U.S.*, 480 F.2d 293, 296 (2d Cir.), *cert. den.,* 416 U.S. 979 (1973) ("The purpose of the Expediting Act, as its very title indicates, is to eliminate piecemeal appeals); *U.S. v. Young*, 580 F.3d 373, 378 (6th Cir.), *reh'g den., 2009 U.S. App. LEXIS 23705 (6th Cir. Oct. 26, 2009), and cert. den.,* 130 S.Ct. 1723 (2010) (purpose of act is indicated by its title); *Owens v. Samkle Auto, Inc.*, 425 F.3d 1318, 1322 (11th Cir. 2005) ("Odometer Act, as its title suggests, is aimed at preventing odometer tampering and odometer fraud"); *Wash. Water Power Co. v. Fed. Energy Reg. Com.,* 775 F.2d 305, 325 (D.C. Cir. 1985) ("The title of the act indicates that its purpose . . . ."); *Azby Brokerage, Inc. v. Allstate Ins. Co.,* 681 F. Supp. 1084, 1089 (S.D.N.Y. 1988) ("It's purpose, as indicated by the title, 'Consumer Protection for Deceptive Acts and Practices,' was to remedy injury to consumers.")

Of course, it is not only the title of the Act that makes clear that the purpose was to regulate advisers. The language of the Advisers Act expressly states as much. Section 201 of the Advisers Act provides that "it is found that investment advisers are of national concern." And as explained by the Congress in the text of the act, investment advisers are of national concern because:

> (1) their advice, counsel, publications, writings, analyses, and reports are furnished and distributed, and their contracts, subscription agreements, and other arrangements with clients are negotiated and performed, by the use of the mails and means and instrumentalities of interstate commerce;

> (2) their advice, counsel, publications, writings, analyses and reports customarily relate to the purchase and sale of securities traded on national securities exchanges and in interstate over-the-counter markets, securities issues by companies engaged in business in interstate commerce, and securities issued by national banks and member banks of the Federal Reserve System; and

> (3) the foregoing transactions occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, the national banking system and the national economy.

Gruss, through the crafty use of ellipses, misquotes a small segment from the above-quoted Section 201 to suggest that the client is the only focus of Advisers Act.[5] To the contrary, the national interest in the regulation of investment advisors was based upon numerous issues beyond the "client."[6] As the 9th Circuit Court of Appeals stated "[o]ne of the main purposes of the Investment Adviser's Act was to protect the public's confidence in investment advisers." *United States v.* Elliot, 62 F.3d 1304, 1312 n.9 (9th Cir. 1995).[7] And there are numerous provisions in the Advisers Act that demonstrate that the purpose of the Act was to regulate advisers, including Section 203(registration),[8] Section 204 (records and reports), and Section 204A (which requires advisers to establish, maintain, and enforce written policies and procedures to prevent the misuse of material nonpublic information).

Consequently, to the extent that *Morrison* applies at all to this SEC enforcement action brought under the Advisers Act, it would suggest that the SEC has the ability to sue all domestic advisers

---

[5] Gruss' memorandum of law provides "Section 201 states: 'investment advisors are of national concern, in that, among other things – (1) their advice, counsel, publications, writings, analysis, and reports are furnished ... with clients.'" Gruss ignores all of the other language of this section, which demonstrates that the reason why advisers were being regulated was because of their impact on the securities markets, on companies engaged in interstate commerce, and on the national economy in general as well as the advice that they provided to clients. Moreover, even the "with clients" language cited by Gruss does not refer to the "advice, counsel, publications, writings, etc. but to "contracts, subscription agreements, and other arrangements."

[6] Gruss' argument is also belied by the language of Section 206(1)-(2), which prohibits fraud not just against "clients" but also "prospective clients."

[7] Indeed, the Senate Report warned: "not only must the public be protected from the frauds and misrepresentations of unscrupulous tipsters and touts, but the bona fide investment adviser must be safeguarded against the stigma of the activities of these individuals." S.Rep. No. 1775, 76th Cong., 3d Sess. 21 (1940).

[8] The registration provisions of the Advisers Act apply to domestic investment advisers who provide advisory services exclusively to foreign clients. *See, e.g. Gim-Seong Sow,* 1987 SEC No-Act. LEXIS 2789 ("a United States resident adviser that uses U.S. jurisdictional means to solicit and provide investment advisory services exclusively to foreign clients would, barring an appropriate exemption under Section 203(b), be required to register under the Advisers Act"); *Operadora Internacional, S.A.,* 1990 SEC No-Act. LEXIS 31; Vol. 6 A.A. Sommer, Jr., Securities Laws Techniques, Ch. 84, § 84.02(3)(a) (Matthew Becker) ("As a general matter, any resident adviser who uses U.S. jurisdictional means to solicit foreign clients must register under the Act . . . . This position reflects the SEC's view that United States' laws should not be interpreted in a manner that would permit the U.S. to serve as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.") "Registration appears to be required without regard to whether the advice (from the U.S. advisor to the foreign client) concerns securities of companies organized in the U.S. or securities traded in U.S. markets. Of course, if a resident's advice to nonresident clients relates to such securities there would be additional grounds for assuming that Congress intended to require registration." Judd, *supra* note 1 at p. 4.

11

(regardless of the location of the client) because the adviser is the primary focus of the act.[9] This is not a case like *Morrison* where the Court found that there was never an indication that the United States securities laws were intended to address securities sold on foreign exchanges. Indeed, it would be absurd that the SEC – the government agency tasked with the job of regulating investment advisers – is unable to sue a United States investment adviser. And by allowing the SEC to sue all domestic advisers, regardless of the client's location, this Court would be applying a bright-line rule, which the Supreme Court in Morrison found important. 130 S.Ct. at 2880, 2886.

Further demonstrating that the focus of the Advisers Act is the adviser and not the client, there is no private right of action under Section 206. *See, e.g., In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 420 (S.D.N.Y. 2007), *aff'd,* 573 F.3d 98 (2d Cir. 2009); *Clark v. Nevis Capital Mgmt., LLC,* 04 Civ. 2702, 2005 U. S. Dist. LEXIS 3158 *39 (S.D.N.Y. March 3, 2005); *Wellington Int'l Commerce Corp. v. Retelny,* 727 F. Supp. 843, 845-46 (S.D.N.Y. 1989); *SSH Co. v. Shearson Lehman Bros., Inc.*, 678 F. Supp. 1055, 1058 (S.D.N.Y. 1987). As the Second Circuit Court of Appeals has repeatedly stated, "statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Lindsay v. Ass'n of Prof'l Flight Attendants,* 581 F.3d 47, 53 (2d Cir. 2009), *cert. den.,* 130 S.Ct. 3513 (2010); *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007); *Olmsted v. Pruco Life Ins. Co. of New Jersey,* 283 F.3d 429, 433 (2d Cir. 2002). The fact that there is no private right of action is indicative that the focus of the act is the adviser and that clients of

---

[9] The fallacy of Gruss' argument is demonstrated in *SEC v. Goldman Sachs & Co.*, No. 10 Civ. 3229, 2011 WL 2305988 *14-15 (S.D.N.Y. June 10, 2011). In that case, the court agreed that in applying *Morrison* to claims brought under Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q, "sales" that took place outside the United States were not covered under the act (interpreting the term "sale" consistently with Morrison's interpretation of the Exchange Act) . However, the Court noted that Section 17(a) was written more broadly than Section 10(b) and also included fraud in the "offer" of securities. Relying on the definition of "offer," the court rejected defendant's argument that an offer made in the United States to a foreign party was outside the scope of the act. Instead, the court found the act covered a claim based on defendant's "offer" through e-mails and phone calls from New York.

the investment adviser are not the "class for whose especial benefit the statute was enacted." *Cort v. Ash*, 422, U.S. 66, 78 (1975).[10]

Finally, Section 206, as amended, was intended to be a very broad remedy. It applies "to all investment advisers, whether or not such advisers were required to register under § 203 of the Act." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11 (1979). Congress intended that this section not be applied "technically and restrictively, but flexibly to effectuate its remedial purposes." *Capital Gains*, 375 U.S. at 195. And it is even more broad than Section 10(b) of the Exchange Act.

> By its own language Section 206(1) and (2) makes illegal "any device, scheme or artifice to defraud," and "any transaction or course of business which operates as a fraud." Considering the broad language of the statute and the fact that the subsections do not even contain the words "misrepresentation" or "omission," it is difficult to conceive of how Section 206 could be limited to only those concepts.

*SEC v. Moran*, 922 F. Supp. 867, 896 (S.D.N.Y. 1996). Given this expansive scope, the Court should not accept Gruss' severely limiting interpretation.

Alternatively, to the extent that, comparable to *Morrison*, the Advisers Act only allows the SEC to sue an investment advisor where the fraudulent transaction took place, it is clear that such "transactions" in the instant case occurred in the United States and not abroad. The "device, scheme, or artifice" and the "transaction, practice or course of business" employed by DBZCO and Gruss took place in the United States. Gruss, in New York, instructed the accounting department to transfer money from the Offshore Fund to the Onshore Fund. In the case of the transfers to repay the revolving credit facility, the money was transferred from the U.S. bank account of the Offshore Fund to the U.S. bank account of the entity that provided the credit facility. And in the case of the transfers to fund investments (many of which were in U.S. companies), the money was transferred from the U.S. bank account of the Offshore Fund directly to the U.S. bank account of the funded company. All of the transfers took place in the

---

[10] While the Advisers Act has, on a very basic level, a purpose of protecting investors, that same purpose underlies all of the federal securities laws. The Advisers Act, however, is focused on the adviser, just as the Exchange Act is focused on the trading of securities on national securities exchanges, and the Securities Act is focused on the issuance of securities.

13

United States. Gruss suggests that by alleging these facts, the SEC is proposing a "conducts and effects" test, which the Court in *Morrison* rejected. This is not the case. These facts demonstrate that the fraudulent transactions – the transfers – took place in the United States and not the Cayman Islands.

**B.     Even if the "Client" is the Focus of the Advisers Act, Gruss Aided and Abetted a Fraud on a Domestic Client and may be Sued by the SEC**

While the SEC believes that for purposes of *Morrison*, the issue is where the adviser is located or, alternatively, where the "transaction" took place, should the Court disagree and find that the locus of the "client" is the relevant issue, even that requirement is met in this case. As alleged in the Amended Complaint, there were two funds that were equally impacted by DBZCO's fraud, which was aided and abetted by Gruss – the Offshore Fund AND the Onshore Fund. Gruss conveniently declines to address the domestic fund, which uncontrovertibly was located in the United States.[11] Because the domestic fund was defrauded as well, the SEC may bring a claim under Section 206.

The SEC anticipates that Gruss might argue that the domestic fund was not injured by the fraud, so it cannot serve as the basis for a claim. Such argument is baseless. The Commission does not have to prove damages or injury to the advisory client in order to bring a suit under Section 206. As such, the SEC has the ability to sue Gruss for aiding and abetting the fraud against the domestic fund even if the domestic fund suffered no injury. In *Capital Gains,* 375 U.S. at 185-86, the Supreme Court addressed the question of "whether Congress, in empowering the courts to enjoin any practice which operates 'as a fraud or deceit upon any client or prospective client,' [under Section 206 of the Investment Advisers Act] intended to require the Commission to establish fraud and deceit 'in their technical sense,' including intent to injure and actual injury to clients, or whether Congress intended a broad remedial construction of the Act which would encompass nondisclosure of material facts." After an exhaustive review of the legislative history, the Court held that Rule 206(2) did not require that the Commission prove intent to injure or actual injury to the client. *Id.* at 195. *See also SEC v. Wash. Inv. Network,* 475 F.3d 392, 396

---

[11] As alleged in the Amended Complaint, it was a Delaware limited partnership. (Amended Complaint ¶15).

14

(D.C. Cir.), *reh'g den.*, 2007 U.S. App. LEXIS 9984 (D.C. Cir. April 4, 2007) (SEC does not have to prove injury to obtain an injunction under section 206); *SEC v. Blavin*, 706 F.3d 706, 711 (6th Cir. 1985); *SEC v. Rana Research*, 8 F.3d 1358, 1363 (9th Cir. 1993)("The SEC need not prove injury in an action to enjoin violation of § 206 of the Investment Advisers Act."); *SEC v. Mannion*, 1:10-cv-3374, 2011 U.S. Dist. LEXIS 63621 * 46 (N.D. Ga. June 1, 2011); *SEC v. Bolla*, 401 F. Supp.2d 43, 67 (D.D.C. 2005); *Morris v. Wachovia Secs., Inc.*, 277 F. Supp.2d 622, 644 (E.D. Va. 2003); *Sheldon Co. Profit Sharing Plan & Trust v. Smith*, 828 F. Supp.2d 1262, 1284 (W.D. Mich. 1993).[12] Consequently, because the Onshore Fund was defrauded as well as the Offshore Fund, the SEC has the ability to sue Gruss for aiding and abetting this fraud.

Moreover, even the Offshore Fund (which had more than 50% of its investors located in the United States) was for *Morrison* purposes located in the United States. The following facts from paragraphs 20-23 the Amended Complaint are uncontroverted: (1) all operational and investment decisions for the Offshore Fund were made by DBZCO primarily in DBZCO's New York office (Amended Complaint ¶20); (2) the Offshore Fund agreed that DBZCO, in New York, would monitor the performance of the Offshore Fund (*Id.*); (3) The Offshore Fund agreed that DBZCO, in New York, would monitor compliance of the fund with all regulatory requirements applicable to its operations (*Id.*); (4) the Offshore Fund agreed that DBZCO, in New York, would negotiate the terms of all agreements to be entered into on behalf of the fund (*Id.*); (5) the Offshore Fund agreed that DBZCO, in New York, would retain brokers and borrow money from certain banks on behalf of the Fund (*Id.*); (6) in certain due diligence materials provided to prospective investors, the full legal name and address of the Offshore

---

[12] Gruss actually argues that the Amended Complaint does not specify any harm to the Offshore Fund. As described in this section, as injury is not a requirement under Rule 206, the absence of harm is not fatal to the SEC's claim. In any event, the Offshore Fund was clearly injured as it effectively loaned money to the Onshore Fund for long periods of time without receiving any interest. Moreover, these transfers may have impacted the Offshore Fund's ability to claim that it was not engaged in a U.S. trade or business, which would be contrary to the stated purpose of the fund and could result in severe negative tax implications for the investors in the Offshore Fund. Finally, the fact that the Offshore Fund ultimately was repaid by the Onshore Fund does not let Gruss "off the hook." As of the date that Gruss resigned when faced with termination, the Onshore Fund owed $108 million to the Offshore Fund. (Amended Complaint at ¶¶ 11, 44). Gruss should not benefit from the fact that the Offshore Fund was ultimately repaid when, as of the date that he resigned, there was no certainty of repayment.

15

Fund was listed as in care of DBZCO at DBZCO's New York address (*Id.* at ¶21); (7) the offering and subscription documents for the Offshore Fund were distributed to potential investors by DBZCO from its New York office (*Id.*); (8) the accounting for the Offshore Fund's investment and other activities was performed primarily in New York, with data being provided to the third party administrator in the Cayman Islands, which distributed statements to individual investors (*Id.* at ¶22); (9) monthly performance figures were provided to individual investors from DBZCO's investor relations personnel in New York (*Id.*); (10) all of the Offshore Fund's cash was held at and paid from U.S. bank and brokerage accounts. (*Id.* at ¶23).  These facts all demonstrate that the Offshore Fund was conducting business though DBZCO in the United States.[13]  In addition, the offering memoranda and other materials that Gruss has provided to the Court in support of his motion demonstrate the following additional points: (a) the securities of the Offshore Fund were marketed to permitted U.S. persons (Ex. C to the Declaration of Perry A. Gruss ("Gruss Ex.") at v.); (b) the securities of the Offshore Fund were marketed to accredited investors and qualified purchasers, as defined by the United States securities laws (*Id.*); (c) the investment objectives of the Offshore Fund included investing in United States securities (*Id.* at p. 3);[14] (d) the Offshore Fund would be paying certain United States taxes for dividend income and certain other interest from United States investments (*Id.* at p. 15); (e) the auditors of the Offshore Fund were located in New York (*Id.* at p. 60); (f) investors wishing to subscribe in the Offshore Fund were instructed to wire funds to a Citibank account in New York (Gruss Ex. A. at p. AII-1); and (g) shareholders in the Offshore Fund would receive quarterly unaudited financial information from DBZCO.  (Gruss Ex. C. at p. 17).  Finally, the offering memorandum for the Offshore Fund referred to securities issued by, or loans

---

[13] Courts have found that mutual funds conduct business (for personal jurisdiction purposes) where such funds are managed. *See Siepel v. Bank of America, N.A.*, 239 F.R.D. 558, 566 (E.D. Mo. 2006), *vacated on other grounds,* 2007 U.S. Dist. LEXIS 14430 (E.D. Mo. March 1, 2007); *Ohio Bureau of Workers' Compensation v. MDL Active Duration Fund, Ltd.*, No. 2:05-cv-0673, 2006 U.S. Dist. LEXIS 35448 *42-44 (S.D. Ohio June 1, 2006 (jurisdiction over Bermuda fund based on conduct of investment adviser in Ohio).

[14] This point is of particular importance.  As described above, Section 201 specifically states that the regulation of investment advisers was in the national interest because of the impact of advisers on securities traded on national securities exchanges and securities issued by companies engaged in business in interstate commerce.

to, non-U.S. companies as "foreign securities," (*Id.* at p. 43), conclusively demonstrating that the Offshore Fund should be understood, for purposes of *Morrison*, to be a domestic client.

III.    **THE ALLEGATIONS IN THE AMENDED COMPLAINT ARE NOT CONTRADICTED BY THE OFFERING DOCUMENTS WHICH DO NOT CONTEMPLATE SUCH TRANSFERS**

Gruss contends that the offering documents for the Funds allow for the transfers between the funds and that, therefore, there can be no fraud. He also suggests that the SEC somehow improperly failed to place these documents before the Court. These arguments are baseless. The fund documents do not mention or contemplate the transfers at issue. Moreover, these arguments are completely belied by the allegations in the Amended Complaint that "all investment decisions were made by DBZCO's managing partner" (Amended Complaint ¶ 22), that the transfers were not approved by DBZCO's managing partner (Amended Complaint ¶ 26), and that Gruss "did not inform DBZCO's managing partner or any of the other DBZCO partners of the Inter-fund Transfer practice." (Amended Complaint ¶34). If these were "normal" transactions contemplated by the offering memoranda, the managing partner would have approved them and certainly would have been aware of them.

A.    **The Offering Documents did not Allow the Transfers Between the Funds**

In his motion to dismiss, Gruss focuses on the following language from the offering memorandum (taken from the conflicts of interest section) to suggest that it was proper for him to direct the Offshore Fund to transfer money to the Onshore Fund:

> Notwithstanding the potential conflicts of interest resulting from these multiple relationships, the Manager [DBZCO] is expressly permitted to enter into contracts and transactions with its affiliates on behalf of the [Offshore] Fund.

(Gruss Ex. C at p. 52). Gruss is wrong. While the term "affiliates" is not defined in the offering memorandum for the Offshore Fund, the meaning of the term can be gleaned from its use in that document and it is very clear that this term does not refer to the Onshore Fund. For example, in describing conflicts of interest, the offering memorandum provides:

17

> The manager, Mr. Zwirn and **their respective affiliates**, are actively engaged in advisory and management services for multiple collective investment vehicles and managed accounts and funds, including, without limitation, the U.S. Fund [the Onshore Fund], the Parallel Cayman Fund, the TE Fund and certain private accounts.

(Gruss Ex. C. at p. 51, emphasis added). Likewise, the offering memorandum provides that "[o]ther accounts and funds may compete with the [Offshore] Fund for positions and may compensate the Manager and/or its affiliates better than the [Offshore] Fund." (Id.) The plain meaning of these provisions is that DBZCO and its affiliates advise and manage the investment vehicles (including the Onshore Fund and the Offshore Fund). And the investment vehicles compensate DBZCO and (where applicable) DBZCO's affiliates. The investment vehicles themselves are not "affiliates" of DBZCO.[15] Any reading of the term "affiliates" to include the investment vehicles would be tortured and should not be applied. *See, e.g. Long Island Lighting Co. v. IMO Indus.*, 6 F.3d 876, 890 (2d Cir. 1993) (applying "natural reading of the contract"); *Hernandez v. GPSDC (New York), Inc.*, 04 Civ. 127, 2008 U.S. Dist. LEXIS 5516 *11, n. 2 (S.D.N.Y. Jan. 28, 2008) (rejecting argument that "rests on a tortured reading of the contract); *Inter-American Dev. Bank v. NextG Telecom Ltd.*, 503 F. Supp.2d 687, 698 (S.D.N.Y. 2007) (rejecting "strained" interpretation of contract in favor of "most natural reading"); *Stickle v. City-Wide Sec. Servs.*, 839 F. Supp. 207, 210 (S.D.N.Y. 2003) (in denying motion for summary judgment, court states "while one may argue for different readings of the contract, there is a natural reading which clearly provides for guarding the building's tenants").

In addition, Gruss focuses on the term "transactions" in the conflicts of interest disclosure, offering a definition from the Merriam-Webster Collegiate Dictionary to demonstrate

---

[15] Affiliates of DBZCO specifically identified in the offering documents include Zwirn Holdings, LLC, the managing member of DBZCO's general partner (Gruss Ex. C at p. 28, ); Dubin & Swieca Asset Management, LLC, a minority partner of DBZCO as well as a minority member of DBZCO's general partner (Gruss Ex. C. at p. 28); and Bernard Capital Funding, LLC, a wholly owned subsidiary of DBZCO (Gruss Ex. C. at p. 8).

18

that "transactions" can include a transfer of money without interest. (Mov. Br. at pp. 10-11).[16]

While the term "transaction" appears in the offering memorandum dated July 2005 (Gruss Ex. C), notably it does not appear in the offering memorandum dated April 2002 (Gruss Ex. A) or the offering memorandum dated July 2003 (Gruss Ex. B). Those provisions are less broad and only provide that the manager "is expressly permitted to enter into contracts with its affiliates on behalf of the fund." Gruss does not attempt to argue in his motion to dismiss that there were actual "contracts" between the two funds. The Amended Complaint makes clear that the improper transfers took place between March 2004 and July 2006 (Amended Complaint ¶ 3), and that Gruss was told by his accounting subordinates that the practice was improper in April 2005 (Amended Complaint ¶ 33). Consequently, even assuming that the term affiliates could broadly be interpreted to include the other funds (which it can't), and even if the term "transaction" was broad enough to cover the transfers of funds at issue (which it isn't), Gruss cites the wrong operating document with respect to many of the transfers at issue.

Finally, Gruss does not cite the key language from the conflicts of interest section of the offering memorandum, which actually demonstrates that these transfers were improper:

> Notwithstanding the foregoing, the Manager has agreed to treat the Fund fairly, and not knowingly favor any other client over the Fund, on an overall basis. Neither the Manager nor Mr. Zwirn will knowingly or deliberately favor any other companies over the fund on an overall basis in their dealings on behalf of such companies.

(Gruss Ex. C at p. 52). The offering memorandum clearly provides that DBZCO was not going to favor one of the funds over the other. But by transferring money from the Offshore Fund to the Onshore fund for purposes of repaying the Onshore Fund's revolving loan facility and to allow the Onshore Fund to make investments for the benefit of its shareholders (as opposed to the shareholders of the Offshore

---

[16] Not all dictionaries share this definition, the Oxford Dictionaries (available on-line) define transaction as "an instance of buying or selling something; a business deal" or "the action of conducting business." http://oxforddictionaries.com/definition/transaction?region=us

19

Fund), DBZCO and Gruss were favoring the Onshore Fund to the detriment of the Offshore Fund. DBZCO and Gruss were explicitly prohibited from doing this.

Gruss also argues that the transfers alleged in the Amended Complaint were disclosed in the offering memoranda as "an integral part" of the operation of the two funds. (Moving Br. at p. 10). And in support of this argument, he cites various provisions of the offering memoranda, which provide that the Onshore Fund served as the sourcing agent for some of the investment assets for the Offshore Fund. For example, the 2005 offering memorandum provides that "[t]he [Offshore] Fund or a subsidiary of the [Offshore] Fund may, however, accept an assignment of, of participation in, a loan from the U.S. Fund at a price approved by an independent third party." (Gruss Ex. C at p. 20.) Likewise, the same offering memorandum provides that "[t]he U.S. Fund [Onshore Fund] may assign or participate out certain of the loans that it makes, or portions thereof, to other entities including to the [Offshore] Fund or to its affiliates." (Gruss Ex. C at p. 52.) The SEC does not deny that the offering memorandum describes this process or that on occasion the Onshore Fund purportedly transferred some of investment assets to the Offshore Fund in exchange for fair value. The problem for Gruss is that the transfers alleged in the Amended Complaint did not relate to the Onshore Fund assigning investment assets to the Offshore Fund. The Amended Complaint alleges that the transfers of funds from the Offshore to the Onshore Fund were not intended to pay for investments being transferred to the Offshore Fund but, instead, to allow the Onshore Fund to repay its revolving credit facility or to make its own investments. And the Amended Complaint is clear that after some period of time the Onshore Fund repaid the Offshore Fund with cash transfers – not with a portion of an investment asset. (See, e.g., Amended Complaint ¶ 28 "Gruss . . . provided instruction to use cash from the Offshore Fund which would eventually be repaid when new investor capital came into the Onshore Fund"; ¶ 35 "certain amounts were repaid")

Recognizing that the Offshore Fund was negatively impacted by these transfers, Gruss invents "valuable benefits" that the Offshore Fund purportedly received from the Onshore Fund. (Mov. Br. at p.

20

11). While this section is very confusing, the SEC understands Gruss to argue that the Onshore Fund could have charged the Offshore Fund origination fees and or sourcing fees when it assigned some of its investment assets to the Offshore Fund, however, "neither fund changed the other for reciprocal services." (Mov. Br. at p. 12).[17] The implication of this statement appears to be that in exchange for the Offshore Fund not charging some form of interest for the money it transferred to the Onshore Fund, the Onshore Fund did not charge the Offshore Fund fees for the investment assets sold to the Offshore Fund. This argument is nonsense. First, the Onshore Fund was not entitled to charge the Offshore Fund any fees. The portion of the offering memorandum cited by Gruss provides as follows: "Affiliates of the Manager [DBZCO] may charge the [Offshore] Fund a fee in connection with the management and servicing of the certain portion of the [Offshore] Fund's loan portfolio." (Gruss Ex. C at p. 31). As described above, the Onshore Fund is not an affiliate of the Manager. Consequently, it could not charge the Offshore Fund any fees. Moreover, Gruss declines to quote the very next sentence which states: "This fee . . . will be used to facilitate the Manager or its affiliate in engaging personnel and incurring other overhead costs to manage these loans in lieu of hiring an unaffiliated third-party service provider . . . ." Consequently, even if the Onshore Fund was an affiliate of the Manager (which it isn't), this provision would not entitle the Onshore Fund to charge the Offshore Fund a fee for selling investment assets to the Offshore Fund. Finally, it is inconceivable that Gruss could have created this kind of *quid pro quo* arrangement when DBZCO's managing partner – who had to approve all investments – was unaware of the transfers.

**B.      The Improper Transfers Between the Funds were not Disclosed**

Gruss also argues in his motion to dismiss that, contrary to the allegations in the Amended Complaint, the transfers between the funds were specifically disclosed. This is not the case. The

---

[17] There is no factual predicate for this conclusory statement. Consequently, it should not be relied upon by the Court on this motion to dismiss even if the Court though it was somehow relevant.

financial statements do not disclose the full extent of the transfers and falsely explain the nature and purpose of those transfers.

While the financial statements for the Offshore Fund do list, as of a particular date, the amount due from its affiliates, they do not document the full extent of the transfers. For example, the financial statements for the year ended December 31, 2005 state that as of that date (12/31/05), the money owed to the Offshore Fund was $220,788,666. (Gruss Ex. D. at 2). However, the financial statements do not disclose that, as alleged in the Amended Complaint, the Offshore Fund transferred a much greater amount to the Onshore Fund during 2005 and that that money was repaid before the end of the year specifically in order to avoid inquiries from the auditors. (Amended Complaint ¶ 35). Moreover, the notes to the financial statements indicate that the money owed from affiliates relates to the process described above where the Onshore Fund would transfer some of its investment assets to the Offshore Fund at fair market value. Specifically, the 2005 financial statements provide:

4.      Related Party Transactions

In connection with certain investments entered into by an affiliate (primarily corporate loans), the Company (the Offshore Fund) may purchase a portion of such loans from such affiliate at the current estimated fair value as determined by the Trading Manager. Such transactions are subject to review by an independent third party. At December 31, 2005, the Company (the Offshore Fund) is due $223,049,505 from affiliates for certain investment transactions and their related cash flow . . . .

Nowhere do the notes – which are described on every page of the financial statements as "an integral part of these consolidated financial statements" – disclose that the transfers were being made in order to allow the Onshore Fund to repay its revolving credit facility or to make investments for its own behalf (where none of that investment would ultimately be sourced to the Offshore Fund). As such, these so-called disclosures do not meet the requirement of Section 206, which requires "full and frank disclosure." *Capital Gains*, 375 U.S. at 197, 201 ("what is required is 'a picture not simply of the show window, but of the entire store . . . .'").

22

**IV.    GRUSS' 9(B) ARGUMENT IS SIMILARLY UNAVAILING**

In the final breath of his motion to dismiss the Amended Complaint, Gruss argues that the SEC failed to comply with its pleading obligations under Rule 9(b). Specifically, he states that the SEC failed to allege sufficient facts to demonstrate "that he acted recklessly to satisfy the requisite knowledge to be an aider or abettor." (Mov. Br. at pp. 24-25). Gruss also suggests that the claim relating to the purchase of the airplane for DBZCO's managing partner is not properly pleaded because the Amended Complaint does not allege that the fees owed to DBZCO were less than what was taken from the fund to pay for the airplane. (Mov. Br. at p. 3, n.2). These arguments are unavailing.

Because the first allegation challenged by Gruss is an allegation of intent, Rule 9(b) does not require that such allegation be pleaded with particularity. *See Burkina Wear, Inc. v. Campagnolo, S.R.L.,* 07 Civ. 3610, 2008 U.S. Dist. LEXIS 29031 at * 11-12 (S.D.N.Y. April 9, 2008) (Sweet, J.) In any event, the Amended Complaint specifically alleges that Gruss' subordinates repeatedly told him that the transfers were inappropriate and, nonetheless, he continued that practice. Such allegations are sufficiently strong to demonstrate Gruss' conscious misbehavior or recklessness. *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir. 1995). Likewise, with respect to the allegations concerning the airplane purchase, the Amended Complaint alleges that the money was returned to the Onshore Fund approximately two weeks after it was taken from the fund. (Amended Complaint ¶¶ 55-56). If, as suggested by Gruss, DBZCO was entitled to take such money because it represented owed fees, the money would not have been returned. The facts are sufficient pleaded such that Gruss can defend the claims.

## CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that this Court deny the Motion to Dismiss filed by Defendant Perry A. Gruss and grant such other relief as appropriate.

Dated:  August 16, 2011                    Respectfully Submitted,

Todd D. Brody
Senior Trial Counsel
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, NY 10281

24