Nathaniel H. Akerman
Thomas O. Gorman
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, New York 10019
Tel.: (212) 415-9200
Fax: (212) 953-7201
akerman.nick@dorsey.com
gorman.tom@dorsey.com
*Attorneys for Defendant Perry A. Gruss*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                 Plaintiff,

v.

                                             Index No. 11 CV 2420

PERRY A. GRUSS.

                 Defendant.
-------------------------------------------------------------X

## DEFENDANT PERRY GRUSS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Defendant Perry Gruss hereby submits his Local Civil Rule 56.1 Statement of Undisputed Facts in support of his motion for summary judgment filed pursuant to Fed. R. Civ. P. 56.

    **A.**       **The DBZCO Fund Complex**

    1.      DBZCO, a Delaware limited partnership was founded in October 2001 by Daniel Zwirn ("Mr. Zwirn") and was headquartered in New York.  Ex. A at p. 7 (MAXAM00001024) and Ex. B at p. 2 (SEC_GRUSS 001009).

    2.      DBZCO provided investment advisory services to a series of hedge funds that operated as private investment funds and several third party Managed Accounts. Ex. A at p. 7 (MAXAM00001024) and Ex. B at p. 2 (SEC_GRUSS 001009).

3.     DBZCO initially operated two funds, both of which it established in April 2002 and added a third fund in March 2003 and a fourth fund in May 2005, in addition to several separately managed private accounts.  Ex. B at p. 2 (SEC_GRUSS 001009).

4.     By December 2006, DBZCO expanded to establish offices in New York, Connecticut, Houston, Mexico, Frankfurt, London, Milan, New Delhi, Luxembourg, Warsaw, Tel Aviv, Beijing, Hong Kong, Seoul, Singapore, Tokyo and Taipei in order to manage its growing network of funds and investments.  Ex. C at p. 171 (B 01913).

5.     DBZCO served as the manager to the D.B. Zwirn Special Opportunities Fund, L.P. ("Onshore Fund" or the "LP"), the D.B. Zwirn Special Opportunities Fund (TE), L.P. ("TE Fund"), the D.B. Zwirn Special Opportunities Fund, Ltd. ("Offshore Fund" or the "LTD"), and the D.B. Zwirn Special Opportunities Fund II, Ltd. (the "LTD II"), as well as the HCM/Z Special Opportunities LLC ("HCM/Z") and several private accounts. Ex. A at p. 7 (MAXAM00001024) and Ex. B at pp. 1-2 (SEC_GRUSS 001008-1009).

6.     PriceWaterhouseCoopers ("PWC") audited annually each of these funds.  (Exhs. E-J) (Exhs. E-G are LTD; Exhs. H-J are LP).

7.     The LP was a Delaware limited partnership that was formed in April 2002.  Ex. K at DBZ 0009446.

8.     The LTD, a Cayman Islands exempt company, was formed in April 2002 to operate as a private investment fund. Ex. L at DBZ 0009677.

9.     The LTD was open to both non-U.S. investors and permitted U.S. investors, and both groups of investors were required to be accredited investors and qualified purchasers.  Ex. M at pp. 14-15 (DBZ 0009840-41).

10.     Over 50% of the LTD's investors were individuals or entities in the U.S.  Ex. N at p. 5 ¶18.

11.     The LTD was an exempted company under Cayman Islands law; as such, it had received an undertaking as to tax concessions that provided that, for a period of 20 years from the date of issue of the undertaking, no law thereafter enacted in the Cayman Islands imposing any taxes or duty to be levied on income or capital assets, gains or appreciation would apply to any income or property of the LTD.  Ex. M at pp. 15-16 (DBZ 0009841-42).

12.     A significant proportion of the investors in both funds were themselves registered investment advisors.  Ex. D at p. 26.

13.     The 2002, 2003 and 2005 LTD Offering Memoranda disclosed that "these securities [shares in the LTD] are suitable for sophisticated investors" who "fully understand and are willing to assume the risks involved in the portfolio's investment program."  Ex. L at DBZ 0009680; Ex. M at DBZ 0009823; Ex. O at DBZ 0009747.

14.     The Offering Memoranda further disclosed that "Shares will only be offered to non-U.S. or permitted U.S. investors" who had to be "'accredited investors,' as defined in Rule 501(a) under Regulation D of the United States Security Act of 1933," as well as "'qualified purchasers', as defined by Section 2(a) (51) of the United States Investment Company Act of 1940."  Ex. L at p. 12 (DBZ 009688); Ex. M at p. 15 (DBZ 0009841); Ex. O at p. 6 (DBZ 0009755).

15.     The investors of the fund 1) were a bank, insurance company or investment company or had investments of at least $5 million, or had a net worth of at least $1 million (as an accredited investor) and 2) owned at least $5 million in investments (as a qualified purchaser).  Ex. P; Ex. Q at p.16.

16.    Perry Gruss was employed by DBZCO from July 2002 to September-October 2006, during which time he served as Chief Financial Officer. Ex. R at pp. 16-17, 20, 33.

17.    During Gruss' tenure at DBZCO, the LP and LTD experienced substantial and rapid growth in Assets Under Management ("AUM") from inception in May of 2002 to the end of 2006: the LP's AUM was approximately $525 million on December 31, 2004 (Ex. H at p. 2) and was $1.6 billion by December 31, 2006.  (Ex. J at p. 2).

18.    The LTD had more than $877 million in AUM by December 31, 2004, (Ex. E at p. 2), over $1.4 billion by December 31, 2005 (Ex. F at p. 2), and by December 31, 2006, the LTD's AUM was $2.3 billion.  (Ex. G at p. 2).

**B.    The Funds' Operating Documents Permitted the LTD Advances to the LP**

19.    The LTD and LP were largely unregulated.  (Ex. D at pp. 8, 12, 41).  They were governed by their operating documents.  Those include the LTD Shareholder Agreement and LP Limited Partnership Agreement (collectively "formation documents"), the Offering Memoranda for each fund furnished to each investor (Exhs. K, L, M, O, T, U), and the Management Agreement executed by each fund with DBZCO.  (Exhs. V, W, MM, NN, SS).  Collectively the documents created essentially the same governance structure, although there were certain differences.

**1.    The Formation Documents**

20.    The LP Limited Partnership Agreement vested broad powers in the General Partner, DBZCO:

> management, operation and control . . .[vests] exclusively in the General Partner, which shall have the Power by itself on behalf and in the name of the Partnership to carry out any and all of the purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental." Ex. TT at p. 5, §3.1.

21.　　Similarly, the LTD Memorandum of Association specifies the reasons for the formation of the term –" investments" – in the broadest possible terms:

> The objects for which the company is established are unrestricted and shall include, but without limitation . . . (e) to undertake and carry on and execute all kinds of investment, financial, commercial, mercantile trading and other operations . . . (iii) To purchase or otherwise acquire, to sell, exchange, surrender, lease, mortgage, charge, convert, turn to account dispose of and deal with real and personal property and rights of all kinds . . . (v) To stand surety for or to guarantee, support or secure the performance of all and any of the obligations of any person, firm or company whether or not related or affiliated to the Company in any manner.

Ex. S at pp. 1-3 (MAXAM00000929-931). To implement these goals the LTD could "advance, deposit, or lend money, securities and/or property to or with such [other] persons, and on such terms as may seem expedient." Ex. S at p. 2 (MAXAM00000930), ¶(d).

### 2.　　The Offering Memoranda

22.　　The Offering Memoranda or Private Placement Memoranda for each fund was utilized to solicit investors to purchase the securities of either the LP or the LTD under "Section 4(2) of the Securities Act of 1933", Regulation D, which provided an exemption from the registration provisions of Section 5 of the Securities Act of 1933. See e.g. Ex. K at DBZ 0009448. There were multiple Offering Memoranda, but each was essentially similar including those for the LP and LTD. Each defined the type of investments the fund would make on behalf of its shareholders in broad, general terms which gave the investment adviser or Manager the broadest possible discretion.

23.　　For example, the LTD Memoranda represented that it "focuses on multiple strategies, including but not limited to" corporate debt investments, assets, public equity, and that LP and other funds "are managed using strategies generally similar to those the Manager used

for the [LTD] Fund." Ex. M at pp. 18-20 (DBZ 0009844-9846).  Compare e.g. Ex. T at pp.14-16 (DBZ 0009601-9603).

24.     Those investments selected by the Manager for both the LP and LTD could be highly speculative.  As the Offering Memoranda for the LTD Fund specified, "The Fund (and including for the avoidance of doubt, any managed accounts or investment vehicles advised or managed by the Manager or any of its affiliates in which a portion of the Fund's assets may be invested) will utilize highly speculative investment techniques."  Ex. M at p. 34 (DBZ 0009860). Compare e.g. Ex. T at p. 30 (DBZ 0009617).

25.     Co-investments with third parties were specifically authorized by the LTD Offering Memoranda. Ex. M at p. 42 (DBZ 0009868).  ("co-investment with third parties through joint ventures").  Assignments of investments from the LP were also specifically authorized for the LTD. Ex. M at p. 20 (DBZ 0009846).  ("an assignment of, or participating in, a loan from the U.S. Fund at a price approved by an independent third party.").  And, the LTD could also invest directly in other funds managed by DBZCO:  Alternatively the investments for the LTD and others managed by DBZCO could also include investments in affiliated funds. *Id.*

26.     The fact that the two funds not only used similar investment strategies but also had the ability to operate together and invest in each other – all requiring the transfer of cash among the DBZCO affiliated entities -- was confirmed by the conflict sections of the Offering Memoranda.  The Offering Memoranda acknowledged that at times working for a group of funds and making investments for each and for the group not only required the Manager to allocate its time but created potential conflicts that investors had to consider in investing in the LP or the LTD: "inherent or potential conflicts of interest in the structure and operation of the Fund's business should be considered by prospective investors before subscribing for Shares."  Ex. M at

p. 50 (DBZ 0009876); Ex. O at p. 28 (DBZ 0009777); Ex. L at p. 28 (DBZ 0009704); Ex. T at p.

46 (DBZ 0009633); Ex. U at p. 29 (DBZ 0009561); Ex. K at p. 23 (DBZ 0009473). *See also* Ex.

B at pp. 8-10 (SEC_Gruss 001015-17) (DBZCO also provided a similar conflicts of interest

disclosure in due diligence materials for potential investors.)  For example, a conflict can arise

from the practice of 'cross trading,' *i.e.*, the Manager effects a trade or a loan between the Fund

and another investment fund or account that it or its affiliates manage." Ex. M at p. 52 (DBZ

0009878); Ex. L at p. 29 (DBZ 0009705); Ex. T at p. 47 (DBZ 0009634); Ex. U at p. 30 (DBZ

0009562); Ex. K at p. 24 (DBZ 0009474).  Thus, the Offering Memoranda granted DBZCO the

right to engage in transactions between the funds, while simultaneously disclosing that such a

transaction could create a conflict of interest.  The Offering Memoranda also disclosed that

"notwithstanding the potential conflicts of interest resulting from these multiple relationships, the

Manager is expressly permitted to enter into contracts and transactions with its affiliates on

behalf of the Fund." *Id.*; Ex. K at p. 25 (DBZ 0009475).  Similar disclosures appeared in the due

diligence materials provided to investors.  Ex. B at p. 9 (SEC_Gruss 001016).

    27.     In such instances "the Manager and Mr. Zwirn may have a conflict of interest

between acting in the best interests of the Fund and such other accounts and funds." Ex. M at p.

51 (DBZ 0009877); Ex. O at p. 28 (DBZ 0009777); Ex. L at p. 28 (DBZ 0009704); Ex. T at p.

46 (DBZ 0009633); Ex. U at p. 29 (DBZ 0009561); Ex. K at p. 23 (DBZ 0009473).  Those

conflicts were to be resolved by the Manager in its sole discretion:  "When the Fund and one or

more other clients of the manager have available funds for investments, investments . . . will be

allocated substantially pro rata on an overall basis . . . to the extent possible, unless the Manager

believes, in good faith, that another method would be more fair and equitable."  Ex. M at pp. 51-

52 (DBZ 0009877-78); Ex. O at p. 29 (DBZ 0009778); Ex. L at p. 29 (DBZ 0009705); Ex. T at

pp. 46-47 (DBZ 0009633-34); Ex. U at pp. 29-30 (DBZ 0009561-62); Ex. K at p. 24 (DBZ 0009474). Indeed the Offering Memoranda confirmed this point, specifying that the Manager can "engage in investment techniques and strategies not described" in the LTD's Offering Memoranda "that the Manager considers appropriate under the circumstances" Ex. M at p. 27 (DBZ 0009853) and "to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental" for the LP. Ex. K at p. 5 (DBZ 0009502).

### 3.   The Management Agreements

28.     The Management Agreements with the Funds, under which DBZCO was retained as investment adviser by each fund, confirmed the authority of the Manager specified in the Offering Memoranda. For example, the 2005 version of the LTD Management Agreement specifies that:

> The Fund desires to employ its capital by investing and reinvesting in securities and other instruments and investments as specified in the Memorandum [Offering Documents] . . . The Manager is authorized as attorney-in-fact of the Fund to take all such actions . . . on behalf of the Fund that it deems, in its sole discretion, necessary or appropriate to perform its obligations under this Agreement. Ex. V at ¶1 (BS00000220).

29.     The agreement for the LP is virtually identical. Ex. W at ¶1 (DBZ0040972) *see also* Exhs. MM, NN, SS at ¶1.

### C.   The Manager Implemented the Shareholder Expectations in the Operating Documents to Benefit the Shareholders

30.     At times the funds had at their disposal many sources of capital available to draw on for investments. These sources included prime brokers, banks, affiliated funds, managed accounts, structured vehicles such as the LTD and LP CLOs and other financing sources. These sources of capital were continually evolving and expanding over time. Depending on the type of

investment and cash availability at each of the sources, certain borrowing sources were preferred over others.  However, several factors influenced the Manager's decision to use one funding source over another, including investment type, financing vehicle constraints, cash availability and differing tax consequences.  Above all, the Manager's goal, when determining its funding source, was to maximize investor returns whenever possible.  Gruss Dec., ¶ 10.

31.     This overall investment approach yielded for the investors of the LTD and the LP "superior annual returns relative to S&P 500 or other multi-strategy hedge funds" from 2004 to 2006.  *Id.*, Ex. D at p. 32.

32.     Gruss arranged in certain limited instances for cash advances from the LTD to the LP so the LP 1) could purchase investments that were held solely by the LP, Ex. X at p. 213, Ex. Y at pp. 129-131, 137,161 and 2) to pay down a credit facility in the name of the LP.  Ex. X at pp. 178-80, Ex. Y at pp. 140-47.

33.     The status of the funds owed from the LP to the LTD was reported on the annual financials of each of the funds for 2004 through 2006.  Ex. X at p. 182.

34.     There were "occasions where the LP" acted as "the agent on behalf of the other funds…where it would purchase the entire investment in its name and in turn provide each of the other funds its percentage participation in that investment.  Ex. Z at pp. 22-23, Ex. Y at pp. 121-22.

35.     When the LP purchased investments for the LTD, "the title to those investments was just in the LP."  Ex. Z at p. 28, Ex. Y at p. 122.

36.     The cash used to purchase these investments would come from the LP or the LTD or both.  Ex. Z at pp. 24-25, Ex. Y at p. 123.

37.     The accounting for each fund's participation in each investment was tracked in a General Ledger account known as DZ PRIV.  Ex. Z at pp. 25-26.

38.     The analysis by Deloitte Financial Services LLP ("Deloitte") shows that cash was advanced between and among all of the funds to purchase investments that, for the most part, were provided to all of the funds.  Ex. AA at pp. 18-19, 132; Gruss Dec. Ex. A at pp. 1-27 (DT 1708-34); Gruss Dec. Ex. C.

39.     The returns of the LP and LTD could not be identical because of the U.S. tax law. The LTD, to avoid U.S. taxation, was prohibited from engaging in a trade or business in the U.S. because "[a] non-U.S. corporation engaged in a U.S. trade or business is generally subject to U.S. corporate income tax on income and gains earned in the U.S. which is connected to such trade or business."  Ex. M at p. 66 (DBZ 0009892).

40.     As a result of tax laws, the LTD could not "buy certain investments for itself," and the LP would have to buy and "season" the investments for anywhere between 30 to 90 days before it could sell those investments to the LTD.  Ex. Z at pp. 31-33; Ex. R at pp. 97-100, 142-43; Ex. CC at pp. 72-74.

41.     All of the funds that the LP received from the LTD, whether for the LTD to purchase investments for itself in which the LTD did not participate or to pay down the LP's credit line, was accounted for on DBZCO's books and records in an internal General Ledger known as DZ PRIV.  Ex. Y at pp. 237-38, 273-74; Ex. Z at pp. 46, 49.

42.     All "private investments are made by the funds and are accounted for in VPM and reconciled by DZ PRIV."  Ex. Y at pp. 193-94, 233; Ex. DD at pp. 170-77; Ex. Z at p. 50, Ex. EE.

43.     PWC was never aware of any of the funds leaving DBZCO "inappropriately." Ex. Z at pp. 41-43.

44.     All of the outstanding balances from these advances from the LTD to the LP were continuously and accurately tracked such that at any point "you could basically say how much the LP owed to the LTD." Ex. Y at pp. 238-42.

45.     The balances were also contained on the 2004 and 2005 Financial Statements for both the LP and LTD in each funds' Consolidated Statement of Assets and Liabilities that were disclosed to the investors. Ex. Y at p. 238, Ex. F; Ex. Z at pp. 41- 44.

46.     Deloitte confirmed the efficacy of this accounting system and traced the funds from DBZCO's bank statements to the VPM and DZPRIV.  Ex. AA at pp. 17, 22-23, 28-30, 37.

47.     The tax restrictions on the LTD also meant that the LTD was dependent on the LP to source its investments.  The Offering Memoranda for the LTD was clear that because of these tax restrictions, it "will not regularly acquire loans from issuers, although it will acquire loans from the U.S. Fund [the LP] after the loans are acquired from the issuer by the U.S. Fund." Ex. L at p. 35 (DBZ 0009711), *see also*, Ex. O at p. 35 (DBZ 0009784), Ex. M at p. 20 (DBZ 0009846).  This practice was consistent with the representation in the LTD Offering Memoranda that the LTD will be "managed using trading strategies generally similar to those the Trading Manager [DBZCO] uses for the U.S. Fund." Ex. L at p. 8 (DBZ 0009684), *see also* Ex. O at p. 8 (DBZ 0009757), Ex. M at p. 19 (DBZ 0009845).

48.     In addition to purchasing investments from the LP, the LTD had what was known as a "mezzanine investment in the Onshore CLO." Ex. R at pp. 125-27. As of December 31, 2004, the LTD had a $25M investment in the Onshore CLO, Bernard National. Ex. E at p. 16. As of December 31, 2006, this mezzanine investment had grown to $141 million. Ex. G at p. 30.

### D.   The Undisputed Expert Testimony Demonstrates that the Funds Operated In Accordance with Shareholder Expectations

49.   Gruss designated as his expert witness Dr. Richard Bergin, a principal with KPMG's Forensic Services practice and co-head of KPMG's U.S. Economic & Regulation practice. Ex. D at p. 4.

50.   Dr. Bergin has testified in significant complex matters involving hedge funds on behalf of private parties and the government, including the SEC. *Id.*

51.   He "served as a board director for six years for Aquamarine Fund, Inc. (an off-shore hedge fund) and Aquamarine Value Fund L.P. (an on-shore hedge fund)." *Id.*

52.   Dr. Bergin has Doctorate and MBA degrees with highest distinction from Harvard Business School. *Id.*

53.   Dr. Bergin summarized his opinion as follows:

- DBZCO operated a rapidly expanding hedge fund complex which generated above-average investment returns for a group of sophisticated investors by successfully implementing a complex, broad, and multi-faceted investment strategy. The fund complex was largely unregulated, as was typical of hedge funds at the time, and thus not subject to many of the constraints of mutual funds which are highly regulated under the federal security laws.

- DBZCO was given a broad mandate under the pertinent operating documents to select investments, manage the funds, and resolve conflicts among the fund complex members as necessary to facilitate implementation of its strategy and increase risk-adjusted returns.

- An aspect of DBZCO's strategy, as detailed in the pertinent fund materials, was for the Offshore Fund and the Onshore Fund to operate symbiotically in order to enhance investment opportunities, facilitate largely parallel strategies and bolster returns for both funds. The Onshore Fund was frequently utilized as a sourcing agent to acquire select investments for the fund complex, and often these investments were not immediately available to the Offshore Fund. This process required a treasury approach which facilitated the movement of funds among fund complex members.

- The movement of funds amongst fund complex members 1) was authorized by the offering memoranda and other fund documents; 2) was documented in the funds' books and records that were available for investor review; 3) was reflected in the

funds' audited financial statements; and 4) created substantial benefits for investors of both funds.

- The SEC's claims that select advances of funds from the Offshore Fund to the Onshore Fund constituted improper activity contradict the investment authority of the manager and the manner in which the fund complex could and did operate. It is thus incorrect to claim that in effecting the transactions to fund the investment selections of the manager that former CFO Gruss did not act in accord with the pertinent fund materials and documents furnished to investors. It is also incorrect to claim that the cash transfers were not disclosed to investors.

*Id. at p. 8 (emphasis added).*

### E.   PWC, the Auditors for the Funds, Determined That the Inter-Fund Transfers, the Early Payment of Management Fees, the Use of Fund Money for the Airplane in Combination with Other Issues Were Not Material

54.   Sulzberger, testified that the "impact on the financial statements" for 2004 and 2005 of the inter-fund transfers, the early payment of management fees, the use of fund money for the purchase of the airplane, "certain operational expenses overcharged by the investment manager to the fund" and other items "were quantitatively and qualitatively immaterial both individually and in aggregate with respect to all impacted periods," and that DBZCO was "not required to restate the 2004 or 2005 financial statements" for the funds. (Ex. Z at pp. 8-11, 72-73, 75, 92, 103, 127, Ex. GG and HH).

55.   Sulzberger testified that none of the financial statements for 2004 and 2005 for the LP and LTD were restated. Ex. Z at pp. 103-05.

56.   PWC determined that the inter-fund transfers, the early payment of management fees and the use of fund money to purchase the airplane, even when aggregated with other operational expenses that were allegedly overcharged, were not material. Ex. Z at pp. 92-95.

57.   PWC reviewed DBZCO's analyses of the LP and LTD funds in accordance with the SEC's Staff Accounting Bulletin "No. 99-Materiality" ("SAB 99") and agreed with DBZCO that the adjustments made to the financial statements for 2004 and 2005 were not quantitatively

or qualitatively material and that the financial statements for 2004 and 2005 did not have to be restated. Ex. Z at pp. 68-69 and 103-105.

58.     As Sulzberger testified, "SAB 99 represents the best authoritative literature available for addressing the issue of materiality and prior period adjustment." Ex. Z at pp. 76-77.

59.     Sulzberger also agreed with DBZCO "that its investors are primarily focused on bottom line fund performance," (Ex. Z at pp. 72-89; 220; Ex. HH at p. 2) and that the threshold of "5 to 10 percent was in line with industry standards and norms for evaluating the quantitative impact on net income and total return" of each fund. Ex. Z at pp. 80-81, 217, see Ex. GG. The investors' primary focus on the funds' returns is also confirmed by Dr. Bergin who compared those returns to standard industry indices – and showed that the DBZCO "hedge fund complex . . . generated above-average investment returns for a group of sophisticated investors." Ex. D at p. 8, *see also*, pp. 30-32. Indeed, Dr. Bergin testified that "one reason that the flow of funds was so strong into the offshore account" "year after year" was because the LTD repeatedly earned these above average returns." Exhibit II at p. 294.

60.     As to the qualitative analysis using the standards of SAB 99, PWC agreed with DBZCO that (1) "most of the errors are subject to reasonably precise measurement," (2) "the errors in question had virtually no impact on the trend of any of the relevant measures," (3) "the errors in question do not impact whether the fund's performance was greater than or less than the performance' of various [market] indices that "certain of its investors could" have used, (4) "none of the misstatements individually or in aggregate changes a loss into income or vice versa for any annual period," (5) each "fund has been assessed on a standalone basis and that there are no segments within the fund," (6) the "adjustments are not concentrated in any individual significant strategies utilized by the management company," (7) "there are no regulatory

thresholds that were affected by the recording of these misstatements and the fund's financial statements," (8) "the misstatements in question do not affect the company's compliance with loan covenants or other contractual requirements," (9) "the impact on the management incentive fees overall is a $233,000 decrease in compensation," (10) "insufficient evidence exists to conclude that these matters and the errors in question were the result of an attempt to conceal unlawful transactions," (11) "the related party elements of these adjustments [did not] result in any of these adjustments being qualitatively material," and (12) that "there are no other qualitative aspects of these adjustments that would make them material in any of the financial statements for any of the periods in questions." Ex. Z at pp. 89-102; Ex. GG and HH.

### F.     The Impact of the Inter-Fund Transfers Was Immaterial to the Funds' Net Profits

61.     As alleged in the complaint, there were two types of inter-fund transfers. The first were the alleged $576 million in [85] transfers between March 2004 and July 2006 . . . to fund Onshore Investments" "for the benefit of the Onshore Fund." Ex. N at ¶¶ 3, 26. The 85 transfers amounting to $576 million was derived from a chart prepared by Deloitte and represent 66 investments purchased, in whole or in part, from funds advanced to the LP by the LTD. Ex. AA at pp. 51-52; Gruss Dec. Ex. A; Gruss Dec. Ex. B.

62.     Of those 66 investments, in the regular course of DBZCO's management of its investment process, the LTD participated in 45 of those investments through direct assignments from the LP to the LTD or indirectly through its subsidiary Le Moyne Avenue Investors, LLC, and/or to the LTD's CLO [Collateralized Loan Obligation], Bernard Global. Gruss Dec.,¶¶ 3-8.

63.     As a way to invest in other LP assets, the LTD made several direct investments in the Mezzanine Tranche of the LP, Bernard National, which totaled $141,000,000 as of December 31, 2006. Ex. FF at p. 50, Gruss Dec., ¶ 6.

64.     Approximately $449 million of the approximate $576 million cash from the LTD alleged in the complaint was not used to make investments for the benefit of the LP but was in fact used to make investments for both the LP and LTD, Gruss Dec. Ex. A, and at most, approximately $127 million of LTD funds were used only to "fund Onshore Fund investments." Gruss Dec., ¶ 3.

65.     Certain of the investments at issue could not initially be assigned to the LTD because of the U.S. tax laws that prohibited the LTD from engaging in a trade or business in the U.S. Before any investment was made, DBZCO included in its investment analysis whether or not an investment was eligible to be made by the LTD, whether at the time of initial funding or at a later date, via a transfer from the LP to either the LTD directly or through its subsidiary or CLO. This analysis included making certain it was an investment that fit into the tax parameters ¶spelled out in the LTD Offering Memorandum. Gruss Dec., ¶ 8.

66.     For example, DBZCO invested in a number of joint ventures such as Horizon where the LTD could not initially participate in the investment because the joint venture was engaged in a U.S. trade or business. However, it was always the intention from the outset of the investment in these joint ventures that DBZCO would restructure these joint ventures so portions of the investments could be assigned to the LTD. In connection with that intent, DBZCO hired a full-time on staff attorney who was charged with the task of restructuring these joint ventures so portions of these investments would be eligible for assignment to the LTD. Gruss Dec., ¶ 9; Gruss Dec. Ex. E.

67.     Certain joint ventures were restructured and portions of the underlying investments were transferred to the LTD. However, without the complete records of DBZCO, there is no way to identify which portions of the investments represented by the remaining

$126,896,039 out of the $576,124,932 in cash transfers from the LTD to the LP were ultimately transferred to the LTD.  Gruss Dec., ¶ 8-9, Gruss Dec. Ex. D.

68.     That the LP initially purchased the investments and subsequently provided a portion of the investments to the LTD was consistent with the LP's undisputed role as the sourcing agent for investments for the LTD and other funds managed by DBZCO.  *See* Ex. D at p. 8 (The LP "was frequently utilized as a sourcing agent to acquire select investments for the fund complex, and often these investments were not immediately available to the Offshore Fund."), Ex. Z at pp. 22-25, Ex. Y at pp. 121-22, Gruss Dec., ¶ 6.

69.     Even though there is no provision in any of the Funds' Offering Memoranda to conclude that the LP owed the LTD interest for the use of its funds for investments solely for the LP or to pay down the credit line of the LP (a decision made by management, Ex. Z at p. 48), PWC used the interest not paid to the LTD for the use of its money to determine the materiality of these transactions.  Ex. Z at pp. 45-55, Ex. EE, Gruss Dec. ¶ 11.

70.     The Offering Memoranda required the Manager to treat the Funds fairly.  Ex. K at p. 24 (DBZ 0009474) ("the Trading Manager has agreed in all cases to treat the Fund fairly and not knowingly favor any other client over the Fund").  The LP did not charge the LTD any performance-based fees or asset-based fees for sourcing investments to the LTD, even though the LP had the right to charge the LTD such sourcing fees.  Under the Offering Memoranda, DBZCO had the discretion "to charge the Fund [the LTD] a fee in connection with the management and servicing of certain portions of the Fund's [LTD's] loan portfolio." Ex. M at p. 8 (DBZ 0009834).  This fee was "in addition to the Management Fee already payable by the Fund [LTD]" and was to "be used to facilitate the Manager [DBZCO] or its affiliate in engaging personnel and incurring other overhead costs to manage these loans in lieu of hiring an

unaffiliated third-party service provider to provide these services." Ex. M at p. 9 (DBZ 0009835). DBZCO never charged the LTD for any such fee for sourcing its investments. Gruss Dec., ¶ 11, n. 4.

71.     Using the interest rate relied upon by Deloitte ("Greater of (i) short term monthly applicable funds rate or (ii) the fed fund rate plus 25 basis points" Ex. JJ at p. 11), if the LTD had not advanced the $126,896,039 to the LP for the purchase of investments for which it does not appear the LTD ever received any participation, the LTD's Net Profit in 2004 would have increased by 0.01%, the LTD's Net Profit in 2005 would have increased by 0.43%, and the LTD's Net Profit in 2006 would have increased by 0.18%. Annexed as Gruss Dec. Ex. F is a spreadsheet showing the interest calculated for the 27 cash transfers from the LTD to the LP amounting to $126,896,039 and representing transfers for the purchase of 21 investments for which there is no evidence of LTD participation in the 21 investments associated with those 27 cash transfers. Gruss Dec., ¶¶ 12 -14; Gruss Dec. Ex. G; Gruss Dec. Ex. H.

72.     The second group of inter-fund transfers charged in the complaint were the "$273 million in transfers between March 2004 and July 2006 from the Offshore Fund to repay the revolving credit facility of the Onshore Fund." Ex. N at ¶3. Applying the same interest rate used by Deloitte to the funds the LTD advanced to the LP for the payment of LP's obligation to the revolving credit account, if the LTD had not advanced those funds to the LP to repay the revolving credit facility, the Net Profit in 2005 for the LTD would have increased by 0.92%, and the Net Profit in 2006 would have increased by 1.83%. Gruss Dec., ¶ 15; Ex. I.

### G.   The Early Payment of Management Fees Represented a Miniscule Percentage of the Funds' Net Profits

73.     Each of the funds was obligated to pay DBCZO a management fee that, according to their Management Agreements with DBZCO, was to "be accrued monthly and payable quarterly." Ex. Y at p. 60; Ex. LL at p. 155; Ex. V, MM and NN.

74.     From May 2004 through March 2006, DBZCO withdrew the management fees owed under the Management Agreements from the LP, the LTD, the TE Fund and the LTD II accounts anywhere between 1 to 31 days before the fees were due to DBZCO at the end of the appropriate quarters. Ex. OO at pp. 5-6 (a legible version of the spreadsheet is attached as Gruss Dec. Ex. J).

75.     There were also instances where the management fees were paid after the end of the quarter when they were due. Ex. LL at pp. 155-156.

76.     In June 2006 DBZCO and PWC quantified the impact of the early payment of management fees on each of the funds by determining the lost use of those funds to the investors from May 2004, when the early payment of management fees began for certain of the funds, to June 2006, when the interest was calculated and paid. The interest rate used for each amount of early payment of management fees was the applicable "monthly fund performance return" used by DBZCO and PWC. (Interest Calculation Rate"). Ex. Z at pp. 198-201; (Ex. OO).

77.     Based on these calculations, if the management fees had not been paid early, the LP's Net Profit would have increased between May 1, 2004 and June 30, 2006, by 0.039%, the LTD's Net Profit would have increased between June 1, 2004 and June 30, 2006, by 0.055%, the TE Fund's Net Profit would have increased between May 1, 2004 and June 30, 2006 by 0.041%, and the LTD II Fund's Net Profit would have increased between March 1, 2006 and June 30, 2006 by 0.041%. Gruss Dec., ¶¶ 16-17; Ex. J.

**H.  The Use of Fund Money for the Aircraft Purchase Represented a Miniscule Percentage of the Funds' Net Profits**

78.     The complaint alleges "a total of $3.8 million taken from the Onshore Fund and a managed account in September 2005 to fund a portion of the $17.95 million purchase price of a Gulfstream IV aircraft purchased by DBZCO's managing partner." Ex. N at ¶3.

79.     The approximate $3.8 million consisted of four individual payments. Two payments totaling $1,980,250 were made from HCM/Z, a managed account, and two payments totaling $1,793,925 were made from the LP.

80.     The first HCM/Z payment was for $1.9 million and the second for $80,250.  Each was transferred on September 28, 2005 from HCM/Z, a managed fund account, ("the September 28[th] Payments"), Ex. Y at pp. 184-86; Ex. PP, QQ.

81.     A third payment for $1,681,350 was transferred on September 29, 2005 from the LP ("the September 29[th] Payment"). Ex. Y at pp. 109-10, Ex. RR.

82.     A fourth payment for $112,575 was transferred on September 30, 2005 ("the September 30[th] Payment) from the LP.  Ex. Y at pp. 110-11, Ex. RR, KK.

83.     On November 10, 2005, the full amount of $3,774,175 was repaid to the LP, and on November 23, 2005, $1,980,250 of that amount was reimbursed to HCMZ.  Ex. BB at p. 7.

84.     In June 2006, DBZCO and PWC quantified the impact of the payment of the monies from HCM/Z and the LP on the Net Profit of the funds by determining the lost use of those funds to the investors from September 28, 2006, when the first two payments were made from HCM/Z to June 2006, when the interest was calculated and paid.  The interest rate used for each of the four payments was the applicable "monthly fund performance return." Ex. Z at pp. 203-04; Ex. BB.

85.     Based on these calculations, if the fund money had not been used to pay for the airplane, HCM/Z's Net Profit would have increased between September 1, 2005 and June 1, 2006, by 0.11% and the LP's Net Profit would have increased by 0.02%.  Gruss Dec. ¶ 18; Ex. K.

Dated: March 11, 2016

Respectfully submitted,

Nathaniel Akerman, Esq.
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019-6119
(212) 415-9200

*Attorney for Defendant Perry A. Gruss*

85.     Based on these calculations, if the fund money had not been used to pay for the airplane, HCM/Z's Net Profit would have increased between September 1, 2005 and June 1, 2006, by 0.11% and the LP's Net Profit would have increased by 0.02%.  Gruss Dec. ¶ 18; Ex. K.

Dated: March 11, 2016

Respectfully submitted,

Nathaniel Akerman, Esq.
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019-6119
(212) 415-9200

*Attorney for Defendant Perry A. Gruss*