# EXHIBIT M
# Part 5 of 7

to BCF, to the extent such fee is allocable to the portion of the CLOs' assets acquired, directly or indirectly, from the Fund.

**Loan Servicing Fees**

Affiliates of the Manager may charge the Fund a fee in connection with the management and servicing of certain portions of the Fund's loan portfolio. This fee is in addition to the Management Fee already payable by the Fund and will be used to facilitate the Manager or its affiliate in engaging personnel and incurring other overhead costs to manage these loans in lieu of hiring an unaffiliated third-party service provider to provide these services. Any fee payable to the Manager or its affiliates will be comparable to a fee that an independent third-party service provider would have charged to the Fund for such services.

## THE FUND

**Organization**

The Fund was incorporated and registered as an exempted company in the Cayman Islands under the Companies Law (2004 Revision) of the Cayman Islands on April 12, 2002. The liability of each Shareholder is limited to the amount paid for the Shares purchased by the Shareholder.

**Capitalization**

The Fund is authorized to issue one or more classes of shares of the Fund with such rights, preferences and privileges as the directors of the Fund may authorize. Currently, there are five classes of shares with a total of 50,000,000 Participating Shares, par value $0.001 per share ("Shares") authorized in the aggregate. Each Share, upon issue, will be entitled to one vote at all meetings of Shareholders and to share in the profits, losses and dividends of the Fund and in its capital and assets on liquidation.

Currently, the Fund is offering Class B Shares (issued to Shareholders electing the One-Year Plus Liquidity Option) and Class D Shares (issued to Shareholders subject to the three-year "lock-up"). Class A Shares and Class E Shares (issued to Shareholders subject to a two-year "lock-up"), as well as Class C Shares, are no longer offered by the Fund.

All Shares are in registered form. No Share certificates will be issued to Shareholders.

The Articles authorize the directors of the Fund to issue the Shares in accordance with the conditions set forth in this Memorandum. The directors may decide to offer additional classes, sub-classes or series of Shares in the future.



onfidential Treatment Requested
DBZ 00098[illegible]

**Directors**

The following persons are the directors of the Fund:

**Daniel B. Zwirn**, Director
**Alun J. Davies**, Director

Mr. Zwirn's biography appears under "The Manager."

Mr. Alun J. Davies has nearly 20 years of experience in the financial industry, including over 10 years within the Cayman Islands financial sector. Mr. Davies graduated in law from Kings College London and joined KPMG in 1987, specializing in international tax until 1993. Mr. Davies moved to the Cayman Islands in 1993 and managed the liquidation division of the then Coopers & Lybrand until 1998. Since 1998, Mr. Davies has worked in the client service area, spending two years as Managing Director of a financial services provider, followed by five years as head of the client service division of Bank Austria, working closely with a U.S. hedge fund manager whose funds were promoted by the bank. Mr. Davies now works for Cayman Financial Consultants Ltd. providing directorship services.

**Valuation of Assets**

The "Net Asset Value" or "Net Assets" of the Fund as of any Redemption Date, or other date of valuation, is determined by aggregating the value of all securities and other assets of the Fund and subtracting all of the Fund's liabilities. As used in this Memorandum, Net Assets equals Net Asset Value. Net Asset Value per Share is calculated by dividing the Net Asset Value by the number of Shares outstanding. Where the Fund has issued different classes of Shares (for example, to give effect to the One-Year Plus Liquidity Option), the Net Asset Value per Share will be calculated by reference only to the assets attributable to such class and the term "Net Asset Value per Share" throughout this Memorandum will be construed accordingly.

The Fund's assets are valued by the Manager. The Fund's Net Asset Value calculations are reviewed by the Administrator, in accordance with the terms of the Administration Agreement. Securities (other than options) that are listed on a national securities exchange and are freely transferable will be valued at their last sales price on the principal exchange on which such securities are listed, and options that are listed on a national securities exchange will be valued at their last sales price on the principal exchange on which such options are traded; provided, however, that if the trading of any such securities is suspended at the date of determination, then the securities will be valued at their last sales price on the first subsequent day on which trading is resumed on the principal exchange on which such securities are listed. Securities (including options) traded over-the-counter that are freely transferable will be valued, in the case of "long" positions, at their last "bid" price and, in the case of "short" positions, at their last "asked" price as reported by the NASD's Automatic Quotation System or, if not quoted on such system, by one of the principal market makers in such security selected by the Manager. Notwithstanding the foregoing, if the security to be

valued constitutes a block which, in the judgment of the Manager, could not be liquidated in a reasonable time without depressing the market, such block will then be valued by the Manager, but not at a unit value in excess of the quoted market price for the security. In circumstances in which the Manager determines that market prices or quotations do not fairly represent the value of particular securities or if no quotation exists, the Manager is authorized to assign a value to such securities which differs from the market prices or quotations in its good faith discretion. Financial instruments (primarily bank loans and corporate bonds) for which market quotations are not listed on an available national securities exchange, or for which identified market quotations may be deemed inappropriate by the Manager, are valued at estimated fair value as determined in good faith by the Manager after consideration of, among other things, quotations obtained from up to five independent brokers, to the extent available. Investments in privately held corporate loans, either directly owned or held through a loan participation, are valued at estimated fair value which generally approximates cost, plus accrued interest, unless a write-down is deemed necessary based on an estimate of ultimately recoverable principal amounts. On a quarterly basis, and at the direction of the Board of Directors, the Manager engages the services of several independent third-party corporate valuation experts to assess the reasonableness and fair value of certain: (i) privately held corporate loans; (ii) private equity investments; (iii) commercial, industrial and/or consumer assets held via special purpose vehicles; and (iv) other illiquid assets. Due to the inherent uncertainty of valuation for the investments described above, the estimates of fair value may differ from the values that would have been used had a ready market existed, and such differences could be material. Except as provided above, all assets (including options not listed on any national securities exchange or not traded over-the-counter) of the Fund shall be valued in the manner determined by the Manager. The Manager may, from time to time, also establish or abolish reserves or holdbacks for estimated or accrued expenses, liabilities and contingencies (including, without limitation, general reserves for unspecified contingencies).

The Fund may suspend the calculation of the Net Asset Value per Share and the redemption of Shares during: (i) all or part of any period when any of the principal exchanges on which a substantial portion of the investments of the Fund are listed, quoted or traded is closed (other than for weekends or holidays) or during which trading is restricted or suspended or (ii) the existence of any state of affairs as a result of which the Manager is unable (or, in the opinion of the Manager, it is not reasonably practicable or would be prejudicial to Shareholders) to value or dispose of its assets.

**Registered Office and Mailing Address**

The Fund's registered office is at the offices of M&C Corporate Services Limited, P.O. Box 309 GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands, British West Indies; telephone 345-949-8066. The Fund's mailing address is c/o Goldman Sachs (Cayman) Trust, Limited, P.O. Box 896 GT, George Town, Harbour Centre, 2nd Floor, Grand Cayman, Cayman Islands, British

West Indies. The Fund's telephone number at its mailing address is 345-949-6770 and its facsimile number is 345-949-6773.

**Termination of the Fund**

The Fund may be liquidated at any time upon passage of a special resolution by the holders of the Shares.

**Dividends**

The Board of Directors may, but does not intend to, declare dividends in the ordinary course of the Fund's activities. All amounts earned in due course of the Fund's operations will typically be reinvested.

**Redemptions and Restrictions on Transfer of Shares**

Shareholders may, upon at least 120 days' prior written notice to the Fund, redeem all or any Shares held by the Shareholder as of the last business day of the calendar quarter ending at least three years after the date on which the Shareholder purchased such Shares and as of each third anniversary of that date thereafter (each such date hereinafter is referred to as a "Redemption Date"). The Manager may waive this limitation and/or permit redemptions at other times, in its sole discretion.

Shares will be redeemed at a per Share price based on Net Asset Value on the Redemption Date and all or a portion of the Equalization Factor (as defined in Appendix A hereto) to the extent that the increase in value of the Shares that caused the payment of the Equalization Factor has not been lost or has not been paid previously to the redeeming Shareholder. Unless waived by the Manager, the remaining Net Asset Value of the Shares held by a Shareholder after any partial redemption must be no less than $2,000,000. The Manager may suspend or defer redemptions in certain circumstances, including a suspension of the calculation of the Net Asset Value. In the event that redemption requests for a Redemption Date are received, representing, in the aggregate, more than 10% of the Fund's Net Assets, the Manager may reduce the redemption requests on a pro rata basis (based upon the amount of the Shareholders' respective redemption requests) among all of the Shareholders requesting redemption so that no more than 10% of the Fund's Net Assets (based on unaudited data) (the "Gate") will be paid out. In calculating the Gate, the Manager will not include the redemption requests of Shareholders that are subject to the One-Year Plus Liquidity Option, and Net Assets will not include any Redeeming Shareholder's (as defined below) portion of the Net Assets. Any unfulfilled redemption request will be paid at the Fund's next Redemption Date (subject to further deferral if the deferred redemption requests themselves exceed 10% of Net Assets) in priority to any subsequent redemption requests, unless the Manager in its sole discretion decides to pay such redemption proceeds earlier than the next Redemption Date.

The Manager may establish reserves or holdbacks for estimated accrued expenses, liabilities and contingencies (including, without limitation, general reserves for

unspecified contingencies) which could reduce the amount of a distribution upon redemption.

The Fund will endeavor to pay redemption proceeds to redeeming Shareholders within 45 calendar days of the Redemption Date. In addition, 10% of any redemption proceeds will be withheld by the Fund until completion of the Fund's annual audit. Redemption proceeds may be paid in cash or in kind. Cash proceeds will be paid in U.S. dollars by wire transfer and expenses related to redemptions will be borne by the redeeming Shareholder.

The Fund has previously offered Shares having a two-year "lock-up." Such Shares are no longer being offered. Under the terms applicable to such Shares, a Shareholder may, upon at least 120 days' prior written notice to the Fund, redeem some or all of its Shares as of the last business day of the calendar quarter ending at least two years after the Shareholder initially purchased Shares and as of the second anniversary of that date thereafter. Thus, each such Share purchased is subject to its own two-year "lock-up."

The Manager, upon 10 days' prior written notice to a Shareholder, may compel redemption of any or all of the Shareholder's Shares at any time and for any reason or no reason.

Shares may not be transferred without the prior written consent of the Manager, which may be given or withheld in the Manager's sole discretion.

**One-Year Plus Liquidity Option**

If a Shareholder elects the One-Year Plus Liquidity Option at the time of investment, such Shareholder will not be subject to the provisions described in this Memorandum in the first sentence under the caption "The Fund - Redemptions and Restrictions on Transfer of Shares." Shareholders electing this option shall be issued a separate class of Shares. An electing Shareholder may, as of each fiscal year-end following the one-year anniversary of a particular investment in the Fund (each such fiscal year-end, a "Special Redemption Date"), upon at least 120 days' prior written notice (i.e., no later than August 31) to the Fund, redeem all or any portion of its Shares related to such investment only (the "Designated Shares", which expression shall include any shares of a different class into which such Shares are converted), subject however to the limitations described below.

On such Special Redemption Date, such number of the Designated Shares as may be redeemed using the Liquid Assets (as defined below) shall be redeemed at the Net Asset Value per Share of such Designated Shares and all or a portion of the Equalization Factor (as defined in Appendix A hereto) to the extent that the increase in value of the Designated Shares that caused the payment of the Equalization Factor has not been lost or has not been paid previously to the redeeming Shareholder, as more fully set forth in Appendix A. Within 30 days of the Special Redemption Date, each Shareholder redeeming on a Special Redemption Date (each, a "Redeeming



onfidential Treatment Requested

DBZ 00098

Shareholder") will receive an amount equal to its pro rata share based on its redeemed Shares (relative to all Shareholders) on such Special Redemption Date of (i) the cash and cash equivalents (as determined by the Manager, in its sole discretion) of the Fund and (ii) in the sole discretion of the Manager, any other liquid assets of the Fund (together, the "Liquid Assets"). The remainder of each redeeming Shareholder's Designated Shares will be addressed as described below.

Any Designated Shares that are not redeemed on the Special Redemption Date shall be converted into shares of a new class to which shall be attributed a pro rata share of the assets of the Fund not comprising the Liquid Assets (the "Designated Assets").

A Shareholder that has redeemed pursuant to this One-Year Plus Liquidity Option will not be entitled to participate in any new investment or any follow-up investment to an existing investment with respect to any portion of its Designated Shares that have not yet been redeemed. The Designated Assets relating to a Shareholder's Designated Shares will continue to be managed in accordance with the Articles and the provisions described in this Memorandum, and such Designated Shares will remain subject to both the Management Fee and the Incentive Fee, as well as their pro rata share of the Fund's operating expenses.

The Fund will redeem the remaining Designated Shares on the same basis as above from the net proceeds of the sale of any portion of a Designated Asset or the receipt of other payments (such as dividends, principal and interest) relating thereto, after deduction of any accrued Management Fees, Incentive Fees and allocated expenses, based on the pro rata share of each Redeeming Shareholder relative to all Redeeming Shareholders quarterly and on such other redemption dates (not more often than monthly) as determined by the Manager, in its sole discretion (the "Special Redemption Payment Date"). On each Special Redemption Payment Date, each Redeeming Shareholder will receive its pro rata share relative to all Redeeming Shareholders of the net proceeds of the Designated Assets. The Manager may, in its sole discretion, cause the Fund, or a Redeeming Shareholder may in its redemption notice request that the Manager cause the Fund (which request the Manager may in its sole discretion grant, but is not required to grant), to distribute to such Shareholder at the end of any month all or any portion of the proceeds with respect to such Shareholder's Designated Shares at the then-Net Asset Value per Share thereof. Upon realization of any Designated Assets relating to the Designated Shares not previously redeemed by the Fund, the net proceeds therefrom that are allocated to the Designated Shares of a Redeeming Shareholder will be paid to such Shareholder on the next Special Redemption Payment Date.

It is the Manager's intention that the liquidation of the majority of all assets relating to a Redeeming Shareholder's Designated Shares and distribution of the redemption proceeds relating thereto will be completed within two to four years of the Special Redemption Date, although the Fund is not obligated to do so and it is possible that such liquidation will not occur within such time period.



nfidential Treatment Requested

## Auditors and Legal Counsel

PricewaterhouseCoopers LLP, 300 Madison Avenue, New York, New York 10017, USA, serves as independent auditors of the Fund.

Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, USA, acts as counsel to the Fund in connection with the offering of the Shares and has also advised the Fund with regard to U.S. Federal tax matters. Schulte Roth & Zabel LLP also acts as counsel to the Manager and certain of its affiliates and managed funds. In connection with the offering of the Shares and subsequent advice to such entities and their affiliates, Schulte Roth & Zabel LLP will not be representing investors in the Fund.

Maples and Calder, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands, British West Indies acts as Cayman Islands counsel to the Fund.

No independent counsel has been retained to represent investors in the Fund.

## Reports to Shareholders

The Fund's accountants will audit the Fund's books and records as of the end of each fiscal year. Within 150 days after each such audit date, the Fund will prepare and mail to each Shareholder, together with the report prepared by the Fund's accountants, a financial report setting forth a balance sheet of the Fund and a statement of its Net Asset Value, a statement of such Shareholder's Net Asset Value per Share and the manner of its calculation. After the end of the fiscal year, each Shareholder will be furnished certain tax information for preparation of its tax return. In addition, each Shareholder will be mailed at least quarterly unaudited summary financial information. Finally, each Shareholder will be sent at least monthly an estimated performance figure for the Fund setting forth such information deemed appropriate by the Manager.

## Fiscal Year

The Fund intends to close its fiscal year on December 31 of each calendar year. The Board of Directors, in its sole discretion, has the authority to change the fiscal year-end of the Fund as deemed appropriate by it.

## Additional Information

The Manager will make available to any proposed Shareholder such reasonable additional information as it may possess, or as it can acquire without unreasonable effort or expense, to verify or supplement the information set forth herein.

## OFFERING OF SHARES

### Plan of Distribution

The Fund intends to offer investors Shares in a continuing offering. The Shares may be purchased by non-U.S. persons or Permitted U.S. Persons (as defined below) in private transactions. Prior to the start of trading, Shares will be purchased at $1,000 per Share. Thereafter, Shares and fractional Shares may be purchased as of the first business day of each calendar month; provided that the Manager may offer Shares at any other time as it may determine, in its sole discretion. The minimum subscription is $5,000,000 and additional Shares may be purchased in multiples of $250,000. These minimum investment amounts may be waived by the Manager in its sole discretion; provided, however, that subscriptions of less than $50,000 will not be permitted. No selling commissions will be paid to the Fund by subscribers. The Fund reserves the right to reject any application in whole or in part in which case the subscription funds will be returned, without interest, to the subscriber by any means deemed appropriate by the Fund.

Unless otherwise agreed by the Manager, subscription amounts must be paid either (i) by check received five business days prior to the date on which such payment is due or (ii) by wire transfer of immediately available funds received two business days prior to the date on which such payment is due. The Manager, on behalf of the Fund, reserves the right to reject subscriptions, in whole or in part, in its sole discretion, for any reason.

Shareholders pay no sales commissions or charges to the Fund on the purchases of Shares of the Fund. However, the Manager may enter into arrangements with placement agents where, in return for an investment by a Shareholder introduced to the Fund through a placement agent, the Manager may pay or cause the Fund to pay the placement agent a one-time or ongoing fee, such as one based upon the value of a Shareholder's subscription to the Fund.

Shares (including fractional Shares rounded to three decimal places) are offered at $1,000 per Share as of the first Closing and, thereafter, at the Net Asset Value of the Shares as of the close of business on the immediately preceding business day. However, when Shares are subscribed for during the course of a fiscal year, certain adjustments to the amount of money paid for the purchase of Shares are necessary so that (i) the Incentive Fee paid to the Manager is charged only to those Shares which have appreciated in value since their acquisition, (ii) all Shareholders will have the same amount per Share at risk and (iii) all Shares of a class will have the same Net Asset Value per Share. A specific description of the manner in which these adjustments will be made is set forth in Appendix A hereto.

## ELIGIBLE INVESTORS

Prospective Shareholders in the Fund must be non-U.S. investors or Permitted U.S. Persons and must be (i) "accredited investors", as such term is defined



nfidential Treatment Requested

DBZ 00098

in Rule 501(a) under Regulation D of the Securities Act and (ii) "qualified purchasers", as such term is defined in Section 2(a)(51) of the Investment Company Act, and must meet other suitability requirements described below and in the Subscription Agreement. The term "Permitted U.S. Person" means a Tax-Exempt U.S. Person (as defined herein under the heading "Tax Aspects — Tax-Exempt U.S. Persons") or an entity substantially all of the ownership interests in which are held by Tax-Exempt U.S. Persons. The Fund, in its sole discretion, may decline to accept the subscription for Shares of any prospective Shareholder.

Each prospective purchaser is urged to consult with its own advisers to determine the suitability of an investment in the Fund and the relationship of such an investment to the purchaser's overall investment program and financial and tax position. Each purchaser of Shares is required to represent further that, after all necessary advice and analysis, its investment in the Fund is suitable and appropriate in light of the foregoing considerations and risks.

Each purchaser of Shares must bear the economic risk of its investment for an indefinite period of time (subject to the limited right to redeem the value of its investment) because the Shares have not been registered under the Securities Act or other applicable securities law and, therefore, cannot be sold unless they are subsequently registered under the Securities Act or other applicable securities law or an exemption from such registration is available. It is not contemplated that any such registration will ever be effected, or that certain exemptions provided by rules promulgated under that act (such as Rule 144) will ever be available. No Shareholder may transfer its Shares without the prior written consent of the Manager, which may be given or withheld in the Manager's sole discretion.

A "U.S. Person" is a person described in one or more of the following paragraphs:

1. With respect to any person, any individual or entity that would be a U.S. Person under Regulation S of the Securities Act (as provided below).

2. With respect to individuals, any U.S. citizen or "resident alien" within the meaning of U.S. income tax laws as in effect from time to time. Currently, the term "resident alien" is defined under U.S. income tax laws to generally include any individual who (i) holds an Alien Registration Card (a "green card") issued by the U.S. Immigration and Naturalization Service or (ii) meets a "substantial presence" test. The "substantial presence" test is generally met with respect to any current calendar year if (i) the individual was present in the U.S. on at least 31 days during such year <u>and</u> (ii) the sum of the number of days on which such individual was present in the U.S. during the current year, 1/3 of the number of such days during the first preceding year, and 1/6 of the number of such days during the second preceding year, equals or exceeds 183 days.

3. With respect to persons other than individuals, (i) a corporation or partnership created or organized in the U.S. or under the law of the U.S. or any state thereof, (ii) a trust where (a) a U.S. court is able to exercise primary supervision over the administration of the trust and (b) one or more U.S. persons have the authority to control all substantial decisions of the trust and (iii) an estate which is subject to U.S. tax on its worldwide income from all sources.

Each subscriber for Shares will be required to certify to the Fund, among other things that, the Shares are not being acquired and will not at any time be held for the account or benefit, directly or indirectly, of any U.S. Person (other than a Permitted U.S. Person). Shareholders are required to notify the Fund immediately of any change in such information. IT IS THE RESPONSIBILITY OF EACH SHAREHOLDER TO VERIFY THAT IT IS NOT A U.S. PERSON THAT WOULD BE PROHIBITED FROM OWNING SHARES IN THE FUND.

Each prospective Shareholder will be required to agree that no Shares, nor any interest therein, will be transferred without the prior written consent of the Board of Directors, which consent may be withheld in its sole discretion, and that, prior to considering any request to permit transfer of Shares, the Board of Directors may require the submission by the proposed transferee of a certification as to the matters referred to in the preceding paragraphs as well as such other matters and documents the Board of Directors considers reasonably necessary. The Articles provide, and each subscriber for Shares will be required to agree, that: (i) any transfer or attempted transfer in violation of the foregoing restrictions shall be invalid, and (ii) in the event that the Board of Directors has reason to believe that a Shareholder has violated the applicable restrictions on transfer or that any material matters set forth in the certifications referred to in the preceding paragraphs were false, the Board of Directors is entitled to compulsorily redeem all Shares held by such Shareholder.

For purposes herein, pursuant to Regulation S of the Securities Act, "U.S. Person" means:

(i) any natural person resident in the United States;

(ii) any partnership or corporation organized or incorporated under the laws of the United States;

(iii) any estate of which any executor or administrator is a U.S. Person;

(iv) any trust of which any trustee is a U.S. Person;

(v) any agency or branch of a foreign entity located in the United States;

(vi) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. Person;



nfidential Treatment Requested

DBZ 00098

(vii) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; or

(viii) any partnership or corporation if:

(A) organized or incorporated under the laws of any non-U.S. jurisdiction; and

(B) formed by a U.S. Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts.

Notwithstanding the above, any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. Person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States shall not be deemed a "U.S. Person."

Notwithstanding the above, any estate of which any professional fiduciary acting as executor or administrator is a U.S. Person shall not be deemed a U.S. Person if:

(i) an executor or administrator of the estate who is not a U.S. Person has sole or shared investment discretion with respect to the assets of the estate; and

(ii) the estate is governed by non-U.S. law.

Notwithstanding the above, any trust of which any professional fiduciary acting as trustee is a U.S. Person shall not be deemed a U.S. Person if a trustee who is not a U.S. Person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. Person.

Notwithstanding the above, an employee benefit plan established and administered in accordance with the law of a country other than the United States and in accordance with customary practices and documentation of such country shall not be deemed a U.S. Person.

Notwithstanding the above, any agency or branch of a U.S. Person located outside the United States shall not be deemed a "U.S. Person" if:

(i) the agency or branch operates for valid business reasons; and

(ii) the agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located.

The International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies, affiliates and pension plans, and any other similar international organizations, their agencies, affiliates and pension plans shall not be deemed "U.S. Persons".

**TAX ASPECTS**

**CIRCULAR 230 NOTICE. THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

THE DISCUSSION HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS A DISCUSSION PRIMARILY OF THE U.S. TAX CONSEQUENCES TO PROSPECTIVE SHAREHOLDERS. EACH PROSPECTIVE SHAREHOLDER SHOULD CONSULT ITS PROFESSIONAL TAX ADVISER WITH RESPECT TO THE TAX ASPECTS OF AN INVESTMENT IN THE FUND. TAX CONSEQUENCES MAY VARY DEPENDING UPON THE PARTICULAR STATUS OF A PROSPECTIVE SHAREHOLDER. IN ADDITION, SPECIAL CONSIDERATIONS (NOT DISCUSSED HEREIN) MAY APPLY TO PERSONS WHO ARE NOT DIRECT SHAREHOLDERS IN THE FUND BUT WHO ARE DEEMED TO OWN SHARES AS A RESULT OF THE APPLICATION OF CERTAIN ATTRIBUTION RULES.

The Fund has not sought a ruling from the United States Internal Revenue Service (the "Service") or any other U.S. Federal, state or local agency with respect to any of the tax issues affecting the Fund, nor has it obtained an opinion of counsel with respect to any tax issues.

The following is a summary of certain potential U.S. Federal tax consequences which may be relevant to prospective shareholders. The discussion contained herein is not a full description of the complex tax rules involved and is based upon existing laws, judicial decisions and administrative regulations, rulings and practices, all of which are subject to change, retroactively as well as prospectively. A



onfidential Treatment Requested DBZ 00098

decision to invest in the Fund should be based upon an evaluation of the merits of the trading program, and not upon any anticipated U.S. tax benefits.

BASED ON THE STRUCTURE AND OPERATIONS OF THE FUND, THE FUND GENERALLY SHOULD NOT BE SUBJECT TO U.S. INCOME TAX, EXCEPT AS PROVIDED BELOW.

The discussion below is based upon the manner in which the Fund anticipates structuring its investments. No assurance can be given that the Fund will be able to structure its investments in that manner or to otherwise avoid substantial U.S. income tax.

**U.S. Trade or Business**

A non-U.S. corporation engaged in a U.S. trade or business is generally subject to U.S. corporate income tax on income and gain earned in the U.S. which is connected to such trade or business, in the same manner as a U.S. corporation. In addition, a non-U.S. corporation engaged in a U.S. trade or business is subject to a "branch profits" tax equal to 30% of the amount of its U.S. earnings which are not reinvested in U.S. assets. Moreover, if a non-U.S. corporation owns a partnership interest (including a limited partnership interest) in a partnership (or an interest in a limited liability company) engaged in a U.S. trade or business, the non-U.S. corporation will be treated as engaged in a U.S. trade or business and will be taxed as described above on its income and gain from that investment. As described below, the Fund intends to operate and structure its investments in a manner such that it should not be deemed to be engaged in a U.S. trade or business.

Section 864(b)(2) of the United States Internal Revenue Code of 1986, as amended (the "IRC"), provides a safe harbor (the "Safe Harbor") applicable to a non-U.S. corporation (other than a dealer in securities) that engages in the U.S. in trading securities (including contracts or options to buy or sell securities) for its own account pursuant to which such non-U.S. corporation will not be deemed to be engaged in a U.S. trade or business. The Safe Harbor also provides that a non-U.S. corporation (other than a dealer in commodities) that engages in the U.S. in trading commodities for its own account is not deemed to be engaged in a U.S. trade or business if "the commodities are of a kind customarily dealt in on an organized commodity exchange and if the transaction is of a kind customarily consummated at such place." Pursuant to proposed regulations, a non-U.S. taxpayer (other than a dealer in stocks, securities or derivatives) that effects transactions in the United States in derivatives (including (i) derivatives based upon stocks, securities, and certain commodities, and (ii) certain notional principal contracts based upon an interest rate, equity, or certain commodities and currencies) for its own account is not deemed to be engaged in a United States trade or business. Although the proposed regulations are not final, the Service has indicated in the preamble to the proposed regulations that for periods prior to the effective date of the proposed regulations, taxpayers may take any reasonable position with respect to the application of Section 864(b)(2) of the IRC to derivatives, and that a



›nfidential Treatment Requested

DBZ 00098!

position consistent with the proposed regulations will be considered a reasonable position.

The Manager intends to conduct the business of the Fund in a manner so as to meet the requirements of the Safe Harbor, and believes that the transactions under its investment program, including investments in loans originated by the U.S. Fund or its affiliates, should qualify for the Safe Harbor. There can be no assurance, however, that the Service will agree that each of such transactions qualifies for the Safe Harbor. If certain of the Fund's activities were determined not to be of the type described in the Safe Harbor, the Fund's activities may constitute a U.S. trade or business, in which case the Fund would be subject to U.S. income and branch profits tax on its share of the income and gain from those activities and related activities, if any, and the Fund may have to file a U.S. tax return. In addition, if any credit default swap is characterized as a contract of insurance or a guarantee, payments to the Fund under such credit default swap may be subject to an excise tax or a withholding tax.

The Safe Harbor, however, may not apply to the trade or business of actively originating loans within the U.S. The Manager believes that the transactions under its investment program, including investments in loans, should qualify for the Safe Harbor, although there can be no assurance that the Service will agree. Moreover, as indicated above, the Fund may acquire interests in loans (including leases treated as financings for U.S. Federal income tax purposes), revolvers and letters of credit originated by the U.S. Fund or its affiliates and may make such investments through subsidiary vehicles. The Fund believes that these activities should qualify for the Safe Harbor since it will only be committing to buy the interests in the loans after the loan terms are agreed upon and will not in any event be obligated to make any purchases until after the loans are made. Furthermore, the Fund will not be permitted to purchase interests in loans originated by the U.S. Fund or its affiliates unless an independent party approves the purchase. Nevertheless, there can be no assurance that the Service will not assert that the Fund is engaged in a trade or business within the U.S. by virtue of such purchase of interests in loans from the U.S. Fund or its affiliates. If the Service is successful in such an assertion, the Fund's or its subsidiary's income from these activities and related activities, if any, may be subject to U.S. income and branch profits tax and the Fund or its subsidiary may have to file a U.S. tax return.

In some instances, it may be necessary for the Fund to foreclose on debt securities secured by real estate. An acquisition of U.S. real estate or other U.S. trade or business assets by the Fund would result in the Fund being engaged in a U.S. trade or business and would subject the Fund to U.S. tax as a non-U.S. corporation engaged in a U.S. trade or business. As described below (see "U.S. Subsidiary", below), such foreclosures may be made through U.S. corporate entities.

Even if the Fund's securities trading activity does not constitute a U.S. trade or business, income derived from, and gains realized from the sale or disposition of (i) real property located in the U.S. that, for example, might be acquired as the result of foreclosure upon a loan secured by that property and (ii) stock or securities (other than

9761347.13



onfidential Treatment Requested