Nathaniel H. Akerman
Thomas O. Gorman
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, New York 10019
Tel.: (212) 415-9200
Fax: (212) 953-7201
akerman.nick@dorsey.com
gorman.tom@dorsey.com
*Attorneys for Defendant Perry A. Gruss*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

v.

PERRY A. GRUSS,                          Index No. 11 CV 2420

                Defendant.
----------------------------------------------------------------X


## THE DEFENDANT PERRY GRUSS' RESPONSE TO THE SEC'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

     The Defendant Perry Gruss, as and for his Response to Plaintiff's, the U.S. Securities &

Exchange Commission's ("SEC") Local Rule 56.1 Statement of Material Facts Not in Dispute

submitted in connection with its motion for summary judgment filed pursuant to Fed. R. Civ. P.

56 hereby asserts as follows:


## BACKGROUND

     1.     D.B. Zwirn & Co., L.P. ("DBZCO")1 was an investment adviser to and manager of certain hedge funds and managed accounts. (Exhibit 1 to the Declaration of Todd D. Brody dated March 11, 2016 (Brody Decl.") at ¶ 1).

**RESPONSE TO NO. 1**:  Admitted.

---

1 DBZCO was formerly known as Highbridge/Zwirn Capital Management, LLC.

2.      DBZCO no longer performs any business functions. (Brody Decl. Ex. 2 at 11:913, 14:3-6, 19-23, 15:24 – 16:9; Brody Decl. Ex. 1 at ¶ 1; Affidavit of Daniel B. Zwirn at ¶ 15).

**RESPONSE TO NO. 2**:  Admitted.

3.      At different times, DBZCO had offices in numerous locations, including New York, London, Hong Kong, Houston, Milan, Frankfurt, Tokyo, Seoul, Beijing, Singapore, Melbourne, and Luxembourg. (Brody Decl. Ex. 2 at 164:8-17).

**RESPONSE TO NO. 3**:  Admitted in part and denied in part.  DBZCO also had offices in

Connecticut, Mexico, New Delhi, Warsaw, Tel Aviv, and Taipei.  See Defendant Gruss'

Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, ¶ 4.

4.      Daniel B. Zwirn ("Zwirn") was the founder and managing partner of DBZCO. (Brody Decl. Ex. 3 at 28; Affidavit of Daniel Zwirn at ¶ 1)).

**RESPONSE TO NO. 4**:  Admitted.

5.      The Chief Financial Officer ("CFO") and Chief Administrative Officer for DBZCO was Perry Gruss ("Gruss"). (Brody Decl. Ex. 1 at ¶ 11). In January 2006, Gruss became a partner of DBZCO. *Id*.  Prior to becoming the CFO of DBZCO, Gruss had never served as a CFO, although he did work in the finance departments at Nomura Holdings America, where he prepared profit and loss statements, and at American International Group. (Brody Decl. Ex. 4 at 17:11-18:13).

**RESPONSE TO NO. 5**:  Admitted.

6.      During the time period of 2002 through 2009, DBZCO managed several "hedge funds," including the D.B. Zwirn Special Opportunities Fund, L.P. ("the Onshore Fund")[2] and the D.B. Zwirn Special Opportunities Fund, Ltd. (the "Offshore Fund"). (Brody Decl. Ex. 3 at ii).[3]

**RESPONSE TO NO. 6**:  Admitted.

7.      DBZCO also managed several individual accounts, including the account of HCM/Z Special Opportunities LLC (the "HCM/Z Account"). (Brody Decl. Ex. 5).

**RESPONSE TO NO. 7**:  Admitted.

8.      The Onshore Fund was a Delaware limited partnership founded in April 2002 to operate as a private investment fund.  The Onshore Fund commenced investment operations in May 2002. (Brody Decl. Ex. 6 at DBZ 0003581).

---

[2] The Onshore Fund was formerly known as Highbridge/Zwirn Special Opportunities Fund, L.P.
[3] The Offshore Fund was formerly known as Highbridge/Zwirn Special Opportunities Fund, L.P.

**RESPONSE TO NO. 8**: Admitted.

9.      The Offshore Fund was a Cayman Island exempted company incorporated on April 12, 2002 to operate as a private investment fund. (Brody Decl. Ex. 3 at 1). The Offshore Fund commenced investment operations in May 2002. *Id*.

**RESPONSE TO NO. 9**: Admitted.

10.      While there was some overlap in the investors in the Onshore and Offshore Funds, the vast majority of investors in the two funds were different. (Brody Decl. Exs. 7-8). Gruss knew that the investors in the Onshore Fund were separate and distinct from the investors in the Offshore Fund. (Brody Decl. Ex. 9 at 27:10-13).

**RESPONSE TO NO. 10**: Admitted in part, denied in part and object to.  The evidence the SEC

has offered in support of its proposition that "vast majority of investors in the two funds were

different" are listings of investors for the LP and LTD for the period of January 1, 2006 to March

4, 2008.  The relevant period of the inter-fund transfers alleged in the complaint and claimed on

the SEC's summary judgment motion is March 2004 through July 2006.  Ex. N, ¶ 2.  Without

complete records for the relevant time period alleged in this complaint this evidence as to the

relative proportion of the same investors in both funds should be excluded.

11.      The Offshore Fund had assets under management of (1) $870,000,000; (2) $1,500,000,000; and (3) $2,400,000,000 respectively as of December 31, 2004, December 31, 2005, and December 31, 2006. (Brody Decl. Ex. 10). At the end of February 2006, the Offshore Fund's assets under management were $1,500,000,000. *Id*.

**RESPONSE TO NO. 11**: Admitted.

12.      At the end of September or early October 2006, Gruss was asked by Zwirn to leave DBZCO. (Brody Decl. Ex. 4 at 20:23 – 21:6).  Even though he had been asked to leave, Gruss told people that he had voluntarily resigned.  He told an investor that he left because it was difficult to raise three small kids given his time commitments at DBZCO. (Brody Decl. Ex. 12). Indeed, when asked by a potential employer if he was fired or had resigned and that this was an "important distinction," Gruss lied and stated that he had voluntarily resigned.  (Brody Decl. Ex. 13).

**RESPONSE TO NO. 12**: Denied in part and object to in part.  At his July 25, 2003 deposition

in this case the SEC asked Gruss, "Were you fired," and Gruss responded, "I was asked to

leave." (Brody Decl. Ex. 11).  This single question and answer was taken out of context.  Under

Fed.R.Evd. 106 this single question and answer "in fairness ought to be considered" along with

other testimony Gruss gave in this same deposition and had previously given before the SEC on

October 5, 2009.  In the same deposition Gruss clarified that he was uncertain whether Zwirn

actually told him to leave or he, Gruss, said he resigned, knowing he would be asked to leave.

"It is very unclear.  Like I said earlier, it is very unclear exactly what went on."  Ex. UU at p. 31.

See also *id*. at p. 42. ("Sitting here today, I can't recall exactly how the events went down").

Gruss' reference in his July 25, 2013 deposition to what he had said "earlier" was to his October

5, 2009, testimony in which the SEC lawyer acknowledged that "As to whether you [Gruss]

resigned or whether you were fired, you're not sure how to characterize it."  Ex. VV at p. 171.  In

short, Gruss had testified *nearly* four years earlier that whether he was fired or resigned "was

extremely confusing" and that based on a conversation with DBZCO's compliance officer

Lawrence Cutler, Gruss believed he "was going to be let go," had a meeting with Zwirn after

which he "walked out unemployed."  Ex. VV at pp. 72-76, 171.  Also, the documents cited to by

the SEC to support its assertion that Gruss had allegedly 1) "told people that he had voluntarily

resigned," (Brody Decl. Ex. 11), 2) "told one investor he had left because it was difficult to raise

three small kids given his time commitments at DBZCO," (Brody Decl. Ex. 12) and 3) that

"Gruss lied" to "a potential employer if he was fired or had resigned" are irrelevant to any issue

in this case and are inadmissible hearsay pursuant to Fed.R.Evd. 801.  (Brody Decl. Ex. 12)

13.    Zwirn made all investment decisions for the funds managed by DBZCO. (Brody
Decl. Ex. 4 at 64:22-25). Gruss was not authorized to make any investment decisions. *Id*. at
66:15-18.

**RESPONSE TO NO. 13**:  Admitted in part and objected to in part.  Under Fed.R.Evd. 106

Gruss' role in managing the non-investment portion of DBZCO's business "in fairness ought to

be considered" along with the fact that Zwirn made all investment decisions for the funds

managed by DBZCO.  Zwirn has acknowledged that Gruss and later Harold Kahn managed the

non-investment portion of the firm.  Ex. WW at p. 400.

14.     The individuals in the accounting and finance departments who reported to Gruss included Sylvia Wu ("Wu"), Li Anne Law ("Law"),[4] Robert Racusin ("Racusin"), Michelle O'Hara ("O'Hara"), and Jason Pecora ("Pecora"). (Brody Decl. Exs. 14-15). Josh Karotkin ("Karotkin") was also in a line that reported to Gruss. (Brody Decl. Ex. 4 at 116:17 – 117:16).

**RESPONSE TO NO. 14**:  Admitted in part and denied in part.  There were others in the

accounting and finance department who also reported to Gruss or were in his reporting line.

15.     The funds had various bank accounts. The main bank account for the Offshore Fund was account ***600 at ABN Amro.  The main account for the U.S. Fund was account ***559 at ABN Amro.  Everyone in the accounting department knew which account was which. (Brody Decl. Ex. 16 at 87:7-9). When Law spoke with Gruss about the accounts, they would refer to them by their account numbers. (Brody Decl. Ex. 17 at 142:10-142:18)   Gruss knew that Ltd. Account #***600 was for the Offshore Fund because it was one of the accounts most frequently used at the custodian bank and was the shorthand way the accountants referred to the account. (Brody Decl. Ex. 1 at ¶ 19).

**RESPONSE TO NO. 15**:  Admitted in part and denied in part.  Admit that the funds had various

bank accounts and that the main bank account for the Offshore Fund was account ***600 at

ABN Amro, that the main account for the U.S. Fund was account ***559 at ABN Amro and that

Wu testified that everyone in the accounting department knew which account was which.  Ex.

ZZ at p. 87.  Gruss, however, was not aware of the identity of the account numbers for each

account.  Ex. XX at pp. 159, 194, 204-206; Ex. YY at pp. 176, 179, 184-85, 195-97.  The SEC

omits Law's testimony that when she spoke to Gruss about the LP and LTD accounts, she used

both the account number and the name of the fund.  Ex. BBB at p. 142.

16.     Each of the funds also had a brokerage account at Bear Stearns. (Brody Decl. Ex. 17 at 52:9-12)

**RESPONSE TO NO. 16**:  Admitted.

17.     The Offshore Fund was referred to in shorthand as "Ltd" and the Onshore Fund was referred to in shorthand as "LP." *Id*. at 53:3-6.

---

[4] Law's married name is Li Anne Tan and at her deposition she went by the name Tan.  (Brody Decl. Ex. 17 at 16:1-6).  To avoid confusion, the Commission refers to her throughout this motion as "Law."

**RESPONSE TO NO. 17**:  Admitted.

18.     During all relevant time periods, Daniel Zwirn and Perry Gruss were the two individuals at DBZCO who were authorized to transfer cash from the funds. (Brody Decl. Ex. 2 at 262:17-21). Only one of their signatures was required to transfer money. (Brody Decl. Ex. 17 at 55:19 – 56:6).

**RESPONSE TO NO. 18**:  Admitted.

19.     DBZCO had no written manual of accounting policies or procedures during the relevant period of time. (Brody Decl. Ex. 16 at 53:21 – 54:6; Ex. 18 at 16:17-23). Nor were there any written policies at DBZCO concerning the movement of cash, however, the accounting department knew that Gruss was the signatory on all fund accounts. (Brody Decl. Ex. 17 at 54:1-8).

**RESPONSE TO NO. 19**:  Admitted.

20.     The procedure for requesting that wires be made from the funds accounts at ABN Amro was that "the accounting team would send out the instructions [to the bank] and say 'Please do this wire' and then [Gruss] would have to send an e-mail reply back to all that says okay to go. And then that wire would go out." (Brody Decl. Ex. 16 at 55:13-18).

**RESPONSE TO NO. 20**:  Admitted.

21.     There was a photocopy of Gruss's signature that was used to fax wire requests to Bear Stearns when Gruss was not available. *Id.* at 47:1-3, 48:25 – 49:2. Most of the accounting and operations team had a copy of the signature. (Brody Decl. Ex. 17 at 47:7-12).

**RESPONSE TO NO. 21**:  Admitted.

22.     Because money needed to be sent quickly and Gruss was sometimes not available, the accountants would "take the signature and take it to a photocopy and take it on the sheet that we created, instruction that we created, and photocopy it and to make it look like it was signed by Perry, and then fax it to Bear Stearns." (Brody Decl. Ex. 16 at 48:20-24).

**RESPONSE TO NO. 22**:  Admitted.

23.     Using Gruss's signature under these circumstances was part of the standard operating procedure at DBZCO (Brody Decl. Ex. 19 at 120:4-18).  People talked about using the photocopied signature since this was a standard practice. *Id.* at 123:6-10.

**RESPONSE TO NO. 23**:  Denied.  Gruss' signature was only used "when he was out of the

office", Ex. ZZ at p. 50, or he "could not be located to sign a wire."  Ex. BBB at p. 47.  Also,

there is no Brody Decl. Ex 19 at 120:4-18 or 123:6-10.

24.     Gruss was aware of this practice, approved the practice, and joked about the practice saying "[h]ey, look, here is my fake signature." (Brody Decl. Ex. 16 at 49:3-13, 50:824; Ex. 17 at 48:1-7 "joking atmosphere").

**RESPONSE TO NO. 24**:  Admitted.

25.     Gruss never complained that his signature had been used in an unauthorized fashion. (Brody Decl. Ex. 17 at 48:18-20).  Gruss even praised accountants after they used his copied signature to get a wire out. (Brody Decl. Ex. 16 at 49:13-18).

**RESPONSE TO NO. 25**:  Admitted in part and denied in part.  Gruss never knew that his

signature had been used in an unauthorized fashion to pay a portion of the closing costs on the

airplane and thus did not know to complain.  See Responses to 138, 142 and 144 *infra*.

26.     Gruss also used a hand motion of crossing one hand over the other to indicate that the accountants should use his copied signature, which he referred to as "whew whew." (Brody Decl. Ex. 16 at 52:23 – 53:5; Ex. 17 at 48:21 – 49:14).  In 2004, Wu sent Gruss an email stating "FYI we are 'whew whew' the fax notice since it needs your signature." (Brody Decl. Ex. 21).

**RESPONSE TO NO. 26**:  Cannot admit or deny this paragraph.  Ex. UU at pp. 332-37.

## THE OBJECTIVE OF THE OFFSHORE FUND WAS TO AVOID TAXES

27.     The purpose of the Offshore Fund, a Cayman Island company, was to create an investment vehicle that would not be subject to U.S. taxes. (Brody Decl. Ex. 1 ¶ 15).

**RESPONSE TO NO. 27**:  Admitted.

28.     A representation letter to the auditors for all of the offshore funds managed by DBZCO, signed by Gruss and Zwirn stated: "[t]he Funds have structured their operation in order that it will not be deemed to be engaged in a trade or business within the U.S. for purposes of U.S. federal tax laws." (Brody Decl. Ex. 21).

**RESPONSE TO NO. 28**:  Admitted.

29.     DBZCO made similar representations to the investors in the Offshore Fund. The offering memorandum explained that "[a] non-U.S. corporation engaged in a U.S. trade or business is generally subject to U.S. corporate income tax on income and gain earned in the U.S. which is connected to such trade or business, in the same manner as a U.S. corporation. In addition, a non-U.S. corporation engaged in a U.S. trade or business is subject to a 'branch profits' tax equal to 30% of the amount of its U.S. earning which are not reinvested in U.S. assets." In order to avoid these taxes, "the [Offshore] Fund intends to operate and structure its investments in a manner such that it should not be deemed to be engaged in a U.S. trade or business." (Brody Decl. Ex. 3 at 66; 15 "[t]he manager intends to conduct the business of the

[Offshore] Fund (including investments in loans originated by the U.S. Fund or its affiliates) in a manner such that the fund should not be engaged in a U.S. trade or business").

**RESPONSE TO NO. 29**:  Admitted in part and objected to on the basis of Fed.R.Evd. 106 that

this quoted passage from the July 2005 Offering Memoranda "in fairness ought to be considered"

with the following and subsequent language from the same section of the July 2006 Offering

Memoranda that reflects that ECI [Effectively Connected Income] was a risk factor disclosed to

potential investors, which the below bolded text reflects that "there can be no assurance that the

Service [the IRS] will not assert that the Fund is engaged in a trade or business within the U.S.

by virtue of such purchase of interests in loans from the U.S. Fund or its affiliates" and that [i]f

the Service is successful in such an assertion, the Fund's or its subsidiary's income from these

activities and related activities, if any, may be subject to U.S. income and branch profits tax and

the Fund or its subsidiary may have to file a U.S. tax return:

> The Manager intends to conduct the business of the Fund in a manner so as to meet the requirements of the Safe Harbor, and believes that the transactions under its investment program, including investments in loans originated by the U.S. Fund or its affiliates, should qualify for the Safe Harbor. There can be no assurance, however, that the Service will agree that each of such transactions qualifies for the Safe Harbor. If certain of the Fund's activities were determined not to be of the type described in the Safe Harbor, the Fund's activities may constitute a U.S. trade or business, in which case the Fund would be subject to U.S. income and branch profits tax on its share of the income and gain from those activities and related activities, if any, and the Fund may have to file a U.S. tax return. In addition, if any credit default swap is characterized as a contract of insurance or a guarantee, payments to the Fund under such credit default swap may be subject to an excise tax or a withholding tax.
>
> The Safe Harbor, however, may not apply to the trade or business of actively originating loans within the U.S. The Manager believes that the transactions under its investment program, including investments in loans, should qualify for the Safe Harbor, although there can be no assurance that the Service will agree. Moreover, as indicated above, the Fund may acquire interests in loans (including leases treated as financings for U.S. Federal income tax purposes),

revolvers and letters of credit originated by the U.S. Fund or its affiliates and may make such investments through subsidiary vehicles. The Fund believes that these activities should qualify for the Safe Harbor terms are agreed upon and will not in any event be obligated to make any purchases until after the loans are made. Furthermore, the Fund will not be permitted to purchase interests in loans originated by the U.S. Fund or its affiliates unless an independent party approves the purchase. Nevertheless, **there can be no assurance that the Service will not assert that the Fund is engaged in a trade or business within the U.S. by virtue of such purchase of interests in loans from the U.S. Fund or its affiliates. If the Service is successful in such an assertion, the Fund's or its subsidiary's income from these activities and related activities, if any, may be subject to U.S. income and branch profits tax and the Fund or its subsidiary may have to file a U.S. tax return.**

Ex. M at p. 67.

30.     In particular, the offering memorandum noted that "actively originating loans within the U.S." might create adverse tax consequences and that "certain investments by the Offshore] Fund could result in the [Offshore] Fund being deemed engaged in a U.S. trade or business, including direct investments by the [Offshore]Fund in U.S. real estate." *Id*. at pp. 67, 69. As such, the offering memorandum noted that "the [Offshore] Fund ... will generally not invest in leased equipment and other assets such as real estate or make direct loans to or otherwise engage in the active management of a U.S. company." *Id*. at pp. 19-20.

**RESPONSE TO NO. 30**:  Admitted in part and objected to on the basis of Fed.R.Evd. 106 that

this quoted passage from the July 2005 Offering Memoranda "in fairness ought to be considered"

with the full passage from the July 2005 Offering Memoranda recited in response to No. 29

above and in the context of the full following paragraph in the July 2005 Offering Memorandum:

The U.S. Fund, the Parallel Cayman Fund and the TE Fund are managed using strategies generally similar to those the Manager uses for the Fund. Even though their strategies are generally similar, performance of the U.S. Fund, the Parallel Cayman Fund and the TE Fund will not be the same as the Fund's performance as a result of, among other things, different legal, regulatory, tax, liquidity, structuring and investment constraints on the U.S. Fund, the Parallel Cayman Fund and the TE Fund. These constraints include adverse tax consequences to the Fund and the Parallel Cayman Fund of certain investments made by the U.S. Fund as well as differences in the timing of investments, limitations on size of investments, nature of investments, and governmental regulation

of investments. For example, the Fund and the Parallel Cayman Fund will generally not invest in leased equipment and other assets such as real estate or make direct loans to or otherwise engage in the active management of U.S. company. The Fund or a subsidiary of the Fund may, however, accept an assignment of, or participation in, a loan from the U.S. Fund at a price approved by an independent third party (see "Conflicts of Interest"). The TE Fund is managed using strategies generally similar to those the Manager uses for the U.S. Fund, except that the TE Fund generally does not engage in investment activities that would generate UBTI for U.S. tax purposes. As a consequence of these and other differences, the Fund's performance will differ from the performance of the U.S. Fund, the Parallel Cayman Fund and the TE Fund. In the future, the Fund may carry out its investment objectives by investing all or a portion of its capital through a master-feeder structure along with other funds and accounts managed by the Manager. The offering memorandum explained that instead of making a direct investment, "[t]he [Offshore] Fund or a subsidiary of the [Offshore] Fund may, however, accept an assignment or, or participation in, a loan from the U.S. Fund at a price approved by an independent third party ...." Id. at pp. 19-20. "The [Offshore] Fund believes that these activities should qualify for the Safe Harbor since it will only be committing to buy the interests in the loans after the loan terms are agreed upon and will not in any event be obligated to make any purchases until after the loans are made. Furthermore, the Fund will not be permitted to purchase interests in loans originated by the U.S. Fund or its affiliates unless an independent party approves the purchase." *Id*. at p. 67.

31.    The offering memorandum explained that instead of making a direct investment, "[t]he [Offshore] Fund or a subsidiary of the [Offshore] Fund may, however, accept an assignment or, or participation in, a loan from the U.S. Fund at a price approved by an independent third party . . . *Id*. at p. 20.  "The [Offshore] Fund believes that these activities should qualify for the Safe Harbor since it will only be committing to buy the interests in the loans after the loan terms are agreed upon and will not in any event be obligated to make any purchases until after the loans are made.  Furthermore, the Fund will not be permitted to purchase interests in loans originated by the U.S. Fund or its affiliates unless an independent party approves the purchase."  *Id*. at p. 67.

**RESPONSE TO 31**:  Admitted.

32.    The offering memorandum noted that the inability for the Offshore Fund to participate in certain transactions for tax reasons could result in a disparity of performance between the Offshore Fund and other investment vehicles managed by Zwirn.  Indeed, in a 2005 internal email, Gruss noted that a recently disparity in performance was because "there have been several pops on a few assets that cannot go offshore bc of ECI", including "Oil/Gas

Overides. Resi Platforms." (Brody Decl. Ex. 22).  "ECI" is the acronym for "effectively
connected income," which is the income when a foreign person engages in a trade or business in
the United States, connected with the conduct of that trade or business.
(https://www.irs.gov/IndivIduals/International-Taxpayers/Effectively-Connected-Income-(ECI)).

**RESPONSE TO NO. 32**:  Admitted in part and denied in part.  Brody Decl. Ex. 22 is an email

exchange between Gruss/Kahn and a member of the DBZCO staff in the London office. There

are many different causes for a potential disparity in returns between the LP and the LTD,

including most significantly, the leverage attributed to the LP's CLO.

33.     Quarterly investor letters sent from D.B. Zwirn to offshore investors also noted
that the offshore entities, including the Offshore Fund "do not expect to originate loans." (Brody
Decl. Ex. 23 at p. 5).

**RESPONSE TO NO. 33**:  Admitted.

34.     In response to a question from a prospective investor about this language in the
quarterly letter and "does the offshore [fund] eventually participate via a seasoning vehicle or
does it never participate at all," DBZCO responded "[w]e are **extremely sensitive** to trade or
business issues related to our lending and assets business. Yes, while the onshore fund originates
the loans, for the majority of the loans we can season them and then the offshore fund can
participate as well." (Brody Decl. Ex. 24, emphasis added). Likewise, DBZCO said that "[t]he
fund is mindful of [*sic.*] offshore fund can't be in the business of originating to US companies
otherwise it would be subject to 54.5% US tax rate." (Brody Decl. Ex. 25).

**RESPONSE TO NO. 34**:  Objected to.  The documents underling this paragraph are

inadmissible hearsay pursuant to Fed.R.Evd. 801.  (Brody Decl. Ex. 24 and 25)

35.     This tax issue was regularly discussed with investors and potential investors. In
2004, one investor emailed DBZCO as part of its due diligence and asked "does the manager
generate any Effectively Connected Income." (Brody Decl. Ex. 26).

**RESPONSE TO NO. 35**:  Admitted.

36.     In 2005, Gruss told one investor doing due diligence that "DB Zwirn seasons their
loans in the onshore [fund] for 90 days before they contemplate participating in the loans by the
offshore [fund].... [W]hen a loan is ready to be sold to the offshore [fund], the loan is priced at
fair market value.... Prior to every sale to the offshore, DB Zwirn utilizes an independent trading
manager that determines if a loan is 'offshorable' and the trading manager also opines on the
transaction price. The independent trading manager they use is called the Taylor Group and they
are based in Chicago." (Brody Decl. Ex. 27).

**RESPONSE TO NO. 36**:  Objected to.  The document underling this paragraph is inadmissible

hearsay pursuant to Fed.R.Evd. 801.  (Brody Decl. Ex. 27).

37.     In another 2005 due diligence meeting with an investor, Gruss said that the tax/ECI issue "is a focus of Perry [Gruss].  They [DBZCO] have structured every deal in order to avoid it.  If needed, the offshore does not participate and deals are held for 90 days.  The lawyers told him deals should be held 30-60 [days] to avoid it [ECI] but practice may hit 90 days eventually and they use 90 days for all deals going forward." (Brody Decl. Ex. 28). Approximately a month after this meeting, the same investor emailed Gruss and stated "ECI is become a priority issue for us in many of our products and I was telling [our CFO] of your dealings in this area and she would like to speak to you at your convenience." (Brody Decl. Ex. 29).

**RESPONSE TO NO. 37**:  Objected to.  The documents underling this paragraph are

inadmissible hearsay pursuant to Fed.R.Evd. 801.  (Brody Decl. Ex. 28 and Ex. 29).

38.     In a 2006 due diligence meeting between Gruss and a potential investor, Gruss informed the investor that "[b]ecause of tax issues associated with loan origination the offshore fund does not participate in all trades" and that "[t]he offshore fund historically underperforms the on shore due to tax issues associated with loan origination." (Brody Decl. Ex. 30).

**RESPONSE TO NO. 38:**  Objected to.  The document underling this paragraph is inadmissible

hearsay pursuant to Fed.R.Evd. 801.  (Brody Decl. Ex. 30).

39.     In response to an email from one investor about whether offshore investors were involved in loan origination, Gruss responded that they were not involved in loan origination because of ECI issues. (Brody Decl. Ex. 31).

**RESPONSE TO NO. 39**:  Admitted.

40.     One investor had a specific call with Gruss about whether the Offshore Fund was in the domestic lending business. In this call, Gruss stated that "[a]ll loans will be seasoned a minimum of 90 days sometimes 110 days. In addition to the seasoning term all loans purchased by the offshore fund from the onshore fund will have an independent 3rd party valuation group price the loan." Gruss also told the investor that he was "confident enough portfolio statistics will be generated to support a strong case that the offshore fund is not solely a domestic lender." The investor noted that "[i]f an offshore fund was found to be a domestic lender by the IRS the implications would be very serious and could cause a very material impact." (Brody Decl. Ex. 32).

**RESPONSE TO NO. 40**:  Objected to.  The document underling this paragraph is inadmissible

hearsay pursuant to Fed.R.Evd. 801.  (Brody Decl. Ex. 32).

41.     Gruss understood that the Offshore Fund could not make certain investments because of "limitations" including that it could not be deemed to be involved in a U.S. trade or

business because that would have "adverse tax implications" for the Offshore Fund. (Brody Decl. Ex. 4 at 77:14 – 78:3). This was important. *Id*. at 78:23 – 79:2.

**RESPONSE TO NO. 41:**  Admitted.

42.     Gruss reviewed transactions to try and find ways to allow the Offshore Fund to participate in investments "without incurring ECI." (Brody Decl. Ex. 33)

**RESPONSE TO NO. 42:**  Admitted.

43.     Gruss candidly stated that ECI "scares the [expletive] out of me." (Brody Decl. Ex. 34). Gruss was scared about ECI because of its complexity and because it would cause issues for the investors in the Offshore Fund if the Offshore Fund was found to have engaged in a U.S. trade or business. (Brody Decl. Ex. 4 at 132:13-21).

**RESPONSE TO NO. 43:**  Admitted.

44.     Gruss told Sylvia Wu, the controller for the funds, that because of tax reasons, the Onshore Fund could originate loans while the Offshore Fund could not. (Brody Decl. Ex. 16 at 24:13:22).

**RESPONSE TO NO. 44:**  Admitted.

45.     Other members of the accounting department also understood that if loan originations would come out of the Offshore Fund, it would open the Offshore Fund to tax liability. (Brody Decl. Ex. 18 at 39:11-19, 40:12-15; Ex. 35 at 93:17 – 95:10).

**RESPONSE TO NO. 45**:  Admitted.


**THE OFFSHORE FUND PAYS FOR ONSHORE FUND'S INVESTMENTS**

46.     The Onshore Fund consistently suffered from a lack of available cash. (Brody Decl. Ex. 1 at ¶ 14; Ex. 36 "we are extremely tight right now"; Ex. 37 "pls don't tell me we're out of cash"; Ex. 199; Ex. 38; Ex. 39 "we have negative really big $$$$ - Wu is freakin. How do we avoid this in the future?"; Ex. 40 "Wu is losing it over the whole money thing"; Ex. 41 "US = BROKE"; Ex. 42 "we owe at least $11M in cash we don't have right now and that is a very conservative number"; Ex. 43; Ex. 44; Ex. 45; Ex. 46 "LP is tight on cash"; Ex. 47 "tight"; Ex. 48; Ex. 49 "we should discuss our current funding availability situation sometime today"; Ex. 50 "we need to start exploring the idea of maintaining a min cash available amount for each fund"; Ex. 51 "LP is just about tapped"; Ex. 52 "not good. LP is getting extremely tight"; Ex. 53 "we have no cash in LP"; Ex. 54 "Do we need the money today ..." "Not today, last Wednesday."

**RESPONSE TO NO. 46**:  Admitted in part, denied in part and objected to.  There were times

when the LP did not have sufficient cash.  The use of the adverb "consistently" is an

overstatement.  Brody Decl. Ex. 1 does not address this issue.  Further, Gruss objects on the

ground that whether the LP at times had a lack of cash is irrelevant.  As already stated, the LTD

was permitted to advance cash to the LP pursuant to the funds' Offering Memoranda and

formation documents and was done as part of the investing process.  Gruss Rule 56.1, ¶¶ 19-27,

53.

47.    The Offshore Fund often did not have sufficient cash on hand to fund new
investments to which it had committed capital. (Brody Decl. Ex. 1 at ¶ 14; Ex. 55 at 85:4-8; Ex.
17 at 124:1-4 "Not enough subscriptions, investor subscriptions to match the investments that
were going out the door").

**RESPONSE TO NO. 47**:  Admitted in part and denied in part.  There were times when the LP

did not have sufficient cash on hand to fund new investments in which it committed capital.  The

use of the adjective "often" is an overstatement.  Brody Decl. Ex. 1 does not address this issue.

48.    Gruss admits that the Offshore Fund, however, "had more cash than investment
opportunities due to its inability to make investments or loans directly in a U.S. trade or business
without being subject to a U.S. tax liability." (Brody Decl. Ex. 1 at ¶ 15).

**RESPONSE TO NO. 48:**  Denied, Brody Decl. Ex. 1 does not address this issue.

49.    In 2004, a practice started where Gruss and the accountants would take cash that
was sitting in the Offshore Fund and use that money to pay for Onshore Fund investments. As
described by Sylvia Wu, the controller for the funds:

> [W]e didn't have the money [in the US Fund]. We received an e-
> mail from the analyst, but we didn't have the money to send the
> money out from the onshore fund. And at that time, Bob [Racusin]
> and I were sitting to next together and we want to figure out what
> to do and we don't know what to do, and we go into Perry's office
> and the three of us will have a -- the three of us had a powwow and
> trying to figure out how to deal with the situation. Perry asked me
> how much there is in the onshore fund, how much there is in the
> offshore fund, and how much the fund -- the analyst want to send
> out, and we will come up with suggestions. I said to him before
> that, like, he could -- can we lend the money that we have excess
> sitting at the offshore fund and lend it to the onshore fund, and we
> create like an intercompany loan and charge interest, and once the
> onshore fund has money, it can pay back. And he said no, you
> cannot do that because of some tax reason, that the offshore fund
> cannot lend to the onshore fund. I didn't remember the exact details
> of it, but it's just a "No" answer. And then I also said can we lend
> money directly from the offshore fund to the borrower so we have

enough money, since we have enough money in the offshore fund. And he said no, the loan cannot be originated from the offshore fund. And then he said that since we will have money coming in, you know, next week or so for the new subscriptions of the onshore fund, we can send the money out from the offshore fund now and then we can repay -- when the subscription money comes in, we can repay the offshore fund. And since that was the only alternative that we had, and so that's what we did. (Brody Decl. Ex. 16 at 63:4-64:13).

**RESPONSE TO NO. 49**:  Admitted in part and denied in part.  As demonstrated on cross-examination in her deposition, Wu was confused as to what she was told by Gruss.  She did not understand that the tax reason as to why the LP could not lend money to the LTD with interest was because the act of lending money with interest could arguably place the LTD in engaging in the trade or business of loaning money.  Wu also confused "loan origination" by the LP with the LTD advancing funds to the LP so it could originate the loans that were the investments that the LTD would season and later provide to the LTD:

> Q.  Phil Ryu, I believe you testified before he knew that money was going from the offshore fund to the onshore fund to be used for investments; correct?
>
> A.  I do not know if he knew the -- I do not know if he knew there was anything, anything wrong with it.  Like he, he knew he was using the offshore money to help onshore to fund the deals.
>
> Q.  What was wrong with it?
>
> A.  Perry told me that we were not supposed to have the offshore fund fund the deals that were supposed to be originated from the onshore fund.
>
> Q.  But it had to do with originating.  Who said there was anything illegal or wrong about money going from the offshore fund to the onshore fund to be used for investments for the onshore fund?
>
> A.  Because the onshore fund cannot lend money to the off -- the offshore fund cannot lend money to the onshore fund.

Q.  On what basis are you saying that?

A.  I do not remember the details of it, but Perry told me that it has something to do with tax.

Q.  Well, the tax would have to do with charging interest, on it, correct?  Because then it would be trader business.

MR. BRODY:  Objection.

A.  I do not remember the details of it.  I just remember it had something to do with that.

BY MR. AKERMAN:

Q.  Perry never told you it was illegal to do it, did he?

MR. BRODY:  Object to form.

A.  He told me we cannot do it.

BY MR. AKERMAN:

Q.  Did he tell you what it was that you could not do with respect to those funds?

A.  Did he tell me --

Q.  What it was you could not do.

A.  What it was that you could not do.  We could not have, use the Ltd.'s money to fund the onshore activities or just send it to onshore to let it use it.  Is that what you're asking?

Q.  Okay.  No, on what basis -- I mean, your only basis for this is the statement that you say Perry made to you.

A.  Yes.

Q.  And are you sure it wasn't him saying that the offshore fund couldn't originate investments or loans?

A.  He said a couple of things.  First, the offshore fund cannot lend money to the onshore fund for some tax reason, for some reason related to tax.  Second, he told me that offshore fund cannot originate loans.  The -- only the onshore fund can originate loans.  These are the two things.  And when I had --

Q.  Okay, those are the two things.  So he said, one, the

offshore cannot originate loans; correct?

A.  Correct.

Q.  And when he said that the offshore fund cannot loan money to the onshore fund, was he saying that it couldn't receive interest for loaning that money?  Do you know if that distinction was being made, yes or no?

MR. BRODY:  Object to form.

A.  I only remember he said the reason that the offshore fund cannot lend to the onshore fund was for some tax reasons.

BY MR. AKERMAN:

Q.  But do you know if --

A.  But how, how tax reason or whatever tax reason or how it affect onshore or offshore or both or whatever, I do not remember.

Q.  And you don't remember if he said it had to do with the interest that would be charged for such a loan, if he referred to it as a loan?

A.  I do not remember.

Ex. ZZ at pp. 187-90.

50.     It was Gruss's idea to use the money from the Offshore Fund to fund the U.S. Fund's investments. *Id*. at p. 64:14-18.  Wu recalled that the initial conversation was essentially "[b]asically we are screwed; what are we going to do. We have no money. That dude back there wants the money out.  What are we going to do." *Id*. at p. 65:10-14.

**RESPONSE TO NO. 50**:  Denied and objected to.  Over the objection of Gruss' lawyer, the

SEC attorney improperly elicited an answer to a leading question that it was "Gruss' idea to use

the money from the Offshore Fund to fund the U.S. Fund's investments in violation of

Fed.R.Evd.611(c) because Wu was a witness for the SEC, had entered into a cooperation

agreement with the SEC (Ex. AAA), the question was asked on direct examination and the

witness was not hostile to the SEC or identified with Gruss.  In addition, the remaining

statements referenced in paragraph 50 are inadmissible hearsay in which Wu relates a

conversation she had with Racusin.  (Brody Decl Ex 16 at 65:10-14).

51.    Wu was uncomfortable with the practice of moving "money from the offshore fund in order to fund the onshore fund obligations." *Id*. at 33:20 – 34:12. She was uncomfortable because she was "told that we were not supposed to lend money from the offshore fund to the onshore fund. So since I was told that, so I thought we had – as a hedge fund manager, you are supposed to have fiduciary duty to your investors, so we're doing something that wasn't beneficial to the investors." *Id*. at 72:25 - 73:5.

**RESPONSE TO NO. 51**:  Denied.  First, Wu's statement is inadmissible.  What she thought or

felt is not admissible evidence.  Wu admitted that she did not explain her "reasoning to him

[Gruss]."  Ex. ZZ at p. 73.  Second, as set forth in the response to paragraph 49, Wu did not

know what the funds could or could not legally do under their Offering Memoranda and

formation documents.  Third, Wu admitted at her deposition that she had never read any of the

fund Offering Memoranda to determine whether the LTD could advance funds to the LP:

> Q.  Did you ever read the fund's offering documents to determine whether or not this was allowable?
>
> No.  *Id*. at p. 76
>
> Q.   And in fact, you never looked at any of the offering memos for any of the funds; is that correct?
>
> A.  Yes, to the best of my recollection.
>
> Q.   So even though you thought that, in your own mind, that the Ltd. was not supposed to lend money to the L.P., you never consulted with any of the offering memos to determine whether or not that was correct; right?
>
> A.  That's correct.  *Id*. at pp. 119-20

Even though Wu had the title of "Controller," she admitted she was "essentially a bookkeeper at

D.B. Zwirn."  *Id*. at pp. 21, 232.

52.    Wu told Gruss that she was uncomfortable with the practice "and we really need to find some solutions to this ... I asked him if Dan Zwirn knows about what we are doing, and basically tell him that this is causing me a lot of stress." *Id*. at 72:5-13.

**RESPONSE TO NO. 52**:  Admitted in part and denied in part.  Under Fed.R.Evd. 106 this

single question and answer "in fairness ought to be considered" along with Law's testimony that "[n]o one acted like it [the LTD advancing funds to the LP] was wrong" and "nobody told . . . [her] that this was illegal."  Rather it was "stressful" because it was "an accounting headache that we needed to clear as soon as we could" and that "it was creating a lot of accounting work and responsibilities."  Ex. BBB at pp. 174, 198-99. "[T]he monies that went from the Offshore to the Onshore, this all had to be done the last minute, and the money had to be moved in and it was extremely stressful."  *Id* at p. 263.  Gruss testified that Wu attempted to resign 5 times before she actually left because of stress.  Ex. VV at pp. 188-89.

53.     Wu told Gruss numerous times that she was uncomfortable with the practice because "we're not supposed to do this, so we need to do something." *Id*. at 73:8-13. Wu even joked with Gruss that they were going to go to jail because of the interfund transfers. *Id*. at 97:10-17. When Wu had these conversations with Gruss, at no point did Gruss say that this practice was allowed under the offering documents. *Id*. at 75:25 – 76:4.

**RESPONSE TO NO. 53**:  Admitted in part and denied in part.  Again, as referenced in the responses to paragraphs 49 through 52 above, Wu, a bookkeeper, did not understand what was and was not permitted under the Offering Memoranda or the fund operating documents. Moreover, under Fed.R.Evd. 106 Wu's statement about "going to go to jail because of the inter-fund transfers "in fairness ought to be considered" along with Wu's admission that "she did not know if it [the LTD advancing funds to the LP] could be legal," Ex. ZZ at p. 122.

54.     Wu threatened to quit numerous times over the interfund transfers and each time would have discussions with Gruss about the practice. *Id*. at 74:10-12. The gist of the conversations was that she felt "very uncomfortable. We cannot do this, and this thing just keeps snowballing and it's not getting any smaller and we just cannot do this, it's not right, and I feel very uncomfortable." *Id*. at 74:17-24. Gruss's response to Wu's concerns was "we will figure out something." *Id*. at 74:25 – 76:1.

**RESPONSE TO NO. 54**:  Admitted in part and denied in part.  Again, as stated in response to paragraph 53, Wu's statements must be considered in response to Gruss' and Law's testimony that the concern was not about the legality of the practice but rather the stressful accounting work

it created and Gruss' testimony that Wu's concern was also about the size of the receivable from the LP to the LTD.  Ex. VV at p. 189, Ex. UU at pp. 421-22.

55.    In 2007, the accounting firm Deloitte LLP ("Deloitte") reviewed the books and records of DBZCO and the funds that it managed and determined that in at least the following instances, the Offshore Fund funded an investment for another entity managed by DBZCO (including the Onshore Fund) where the Offshore Fund did not initially participate or where its initial participation was less than the amount it funded[5]:

| Name of Investment | Funding Date | Funding From Offshore Fund | Initial Participation by Offshore Fund | Investment in U.S. Real Estate | Cash Transfer from Offshore Fund Directly to Investment | Transfer Repaid Entirely in Cash |
|---|---|---|---|---|---|---|
| LFG | 26-Mar-04 | $377,715 | 0% | | X | X |
| Suncruz | 9-Apr-04 | $10,000,000 | 0% | | | X |
| Comcap | 9-Jun-04 | $3,266,252 | 0% | | X | X |
| L Group | 9-Jun-04 | $5,400,000 | 0% | X | X | |
| Cornerstone | 14-Jun-04 | $414,417 | 50% ($207,706) | | X | |
| Levitz | 18-Jun-04 | $6,000,000 | 50% ($3,000,000) | | X | |
| SVS First | 28-Jun-04 | $990,000 | 0% | | X | |
| Genutec | 14-Jul-04 | $3,540,500 | 0% | | X | X |
| Interim Saddleback | 16-Jul-04 | $6,051,500 | 0% | X | X | |
| Northlake | 29-Jul-04 | $17,500,000 | 0% | | X | |
| JPM | 16-Aug-04 | $999,990 | 0% | | X | X |
| Priority | 30-Aug-04 | $975,000 | 0% | | X | |
| LFG | 30-Aug-04 | $447,500 | 0% | | X | X |
| LFG | 12-Oct-04 | $268,518 | 0% | | X | X |
| Cornerstone | 14-Oct-04 | $410,022 | 50% ($205,501) | | X | |
| Quantum | 25-Oct-04 | $16,800,000 | 0% | | X | |
| Kimco | 26-Oct-04 | $2,055,290 | 0% | | X | X |
| GPE | 23-Nov-04 | $15,000,000 | 40% ($6,000,000) | | X | |
| NCC | 29-Nov-04 | $14,690,385 | 0% | | X | X |
| Brantley | 20-Dec-04 | $3,107,815 | 0% | | | |
| Schilling | 27-Jan-05 | $999,014 | 0% | | X | X |
| Davidson | 28-Jan-05 | $18,596,150 | 0% | | X | X |
| TLC | 11-Feb-05 | $27,500,000 | 0% | | X | X |
| Help | 15-Feb-05 | $16,273,485 | 0% | | | X |
| Help | 18-Feb-05 | $12,805,000 | 0% | | | X |
| Tremont | 4-Mar-05 | $19,000,000 | 0% | X | | X |
| Malara | 8-Mar-05 | $27,918,485 | 0% | | X | X |
| Markley | 22-Mar-05 | $20,920,380 | 0% | X | X | |
| Lifesource | 14-Apr-05 | $1,005,774 | 0% | | X | X |
| Summitbridge | 15-Apr-05 | $4,190,000 | 0% | | X | X |
| LS Reo | 18-Apr-05 | $3,000,000 | 0% | | | X |
| RIH Investment | 19-Apr-05 | $5,000,000 | 0% | X | X | X |
| Hudson Spokane | 27-Apr-05 | $3,358,055 | 0% | X | X | X |
| River Island | 5-May-05 | $25,000,000 | 0% | X | | |
| LLJ Precis | 16-Jun-05 | $7,849,808 | 0% | | X | |
| Marquette | 14-Jul-05 | $14,422,470 | 0% | X | X | X |
| Lotus | 25-Jul-05 | $8,250,000 | 0% | | X | |
| Copper Canyon | 25-Jul-05 | $27,529,057 | 0% | | X | |
| Port Cardig | 23-Aug-05 | $14,850,000 | 0% | | X | |
| Latam | 24-Aug-05 | $2,307,337 | 70% ($1,615,136) | | X | |
| Vision Bozeman | 24-Aug-05 | $4,400,000 | 0% | | X | X |
| Tremont | 25-Aug-05 | $6,192,263 | 0% | X | | X |
| SWB | 9-Sep-05 | $1,177,200 | 65% ($765,180) | | X | |
| Petro Edge | 15-Sep-05 | $330,080 | 76% ($252,294) | | X | |
| Chesapeake/Shelly | 15-Sep-05 | $2,227,500 | 0% | | X | X |

[5] The information contained in the chart that follows is derived from the Deloitte workpapers.  (Brody Decl. Ex. 56). Where the same portfolio company was the subject of several interfund transfers (i.e. Davidson, Cornerstone), we have only included the workpapers a single time in the exhibit.

| | | | | | | |
|---|---|---|---|---|---|---|
| Extell | 12-Oct-05 | $5,064,006 | 0% | X | X | X |
| Solana | 17-Oct-05 | $26,000,000 | 0% | X | X | |
| Ireo | 21-Oct-05 | $3,212,000 | 25% ($803,000) | | X | |
| Vanguard | 1-Nov-05 | $7,839,393 | 0% | | X | X |
| Project Taka | 10-Nov-05 | $4,783,126 | 0% | | X | X |
| DPH | 21-Nov-05 | $2,500,000 | 53% ($1,325,000) | | X | |
| MBW | 1-Dec-05 | $17,379,295 | 0% | | | X |
| INT Ventana | 1-Dec-05 | $3,349,344 | 95% ($3,181,877) | | X | |
| Longroad HOP | 9-Dec-05 | $5,987,224 | 50% ($2,993,612) | | X | |
| Davidson | 9-Dec-05 | $391,879 | 0% | | X | |
| Summitbridge | 22-Dec-05 | $2,450,000 | 0% | | X | X |
| Kaufman | 11-Jan-06 | $7,692,760 | 0% | X | X | X |
| Plant | 30-Jan-06 | $12,610,000 | 43% ($5,399,414) | | X | |
| Pilot Barrington Broad | 30-Jan-06 | $5,060,556 | 50% ($2,519,948) | | X | |
| Davidson | 31-Jan-06 | $16,600,000 | 0% | | X | |
| Da Vinci | 6-Feb-06 | $25,000,000 | 50% ($12,500,000) | | X | |
| Interim Apex | 28-Feb-06 | $6,745,000 | 0% | X | X | |
| Vermillion | 10-Mar-06 | $10,000,000 | 80% ($8,000,000) | | X | |
| Summitbridge | 13-Apr-06 | $2,930,000 | 0% | | X | X |
| Interim Mt. Lau | 17-Apr-06 | $6,650,000 | 0% | X | X | |
| Ireo | 25-May-06 | $3,400,000 | 82% ($2,797,829) | | X | |
| *Total Funding* | | $559,041,545 | ($51,566,497) | | | |
| *Less Initial Participation* | | ($51,566,497) | | | | |
| *Total Advances* | | $507,475,048 | | | | |

**RESPONSE TO NO. 55**:  Denied and objected to.  This chart is objectionable on a number of

grounds.  First, this chart completely and improperly changes the SEC's theory and factual

allegations from the amended complaint where it is alleged that there were "$576 million in [85]

transfers between March 2004 and July 2006 . . . to fund Onshore Investments" "for the benefit

of the Onshore Fund."  See ¶ 61 of the Defendant Perry Gruss' Statement of Undisputed Material

Facts Pursuant to Local Civil Rule 56.1, Ex. N at ¶¶ 3, 26.  These factual allegations were

supported by the Deloitte work papers that showed that the 85 transfers amounting to $576

million was derived from a chart prepared by Deloitte and represent 66 investments purchased,

in whole or in part, from funds advanced to the LP by the LTD.  *Id*., Ex. AA at pp. 51-52; Gruss

Dec. Ex. A; Gruss Dec. Ex. B.  The above chart expands and changes the allegation beyond the

LTD advancing funds to the LP for investments to any "entity managed by DBZCO."  Also,

rather than adhering to its allegation in the amended complaint that the funds advanced from the

LTD to the LP were just "for the benefit of the Onshore Fund," the SEC totally changes its

factual allegation to those instances where "the Offshore Fund funded an investment for another

entity managed by DBZCO (including the Onshore Fund) where the Offshore Fund did not

initially participate or where its initial participation was less than the amount it funded."

Nonetheless, all of the transactions reflected on this chart representing the advancement of funds

from the LTD to the LP and other DBZCO managed funds are permitted by the funds' Offering

Memoranda and operating documents as set forth in the Defendant Perry Gruss' Statement of

Undisputed Material Facts Pursuant to Local Civil Rule 56.1, ¶¶ 19-53.  Second, the chart's

emphasis on "Initial Participation by Offshore Fund" is misleading and contrary to the LTD's

Offering Memoranda that clearly provides that "the Fund may acquire interests in loans

(including leases treated as financings for U.S. Federal income tax purposes), revolvers and

letters of credit originated by the U.S. Fund or its affiliates and may make such investments

through subsidiary vehicles."  Ex. M at p. 67.  In certain instances, the LP regularly "seasoned"

those interests in loans between 30 to 90 days before they were transferred to the LTD.  Ex. CCC

at pp. 31-32; Ex. UU at p. 97.  See also, the Defendant Perry Gruss' Statement of Undisputed

Material Facts Pursuant to Local Civil Rule 56.1, ¶ 65, Gruss Declaration, ¶ 8.  Thus, the Chart

omits to reflect that the LTD subsequent to its advance of funds to the LP was later provided

ownership interests in the following investments:  Suncruz, Comcap, L Group, SVS First,

Interim Saddleback, Northlake, NCC, Copper Canyon, Port Cardig, and Solana.  See Gruss Dec.

Ex. D.  The LP also later provided the LTD with an ownership interest in Bantley, DT 1892,

1914; Latam, DT 1896-7, 1921 and Interim Apex, DT 1795, 1892, 1854.  Ex. DDD.  The Chart

also omits to acknowledge that the LTD received interests in the following investments, portions

of which were transferred to the LTD's CLO, Bernard Global:  Priority, Schilling, Davidson,

TLC, Help, Malara, River Island, LLJ Precis, Extell, Davidson, and Plant.  See Ex. C at B01801.

The Chart further omits to acknowledge that the LTD received interests in the following

investments through its mezzanine investment in the LP's CLO:  Priority, Quantum, Davidson, TLC, Malara, and Markley.  Ex. FF at p. 50.

56.     As the chart demonstrates, in some cases, the Offshore Fund received a combination of cash and a portion of the investment as reimbursement for the money that it had advanced. In many instances, however, the Offshore Fund did not participate in the investment at all and only received cash as its reimbursement.

**RESPONSE TO NO. 56**:  Admitted in part and denied in part.  This statement and the Chart imply there was something wrong with the LTD advancing funds to the LP.  As reflected in the Defendant Perry Gruss' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, ¶¶ 19-53, these advances were permitted by the fund Offering Memoranda and fund operating documents and were part of the investment process among the DBZCO managed funds.  Also, as stated in ¶ 71 of the Defendant Perry Gruss' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, the SEC can only prove in its allegation of "$576 million" in the amended complaint that "the LTD had not advanced . . . $126,896,039 to the LP for the purchase of investments for which it does not appear the LTD ever received any participation."  Also, "without the complete records of DBZCO," Gruss is "unable to identify which portions of the investments represented by the remaining $126,896,039 out of the $576,124,932 in cash transfers from the LTD to the LP were ultimately transferred to the LTD." Gruss Declaration, ¶ 9.

57.     As of the time that Deloitte completed its review, the Offshore Fund had not yet been reimbursed for some of the advances that it had made. (Brody Decl. Ex. 57 at 69:19 – 70:1). Indeed, in March 2007 when DBZCO informed the investors about the interfund transfers, it stated that the Onshore Fund at that time owed in excess of $100 million to the Offshore Fund and to a managed account. (Brody Decl., Ex. 177).

**RESPONSE TO NO. 57**:  Admitted.

58.     As the chart demonstrates, in some cases, the Offshore Fund sent the money to the Onshore Fund, which then funded the investment (in most cases a loan). Mostly, however, the Offshore Fund sent the money directly to the borrower.

**RESPONSE TO NO. 58**:  Admitted in part, denied in part and objected to.  Whether the LTD

sent the advance to the LP directly to the investment is irrelevant.  As stated above, DBZCO had

the right under the fund Offering Memoranda and the operating documents to arrange for the

LTD to advance cash to the LP.  Those advances were reflected on the funds' books and records

as a receivable and payable on each of the funds' corresponding balance sheets.

59.     As the chart demonstrates, many of the Onshore Fund's investments that were
funded by the Offshore Fund were real estate investments in the United States.

**RESPONSE TO NO. 59**:  Denied.  There were "some," not "many."  The Chart does not reflect

which investments are real estate investments.

60.     As the chart demonstrates, the Offshore Fund advanced more than $500 million
for investments made by the Onshore Fund and other funds and accounts managed by DBZCO.

**RESPONSE TO NO. 60**:  Admitted.

61.     Deloitte did not find any evidence that the Offshore Fund received any interest on
the money that it advanced. (Brody Decl. Ex. 57 at 109:9-19). Nor did Deloitte find any loan
documentation for any of these advances that would show when the money needed to be paid
back. *Id*. at 110:3-111:1.

**RESPONSE TO NO. 61**:  Admitted in part and denied in part.  As explained by Deloitte, the

money the LTD advanced to the LP "were really more advances than anything else or monies

transferred."  These advances were reflected on the Annual Financial Statements not as loan but

as "Due to affiliates" or "Due from affiliates."  Ex. E at 2, Ex. F at 2, Ex. G at 2, Ex H at 2, Ex. I

at 2, Ex. J at 2.  Further, all the amounts due between and among all of the funds were recorded

and tracked on a daily basis in DBZCO's accounting system in an account known as DZPRIV.

Ex. BBB at pp. 277-78.

62.     Gruss authorized ABN Amro to transfer the money from the Offshore Fund's
accounts to fund these investments. (Brody Decl. Ex. 58).

**RESPONSE TO NO. 62**:  Admitted in part and denied in part.  The emails (Brody Decl. Ex. 58)

show that Gruss authorized ABN Amro to transfer the money from the Offshore Fund's account

to fund the following investments:  IREO, Vermillion, Pilot Group, Kaufman, Longroad Hop, Chesapeake, Tremont, Vision-Bozeman, LLJ Precis, River Island, Hudson-Spokane, Barrett, and Markley.  Certain of the emails in Brody Decl. Ex. 58 simply reflect transactions between certain funds managed by DBZCO and unrelated third party funds and were unrelated to any inter-fund transfers.

63.    There is no question that Gruss understood these wires were to fund investments.  Gruss knew which investments were being funded. (Brody Decl. Ex. 16 at 56:1-4 "he is very well aware of all the deals in the pipeline; Ex. 55 at 37:10-18).  He regularly received a "pipeline report" that "showed all of the upcoming ... fundings and repayments that were happening at the firm". (Brody Decl. Ex. 35 at 30:12-16).  All private investments appeared on the pipeline report. *Id*. at 30:17-23.

**RESPONSE TO NO. 63**:  Admitted in part and denied in part.  Gruss was aware that the wires

for the specific investments referenced in the response to paragraph 62 were to fund investments.

64.    Gruss also attended a meeting every Monday with Zwirn to discuss "what we called the pipeline of new deals that were coming down.  So in that meeting ... we would discuss which deal and that they were loan originations, and in knowing that they were loan originations, that they were to come out of the onshore fund." (Brody Decl. Ex. 18 at 39:3-10; 41:2-4). The pipeline report was reviewed in detail at these meetings. (Brody Decl. Ex. 35 at 35:16-19).

**RESPONSE TO NO. 64**:  Admitted.

65.    While Gruss may not have been aware of subsequent drawdowns if there was a revolving credit facility and the borrower did not immediately draw down the entire amount, "the bigger ones or the initial closing of a deal, he would definitely, obviously know." (Brody Decl. Ex. 16 at 56:5-17).

**RESPONSE TO NO. 65**:  Denied.  Without specificity as to the identity of the "bigger ones"

there is no way to respond to this paragraph.

66.    Moreover, as described below, Gruss would regularly receive emails prior to an investment being funded that explained exactly where and how much money was going to be wired.

**RESPONSE TO NO. 66**:  Admitted in part and denied in part.  This can only be admitted to the

emails described below.

67.    The first instance that Deloitte identified where the Offshore Fund advanced

money to fund an investment of the Onshore Fund was for an investment referred to as LFG.  On March 26, 2004, at 1:01 pm, Gruss and Wu received an email stating that $877,744.15 needed to be wired in order to fund the LFG investment.  (Brody Decl. Ex. 59). The email instruction also included the principal amount, the interest rate, and the loan maturity.  *Id*.  The email also stated that "[t]he loan should be booked as follows –LawFinance 03/04 –Berry-Microsoft." *Id*. At 1:40 pm, Wu sent an email to the bank providing wiring instructions, including that $377,714.55 should come from the "HZLTD #***600 account, i.e. the Offshore Fund bank account, "upon Perry's approval." (Brody Decl. Ex. 60).  At 6:45 pm, Gruss sent an email to the bank approving the instructions to wire money from the Offshore Fund account. *Id*.

**RESPONSE TO NO. 67**: Admitted in part and denied in part.  The email in question (Brody

Decl. Ex 59 appears to show Zwirn's approval since prior to the word "approval" is a "Z" with

the previous letters blocked out by a paper punch hole.  (Brody Decl. Ex. 59).  The next exhibit,

Ex. 60, which the SEC does not reference, reflects Gruss' approval of the wire transfer.

68.    Other examples of this practice[6] include an investment called "Service First." On June 28, 2004, Gruss received an email concerning the funding for an investment called "Service First." The email stated: "We are funding Bridge Funding – Service First today. DZ's approval is attached below, and I have also attached wiring instructions/escrow letter from Bridge Funding's counsel, along with signed docs from Bridge Funding.  The total loan amount is $1,100,000 and our loan amount is 90% of the total (10% part to Bridge) or $990,000." (Brody Decl. Ex. 61). Several hours later, Law sent an email to the bank instructing "[p]lease wire $990,000 from the Ltd account #***600 to the following instructions. PG's approval to follow.  Thanks." (Brody Decl. Ex. 62).  Later that evening, Gruss emailed his approval of the wire transfer to the bank. *Id*.

**RESPONSE TO NO. 68**:  Admitted.

69.    On July 14, 2014, Gruss, Wu, and Law were emailed instructions concerning a $3,540,500 investment called the "Genutec Funding." (Brody Decl. Ex. 63). The email stated "attached please find the settlement statement and participation agreement for the GenuTec funding. Please send the $3,540,500.00 to the standing wire instructions below."  *Id*.  Later that day, Law emailed the bankers an email stating: "Please transfer $3,450,500 from the Ltd account # ***600 .... PG's approval to follow. Thanks." (Brody Decl. Ex. 64).  Gruss subsequently approved the transfer from the Offshore Fund account. *Id*.

**RESPONSE TO NO. 69**:  Admitted.

70.    On February 23, 2005, Gruss received an email concerning an investment called "Tremont/Bloomfield" stating: "PG – reminder that we will be funding this deal early next week (Monday or Tuesday). It's a $35 million deal but we will only be funding approx. $21 million at closing." (Brody Decl. Ex. 65). On March 3, Gruss, Law and Wu received another email

---

[6] The Commission does not provide this level of detail for each of the sixty-six transactions noted on the chart but can provide additional information at the Court's request.

providing a closing statement for the Tremont/Bloomfield investment, which was now approximately $24 million. (Brody Decl. Ex. 66). On March 4, Gruss, Law and Wu received the wiring instructions for the Tremont/Bloomfield investment with the instruction "[w]ill let you know when to send – will be very soon." (Brody Decl. Ex. 67). Approximately an hour later, Gruss, Law and Wu received the final approval to send the money as per the instructions. (Brody Decl. Ex. 68). Five minutes later, Law sent the email to the bank asking it to process several wires for Tremont/Bloomfield, including to wire $19 million "from the LTD account # ***600 to the LP acct # ***599." (Brody Decl. Ex. 69). Thirteen minutes later, Gruss sent an email to the bank approving the wires, including the wire from the Offshore Fund. *Id.*

**RESPONSE TO NO. 70**:  Admitted.

71.     After numerous transfers from the Offshore Fund in order to fund Onshore Fund investments, the accountants who worked under Gruss expressed their displeasure with this practice. In April 2005, DBZCO decided to invest money in certain real estate assets being sold by Hudson Advisors Taiwan (the "REO portfolio"). (Brody Decl. Ex. 70). After receiving the instruction to fund this investment, Law emailed Gruss asking "should we fund this from Ltd???" *Id.* After Gruss responded "[y]es pls" Law wrote back "[j]ust curious – is there a game plan? Or is this something that the DBZ backoffice must 'learn to accept.'" *Id.* When Gruss responded "what's our alternatives [*sic.*]", Law stated: "Get all the partners/top mgmt in the loop (i.e. REALITY) And then have them make a joint mgmt decision." *Id.*

**RESPONSE TO NO. 71**: Admitted in part and denied in part.  Admit that the email was sent by

Law but object to on the basis that the SEC puts a nefarious spin on this email that was refuted

by Law in her deposition, where she admitted she was simply trying to solve the stressful

accounting issue referenced in the response to paragraph 52 above:

> Q.  Okay.  Ms. Tan, if you could look at Exhibit 41. Looking at the first have them make a joint management decision. Possible alternatives:" What you're really suggesting here, correct me if I am wrong, are basically business options in terms of the monies that go between the Offshore and the Onshore; am I correct?
>
> A.  I just had in mind how to solve the accounting issues, so...
>
> Q.  All this related to was to solve the accounting issues that you saw?
>
> A.  Yes.
>
> Q.  Which were essentially that you just saw the amount of money becoming so large that you were concerned about the

ability to pay it back.  Is that a fair statement?

> A.  Not just the fact that the amounts were large, but that it was an ongoing process.  Like, it kept happening, even though repayments were always gradually being made.

> Q.  But that also starts with your premise that there was something improper about it to begin with; correct?

> A.  Again, in the beginning it was more that it was an accounting hassle, something that I had to keep track of, that the accountant in me said, "Okay, this is a receivable that needs to get cleared," and then later on it progressed to a deeper understanding of how it impacted NAV.

> Q.  But that's -- "later" being beyond April -- was it 18th, 2006?

> A.  This is --

> MR. BRODY:  2005.

> MR. AKERMAN:  I'm sorry, is this the 2005?

> MR. BRODY:  2005.

> BY MR. AKERMAN:

> Q.  So, in other words, you came to think or believe that there were other issues after this e-mail; is that correct?

> A.  Yes.

> Q.  And you formed that belief without having read the offering memoranda for the Funds; correct?

> A.  Yes.

> Q.  And you formed that belief without consulting with counsel; correct?

> A.  Yes.

Ex. BBB at pp. 265-66.

Law further testified:

> Q.  And there's nothing in Exhibit 41 that says or implies in any way that the monies going from the Onshore Fund -- Offshore

Fund to the Onshore Fund were illegal in any way; correct?

     A.  No, there's nothing in this e-mail that suggests that.

     Q.   And there's nothing in this e-mail that suggests that other top management didn't know what was going on with this situation; correct?

     MR. BRODY:  Object to form.

     A.  Sorry, could you repeat that?

     MR. AKERMAN:  Why don't you read it back.

(Question read back by court reporter)

     A.  Sorry, there are a lot of negatives in there, sorry.  So I assume that top management was not in the loop at that time.

     Q.  But you didn't know one way or the other?

     A.  Yes, that's true.

*Id*. at p. 268.

72.    Notwithstanding the criticism of the practice from his subordinates, Gruss continued to fund Onshore Fund investments from the Offshore Fund.  At the pipeline meetings, Gruss did not tell Zwirn that the Offshore Fund was funding an Onshore Fund investment. (Brody Decl. Ex. 71 at 115:2-6). Gruss did not tell Zwirn that the Onshore Fund did not have sufficient cash to make investments, or that the only way that the Onshore Fund could make an investment would be if Zwirn raised additional funds for the Onshore Fund. (*Id*. at 111:3 – 112:16; Brody Decl. Ex. 35 at 42:25 – 43:12).  Nor did Gruss review the cash positions of the Onshore and Offshore Funds at the pipeline meetings. (Brody Decl. Ex. 71 at 112:19-22).

**RESPONSE TO NO. 72**:  Admitted in part and denied in part.  First, the so-called "criticism

from his [Gruss'] subordinates" was not, as stated above, directed at the legality of the LTD

advancing funds to the LP.  None of these subordinates had read the Offering Memoranda or the

fund operating documents.  Ex. ZZ at p. 76, Ex. BBB at p. 268, and Ex. EEE at p. 134.  Second,

this paragraph relates solely to what Gruss said at the pipeline meetings.  Third, in that

connection Gruss did review the cash position of the LTD and LP at the pipeline meetings.  Ex.

FFF at p. 389; *see also* Ex. YY at p. 129; Ex. XX at pp. 89, 126-27.  The Pecora testimony relied

upon by the SEC only reflects that Pecora did not recall Gruss going "through the cash position

of the LP and LTD funds." (Brody Decl. Ex. 71 at 112:19-22).

73.     Indeed, the day after receiving the email from Law concerning the REO portfolio, Gruss received a funding request for RIH Co-Investment Partners concerning "project grand slam." (Brody Decl. Ex. 86). The email to Gruss attaching the instructions to wire $5 million stated: "This is ok to fund. RF sent the capital call request from Colony Capital (lead sponsor). We executed dox several weeks ago." *Id.* At 2:23 pm, a member of the accounting department sent an email to the bank stating "[p]lease wire $5,000,000 from LTD account #***600 to the following account . . . . PG's approval will follow." (Brody Decl. Ex. 203). Five minutes later, Gruss sent his email to the bank approving the transfer from the Offshore Fund. *Id.*

**RESPONSE TO NO. 73**: Admitted.

74.     In September 2005, Gruss was told that DBZCO was purchasing 270,000 shares of a company called SWB in a PIPE transaction. (Brody Decl. Ex. 72). The investment was for $1,177,200. On September 7, 2005, Gruss decided to allocate this investment between the various funds in the following fashion Ltd (65%), LP (15%), LLC (15%), TE (5%). (Brody Decl. Ex. 73). On September 9, 2005, Law emailed the ABN Amro bankers "please wire $1,177,200 from the Ltd account ***600 to the following instructions. PG's approval to follow." (Brody Decl. Ex. 74). Notwithstanding that Gruss only allocated 65% of the investment to the Offshore Fund, Gruss approved the Offshore Fund funding the entire $1,177,200 investment. *Id.*

**RESPONSE TO NO. 74**: Admitted in part and denied in part. The use of the word "only" in

the last sentence implies there was something wrong with "only" allocating "65% of the

investment to the LTD." Under the firms' Offering Memoranda, the Manager had the right to

allocate investments. Per the funds' Offering Memoranda, such conflicts were to be resolved by

the Manager in its sole discretion: "When the Fund and one or more other clients of the manager

have available funds for investments, investments . . . will be allocated substantially pro rata on

an overall basis . . . to the extent possible, unless the Manager believes, in good faith, that

another method would be more fair and equitable." Ex. M at pp. 51-52 (DBZ 0009877-78); Ex.

O at p. 29 (DBZ 0009778); Ex. L at p. 29 (DBZ 0009705); Ex. T at pp. 46-47 (DBZ 0009633-

34); Ex. U at pp. 29-30 (DBZ 0009561-62); Ex. K at p. 24 (DBZ 0009474).

75.     In June 2005, Wu resigned from DBZCO. (Brody Decl. Ex. 75). It was the interfund transfers "that made me cannot stay at this company anymore. Make me want to disassociate myself with this company." (Brody Decl. Ex. 16 at 117:20 – 118:4).

**RESPONSE TO NO. 75**:  Admitted in part and denied in part.  This paragraph quotes from

Wu's testimony, but under Fed.R.Evd. 106 this selective quote "in fairness ought to be

considered" along with Wu's other testimony that her issue with the inter-fund transfers was not

its legality, which she was clueless about, but "the burden."  Ex. ZZ at p. 117, 24:25.

76.     Gruss asked Law to speak to Wu about why she wanted to leave and to try and persuade her to stay. (Brody Decl. Ex. 17 at 130:17-21).  Law reported on her conversation with Wu to Gruss: "Just spoke with her[.]  She's v[ery] clear-headed and calm about it[.]  She says that the proposed remedies i.e. ltd metis and stopping offshore investor $$ (if that even ever happens) are just remedies for going forward purposes[.]  In order to get us out of the current (v[ery] deep) hole, will need at least 2 years' worth of new onshore $$ assuming that no more onshore fundings occur which we all know is not going to happen . . . [a]nd in the meantime there are the audits happening . . . [c]an[']t talk her out of it cos I kinda agree with her." (Brody Decl. Ex. 76).

**RESPONSE TO NO. 76**: Admitted in part and denied in part.  Again, this email implies that the

inter-fund transfers were not permitted.  As stated above, neither Wu nor Law had any

knowledge about what was permitted by the funds' Offering Memoranda or the funds' operating

documents.  Their concern, as best expressed by Law, was the accounting burden and stress

created by this accounting burden.  See Responses, supra., to ¶¶ 52-54, 71 and 72.

77.     Notwithstanding Wu's resignation, the interfund transfers continued.  On October 12, 2005, Gruss received the closing documents for an investment called Extell. (Brody Decl. Ex. 77).  The closing documents were clear that this was a real estate deal for a property at 356-366 Tenth Avenue in New York.  *Id.*  The wiring instructions sent to ABN Amro (which Gruss approved) initially requested that the necessary $5,064,006 come from the Onshore Fund's account. (Brody Decl. Ex. 78).  Later that same day, the accountant sent a second email to the bank requesting that the wire come from the Ltd account #***600 – i.e., the Offshore Fund account.  *Id.*  Gruss approved this second transfer. *Id.*  The clear inference is that there were insufficient funds in the Onshore Fund's account so money was just taken from the Offshore Fund even though the Offshore Fund should not have participated in this loan origination because it was a United States-based real estate transaction.

**RESPONSE TO NO. 77**:  Admitted in part and denied in part.  There is nothing in Brody Decl.

Ex. 77 to reflect that this was a real estate deal.  There is no admissible evidence to support this

so-called "clear inference . . . that there were insufficient funds in the Onshore Fund's account so

money was just taken from the Offshore Fund even though the Offshore Fund should not have

participated in this loan origination because it was a United States-based real estate transaction."

This statement also ignores the undisputed evidence that it was always the intention from the

outset of the purchase of investments in which the LTD could not initially be a participant

because of ECI issues that DBZCO would restructure those investments so portions of the

investments could be assigned to the LTD.  See ¶66 of Defendant Gruss' Statement of

Undisputed Material Facts Pursuant to Local Civil Rule 56.1

78.    On Friday, October 14, 2005, Gruss received an email concerning an approximate $30 million investment called Solana. (Brody Decl. Ex. 79).  The wiring instructions, which were to a title company, indicated that this was a Texas real estate deal.  *Id*.  Law, who was also a recipient on the email responded "Late in the day for such a large funding.  So this is not funding from Bernard?  If not when can we assign. Need to be ASAP."  (Brody Decl. Ex. 80). In sum, Law was indicating that the Onshore Fund did not have sufficient funds in hand to make this investment and that it needed to be assigned to the other funds managed by DBZCO as soon as possible. In the response to her email (which was also sent to Gruss), Law was informed that the investment "[h]as to fund through lp ...." *Id*. That evening, one of the DBZCO accountants sent an email to the ABN Amro bankers (cc'ed to Gruss) stating that $3.7 million should be transferred from the Onshore Fund's account to the Offshore Fund's account and that $27 million should then be wired from the Offshore Fund's account in order to fund the investment. (Brody Decl. Ex. 81). That evening Gruss emailed the DBZCO employees who were working on the funding "[s]o are we good here." (Brody Decl. Ex. 82). In response, Gruss was informed that the deal had not yet closed but that it would close the following Monday. *Id*.  Late that night, Racusin emailed Gruss that "we have no money on Monday once the Solana deal closes." (Brody Decl. Ex. 83). On Monday, one of the DBZCO accountants emailed the ABN Amro bankers "[p]lease wire $29,538,514.72 from the Ltd account #***600 to the following instructions. PG's approval to follow." (Brody Decl. Ex. 84). Notwithstanding that this was a Texas real estate investment, Gruss approved the transfer of Funds from the Offshore Fund Account. *Id*.

**RESPONSE TO NO. 78**:  Admitted in part, denied in part and objected to in part.  Just because

Brody Decl. Ex. 79, the Wire Instructions, were from a Title Company does not mean this "was a

Texas real estate deal."  Moreover, whether or not it was a real estate deal is irrelevant to any

issues in this case.  With respect to Brody Decl. Ex. 80 this paragraph omits the statement "[h]as

to fund though lp but I assume you can move it post-closing."  Under Fed.R.Evd. 106 this

statement in Ex. 80 "in fairness ought to be considered" along with the other statements quoted

in this paragraph.  Moreover, the undisputed evidence shows that the LTD did receive a share of

this investment.  See Ex. D to Gruss Declaration and Response to ¶ 55, *supra*.  There is nothing

in Brody Decl. Ex. 80 from which it can be inferred that "Law was indicating that the Onshore

Fund did not have sufficient funds in hand to make this investment."  This statement is based on

inadmissible speculation.

79.     The interfund transfers continued through at least May 2006. (Infra ¶ 55).

**RESPONSE TO NO. 79:**  Admitted in part and objected to in part.  There is no admissible

evidence that the inter-fund transfers continued beyond May 2006.

80.     Everyone in the accounting and operations department knew about the interfund
transfers. (Brody Decl. Ex. 19 at 76:1-20; Ex. 17 at 131:6-14). Gruss specifically discussed the
interfund transfers with other accountants at DBZCO. He had several discussions with one of the
accountants where they discussed the balance owed by the Onshore Fund to the Offshore Fund
and how the Onshore Fund was going to repay that amount. (Brody Decl. Ex. 18 at 61:8 –
62:11). When this accountant first raised the issue, Gruss was not surprised. He knew exactly
what she was talking about and she did not have to provide any background. *Id*. at 64:21 – 65:10.
DBZCO's treasurer also asked Gruss whether the Onshore Fund borrowed money or utilized
money from the Offshore Fund to fund deals. Gruss responded yes, but stated that it was
disclosed in the financial statements. (Brody Decl. Ex. 35 at 133:16 – 134:14). When the
Treasurer asked why he didn't see the transfers from the Offshore Fund booked as a loan, Gruss
responded that it couldn't be treated as a loan because of the tax issues around it. *Id*. at 135:1822.
Gruss also spoke with Robert Racusin, an individual in the operations department who reported
to Gruss, about the practice. During none of his conversations with Racusin did Gruss say that
the transfers were allowed under the funds' offering documents. (Brody Decl. Ex. 55 at 119:4-8).

**RESPONSE TO NO. 80**:  Admitted in part, denied in part and objected to in part.  The last

statement in the paragraph is misleading in that it states that "[d]uring none of his conversations

with Racusin did Gruss say that the transfers were allowed under the funds' offering

documents."  (Brody Decl. Ex. 55 at 119:4-8).  Racusin did not testify that no such conversations

occurred, only that he did not recall.  *Id*. at 119:9-12.

81.     Gruss, however, never told Zwirn about the fact that the Offshore Fund was
advancing money to fund the investments of the other funds and accounts managed by DBZCO.
(Affidavit of Daniel B. Zwirn at ¶ 7).

**RESPONSE TO NO. 81**:  Denied in part and objected to in part.  Ex. YY at pp. 98-99.  Whether

or not Gruss had told Zwirn about the LTD advancing funds to the LP is irrelevant to the fact

that the practice was permitted under the funds' Offering Memoranda and operating documents.

See ¶¶ 19-29 of Defendant Gruss' Statement of Undisputed Material Facts Pursuant to Local

Civil Rule 56.  In fact, Zwirn admitted to an investor, Eric Dillon of Silver Creek Capital

Management LLC, that the inter-fund transfers were a "common business practice that is

clarified in the offer memo."  See Ex. GGG, annexed to this Response, which is admissible

pursuant to F.R.Evd. 803(6) and 901(11).  Gruss fully complied with the requirements of Rule

901(11) by providing on April 30. 2013, the SEC with notice of his intent to offer this statement

into evidence.  Not once in the last 3 years did the SEC challenge Dillon's statement or take his

deposition to test the adequacy of the foundation set forth in declaration that is part of Ex. GGG.

82.    Initially Law viewed the interfund transfers as an "operational headache[]."
(Brody Decl. Ex. 17 at 132:19-22). After Wu resigned and Law became the controller for the
funds, however, "it really hit me that every dollar that ... an offshore investor puts into the Fund,
into his offshore fund, is not being put to work for his benefit. And – in that instead it was being
put to work for another investor's benefit in another fund. And that only became apparent when
... you run the NAV." *Id*. at 135:14:20.  Moreover, the investors in the onshore fund were getting
a benefit for which they hadn't invested. *Id*. at 134:8-12.  Law was also concerned that if the
monies owed to the Offshore Fund were not repaid by year-end 2005, this would cause red flags
for the auditors that could cause problems for the company and she conveyed this to Gruss. *Id*. at
178:19 – 179:2.  Gruss admits that in his meetings with Law, Law expressed her concern that the
interfund transfers constituted comingling of funds, were not documented, and did not involve
payment of interest to the Offshore Fund for the use of the money at that time. (Brody Decl. Ex.
1 at ¶ 25).

**RESPONSE TO NO. 82**:  Admitted to in part, denied in part and objected to in part.

The following questions and answers to Law should be stricken as inadmissible for improperly

leading the witness over Gruss' objection in violation of Fed.R.Evd.611(c) because Law was a

witness for the SEC, she had entered into a cooperation agreement with the SEC (Ex. HHH), the

question was asked of her on direct examination and she was not hostile to the SEC:

> Q.  So the offshore investors weren't getting the money --
> weren't getting the benefit of the money they invested; is that
> correct?
>
> A.  Yes.

Q.  And the --

MR. AKERMAN:  Object to form.

BY MR. BRODY

Q.  And isn't it true that the investors in the Onshore Fund were getting a benefit for which they hadn't invested; is that correct?

MR. AKERMAN:  Object to form.

A.  Yes.  Ex. BBB at p. 134.

In addition, as stated above, Law never read the Offering Memoranda for the funds, *Id.* at p. 266,

and admitted that she did not have the expertise to opine on how the funds worked:

Is it fair to say you really didn't understand the relationship between how the Onshore and Offshore Fund worked in terms of working together and how investments were obtained for the Offshore Fund?

A.  From -- it sounds like all this is from a business perspective, so definitely that's not within my realm.

Q.  Expertise?

A.  Of expertise, yes.

Q.  And it's also within a regulatory -- regulatory expertise which is not your expertise; correct?

MR. BRODY:  Object to form.

A.  That's correct.

BY MR. AKERMAN

Q.  And you don't have any clue as to what other hedge funds do with respect to this issue; correct?

A.  That's right.

*Id.* at p. 272.  Law's view was in line with separate mutual funds, which are not permitted to

advance funds to each other.  Here the Offering Memoranda and operation documents permitted

such advances between and among the DBZCO managed funds.  As Wu admitted, without the

LP, the LTD would have never received the investment assets it did.  Ex. ZZ at p. 131.

Moreover, Gruss' expert Dr. Bergin opined that hedge funds, unlike mutual funds, "could have a

lot of freedom within their funds or fund complex to do certain transactions or loans.  And it was

granted to them."  Ex. III at p. 177.  See also *Id.* at p. 45 ("investment manager [as opposed to

mutual fund manager has] a lot more flexibility or to actually pursue his strategy and what he

thought would be best for his shareholders"), Exhibit D at pp. 8, 11, 12, 41.

As to the SEC's statement that "Gruss admits that in his meetings with Law, Law

expressed her concern that the interfund transfers constituted comingling of funds, were not

documented, and did not involve payment of interest to the Offshore Fund for the use of the

money at that time" is not supported by Brody Decl. Ex. 1 at ¶ 25.

83.     On June 5, 2006, Law resigned from DBZCO. (Ex. 52) There were several
reasons for her resignation, including "the overwhelming frustration ... about the inter-fund
transfers, and that nothing was being done about it." (Brody Decl. Ex. 17 at 173:16-18). Law told
Gruss at the time about her frustration with the interfund transfers that were "getting too stressful
to handle, and the fact that it... didn't seem like it was getting anywhere near getting fixed." *Id.* at
173:11-15. Law also did not want to have to lie to the auditors, PricewaterhouseCoopers
("PWC") about what the interfund transfers were for. *Id.* at 180:13-17.

**RESPONSE TO NO. 83**:  Admitted in part, denied in part and objected to in part.  The first

sentence about "overwhelming frustration" and the last sentence that "Law also did not want to

have to lie to the auditors" are inadmissible.  These statements about what she thought some

seven years prior to her deposition testimony was not articulated or stated to Gruss or anyone

else.  Ex. BBB at p. 180, 18:21.  Also, as to the reasons why Law resigned, see Response to ¶

211 *infra*.

## THE OFFSHORE FUND REPAYS THE ONSHORE FUND'S LOAN OBLIGATIONS

84.     During 2005 and 2006, the Onshore Fund and the Offshore Fund were parties to a
Revolving Credit and Security Agreement as amended and restated (collectively "the Revolver").
(Brody Decl. Ex. 87).

**RESPONSE TO NO. 84**:  Admitted.

85.     Under the terms of the Revolver, "Borrower Group" was defined as meaning "either (i) the U.S. Fund, or (ii) the Off-Shore Borrowers." *Id*. at 938920.  The Revolver defined the "U.S. Fund" as the D.B. Zwirn Special Opportunities Fund, L.P. *Id*. at 938937. The Revolver defined "Off-Shore Borrowers" as the "Off-Shore Fund" and the "Off-Shore Subsidiary Fund." *Id*. at 938931. The Revolver defined "Off-Shore Fund" as the D.B. Zwirn Special Opportunities Fund, LTD and the "Off-Shore Subsidiary Fund" the Lemoyne Avenue Investors, LLC. *Id*.

**RESPONSE TO NO. 85**:  Admitted.

86.     As stated in the Revolver, the obligations of each "Borrower Group" were several, and not joint and several. (*Id*. at 938917; Brody Decl. Ex. 88 at 5919).  This meant that each of the funds was responsible for its own obligations.

**RESPONSE TO NO. 86**:  Admitted to in part and objected to in part as to the interpretation of

the provision in the Revolver to mean "that each of the funds was responsible for its own

obligations."  This provision does not mean that the LTD could not advance funds to the LP to

pay the LP's obligations under the Revolver, all of which was permitted under the funds'

Offering Memoranda and operating documents.  See ¶¶ 19-29 of Defendant Gruss' Statement of

Undisputed Material Facts Pursuant to Local Civil Rule 56.  The Revolver did not specify the

source of the funds used to repay outstanding balances nor did it preclude a third party from

paying the amounts due.  (Brody Dec. Ex. 88 at 5944-45).

87.     The Maturity Date for advances could not be more than seventy-five days after the Borrowing Date. (Brody Decl. Ex. 87 at 938930).

**RESPONSE TO NO. 87**:  Admitted.

88.     Similar to how the Onshore Fund did not have sufficient cash on hand to fund its investments (as described above), it also did not have sufficient cash on hand to repay its obligations under the Revolver as they came due. (Brody Decl. Ex. 71 at 55:19-56-9).  As Law testified: "Basically the CDC line expires or mature every set amount of time, I can't remember, but maybe, for example, we say every three months. And then at the end of the three months, the whole amount has to be repaid to the CDC, and then CDC would immediately re-lend it back to us again. So there were some times where the Onshore Fund did not have the – enough funds to pay that amount to the ... CDC, so the Offshore Fund would pay for the 50 million or whatever was outstanding at the time." (Brody Decl. Ex. 17 at 137:6-19).

**RESPONSE TO NO. 88**:  Admitted in part, denied in part and objected to in part.  The SEC

cites the testimony of Josh Karotkin, Brody Decl. Ex. 71 at 55:19-56-9, for the proposition that

"[s]imilar to how the Onshore Fund did not have sufficient cash on hand to fund its investments

(as described above), it also did not have sufficient cash on hand to repay its obligations under

the Revolver as they came due."  Karotkin, however, testified that he did not remember if "we

didn't have money when it was due."  As such, Karotkin's lack of recollection does not provide

admissible evidence on this point.  Also, while the funds may have come from the LTD to pay

the LP's outstanding balance, this amount was reflected on the financial statements of both the

LP and LTD as an advance of funds from the LTD to the LP.  Ex. BBB at pp. 240-42, Ex. UU at

p. 403.  Further, Gruss objects on the ground that whether the LP at times had a lack of cash is

irrelevant.  As already stated, the LTD was permitted to advance cash to the LP pursuant to the

funds' Offering Memoranda and formation documents.  Gruss Rule 56.1, ¶¶ 19-27, 53.

89.     On June 13, 2005 at 08:20 a.m., Wu sent an email to ABN Amro with the subject line "Wire from #***599 -- CDC." The email contained instructions to ABN Amro to transfer $78,000,000 from "#***600" to "#***599" and then to wire $80,000,0000 from "#***599" to Citibank New York. (Brody Decl. Ex. 89). The subject of the email was "Wire from #***599 – CDC." *Id*. The email referred to Gruss by initials "PAG" and noted that his approval was to follow. *Id*. At 08:21 a.m., Gruss emailed "Ok pag", expressing his approval of the transfer of the money from the Offshore Fund to the Onshore Fund and from the Onshore Fund to CDC. (*Id*.; Brody Decl. Ex. 4 at 392:15-18).

**RESPONSE TO NO. 89**:  Admitted.

90.     On November 22, 2005, Law emailed Gruss a spreadsheet with the filename "cash consolidation 11-15-05.xls." (Brody Decl. Ex. 90). The spreadsheet contained an entry labeled "CDC" under the column "LP to LTD" in the amount of $77,845,541.65. *Id*.

**RESPONSE TO NO. 90**: Admitted in part and denied in part.  Under Fed.R.Evd. 106 the fact

that this document was prepared on a daily basis and saved on the share drive and accessible to

the entire accounting team and operations team "in fairness ought to be considered."  Ex. BBB at

pp. 277-78.

91.     This spreadsheet was a "payable and receivable schedule showing all of the cash advances ... at a point in time" made by the Offshore Fund to the Onshore Fund and that as of

November 15, 2005, the Onshore Fund owed the Offshore Fund approximately $312 million. (Brody Decl. Ex. 4 at 402:11-20). Gruss explained that the reference to the CDC on this spreadsheet represented money that the Offshore Fund advanced to the Onshore Fund to allow the Onshore Fund repay the Revolver. (*Id*. at 403:17-24).

**RESPONSE TO NO. 91**: Admitted.

92. The Offshore Fund was not fully reimbursed for the money it had advanced in June to repay the Revolver until December 23, 2005. (Brody Decl. Ex. 91 at 19).

**RESPONSE TO NO. 92**: Admitted in part and denied in part. There is no evidence that the amounts on the Revolver due to the LTD were paid in December to avoid their appearance on the LTD's or LP's financial statements. Wu testified that "it was always the intention for the LP to pay back the LTD" for the advances, Ex ZZ at p. 178, and "there was a continual process of paying back on" the advances from the LTD to the LP. *Id*. at pp. 128-29. While the LTD may not have been fully reimbursed for the money it had advanced on June 13, 2005 to repay the Revolver until December 23, 2005, PWC always had access to these records reflecting the advances from the LTD and the amounts being paid back by the LP. *Id*. at p. 179. Moreover, the LTD's Consolidated Financial Statement for the year ended December 31, 2005, shows the sum of $220,788,666 "Due from affiliates" and a corresponding entry "Due to affiliates" on the LP's balance sheet. 56.1 Statement, Ex. F, p. 2, Ex. I, p. 2. Similarly, LTD's Consolidated Financial Statement for the year ended December 31, 2004, shows the sum of $6,383,050 "Due from affiliates" and a corresponding entry "Due to affiliates" on the LP's balance sheet. 56.1 Statement, Ex. E, p. 2, Ex. H, p. 2. Similarly, LTD's Consolidated Financial Statement for the year ended December 31, 2006, shows the sum of $189,019,591 "Due from affiliates" and a corresponding entry "Due to affiliates" on the LP's balance sheet. 56.1 Statement, Ex. G, p. 2, Ex. J, p. 2. If an investor had questions about any of the numbers in either the LTD's or the LP's financial statement, an investor was free to meet with Gruss or anyone else at DBZCO. Ex. UU at p. 81 ("If an investor wanted to meet with the CFO or any other individual they were free to

do so").  Thus, "if the investors came in to review the funds, they could see anything they

wanted." Ex. ZZ at p. 179.  See Response to ¶ 114], *infra*.

93.     On January 9, 2006 at 4:37 p.m., a DBZCO accountant emailed instructions to ABN Amro to transfer $125,000,000 from "Ltd # ***600" (the Offshore Fund's account) to "LP # ***599" (the Onshore Fund's account) and then to wire a total of $125,000,000 from "LP # ***599" to the accounts of the two banks providing the credit facility – $27,777,777.78 to Citibank and $97,222,222.22 to KBC Bank N.V. New York. (Brody Decl. Ex. 92). The subject of the email was "CDC repayment." *Id*. The email referred to Gruss by initials "PG" and noted that his approval was to follow. *Id*. At 4:48 p.m., Gruss emailed "Ok pag." *Id*.

**RESPONSE TO NO. 93**:  Admitted.

94.     A few minutes later, DBZCO's treasurer forwarded the emails with the transfer instructions and the "Ok pag" to Gruss and wrote "what is this?" (Brody Decl. Ex. 92). Gruss responded "Repayment of 75day swingline revolver." *Id*. Gruss was, therefore, fully aware that money from the Offshore Fund was going to repay the obligations of the Onshore Fund under the Revolver.

**RESPONSE TO NO. 94**:  Admitted.

95.     The Offshore Fund was not fully reimbursed for the money it had advanced in January to repay the Revolver until November 6, 2006. (Brody Decl. Ex. 91 at 19).

**RESPONSE TO NO. 95**:  Admitted.

96.     On March 3, 2006, a DBZCO accountant emailed instructions to ABN Amro to transfer $50,000,000 from the "Ltd # ***600" (the Offshore Fund's account) to "#***599" (the Onshore Fund's account) and then a total of $50,000,000 from the "LP # ***599" (the Onshore Fund's account) to the accounts of the two banks providing the credit facility – $38,888,888.89 to KBC N.V. New York Branch and $11,111,111.11 to Bank of New York. (Brody Decl. Ex. 94). The subject of the email was "CDC Repayment." *Id*. The email referenced Gruss by initials "PG" and noted that his approval was to follow. *Id*. Gruss responded "ok pag." *Id*.

**RESPONSE TO NO. 96**:  Admitted.

97.     The Offshore Fund was not fully reimbursed for the money it had advanced in March to repay the Revolver until November 27, 2006. (Brody Decl. Ex. 91 at p.19).

**RESPONSE TO NO. 97:**  Admitted.

98.     On May 26, 2006, at 8:13 a.m., a DBZCO accountant emailed instructions to ABN Amro to transfer $20,000,000 from "# ***600" (the Offshore Fund's account) to "# ***599" (the Onshore Fund's account). (Brody Decl. Ex. 95). The subject of the email was "Various." *Id*. The email referred to Gruss by initials "PG" and noted that his approval was to follow. *Id*. At 8:15 a.m., Gruss emailed "Ok pag." *Id*.

**RESPONSE TO NO. 98**:  Admitted.

99.    On May 26, 2006, at 8:41 a.m., a DBZCO accountant emailed instructions to ABN Amro to transfer a total of $20,000,000 from "LP # ***599" (the Onshore Fund's account) to the accounts of the two banks providing the credit facility – $15,555,555.56 to KBC Bank N.V. New York and $4,444,444.44 to Bank of New York. (Brody Decl. Ex. 200). The subject of the email was "CDC." *Id*. The email referred to Gruss by initials "PG" and noted that his approval was to follow. *Id*. At 1:42 p.m., Gruss emailed "Ok pag." *Id*.

**RESPONSE TO NO. 99**:  Admitted.

100.    The Offshore Fund was not fully reimbursed for the money it had advanced in May to repay the Revolver until November 27, 2006. (Brody Decl. Ex. 91 at 19).

**RESPONSE TO NO. 100**:  Admitted.

101.    The balance owed to the Offshore Fund by the Onshore Fund because of the transfers to repay the Revolver ballooned to $175 million in March 2006. (Ex. 91 at 19).

**RESPONSE TO NO. 101**:  Admitted in part and denied in part.  As of March 3, 2006, the LTD had advanced $175 million to the LP.

102.    In total, the Offshore Fund transferred $273 million to the Onshore Fund (in four transfers: $78 million (Brody Decl. Ex. 33); $125 million (Brody Decl. Ex. 92); $50 million (Brody Decl. Ex. 94); $20 million (Brody Decl. Ex. 95)) in order to allow the Onshore Fund to repay its loan obligations under the Revolver.

**RESPONSE TO NO. 102**:  Admitted in part and denied in part.  Brody Decl. Ex. 33 does not support the statement "the Offshore Fund transferred $273 million to the Onshore Fund."

103.    Without the transfers from the Offshore Fund, the Onshore Fund would not have been able to make the required periodic repayments of the Revolver. (Brody Decl. Ex. 17 at 150:14-16).

**RESPONSE TO NO. 103**:  Admitted.


**THE FUNDS' FINANICAL STATEMENTS HIDE THE INTERFUND TRANSFERS**

104.    On April 19, 2006, PWC, the auditors for the Offshore Fund, issued the Consolidated Financial Statements for the year ended December 31, 2005. (Brody Decl. Ex. 96 at 1).

**RESPONSE TO NO. 104**:  Admitted.

105.    The Financial Statements for the year ended December 31, 2005, listed

$220,788,666 under the assets of the Offshore Fund as "[d]ue from affiliates." *Id*. at 2.

**RESPONSE TO NO. 105**:  Admitted.

106.    The Financial Statements explicitly state that "[t]he accompanying notes are an integral part of these consolidated financial statements." *Id*.

**RESPONSE TO NO. 106**:  Admitted.

107.    The notes, which were written by DBZCO, provide in the section captioned "related party transactions," "[i]n connection with certain investments entered into by an affiliate (primarily corporate loans), the Company may purchase a portion of such loans from such affiliates at the current estimated fair value as determined by the Trading Manager. Such transactions are subject to review by an independent third party. At December 31, 2005, the Company is due $223,049,505 from affiliates for certain investment transactions and their related cash flow, and owes $2,260,839 to the Trading Manager for expenses incurred on behalf of the Company. Such amounts are included net in due from affiliates on the consolidated statement of assets and liabilities." *Id*. at 26.

**RESPONSE TO NO. 107**:  Admitted.

108.    There was no mention in this note or anywhere in the Financial Statements that the "due from affiliates line" included money that the Offshore Fund had advanced on behalf of the Onshore Fund to pay for the Onshore Fund's investments. *Id*. at 26-27.

**RESPONSE TO NO. 108**:  Denied.  Law admitted that the phrase in the note, "and their related cashflow" could refer to "the money that flows from the LTD to the LP for investments that the LP might make for itself."  In fact, she was unable to provide "any reason" why such interpretation was not correct. Ex. BBB at pp. 284-86.  There was also no statement in the note that states that the "due from affiliate line" does not include the advancement of funds from the LTD to the LP for the purchase of assets that would be used for the LP to purchase investments. (Rule 56.1, Ex. E, p. 16; Ex. F, p. 26; Ex G, p. 28).  Moreover, the statement in the LTD's Offering Memoranda that the LTD "may acquire interests in loans . . . originated by the U.S. Fund," Ex. M at p. 67, when coupled with this note, leads to the clear inference by the LTD's sophisticated investors that this "related cash flow" relates to the symbiotic investing process that existed between and among the DBZCO managed funds. Ex. D at pp. 28-30.

109.   On April 19, 2006, PWC, the auditors for the Onshore Fund, issued the Consolidated Financial Statements for the year ended December 31, 2005. (Brody Decl. Ex. 97 at 4127).

**RESPONSE TO NO. 109**:  Admitted.

110.   The Onshore Fund's Consolidated Financial Statements for the year ended December 31, 2005, listed $308,839,745 under the liabilities of the Onshore Fund as "[d]ue to affiliates." *Id*. at 4128.

**RESPONSE TO NO. 110**:  Admitted.

111.   The Onshore Fund's Consolidated Financial Statements explicitly state that "[t]he accompanying notes are an integral part of these consolidated financial statements." *Id*. at 4128.

**RESPONSE TO NO. 111**:  Admitted.

112.   The notes, which were written by DBZCO, provide in the section captioned "related party transactions," "[i]n connection with certain investments (primarily corporate loans), the Fund may sell or participate a portion of such loans to affiliates at the current estimated fair value as determined by the Trading Manager. Such transactions are subject to review by an independent third party. At December 31, 2005, the Fund owes $308,839,745 to affiliates for certain investment transactions and their related cash flows." *Id*. at 4154.

**RESPONSE TO NO. 112**:  Admitted.

113.   There is no mention in this note or anywhere in the Consolidated Financial Statements for either of the funds that amount due to or due from affiliates included money the Onshore Fund owed to Offshore Fund because the Offshore Fund had advanced monies to allow the Onshore Fund to pay its commitments to fund investments.

**RESPONSE TO NO. 113**:  Denied.  As stated above, Law admitted that the phrase in the note, "and their related cashflow" could refer to "the money that flows from the LTD to the LP for investments that the LP might make for itself."  In fact, she was unable to provide "any reason" why such interpretation was not correct.  Ex. BBB at pp. 284-86.  There was also no statement in the note that states that the "due from affiliate line" does not include the advancement of funds from the LTD to the LP for the purchase of assets that would be used for the LP to purchase investments.  (Rule 56.1, Ex. E, p. 16; Ex. F, p. 26; Ex G, p. 28).  See response to ¶ 108 *supra*.

114.   Law, who saw the notes for the 2005 audited Consolidated Financial Statements, did not believe that the notes address the fact that money from the Offshore Fund was "being

used to fund Onshore Fund investments." (Brody Decl. Ex. 17 at 175:20 – 176:16).

**RESPONSE TO NO. 114**:  Denied and objected to.  Law provided this testimony on direct

examination without being shown the note in the financial statement.  She was questioned totally

on her "recollection."  Ex. BBB at p. 176.  When Law was shown the actual note on cross-

examination and questioned about the note placed in front of her, *Id*. at pp. 281-83, she admitted,

as stated above, that the phrase in the note, "and their related cashflow" could refer to "the

money that flows from the LTD to the LP for investments that the LP might make for itself."  In

fact, she was unable to provide "any reason" why such interpretation was not correct.  *Id*. at pp.

284-86.  Moreover, if an investor had questions about any of the numbers in the fund financial

statements, they could have met with Gruss or anyone else at DBZCO.  Ex. UU at p. 81 ("If an

investor wanted to meet with the CFO or any other individual they were free to do so").  Thus,

"if the investors came in to review the funds, they could see anything they wanted."  Ex. ZZ at p.

179.

115.    In connection with the 2005 audit for the Onshore and Offshore Funds, no one at
DBZCO told PWC that the amounts shown as due to affiliates and due from affiliates included
money from the Offshore Fund that was being used to fund Onshore Fund investments. (Brody
Decl. Ex. 98 at 137:21 – 138:13; Ex. 17 at 136:9-16).

**RESPONSE TO NO. 115**:  Admitted.  However, under Fed.R.Evd. 106 the following facts "in

fairness out to be considered at the same time:"  1) most of the back office staff knew about the

inter-funds transfers and no one was ever told "to keep quiet about these transfers", Ex. BBB at

pp. 274-77, Ex. ZZ at pp. 186-88, 2) all of the inter-fund transfers were accounted for in the

books and records of DBZCO, 3) each advance from the LTD to the LP was accurately

accounted for with corresponding entries on the records of the LTD and LP and were not "hidden

off the books," Ex. BBB at pp. 193-94, 232-42, 273-74, Ex. ZZ at pp. 123-24, 168-80, 4) PWC

had "full access to DZPRIV," Ex. BBB at pp. 197, 226-27, and 5) "the DZPRIV schedule [in

"spreadsheet format" was] given to PWC to be used as the basis for the presentation of the

payable-receivable balances for" the funds, Ex. ZZ at p. 159, Ex. BB at pp. 226-27.

Thus, the inter-fund transfers were fully disclosed in the financial statements of the funds.

When the Manager chose to exercise its investment authority so that capital from one fund was

invested with, or in, another member of the group, that investment necessitated the transfer of

investor capital within the group to pay for the investment.  Those investments are related party

transactions requiring specific disclosures. *See, e.g.,* Financial Accounting Standard No. 57

(related party transactions) ("FAS 57").  The transactions were thus reflected in the balance

sheet, the statement of cash flows and the notes to the financial statements, all of which were

prepared by DBZCO and audited by the external audit firm PWC.  *See, e.g.* PCAOB Auditing

Standard No. 18 (auditing standards for related party transactions).  In accord with these

standards, the financial statements for DBZCO informed investors about the transactions.  For

example, the audited financial statements for the LP fund for the fiscal year ended December 31,

2005 in the balance sheet disclosed "Due to affiliates: $308,839,745."  Ex. I at p. 2.  Similarly,

the notes to the financial statements fully disclosed the transactions as required by FAS 57 under

the heading "Related Party Transactions:":

> In connection with certain investments (primarily corporate loans),
> the Fund may sell or participate a portion of such loans to affiliates
> at the current estimated fair value as determined by the Trading
> Manager.   Such transactions are subject to review by an
> independent third party.  At December 31, 2005, the Fund owes
> $308,839,745 to affiliates for certain investment transactions and
> their relate cash flows. Ex. I at p. 28.

Investors, of course, had full access to the underlying documents for these transactions.  See

Response ¶ 114, supra.

In addition, all of the investments were recorded in DBZCO's Virtual Portfolio

Management ("VPM") system, Ex. ZZ at p. 162, and then reconciled as to which fund owned

which percentage of the investments in DZPRIV.  Ex. CCC at pp. 25-26.  DZPRIV "showed how much was owed between the Funds."  Ex. BBB at p. 239.  The VPM contained the separate accounting records for each of the funds.  Ex. ZZ at p. 167.  DZPRIV also recorded "every dime that was owed from the onshore fund to the offshore fund".  *Id*. at p. 186.  Ex. BBB at pp. 273-74.  Law would provide PWC with records reflecting "subsequent repayment[s]" from the LP to the LTD.  *Id*. at p. 198.  Finally, that Gruss never told Law to lie to the auditors about the inter-fund transfers, *Id*. at p. 195, "in fairness ought to be considered" along with the fact as to what told or did not tell to PWC.

116.    Rather, PWC understood at the time that the due to/from affiliates amounts represented the situation where the Onshore Fund would loan money and would subsequently transfer of portion of that loan or other investment to the other funds. (Brody Decl. Ex. 98 at 139:16-25). No one at PWC had the understanding that the "related party note" indicated that the Offshore Fund had provided money to the Onshore Fund to fund investments where the Offshore Fund was not going to be a participant. *Id*. at 140:20 – 141:3. Indeed, that was not PWC's understanding of how the funds operated. *Id*. at 140:17-19.

**RESPONSE TO NO. 116**:  Admitted in part, denied in part and objected to in part.  The paragraph presumes that PWC was aware of what was permitted under the funds' Offering Memoranda and operating documents.  PWC was clear that it was never asked to nor did it ever provide to DBZCO any guidance as to what it could do under the funds' Offering Memoranda or operating documents.  Ex. CCC at pp. 243-46.  Also, this paragraph fails to mention the other transactions on the schedules audited by PWC that "in fairness ought to be considered" along with what PWC did understand at the time.  DBZCO accountants testified that spreadsheets listing the inter-fund transfers were given to PWC.  Ex. ZZ at p. 159, Ex. BBB at pp. 226-227.  If PWC had discovered any impropriety such as a misappropriation, fraud or other prohibited transaction, it may have been required to report it to management and the board of directors and, under certain circumstances, resign.  Securities Exchange Act of 1934, Section 10A.  There is no evidence of any such report.  PWC never resigned.

117.    In August 2006, after the 2005 audited Consolidated Financial Statements were issued, one of the accountants at DBZCO emailed Gruss: "One of the investors asked me about the due to affiliates...what do you normally tell them...I'm sure you aren't 100% forthcoming on the actual answer. Loans to other funds that have been promptly repaid after year end...is that saying too much?" (Brody Decl. Ex. 99).

**RESPONSE TO NO. 117**:  Denied and objected to.  This email is inadmissible hearsay pursuant

to Fed.R.Evd. 801.  This is a statement by someone other than Gruss.  Alisa Butchkowski, the

author of the email, was questioned about this email at her deposition.  She had no recollection

of the email and no recollection of ever discussing the subject matter with Gruss.  Ex. JJJ at pp.

80-89.  Similarly, Gruss had no recollection of this email and testified he was always "100

percent forthcoming" with investors.  Ex. VV at pp. 249-53.  In addition, there is no evidence

that Gruss ever read or responded to this email.

### GRUSS USES INVESTOR MONEY TO PURCHASE A PLANE FOR ZWIRN

118.    The Onshore Fund and DBZCO were parties to a Management Agreement dated May 1, 2002 amended as October 1, 2004, and further amended on January 1, 2006. (Brody Decl. Exs. 100-102). The management agreement provides that "[e]ach of the parties hereto shall bear its own expenses with respect to all matters contemplated hereunder. (Brody Decl. Ex. 102 at 2).

**RESPONSE TO NO. 118**:  Admitted.

119.    With respect to who was responsible for which expenses, the confidential memorandum for the Onshore Fund states: "The Fund bears its operating expenses, including all direct expenses of the Fund, investment expenses (e.g. expenses which the General Partner determines to be related to the investment of the Fund's assets such as brokerage commissions, interest expenses, borrowing costs, clearing and settlement charges, loan servicing fees, custodial fees, bank service fees, extraordinary expenses and all other transaction costs), legal expenses, professional fees (including, without limitation, expense of consultants, experts, and third-party appraisers) relating to investments, accounting expenses, auditing and tax preparation expenses, entity level taxes, including New York City unincorporated business taxes, printing and mailing expenses, and fees and out-of-pocket expenses of any service company retained to provide certain accounting, bookkeeping, asset management, appraisal and administrative services. The Fund also pays its ongoing offering, legal, filing, accounting and reporting fees as well as other operating expenses and expenses incurred in connection with the sale of Interests." (Brody Decl. Ex. 6 at 27).

**RESPONSE TO NO. 119**:  Admitted.

120.    As early as March 2005, Zwirn began discussing with Gruss and others at the company, including its Chief Operating Officer, Harold Kahn, the purchase of a private plane for his business travel. (Brody Decl. Ex. 103).

**RESPONSE TO NO. 120**:  Admitted.

121.    Zwirn wanted the management company to purchase the airplane. (Brody Decl. Ex. 9 at 445:9-13).

**RESPONSE TO NO. 121**:  Admitted.

122.    Gruss was against the purchase of the plane because the management company "was always short on cash, constantly." (Brody Decl. Ex. 9 at 420:10-13).  Similarly, when people in the accounting department found out about the plane purchase, they were surprised because "[t]he management company had at that time been having ...liquidity issues.  Our payments of regular invoices for the management company was becoming an issue.  And then to find out that we were also going to be funding the purchase of a plane, it really -- it didn't make sense to some of us." (Brody Decl. Ex. 104 at 29:2-11).[7]

**RESPONSE TO NO. 122**:  Admitted in part and objected to in part.  That other people were

surprised and that it did not "make sense" to unnamed people is inadmissible hearsay pursuant to

Fed.R.Evd. 801.

123.    From April through July 2005, Gruss met with an airplane broker, PrivatAir, as well as with an aviation attorney and an accountant who would be involved in structuring the plane purchase. (Brody Decl. Exs. 106-110).

**RESPONSE TO NO. 123**:  Denied.  There is no admissible evidence that Gruss actually ever

met with an airplane broker, PrivatAir, an aviation attorney or an attorney regarding the purchase

of an airplane.

124.    In response to a June 14 email from Zwirn stating that he was "even more convinced that I need a solution" to his travel issues, Gruss stated: "[a]t this stage it's really about whether or not you want to deal with $. Tax folks are finalizing structure for holding Plane to maximize cost savings for DZ." (Brody Decl. Ex. 111).

**RESPONSE TO NO. 124**:  Admitted.

125.    On July 1, 2005, Kahn reported to Gruss that PrivatAir had just provided an initial list of acceptable planes so there was a "need to get our structuring ready to go." Gruss responded "Ok good. Let's review." (Brody Decl. Ex. 110).

---

[7] Counsel for Gruss stipulated to the admissibility of Michelle O'Hara's investigative testimony as if it were deposition testimony.  (Brody Decl. Ex. 105 at 13:5 – 14:9)

**RESPONSE TO NO. 125**:  Admitted in part and denied in part.  Kahn did not report to Gruss.

Kahn emailed Gruss and informed him about his meeting with PrivatAir.  Zwirn had tasked

Harold Kahn, the Chief Operating Officer for DBZCO, not Gruss, with the job of "find[ing] out

what potential options were available and to help identify sources of financing for such a

purchase."  Ex. KKK at p. 19.   As such, Kahn identified "[t]ypes of planes, who were sellers of

planes, [and] who were intermediaries that would be involved in the purchase process."  *Id*. at

19.  "Gruss had a role in the purchase of the plane simply based on his position as CFO of the

company."  *Id*. at 27.

126.     On August 25, 2005, PrivatAir informed Kahn that they had a "verbal
confirmation" from the seller of a Gulfstream G-IV that he would accept $19.95 million for the
plane. (Brody Decl. Ex. 112). Kahn forwarded that information to Gruss and stated "[u]pon offer
acceptance we need to be prepared to wire $250K as a deposit .. could be as soon as tomorrow.
Upon closing (say around 9/30), we will need to structure a loan from the mgmt co to ZH for
about $2MM until DZ gets 4th qtr. Mgmt fees payment and thus may have to be prepared to
borrow as you noted the other day." *Id*. Gruss responded "[n]o problem re tomorrow. I'll spark
some interest in the working capital loan for 9/30." *Id*.

**RESPONSE TO NO. 126**:  Admitted.

127.     On August 31, 2005, Kahn emailed Law and O'Hara details to wire $250,000 to
an escrow account with instructions that the "[a]mount should be treated as a mgmt co. prepaid
expense . . . . [a]pproved per PG and me." (Brody Dec. Ex. 198). Gruss responded "[c]orrect. Ok
pag." *Id*. Consistent with the emails from Kahn and Gruss, the $250,000 was paid out of the
management company's operating account on August 31, 2005. (Brody Decl. Ex. 114).

**RESPONSE TO NO. 127**:  Admitted in part and denied in part.  The email, Brody Dec. Ex.

198, does not contain a response from Gruss, "[c]orrect.  Ok pag."

128.     Kahn and Gruss sought financing for the plane purchase. On September 2, Merrill
Lynch sent a financing proposal to Kahn for the 1991 Gulfstream G-IV. (Brody Decl. Ex. 115).
The proposal was based on a purchase price of $17.9 million. *Id*. at 4. In order to offer non-
recourse financing (as Zwirn had requested), the bank required additional collateral in the form
of a $1.9 million letter of credit. *Id*. Kahn provided the letter to Gruss and Zwirn and stated "so
far this is the only one [proposal] that is truly non-recourse and gives us decent flexibility re use
of cash of LC or combination thereof." *Id*.

**RESPONSE TO NO. 128**:  Admitted in part and denied in part.  Kahn, not Gruss, sought

financing for the plane purchase.

129.    On September 9, Kahn emailed Gruss saying" "the LC [letter of credit] we've talked about ... probably around $2 MM plus or minus representing 10% of the purchase price... who do you think would be the best guys to set it up? ... Think we can get away w/not having it fully cash collateralized." (Brody Decl. Ex. 116).  Gruss responded: "[w]e should do citi. Timings perfect. I had them in earlier this week and [expletive] slapped them." *Id*.

**RESPONSE TO NO. 129**:  Admitted.

130.    Shortly thereafter, Gruss and Kahn contacted Citigroup about providing a letter of credit for the airplane purchase as well as a working capital loan for the management company. On September 19, after not receiving a term sheet, Gruss again reached out to Citigroup asking that the term sheet be provided "asap. You now have more than enough information. I want to review quickly as we are in the process of reviewing other 3rd Party term sheets." (Brody Decl. Ex. 117). That same day, Citigroup sent the term sheet to Gruss for a $10 million loan facility, which included the $2 million letter of credit. (Brody Decl. Ex. 118).

**RESPONSE TO NO. 130**:  Admitted in part and denied in part.  The admissible evidence only

shows that Kahn, not Kahn and Gruss, contacted Citigroup about providing a letter of credit for

the airplane purchase as well as a working capital loan for the management company.  Also, the

term sheet was sent to Kahn, and Gruss was copied on the email.

131.    In order to obtain the letter of credit from Citigroup, the management company was required to wire $1.9 million in cash collateral to Citigroup. (Brody Decl. Ex. 119).

**RESPONSE TO NO. 131**:  Admitted.

132.    On September 26, 2005, Gruss wrote Citigroup asking where they stood with respect to the management company loan.  (Brody Decl. Ex. 120 at 731856).  Citigroup responded that the letter of credit would be ready for issuance most likely by September 27. *Id*. at 731855.  When Gruss forwarded this information to one of the internal accountants for the management company who was involved in the transfer of funds, she asked "[a]ny eta on the cash." *Id*. at 731854. Gruss responded "possibly on Friday." *Id*.

**RESPONSE TO NO. 132**:  Admitted.

133.    In addition to the $1.9 million that needed to be transferred to Citigroup, the company needed to wire $1,681,350 to the seller, $112,575 to PrivatAir (the broker) and $80,250 in closing costs to Merrill Lynch.  As such, including the cash collateral for the letter of credit, DBZCO needed to come up with $3,774,175 to close the airplane purchase.

**RESPONSE TO NO. 133**:  Admitted.

134.    While the initial intention may have been to use money from the Citigroup loan facility to pay the $3,774,175 to close on the airplane purchase, that loan facility did not become available until November.  In October, 2005, one of the accountants asked Gruss to approve wiring $163,267.50 for airplane expenses. (Brody Decl. Ex. 121) The accountant also wrote: "FYI, I am now completely out of cash.  Is the Citibank loan ever actually happening. I have about 2MM of invoices holding on my desk waiting to be paid." *Id.*  Gruss approved the expenses and wrote "Pls move $ from Ltd. [the Offshore Fund]". *Id.*

**RESPONSE TO NO. 134**:  Admitted in part, denied in part and objected to in part.  First, the

initial sentence in this paragraph is inadmissible speculation.  There is no admissible evidence

that Gruss was ever aware of how much money the management company had at any one time.

Ex. UU at pp. 223-25.  There is also no admissible evidence that there was any intention to use

the money from the Citigroup loan facility to pay the $3,774,175 to close on the airplane

purchase.  As explained by Michelle O'Hara, the accountant in charge of the Management

Company account, the purpose of the Citibank loan was "to normalize processes" in paying

Management Company expenses on a monthly basis as opposed to paying expenses on an ad hoc

basis by withdrawing money from the funds to reimburse fund expenses, whenever the

Management Company had to pay such expenses.  "[T]he Citibank loan would have alleviated

the need to pay expenses and be reimbursed immediately from the funds."  Ex. LLL at pp. 161-

63.  Gruss also testified that the Citibank revolver was not needed "in order to effect the purchase

of the plane," but for "operating expenses."  Ex. VV at pp. 107-8.  Second, the statement in the

October 25, 2005 email, "Pls move $ from Ltd" without the testimony explaining that statement

is totally misleading and improperly implies that Gruss approved $163,267.50 for airplane

expenses to be paid by the LTD.  The proof shows that the $163,267.50 was taken from the LTD

as a reimbursement to the DBZCO, the management company, for expenses, which the LTD

owed to DBZCO.  Ex. LLL at pp. 156-62; Ex. UU at pp. 361-65.  In the normal course of

operations of the funds, the management company paid expenses on behalf of the funds, and the

funds in turn reimbursed the management company at various times.  Ex. LLL at pp. 157-58.

135.    On October 25, 2005, Gruss wrote Citigroup asking for the status of the loan facility. "What is the holdup? We're now going on the 4th week of the 'we'll turn this around in a week' loan." (Brody Decl. Ex. 122). In fact, the money from the Citigroup loan was not credited to the company's account until November 4, 2005 – more than a month after the money was necessary to pay for the closing costs for the airplane purchase. (Brody Decl. Ex. 123). As one accountant testified: "it was supposed to be a quick process and it turned out to be much longer than I expected." (Brody Decl. Ex. 105 at 41:18-20). "My expectation was that it was coming when they told me it was coming. In a week, in two weeks, in three days. So, every time that deadline passed, I would again be, "What's going on?  Where is the loan?" I -- at some point, in my recollection, I stopped assuming knowing when the loan was coming." *Id*. at 58:17-24.

**RESPONSE TO NO. 135**:  Admitted in part and denied in part.  The phrase 'More than a month

after the money was necessary to pay for the closing costs for the airplane" is contrary to

O'Hara's testimony recited above in response to paragraph 134 that the purpose of the Citibank

loan was "to normalize processes" in paying Management Company expenses on a monthly

basis as opposed to paying expenses on an ad hoc basis by withdrawing money from the funds to

reimburse fund expenses, whenever the Management Company had to pay such expenses.

"[T]he Citibank loan would have alleviated the need to pay expenses and be reimbursed

immediately from the funds."  Ex. LLL at pp. 161-63.

136.    Without the money from the Citigroup loan facility, a decision was made to take the money from the investors' funds to pay the closing costs. Law participated in a meeting in Gruss's office with Kahn where it was decided to use investor money to pay the closing costs since the loan had not come through. (Brody Decl. Ex. 17 at 97:20 – 98:10). Law recalled that during the meeting, Gruss was bouncing a ball off the wall of his office. *Id*. at 96:10-22.

**RESPONSE TO NO. 136:**  Admitted in part and denied in part.  First, as stated in response to

paragraph 134 and 135, the Citigroup loan had nothing to do with the closing costs for the

airplane.  Second, there is no admissible evidence that at the meeting in Gruss' office with Kahn

and Law that it was decided to use investor money to pay the closing costs for the plane.  Law

testified in her deposition that she has no recollection what anybody said at that meeting, and she

"had no recollection of any discussions about the transfers from the LP or HCMZ for plane-

related expenses."  Ex. BBB at pp. 258-59.  Law testified that the only direction she received

from anybody about using fund money to pay for the airplane expenses was an email she

received from Harold Kahn asking her to fund the airplane expenses.  To her that "was an

indication of moving the money from the Funds."  *Id*. at p. 258.  The email in question from

Kahn to Law stated, "Can you pls arrange to have the $1.9MM wired to Citi asap for the

issuance of the LC.  This will only be a short-term deposit in that once the Citi revolver is in

palce (should be w/n a week) we will credit the amount against the line.  Thx."  *Id*. at pp. 289-90,

Ex. MMM.  Third, Gruss has categorically denied that he ever authorized or had knowledge of

these payments being made from the Funds:

> Whatever expenses related to the airplane were management
> company expenses.  At no time then, or ever, did I ever authorize
> anybody to send it out of a fund or a managed account.

Ex. UU at p. 327.

137.    Law was only involved in this meeting, because she was the accountant for the
funds and the money was coming from the funds.  If the money had come from the management
company's account, she would not have been involved at all.  *Id*. at 97:20 – 98:2.  Law was the
person "responsible for fund expenses so if there were any expenses directly related to the fund
or for deals, they would have gone to [Law]." (Brody Decl. Ex. 104 at 33:2-5).

**RESPONSE TO NO. 137**:  Denied and objected to.  First, the Law testimony cited at 97:20 –

98:2 is inadmissible speculation about an unidentified conversation.  Second, the statement about

"any expense directly related to the fund . . .  would have gone to [Law]" is directly refuted by

Law who testified she could approve the expenditure of funds from the Management Company,

Ex. BBB at p. 55, and Kahn who testified that even though Law "was more responsible for the

fund accounting" and "O'Hara was more responsible for the management company accounting,"

this split in responsibilities was "not exclusive."  Ex. KKK at pp. 38-9.  As Controller of

DBZCO, Law had responsibility for paying management company expenses.  Ex. VV at p. 87.

138.    At the time, Law was "very used to this kind of situation whereby if something
needed to get funded and there was not enough money, then we would take it from an entity that
had the money."  In this case, the management company was in a "very tight cash situation" and

could not pay for the plane. Law understood that Gruss knew that the money was going to come from the fund. (Brody Decl. Ex. 17 at 110:6-11).

**RESPONSE TO NO. 138:**   Denied and objected to.  The first statement that Law was 'very used to this kind of situation whereby if something needed to get funded and there was not enough money, then we would take from an entity that had the money," was elicited improperly over Gruss' objection as a leading question in violation of Fed.R.Evd.611(c) because Law was a witness for the SEC, had entered into a cooperation agreement with the SEC (Ex. HHH), the question was asked on direct examination by the SEC, and the witness was not hostile or identified with Gruss.  The second statement that "Law understood that Gruss knew that the money was going to come from the fund" is inadmissible and not based on any statement made to her by Gruss.  Law admitted that prior to the fund money being used to pay for the airplane, she could not recall any specific conversation with Gruss about the airplane being paid with the fund money.  Ex. BBB at pp. 305-07.

As to the two September 28, 2005 payments for the airplane closing costs, Li Anne Law, the Controller for DBZCO, testified that she had created two approval forms for the two payments using wire requests with photocopies of Gruss' signature at the bottom of the wire requests.  *Id*. at pp. 253-54; Exhs. PP-QQ.  Law took "one of" the "old wire approvals" and "fold[ed] it at the part where the signature is shown up, put it on the blank that we just printed out and then photocopied it."  *Id*. at p. 253.  Law has no recollection of speaking to Gruss to obtain his approval for these two wires prior to sending out these two wires on September 28th. *Id*. at pp. 255-56.  In fact, as stated above, Law admitted that what prompted her to pay the amounts from the two managed accounts was an email she had received from Kahn requesting her to fund the two amounts – to her "it was an indication of moving the money from the Funds." *Id.* at pp. 258, 289-90; Ex. MMM.

As to the September 29th and 30th payments for the airplane closing costs, both payments were sent from the funds after Gruss had emailed his approvals "Ok pag" in response to emails from Law.  Exhs. RR, KK.  Law admitted that DBZCO did a number of "investments that related to airplanes including Priority Air, that "she "wouldn't know" whether Gruss actually knew he was approving payments from the funds for Zwirn's airplane and that she could not "recall" any such conversations with Gruss about these payments.  Ex. BBB at pp. 294-300.

139.    At the time Gruss was very cognizant of keeping track, or seeing every payment related to the plane so all invoices specifically required Gruss's separate approval. (Brody Decl. Ex. 104 at 151:16-21).

**RESPONSE TO NO. 139**:  Denied.  O'Hara did not testify that Gruss was very cognizant of keeping track, or seeing every payment related to the plane.  In fact, she testified that "I don't have a specific recollection of him actually approving any particular invoice."  Ex. LLL at p. 150.  There is no evidence that "Gruss was very cognizant of keeping track, or seeing every payment related to the plane."

140.    Gruss knew that the use of investor funds to purchase an airplane for the management company would be a violation of the agreements between the funds and the management company. (Brody Decl. Ex. 9 at 94:18-24, 449:6-9).

**RESPONSE TO NO. 140**:  Admitted.

141.    On September 27, 2005, Kahn sent Law and email with a copy to Gruss requesting that Law "arrange to have the $1.9MM wired to Citi asap for the [i]ssuance of the LC [letter of credit]." (Brody Decl. Ex. 124).

**RESPONSE TO NO. 141**:  Admitted.

142.    A wire transfer instruction to Bear Stearns dated September 28, 2005 requested the transfer of $1,900,000 from the HCM/Z Account to DBZCO's cash collateral account at Citibank. (Brody Decl. Ex 125). A signature appeared on the Perry Gruss signature line. *Id*.

**RESPONSE TO NO. 142**:  Admitted in part and denied in part.  As to the signature on the wire transfer instructions, Law admitted, as set forth response to paragraph 138 above, that she had created the signature on the wire approval by photocopying Gruss' signature on to the wire

instructions without Gruss' knowledge.  Accordingly, the SEC's statement that "[a] signature

appeared on the Perry Gruss signature line" is wholly misleading and intentionally omits a

material fact, namely the testimony of Law.

143.    On September 27, 2005, Kahn sent Gruss and Law an email stating that a "facility fee" in the amount of $80,250 needed to be paid to Merrill Lynch. (Brody Decl. Ex. 126).

**RESPONSE TO NO. 143**:  Admitted in part and denied in part.  Kahn sent the email to Law

and copied Gruss on the email.

144.    A wire transfer instruction to Bear Stearns dated September 28, 2005 requested the transfer of $80,250 from the HCM/Z Account to Merrill Lynch. (Brody Decl. Ex. 127). A signature appeared on the Perry Gruss signature line. *Id*.

**RESPONSE TO NO. 144**:  Admitted in part and denied in part.  As to the signature on the wire

transfer instructions, Law admitted, as set forth response to paragraph 138 above, Law created

the signature on the wire approval by photocopying Gruss' signature on to the wire instructions

without Gruss' knowledge.  Accordingly, the SEC's statement that "[a] signature appeared on

the Perry Gruss signature line" is wholly misleading and intentionally omits a material fact,

namely the testimony of Law.

145.    On September 28, 2005, Kahn forwarded to Law and copied to Gruss the wire instructions for the plane deposit to be sent to the escrow agent, Insured Aircraft Title Service ("IATS"). (Brody Decl. Ex. 128).  On September 29, Kahn sent Law and copied to Gruss the final amount for the wire that needed to be paid to IATS. (Brody Decl. Ex. 129). On that same date, the accountant sent an email -- cc'ed to Gruss -- stating: "Please wire $1,681,350 from the L.P. acct # ***599 to the following instructions. PG's [Perry Gruss's] approval to follow. Thanks." (Brody Decl. Ex. 130).

**RESPONSE TO NO. 145**:  Admitted.

146.    Gruss approved the transfer from the Onshore Fund's account to pay the deposit on the airplane.  *Id*.

**RESPONSE TO NO. 146:**  Admitted in part and denied in part.  As to the September 29th and

30th payments for closing costs for the airplane for which Gruss approved the email requests for

the transfer of the funds, these approvals were a "protocol for LaSalle" bank, which Gruss was

required to perform in order to release funds from the bank.  Ex. VV at p. 17.  Gruss' purpose in approving the transfer was "[t]o make sure the wire was actually sent" because "[w]ithout an authorization that wire does not get sent." Id. at 27.   Gruss received "hundreds of e-mail approval requests." *Id.* at 17.   In the month of "September alone" he "had received over 250 such requests." *Id.*   On September 29th and 30th Gruss received numerous email requests for authorizations to send moneys from the funds and approved the two emails at issue at the same time he approved other email requests for approval.  Ex. BBB at pp. 293-94, 299-300; Exhs. NNN-OOO.  "[T]he control that made sure that the wire was for an appropriate purpose" was the "Finance [personnel] who were actually authorizing the wires and . . . [the] people in the back office the next day that were reconciling the wires."  *Id.* at Exhs. RR, KK.

At the time Gruss approved the September 29th and 30th email requests, he did not know he was approving payments for Zwirn's airplane.  Ex. VV at p. 17.  As a general practice Gruss "would read the "To" line and the "From" line and most likely the subject." *Id.*  The subject on the September 29th and 30th emails was "RE: IATS."  By itself this subject did not reference the purchase of Zwirn's airplane.  If Gruss had read further into the email, he would have seen on the September 29th email the phrase "CREDIT:  INSURED AIRCRAFT TITLE SERVICES, INC., Ex. RR, and on the September 30th email the phrase, "Acct:  FSG Privatair, Inc."  Ex. KK.  These references to aircraft, however, did not mean these requests for approval were related to Zwirn's personal airplane that Gruss had expected to be paid out of DBZCO, the management company.  Prior to September 30th the Zwirn funds had been investing in aircraft, one of which investments was known as "Priority Air," "quite similar to Private Air.'  Ex. BBB at p. 295; Ex. UU at pp. 344-46, Ex. PPP.  As recently as September 6th, Gruss had approved an email relating to "Priority Air." *Id.*  Because the airplane was supposed to be paid out of the Management

Company, Gruss was not expecting to be given an approval for payment from any of the funds. Ex. UU at pp. 232, 355; Ex. XX at pp. 204-05.

Proof that Gruss did not know he was approving a release of money from the funds to pay the airplane is in an email he sent to DBZCO partner Christopher Suan about a week after the completion of the four airplane transactions. On October 9, 2005, Gruss discussed the purchase of the airplane in email correspondence with Suan. In that email Suan asked Gruss if Zwirn had bought "Glenn's [Dubin] plane." Gruss replied, "No his own" and that the funds to pay for the plane came out of the "Mgmt co bc its 95pct mgmt. co related." Ex. QQQ. The remaining 5% of the 95% of the plane that would be used for the management company was for Zwirn's personal use of the plane. Ex. VV at pp. 95-96. This email is admissible pursuant to Fed.R.Evd. 801(d)(B)(i) "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying."

147.    On September 28, PrivatAir sent Kahn its invoice for the balance of the acquisition fee. (Brody Decl. Ex. 131). On September 30, Kahn forwarded the invoice to Gruss and the accountants, stating: "[o]ne more wire to go this am as per attached -- $112,575." *Id*.

**RESPONSE TO NO. 147**: Admitted in part and denied in part. The September 30 email was sent to the accountants and copied to Gruss.

148.    On September 30, the accountant sent an email -- cc'ed to Gruss -- stating: "Please wire $112,575 from the L.P. acct #***599 to the following instructions. PG's approval to follow. Thanks." (Brody Decl. Ex. 132).

**RESPONSE TO NO. 148**: Admitted.

149.    On that same day, Gruss approved the transfer from the Onshore Fund's account to pay PrivatAir for its brokerage services for the plane acquisition. (Brody Decl. Ex. 132).

**RESPONSE TO NO. 149**: Admitted in part and denied in part. See response to paragraph 146.

150.    During this entire time, Gruss was aware that the management company did not have sufficient funds to pay the $3,774,175 required to close the airplane purchase. Indeed, the tone of the discussion in the office was that it was "odd" that the company was purchasing the plane while it was going through liquidity issues. (Brody Decl. Ex. 105 at 69:13-17).

**RESPONSE TO NO. 150**:  Denied and objected to.  Gruss testified that he was not aware that

the management company did not have sufficient funds to pay the $3,774,175.  Ex. VV at pp.

107-08, Ex. UU at pp. 274, 278-79.  The statement about the "tone of the discussion" is

inadmissible hearsay pursuant to Fed.R.Evd. 801.  Moreover, O'Hara expressly testified in

regard to the "general tone" that she did "not recall any specific conversations."  Ex. RRR at p.

69.

151.    During the period from September 28, 2005 through September 30, 2005, the
management company did not have more than $827,000 in its operating account. (Brody Decl.
Ex. 133 at 66).

**RESPONSE TO NO. 151**:  Admitted at to account #9183910.

152.    On September 23, 2005, one of the accountants sent Gruss an email stating that
the management company was "scraping the barrel" (Brody Decl. Ex. 202), meaning that the
funds were very low in the management company's account. (Brody Decl. Ex. 105 at 37:17-19).
On September 23, the management company's operating account balance declined from
$207,000 to just below $178,000. (Brody Decl. Ex. 133 at 66)

**RESPONSE TO NO. 152**:  Admitted in part, denied in part and objected to in part.  The

inference the SEC improperly attempts to draw from the September 23rd email is that Gruss

should have known 5 days later when the moneys were paid for the airplane closing costs that

the management company account did not have sufficient funds and therefore the money had to

come from the LP and HCM/Z.  The additional testimony of O'Hara that the SEC does not cite

or include is her testimony that the funds would reimburse expenses to the Management

Company "on an as-needed basis."  Ex. RRR at pp. 38-41.  Thus, what may be in the

management company on one day will not necessarily be what is available 5 days later since the

Management Company was always in a position to be reimbursed for expenses it paid on behalf

of the funds.  Under Fed.R.Evd. 106 the O'Hara testimony cited to by the SEC "in fairness ought

to be considered" along with her immediately subsequent testimony about how the Management

Company would meet upcoming expenses by obtaining reimbursement from the funds for

expenses the Management Company had spent on behalf of the funds.

153.    On October 26, after the airplane deal closed, one of the accountants sent Gruss a spreadsheet specifically stating that the money to the seller ($1,681,350), to Citgroup ($1,900,000), to Merrill Lynch ($80,250), and to PrivatAir ($112,575) had not come from DBZCO. (Brody Decl. Ex. 135). The term "FUND" was used in the "Bank" column of the spreadsheet to indicate that payment "was made by somebody from the fund account, from one of the fund accounts" as distinguished from DBZCO's operating account at Citibank. (Brody Decl. 105 at 64:19 – 65:4).

**RESPONSE TO NO. 153**:  Admitted in part and denied in part.  The paragraph improperly

implies that Gruss reviewed this spreadsheet at the time.  There is no evidence he ever reviewed

the chart or responded to the October 26 email.  Ex. UU at pp. 366-99.

154.    Similarly, on November 9, 2005, one of the accountants sent Gruss an email describing how much cash was available to the management company. (Brody Decl. Ex. 136). The first liability listed was $3.8 million to "repay LP fund for airplane wires." *Id*.  On November 10, the accountant sent Gruss a second email stating: "PG – we need to send $3.77 mm from the new account where we received the 8.1 mm loan back to the LP fund for reimbursement of the airplane wires." (Brody Decl. Ex. 137).

**RESPONSE TO NO. 154**:  Admitted.

155.    After the plane purchase was completed, Gruss and Law continuously talked about when the Citigroup loan was going to come through so that the funds could be repaid for the money that had been used for the plane. (Brody Decl. Ex. 17 at 96:13 – 97:7).

**RESPONSE TO NO. 155**:  Admitted in part and denied in part.

The only conversations Law recalls with Gruss was "after the fact" of the payments from

the funds about repaying the two managed account and the funds from a loan from Citibank.

Law cannot recall any conversation with Gruss "prior to November 9th [2005], where . . . [she]

actually spoke to him about the fact that the monies had to be repaid for the . . . airplane wires.".

Ex. BBB at pp. 305-07.  On November 9, 2005, Gruss was in Hong Kong.  Ex. UU at pp. 373-

74.  On cross-examination Law testified that she talked to Gruss "[s]everal times, (as opposed to

"continuously talked") but nothing specific," and she could not say if those conversations

occurred in "October or November."  Ex. BBB at p. 307.

## GRUSS AUTHORIZES THE EARLY TAKING OF MANAGEMENT FEES

156.    The Onshore Fund and DBZCO were parties to a Management Agreement dated May 1, 2002, amended as October 1, 2004, and further amended on January 1, 2006. (Brody Decl. Exs. 100-102). Pursuant to this agreement, DBZCO was to be paid a monthly management fee which was to be "accrued monthly and payable quarterly."

**RESPONSE TO NO. 156**: Admitted.

157.    The Offshore Fund and DBZCO similarly were parties to a Management Agreement dated May 1, 2002, amended as of August 19, 2005, and further amended on January 6, 2006. (Brody Decl. Exs. 138-140). Pursuant to this agreement, DBZCO was to be paid a monthly management fee which was to be "accrued monthly and payable quarterly."

**RESPONSE TO NO. 157**: Admitted.

158.    D.B. Zwirn Special Opportunities Fund (TE), L.P. (the "TE Fund")[8] and DBZCO were parties to a Management Agreement dated May 29, 2003, amended as of October 1, 2004, and further amended as of January 1, 2006. (Brody Decl. Exs. 141-143). Pursuant to this agreement, DBZCO was to be paid a monthly management fee which was to be "accrued monthly and payable quarterly."

**RESPONSE TO NO. 158**: Admitted.

159.    D.B. Zwirn Special Opportunities Fund II, Ltd. (the "LTD II Fund") and DBZCO were parties to a Management Agreement as of June 1, 2005. (Brody Decl. Ex. 144). Pursuant to this agreement, DBZCO was to be paid a monthly management fee which was to be "accrued monthly and payable quarterly."

**RESPONSE TO NO. 159**: Admitted.

160.    The meaning of the "accrued monthly and payable quarterly" language was that the fee was calculated on a monthly basis, but it would not be paid until the end of the quarter. (Brody Decl. Ex. 17 at 60:4-11).

**RESPONSE TO NO. 160**: Admitted.

161.    DBZCO was "always short on cash." (Brody Decl. Ex. 17 at 63:9-11). As Gruss explained: "The management company was always tight on cash. . . . It was always tight on cash because ... Dan Zwirn grew the firm way too quickly. Way too quickly. The growth exceeded the amount of operational expenses a firm of that size could bear." (Brody Decl. Ex. 4 at 267:817).

**RESPONSE TO NO. 161**: Admitted.

162.    During most of 2005, DBZCO had little liquidity and had invoices coming down that were close to or exceeding the amount of cash available to it. By the end of each quarter it

---

[8] The TE Fund was formerly known as Highbridge/Zwirn Special Opportunities Fund (TE), L.P.

was hard for DBZCO to pay invoices. (Brody Decl. Ex. 104 at 29:24 – 31:5).

**RESPONSE TO NO. 162**:  Admitted.

163.    In order to pay DBZCO's expenses, a practice developed where management fees were collected early. (Brody Decl. Ex. 145 at 66:25 – 67:6).  Because DBZCO needed to pay rent or salary, "it collected the management fees earned by the Fund but not yet payable." *Id*. at 67:23 – 68:4.  Gruss admits that he was aware of this practice as of the summer of 2004. *Id*. at 65:3-21.  Gruss further admits that he knew and approved for management fees to be paid early without any authority to do so. (Brody Decl. Ex. 9 at 256:25 – 257:18).

**RESPONSE TO NO. 163**:  Admitted and objected to because the paragraph does not show

Gruss' good faith in exploring whether a loan document should be created for the early payment

of management fees between the Fund and DBZCO.  On June 21, 2004, when Silvia Wu,

DBZCO's Financial Accounting Controller, first asked Gruss to approve the early payment of

management fees via an email, Gruss sought Wu's guidance.  In the email response from Gruss

to Wu, Gruss specifically asked Wu whether a loan had to be documented, stating "We need to

paper a loan to mgmt co don't we?" to which Wu replied, "no... just prepaying mgmt fee ahead

of schedule."  Ex. YY at pp. 201-09, Ex. ZZ at pp. 21,113-14, 219-20; Ex. SSS.

164.    The process was on a "needs basis." (Brody Decl. Ex. 17 at 86:10). The trigger point for sending management fees from the funds to DBZCO "was always when Michelle O'Hara came to us saying 'Look, we have a cash crunch.'" *Id*. at 86:12-15.

**RESPONSE TO NO. 164**:  Admitted.

165.    DBZCO would not have been able to pay its bills if the management fees had not been paid early by the Funds. (Brody Decl. Ex. 17 at 94:14-18; Ex. 105 at 20:24 – 21:6 "We didn't have enough cash to stay current on our bills. So during that period I would talk to Perry [Gruss] regularly about cash issues"). As Gruss admits, "[i]f we didn't collect the management fees, people would not have been paid, period." (Brody Decl. Ex. 145 at 74:23 – 75:11).

**RESPONSE TO NO. 165**:  Admitted.

166.    Zwirn was not aware of this practice while it was going on. (Brody Decl. Ex. 145 at 75:14-15; Affidavit of Daniel B. Zwirn at ¶ 9).

**RESPONSE TO NO. 166**:  Admitted.

167.    Gruss knew that the early collection of management fees would violate the

agreements between the funds and the management company and also understood that taking investor funds in ways not permitted by the legal agreements was a serious matter. (Brody Decl. Ex. 9 at 114:9-16, 126:8-12).

**RESPONSE TO NO. 167**:  Admitted.

168.    As demonstrated in the chart below, there were twenty-three instances where DBZCO withdrew accrued monthly management fees before the end of the quarter.

| No. | Date of Withdrawal | Amount | Fee Accrued For Month Ended | End Of Quarter | Number of Days Withdrawn Before End Of Quarter |
|---|---|---|---|---|---|
| 1 | 5/26/04 | $450,595 | 4/30/04 | 6/30/04 | 35 |
| 2 | 6/21/04 | 394,710 | 5/31/04 | 6/30/04 | 9 |
| 3 | 6/25/04 | 497,178 | 5/31/04 | 6/30/04 | 5 |
| 4 | 8/23/04 | 557,557 | 7/31/04 | 9/30/04 | 38 |
| 5 | 9/7/04 | 91,945 | 7/31/04 | 9/30/04 | 23 |
| 6 | 9/7/04 | 484,935 | 7/31/04 | 9/30/04 | 23 |
| 7 | 8/5/05 | 1,183,786 | 7/31/05 | 9/30/05 | 56 |
| 8 | 9/1/05 | 304,114 | 7/31/05 | 9/30/05 | 29 |
| 9 | 9/1/05 | 379,257 | 7/31/05 | 9/30/05 | 29 |
| 10 | 9/14/05 | 1,265,424 | 8/31/05 | 9/30/05 | 16 |
| 11 | 9/14/05 | 323,932 | 8/31/05 | 9/30/05 | 16 |
| 12 | 11/22/05 | 1,440,254 | 10/31/05 | 12/31/05 | 39 |
| 13 | 11/30/05 | 427,498 | 10/31/05 | 12/31/05 | 31 |
| 14 | 12/14/05 | 355,648 | 10/31/05 | 12/31/05 | 17 |
| 15 | 12/19/05 | 1,506,720 | 11/30/05 | 12/31/05 | 12 |
| 16 | 12/19/05 | 433,373 | 11/30/05 | 12/31/05 | 12 |
| 17 | 12/20/05 | 357,844 | 11/30/05 | 12/31/05 | 11 |
| 18 | 12/29/05 | 1,500,000 | 12/31/05 | 12/31/05 | 2 |
| 19 | 12/30/05 | 450,000 | 12/31/05 | 12/31/05 | 1 |
| 20 | 3/1/06 | 5,200,000 | 1/30 & 2/28/06 | 3/31/06 | 30 |
| 21 | 3/1/06 | 3,400,000 | 1/30 & 2/28/06 | 3/31/06 | 30 |
| 22 | 3/1/06 | 770,000 | 1/30 & 2/28/06 | 3/31/06 | 30 |
| 23 | 3/7/06 | 760,000 | 1/30 & 2/28/06 | 3/31/06 | 24 |
| | | $22,534,770 | | | |

**RESPONSE TO NO. 168**:  Denied.  See Gruss Dec. Ex. J; Ex. OO, pp. 5-6 (Rule 56.1 Stmt.).

169.    These early withdrawals of management fees were memorialized in emails and requests for wire transfers, each showing that Gruss approved the early withdrawal of management fees. On May 26, 2004 at 3:16 p.m., DBZCO's controller emailed the Onshore Fund's bank instructions to "wire $450,595 from the Onshore Fund's account to DBZCO's

operating account at Citibank. (Brody Decl. Ex. 146). The subject of the email referenced "wire from #***599 – Mgmt Fee." *Id*. Gruss was copied on the email. *Id*. At 4:48 p.m., Gruss emailed the Onshore Fund's bank stating "[o]nce again, pls take this email as authorization for [DBZCO's controller] to sign on my behalf through Friday the 28th of May." (Brody Decl. Ex. 147).

**RESPONSE TO NO. 169**:  Admitted.

170.    On June 21, 2004, Wu emailed the Offshore Fund's bank instructions to "wire $394,710" from the Offshore Fund's account to DBZCO's account at Citibank and referenced Gruss's initials "PAG" and approval that would follow. (Brody Decl. Ex. 148). The subject of the email referenced "Apr 04 mgmt fee." *Id*. An email from Gruss followed stating "Ok to go. ASAP." *Id*.

**RESPONSE TO NO. 170**:  Admitted and objected to for the same reasons set forth in response

to paragraph 163 above.

171.    On June 21, 2004, Gruss emailed Wu and asked, "[w]e need to paper a loan to the mgmt. co don't we?" (Brody Decl. Ex. 149). Minutes later, Wu replied "no.. just prepaying mgmt. fee ahead of schedule." *Id*.

**RESPONSE TO NO. 171**:  Admitted.

172.    On June 25, 2004, Wu emailed the Onshore Fund's bank instructions to "[p]lease transfer $497,178" from the Onshore Fund's account to DBZCO's account at Citibank and referenced Gruss's initials "PG" and approval that would follow. (Brody Decl. Ex. 150). The subject of the email referenced "May mgmt. fee LP & TE." *Id*. An email from Gruss, stating "ok to go," followed. *Id*.

**RESPONSE TO NO. 172**:  Admitted.

173.    On August 23, 2004, a wire instruction was sent to the Offshore Fund's account at Bear Stearns to transfer $557,557 from the Offshore Fund's account to DBZCO's account at Citibank. (Brody Decl. Ex. 151). The reference on the wire instruction read "Jul 04 Mgmt Fee." *Id*.  A signature appears on the Perry Gruss signature line. *Id*.

**RESPONSE TO NO. 173**:  Admitted.

174.    On September 7, 2004, two wire instructions were sent to Bear Stearns. The first wire instruction was for the transfer of $91,945 from the Onshore Fund's account to DBZCO's account at Citibank. (Brody Decl. Ex. 152). The reference given on the wire instruction was "Jul04 TE Mgmt Fee." *Id*. The second wire instruction was for the transfer of $484,935 from the Onshore Fund's account to DBZCO's account at Citibank. (Brody Decl. Ex. 153). The reference given on the wire was "Jul04 LP Mgmt Fee." *Id*. In both wire instructions, a signature appears on the Perry Gruss signature line. (Brody Decl. Ex. 152-153).

**RESPONSE TO NO. 174**:  Admitted.

175.     On August 5, 2005, according to a record provided to DBZCO by Bear Stearns on November 17, 2006, a $1,183,786 wire was made from the Onshore Fund's account to DBZCO's operating account at Citibank with the comment "JUL 05 MGMT FEE." (Brody Decl. Ex. 154).

**RESPONSE TO NO. 175**:  Admitted.

176.     A November 17, 2006 email from Bear Stearns to DBZCO indicates that DBZCO's controller entered the August 5, 2005 wire request via an online Bear Stearns system. (Brody Decl. Ex. 155).

**RESPONSE TO NO. 176**:  Admitted.

177.     On September 1, 2005, a wire instruction was sent to the TE Fund's account at Bear Stearns to transfer $304,114 from the Onshore Fund's account to DBZCO's account at Citibank. (Brody Decl. Ex. 156). The reference given on the wire instruction was "July mgmt fees." *Id*. A signature appears on the Perry Gruss signature line. *Id*.

**RESPONSE TO NO. 177**:  Admitted.

178.     On September 1, 2005, Law emailed the Offshore Fund's bank instructions to "wire $379,256.58" from the Offshore Fund's account to DBZCO's operating account at Citibank and referenced Gruss's initials "PG" and that approval would follow. (Brody Decl. Ex. 157). The subject of the email referenced "July Mgmt fees." *Id*. An email from Gruss stating "Ok pag" followed. *Id*.

**RESPONSE TO NO. 178**:  Admitted.

179.     On September 14, 2005, Law emailed the Onshore Fund's bank instructions to "wire $1,265,424" from the Onshore Fund's account to DBZCO's operating account at Citibank and referenced Gruss's initials "PG" and that approval would follow. (Brody Decl. Ex. 158).

The subject of the email referenced "Aug mgmt fees." *Id*. An email from Gruss stating "Ok pag"

followed. *Id*.

**RESPONSE TO NO. 179**:  Admitted.

180.     On September 14, 2005, a wire instruction was sent to the TE Fund's account at Bear Stearns to transfer $323,932 from the TE Fund's account to DBZCO's operating account at Citibank. (Brody Decl. Ex. 159). The reference on the wire instruction was "DBZ TE Expense." *Id*. A signature appears on the Perry Gruss signature line. *Id*.

**RESPONSE TO NO. 180**:  Admitted.

181.     On November 22, 2005, DBZCO's controller emailed the Onshore Fund's bank

instructions to "wire $1,440,254" from the Onshore Fund's account to DBZCO's operating account at Citibank and referenced Gruss's initials "PG" and the approval that would follow. (Brody Decl. Ex. 160) An email from Gruss stating "Ok pag" followed. *Id.*

**RESPONSE TO NO. 181**:  Admitted.

182.    On November 30, 2005, Law emailed the Offshore Fund's bank instructions to "transfer "$1,254,345" from the Offshore Fund's account to DBZCO's operating account at Citibank and referenced Gruss's initials "PG" and the approval to follow. (Brody Decl. Ex. 161). The subject of the email referenced "LTD mgmt. fee aug-oct." *Id.* An email from Gruss stating "Ok pag" followed. *Id.* Included within in the $1,254,346 was $427,498 that was being paid early for the month of October. (*Id.*; Brody Decl. Ex. 17 at 85:21-22).

**RESPONSE TO NO. 182**:  Admitted.

183.    On December 14, 2005, Law emailed two wire instructions to Bear Stearns. Gruss was copied on the email. (Brody Decl. Ex. 162). One of the wire instructions directed Bear Stearns to transfer $355,648 from the TE Fund's account to DBZCO's operating account at Citibank. (Brody Decl. Ex. 163). The reference on the wire was "Oct mgmt fees." *Id*. A signature appears on the Perry Gruss signature line. *Id*.

**RESPONSE TO NO. 183**:  Admitted

184.    On December 19, 2005, Law emailed the Onshore Fund's bank instructions to "wire $1,506,720" from the Onshore Fund's account to DBZCO's operating account at Citibank and referenced Gruss's initials "PG" and the approval to follow. (Brody Decl. Ex. 164). The subject of the email referenced "LP Nov mgmt fee." *Id*. An email from Gruss stating "Ok pag" followed. *Id*.

**RESPONSE TO NO. 184**:  Admitted.

185.    On December 19, 2005, Law emailed the Offshore Fund's bank instructions to "wire $433,373.04" from the Offshore Fund's account to DBZCO's operating account at Citibank and referenced Gruss's initials "PG" and the approval to follow. (Brody Decl. Ex. 165). The subject of the email referenced "LTD Nov mgmt fee." *Id*. An email from Gruss stating "Ok pag" followed. *Id*.

**RESPONSE TO NO. 185**:  Admitted.

186.    On December 20, 2005, Law emailed a wire instruction to Bear Stearns (Brody Decl. Ex. 196) requesting that the TE Fund's account transfer $357,844 to DBZCO's operating account at Citibank. (Brody Decl. Ex. 197). The reference given on the wire instruction was "nov mgmt fee." *Id*. Gruss was copied on the email. *Id*. A signature appeared on the Perry Gruss signature line. (Brody Decl. Ex. 196).

**RESPONSE TO NO. 186**:  Admitted.

187.    On December 29, 2005, Law emailed the Onshore Fund's bank instructions to "wire $1,500,000" from the Onshore Fund's account to DBZCO's operating account at Citibank and referenced Gruss by his initials "PG" and that his approval would follow. (Brody Decl. Ex. 173). The subject of the email referenced "LP Dec mgmt fee." *Id*. An email from Gruss stating "Ok pag" followed. *Id*.

**RESPONSE TO NO. 187**: Admitted.

188.    On December 30, 2005, Law emailed the account contact at Bear Stearns with a request – "just posted online wire for $450,000 from LLL . . . pls process ASAP." (Brody Decl. Ex. 166). Gruss was copied on the email. *Id*. A record of a $450,000 wire provided to DBZCO by Bear Stearns on November 17, 2006 shows a $450,000 wire from the Offshore Fund's account to DBZCO's operating account at Citibank with the comment "DEC MGMT FEE." (Brody Decl. Ex. 167).

**RESPONSE TO NO. 188**: Admitted.

189.    On March 1, 2006, Law emailed the Offshore Fund's bank instructions to "wire $5,200,000" from the Offshore Fund's account to DBZCO's operating account at Citibank and referenced Gruss by his initials "PG" and that his approval would follow. (Brody Decl. Ex. 168). The subject of the email referenced "Ltd Jan & Feb 06 mgmt fee." *Id*. An email from Gruss stating "Ok pag" followed. *Id*.

**RESPONSE TO NO. 189**: Admitted.

190.    On March 1, 2006, Law emailed the Onshore Fund's bank instructions to "wire $3,400,000" from the Onshore Fund's account to DBZCO's operating account at Citibank and referenced Gruss by his initials "PG" and that his approval would follow. (Brody Decl. Ex. 169). The subject of the email referenced "LP Jan & Feb 06 mgmt fee." *Id*. An email from Gruss stating "Ok pag" followed. *Id*.

**RESPONSE TO NO. 190**: Admitted.

191.    On March 1, 2006, a wire instruction was sent to the TE Fund's account at Bear Stearns to transfer $770,000 from the TE Fund's account to DBZCO's operating account at Citibank. (Brody Decl. Ex. 170). The reference given on the wire instruction was "2006 Jan & Feb mgmt fee." *Id*. A signature appears on the Perry Gruss signature line. *Id*.

**RESPONSE TO NO. 191**: Admitted.

192.    On March 7, 2006, Law emailed a wire instruction to the LTD II Fund's account at Bear Stearns to transfer $760,000 from the LTD II Fund's account to DBZCO's operating account at Citibank. Gruss was copied on the email. (Brody Decl. Ex. 172). The reference given on the wire instruction was "Jan and Feb 06 mgmt fees," and a signature appears on the Perry Gruss signature line. (Brody Decl. Ex. 171).

**RESPONSE TO NO. 192**: Admitted.

193.    DBZCO's auditors PwC, did not test the timing of management fee payments as part of its audit. (Brody Decl. Ex. 98 at 58:2-5, 156:25 – 157:5).

**RESPONSE TO NO. 193**:  Admitted.


### DBZCO INFORMS THE INVESTORS ABOUT THE IMPROPER TRANSFERS

194.    At the end of October 2006, DBZCO reached out to investors to inform them of certain of the improper actions that had taken place at the funds. (Brody Decl. Ex. 174). These calls were followed up with a November 3, 2006 memorandum to investors that explained that DBZCO was conducting an internal review. *Id*.

**RESPONSE TO NO. 194**:  Objected to on the ground that the November 3, 2006, memo from

DBZCO to investors is inadmissible hearsay pursuant to Fed.R.Evd. 801.  All of the investor

communications and the results of DBZCO's internal investigation consist of hearsay upon

hearsay and should be excluded as inadmissible.  *U.S. Reyes*, 239 F.R.D. 591, 600 (N.D. Ca.

2006).  Gruss further objects on the ground that what the investors were told is irrelevant to any

of the issues in this case.

195.    In its Q4 2006 letters to the Offshore and Onshore Fund investors, DBZCO stated "[a]s you know, we communicated with you in Q4 2006 regarding certain issues affecting our Firm.  At that time, we informed you that we were taking significant, carefully-coordinated steps to resolve these issues, including an internal review in consultation with external lawyers and an external review by independent lawyers and accountants ('the Independent Review'). We also informed you that we took the additional step of informing the S.E.C. of these issues, as well as the actions the Firm was taking to address them, including the Independent Review." (Brody Decl. Ex. 175 at 8865; Ex. 176 at 86).

**RESPONSE TO NO. 195**:  Objected to on the ground that the Q4 2006 letters to the Offshore

and Onshore investors are inadmissible hearsay pursuant Fed.R.Evd. 801.  Gruss further objects

on the ground that what the investors were told is irrelevant to any of the issues in this case.

196.    On March 27, 2007, DBZCO sent a memorandum to investors reporting the completion of the independent review. (Brody Decl. Ex. 177).

**RESPONSE TO NO. 196**:  Objected to on the ground that the March 27, 2007 memorandum to

investors are inadmissible hearsay pursuant Fed.R.Evd. 801.  Gruss further objects on the ground

that what the investors were told is irrelevant to any of the issues in this case.

197.    The memorandum explained that the "exhaustive" review had cost the management company over $20 million in professional fees to date. *Id.*

**RESPONSE TO NO. 197**:  Objected to on the grounds that 1) the March 27, 2007

memorandum to investors are inadmissible hearsay pursuant Fed.R.Evd. 801, and 2) the cost of

the investigation is irrelevant to any issue in this case.  Gruss further objects on the ground that

what the investors were told is irrelevant to any of the issues in this case.

198.    The memorandum reported that there were "numerous inter-fund transfers" where the Offshore Fund and another managed account "frequently made advances" to the other funds and managed accounts "and those advances were used to fund investments. These inter-fund transfers were not properly accounted for and documented." *Id.*

**RESPONSE TO NO. 198**:  Objected to on the grounds that 1) the March 27, 2007

memorandum to investors are inadmissible hearsay pursuant Fed.R.Evd. 801 and 2) that the

competent evidence show that the advances from the LTD to the LP were accounted for to the

penny in DZPRIV and the funds' balance sheets.  See ¶¶ 41-46 of Defendant Gruss' Statement of

Undisputed Material Facts Pursuant to Local Civil Rule 56.1.  Gruss further objects on the

ground that what the investors were told is irrelevant to any of the issues in this case.

199.    The memorandum further reported that the amounts currently due from the Onshore Fund to the Offshore Fund and a managed account "are in excess of $100 million." *Id.*

**RESPONSE TO NO. 199**:  Objected to on the ground that the March 27, 2007 memorandum to

investors is inadmissible hearsay pursuant Fed.R.Evd. 801.  Gruss further objects on the ground

that what the investors were told is irrelevant to any of the issues in this case.

200.    Investors believed that these disclosures were material. One investor wrote following a November 7, 2006 conference call with DBZCO: "DB Zwirn have verbally advised us ... of a number of accounting errors that they have identified prior & subsequent to the departure of their CFO in early October 2006. The errors involve the transfer of an asset from one fund to another without $8 million of associated interest, a management fee drawn down before its due date and some expenses incorrectly booked. . . . This disclosure does, of course, raise questions as to the overall integrity of their accounting. . . . **Given the circumstances, we have reduced our Competence operational rating to a D, and would recommend that clients**

**do not consider new or additional investments until these issues are resolved**." (Brody Decl. Ex. 178, emphasis added).

**RESPONSE TO NO. 200**:  Denied and objected to on the ground that the investor documents are irrelevant and are inadmissible hearsay pursuant Fed.R.Evd. 801.  The improper use of this inadmissible document and the others referenced below in paragraphs 201 through 203 is particularly egregious in light of the SEC's attempt to bolster its argument of materiality by relying on the statement in Zwirn's Affidavit in its memorandum of law that "between September 2006 and November 2007 investors redeemed $1.4 billion from the funds."  SEC Br. at p. 19.  The full statement in Zwirn's Affidavit is that "[a]s a result of the disclosure that the DBZCO made to the SEC, investors in the funds, and auditors, as well as the significant delay in the audit, there were $1.4 billion in investor redemptions from the Funds between September 2006 and November 2007."  Zwirn Affidavit, ¶ 14.  However, in a press report from the Financial Times of February 22, 2008, Zwirn is reported as saying that only "the delayed audit drove the redemptions."  Ex. TTT.  Zwirn's press statement is further confirmed by his statement reported in a July 9, 2007, DZBCO Memo of a Status Meeting with Dan Zwirn, Senator Rudman, and Other Members of Senior Management that "DZ [Daniel Zwirn] has heard from several investors who have stated their wish to invest more money once the 2006 financial statements are issued."  Brody Decl, Ex. 192 at p. 6.

201.    On January 26, 2007, DBZCO received a letter from HCM/Z terminating the advisory agreement for its managed account. (Brody Decl. Ex. 179).

**RESPONSE TO NO. 201**:  Objected to on the ground that the investor letter is irrelevant and inadmissible hearsay pursuant Fed.R.Evd. 801 and is irrelevant to any issues in this case.  See also Response to ¶ 200 above.

202.    An April 11, 2007 follow-up letter confirmed that HCM/Z "had terminated [DBZCO] for improper activities . . . ." (Brody Decl. Ex. 180).

**RESPONSE TO NO. 202**:  Objected to on the ground that the investor letter is irrelevant and

inadmissible hearsay pursuant Fed.R.Evd. 801 and is irrelevant to any issues in this case.  See

also response to ¶ 200 above.

203.    On November 3, 2006, DBZCO received a letter from an investor stating that a $5
million investment made on October 1, 2006 should be immediately rescinded. "[S]imply stated,
[the investor] would not have made the $5 million investment in the Fund on October 1, 2006
had the Fund disclosed to [the investor] (i) the recent termination of the Chief Financial Officer
and the reasons therefor, as expressed to me during my telephone conversation with a
representative of the Fund on Sunday evening, October 29, 2006 ...." (Brody Decl. Ex. 181).

**RESPONSE TO NO. 203**:  Objected to on the ground that the investor letter is irrelevant and

inadmissible hearsay pursuant Fed.R.Evd. 801 and is irrelevant to any issues in this case.  See

also response to ¶ 200 above.

## GRUSS ADMITS HIS WRONGDOING

204.    In 2006 and 2007, Gruss was interviewed several times by lawyers conducting the
investigation for DBZCO. (Brody Decl. Exs. 182-184). Attending these interviews were several
lawyers from the law firm Gibson, Dunn & Crutcher and Albert Lilienfeld from Deloitte
Financial Advisory services. *Id.*

**RESPONSE TO NO. 204**:  Admitted.

205.    During these interviews Gruss repeatedly stated in words or substance that money
from the Offshore Fund needed to be kept separate from money from the Onshore Fund to avoid
ECI issues and that it was well-known that a transfer from the Offshore Fund to the Onshore
Fund would raise ECI and "trade or business" concerns. (Brody Decl. Ex. 182; Ex. 57 at 111:10-
24; 113:16-23).

**RESPONSE TO NO. 205:**  Denied and objected to.

First, as the interview memoranda state in the beginning paragraph, "Gruss has not read,

reviewed, or adopted the contents of this memorandum."  Brody Decl. Ex. 182 at 1.

Second, whoever wrote up Gruss' alleged interview statement did not understand how the

LP and LTD funds worked and why they were established.  That "money from the Offshore

Fund needed to be kept separate from the Onshore Fund to avoid ECI issues" was the entire

purpose of establishing a U.S. fund and a non-U.S. fund.  That the advances were recorded as

such on the books and records of the LP and LTD and not as interest bearing loans, Ex. BBB at

p. 174, was done so there would be no ECI issues.  In connection with Gruss' alleged statement,

Lilienfeld testified that Deloitte 'never found loan documentation, so when we referred to the

CDC or other transfers of monies being loans, that is not the proper terminology because a loan

implies that there is a documentation surrounding it.  It is more of a transfer, an advance or

something along those lines, but not raising it to the level of a loan."  Ex. UUU at p. 113.  This

did not mean that the LTD could not advance funds to the LP that the LP could use to buy

investments.  Gruss had told Jason Pecora, DZBCO's Treasurer, that the monies advanced from

the LTD to the LP were not booked as a "loan in the portfolio accounting system" and "papered

as a loan" precisely to avoid "tax issues."  Ex. EEE at pp. 67-69.  Not only was this practice of

the LTD advancing money to the LP permitted by the funds' Offering Memoranda and operating

documents, see ¶¶ 19-29 of Defendant Gruss' Statement of Undisputed Material Facts Pursuant

to Local Civil Rule 56, but Dr. Bergin was clear that "[a]n aspect of DBZCO's strategy, as

detailed in the pertinent fund materials, was for the Offshore Fund and the Onshore Fund to

operate symbiotically in order to enhance investment opportunities, facilitate largely parallel

strategies and bolster returns for both funds.  The Onshore Fund was frequently utilized as a

sourcing agent to acquire select investments for the fund complex, and often these investments

were not immediately available to the Offshore Fund.  This process required a treasury approach

which facilitated the movement of funds among fund complex members."  Ex. D at p. 8. (Rule

56 Statement).  Thus, the LP, located investments for the LTD and often restructured them in a

manner that fit within the tax limitations of the LTD.  Gruss Dec. ¶¶ 7-9.  This arrangement

benefited both funds – the LP because, although uncompensated for its task, was able to

effectively leverage its assets, which undoubtedly enhanced the LP's rate of return; the LTD

because it was able to expand its investments beyond the limitations imposed by the tax code as

a result of the sourcing and restructuring efforts of the LP.  Ex. D at pp. 28-30.  Finally, the fact

that the Manager must manage potential adverse tax consequences as part of the responsibilities

bestowed up it by the LTD's Offering Memoranda and operating documents does not in any way

substantiate the SEC's claim of fraud.  That the SEC relies solely on a tax related risk disclosed

in the LTD's Offering Memoranda, see Response ¶ 29, *supra.*, demonstrates that the SEC does

not have a provable fraud case.

206.    Gruss stated in words and substance that an arrangement where the Offshore Fund
would loan money to the Onshore Fund to pay its debts, fund its investments, or operate its
business would raise ECI issues and would not be permitted under the funds offering documents.
(Brody Decl. Ex. 183; Ex. 57 at 112:24-113:5).

**RESPONSE TO NO. 206**:  Denied and objected to.

First, as set forth in the response to paragraph 205, there is a significant difference

between the LTD "loaning" money and advancing funds to the LP.  The LTD could not do a

formal loan with interest to the LP because it would expose the LTD to potential ECI issues.

Gruss' full statement in the interview memorandum is clear that his statement was with respect

to the LTD formally loaning funds to the LP.  The full statement in the interview memorandum

is as follows: "When asked, Gruss said he was not aware of any loans between LP and LTD,

except to the extent one view any delay in 'settling up' to be 'the essence of a loan.'  LTD did

not loan money to LP to allow LP to pay its debts, fund its investments, or operate its business.

Any such arrangement would raise ECI issues and would not be permitted by DBZ's offering

documents."  Brody Decl., Ex. 183, p. DBZCO_00025.

Second, Lilienfeld on cross-examination admitted that he had no recollection of Gruss

saying anything about the "funds' Offering Memoranda," not permitting the inter-fund transfers:

Q. All right.  Now, at no time did Mr. Gruss ever tell you that it was contrary to the fund's operating -- to the fund's offering memoranda to engage in the interfund transfers, correct?

A. I don't think as I recall he mentioned anything about the fund's offering memoranda as a –

Q. That's not my question.  My question is at no time did he ever tell you that it was contrary to the offering memoranda to do the interfund transfers?

A. I'm trying to answer your question, because I don't think he ever raised the offering memoranda to say it was contrary or not.

Q. Well, did anybody ask him that?

A. I don't recall that question.  If you read through the memoranda and my recollection, but

Ex. UUU at p. 128.

207.    Gruss further stated in words or substance that the Onshore Fund and the Offshore Fund were responsible for paying their own borrowings and there was no mechanism through which one fund could repay another fund's indebtedness directly or indirectly unless either (a) the repayment was a loan which would require documentation; or (b) there was consideration for some other debt/transfer for value. (Brody Decl. Ex. 184; Ex. 57 at 112:10-20).

**RESPONSE TO NO. 207**:  Admitted in part, denied in part and objected to in part.  Gruss

objects for the same reasons stated in response to paragraphs 205 through 206.  Gruss admits, as

stated in paragraph 86 above, that the LP and LTD were each responsible for its own borrowings

in the Revolver Agreement.  This provision does not mean that the LTD could not advance funds

to the LP to pay its obligations under the Revolver, all of which was permitted under the funds'

Offering Memoranda and operating documents.  See ¶¶ 19-29 of Defendant Gruss' Statement of

Undisputed Material Facts Pursuant to Local Civil Rule 56.

208.    Gruss admitted in words or substance that he transferred cash from the Offshore Fund to the Onshore fund because the Onshore Fund otherwise lacked the ability to fund certain investments that had to originate onshore. (Brody Decl. Ex. 57 at 115:3-12). Gruss also recalled approving interfund transfers to repay the CDC. *Id*. at 116:13-22. He saw no substantive distinction between these interfund transfers – all were intended to address the Onshore Fund's inability to fund investments. (Brody Decl. Ex. 184; Ex. 57 at 116:23-117:3).

**RESPONSE TO NO. 208**:  Admitted.

209.    Gruss admitted in words or substance that he, Wu and a junior accountant devised the practice as a temporary "bandaid" to address the Onshore Fund's liquidity concerns. (Brody Decl. Ex. 184; Ex. 57 at 117:8-13).

**RESPONSE TO NO. 209**:  Admitted in part and denied in part.  The statement attributed to

Gruss does not explain the full meaning of what is meant by a temporary "bandaid" and under

Fed.R.Evd. 106 this alleged statement "in fairness ought to be considered" with Gruss' later

explanation to the SEC.  As Gruss subsequently explained to the SEC, "because the advance

from the LTD to the LP is "recourse to the fund" it '''wasn't the most preferable means on

raising dough."  Ex. XX at pp. 105-106.  The non-recourse methods of raising capital for the LP

to purchase investments were the swing line, both CLOs, a senior tranche CLO with Deutsch

Bank, an Asian facility with Asian Development Bank, a Euro facility known as IXIS, an ABS

facility and a BA facility with a Belgian bank.  *Id*.

210.    Gruss admitted in words or substance that he "knew you shouldn't be going there" – that is, should not be using Offshore Fund cash to fund Onshore Fund obligations given the tax concerns. (Brody Decl. Ex. 184; Ex. 57 at 117:14-20).

**RESPONSE TO NO. 210**:  Admitted in part, denied in part and objected to.  The objections

raised in paragraphs 205 and 206 are adopted in response to this alleged statement.  This

statement, like Gruss' other statements recited by the SEC, does not reference the scope of the

Manager's authority under the funds' operating, offering or management documents.  Again, this

alleged statement does not accurately reflect that Gruss was differentiating between formal loans

and advances from the LTD to the LP, explained in the response to paragraph 205.  This

statement also "in fairness ought to be considered" under Fed.R.Evd. 106 with Gruss' statement

allegedly made immediately thereafter that these "transfers . . . 'were not the favored approach'

to funding investments."  Brody Decl. Ex. 184, DBZCO_00040.  As set forth in the response to

paragraph 209 above, Gruss explained to the SEC why the advances from the LTD to the LP

were not the favored approach to fund LP's obligations or investments.

211.    Gruss admitted in words or substance that Law and Wu both raised concerns to him regarding the interfund transfers and that another individual, Jason Pecora raised concerns specifically about the CDC-related interfund transfers. (Brody Decl. Ex. 57 at 117:21-118:3). Gruss admitted that Wu and Law both quit over the interfund transfer practice. (Brody Decl. Ex. 184).

**RESPONSE TO NO. 211:**  Admitted in part and denied in part.  The use of the word

"concerns" implies that the inter-fund transfers were improper or illegal.  As referenced in the

responses to paragraphs 52, 54, 71, and 76 above, Law and Wu were concerned not about the

legality of the practice but about the stress it placed on them to accomplish the accounting and

bookkeeping that resulted from the LTD advances to the LP.  As stated in response to paragraph

205 above, Pecora's concern was why the advances from the LTD to the LP were not booked in

the sub-ledger as formal interest bearing loans as opposed to advances.  Ex. EEE at pp. 67-69.

Also, the statement that "Gruss admitted that Wu and Law both quit over the interfund practice"

is not accurate.  Gruss never said that the Wu and Law resigned only because of the inter-fund

transfer practice.  While Wu testified that the "burden" of the inter-fund transfers were the main

reason she resigned, Ex. ZZ at pp. 74, 117, Law testified that Wu "tried to resign a number of

times" because of "stress in general," which did not help her depression for which she was

consulting with a physician.  Ex. BBB at pp. 302-04.  Law also admitted that one of the reasons

she resigned was because of DBZCO's internal investigation into the purchase of the airplane

and the early payment of management fees.  *Id*. at pp. 212-17.  It was the investigation of the

airplane and management fees that "pushed" her into "action."  *Id*. at pp. 212-13.  In addition,

Law testified that one of the reasons she explained to Gruss as to why she was resigning "was the

aggressive growth of the firm, and . . . [she] basically felt that there was a lot of extra workload

coming down to the back office.   It was like expanding too much of the top, without giving any

thought to whether the back office was structurally ready to accept that increased workload.  So

it was very crippling and that was very frustrating as well". *Id*. at pp. 172-3.

212.    Gruss admitted in words or substance that he hoped the loans could be paid down relatively quickly and that there was always an event on the horizon, such as an upsize of the Revolver, that Gruss believed might enable him to repay the loans. (Brody Decl. Ex. 184; Ex. 57 at 118:4-13).

**RESPONSE TO NO. 212**:  Admitted in part and denied in part.  The interview report

incorrectly refers to the advances from the LTD to the LP as "loans," even though at the

beginning of the paragraph of the interview report the advances from the LTD to the LP are

referred to as "transfers."  Brody Decl. Ex. 184, DBZCO_00039.  Again, the recording of the

Gruss interview reflects a misunderstanding between formal loans and the advancing of funds

that was part of the investing process.  See Response to ¶¶ 205 and 206, *supra*.

213.    In a July 31, 2007 telephone call with an investor, Gruss stated that he was truthful in his meetings with Gibson Dunn & Crutcher. (Brody Decl. Ex. 185).

**RESPONSE TO NO. 213**:  Objected to on the ground that this memorandum from an investor is

inadmissible hearsay pursuant to Fed.R.Evd. 801.

**PWC DETERMINES THAT THERE WERE MATERIAL CONTROL WEAKNESSES**

214.    In connection with its 2006 audit of the Onshore and Offshore Funds, PwC determined that there were control deficiencies at DBZCO that constituted material weaknesses. (Brody Decl. Ex. 186).

**RESPONSE TO NO. 214**:  Objected to on the ground that any alleged control deficiencies are

irrelevant to the issues in this case and are inadmissible hearsay pursuant to Fed.R.Evd. 801.

Further, after concluding its 2006 audit, which included reviewing the funds' financial

statements for 2004 and 2005, PWC did not find any fraud and concluded there was no reason to

restate the financial statements of the LP and LTD for 2004 and 2005.  Ex. CCC at pp. 68-70.

215.    In 2007, PwC informed DBZCO that a material weakness letter would be provided at the conclusion of the audit of the funds. *Id*.

**RESPONSE TO NO. 215**:  Objected to on the ground that any alleged control deficiencies are

irrelevant to the issues in this case and are inadmissible hearsay pursuant to Fed.R.Evd. 801.

Further, after concluding its 2006 audit, which included reviewing the funds' financial

statements for 2004 and 2005, PWC did not find any fraud and concluded there was no reason to

restate the financial statements of the LP and LTD for 2004 and 2005.  Ex. CCC at pp. 68-70.

216.    On January 10, 2008, DBZCO voiced concerns to PwC about the content of the final letter, stating that investors have already requested it as support for potential redemption actions. (Brody Decl. Ex. 187).

**RESPONSE TO NO. 216**:  Objected to on the ground that any alleged control deficiencies are

irrelevant to the issues in this case and are inadmissible hearsay pursuant to Fed.R.Evd. 801.

217.    PwC's worksheets identified numerous material weaknesses, including: (1) controls, policies and procedures may not have been sufficiently designed or in operation regarding the movement/use of cash between the funds and the proper accounting treatment for these transactions; (2) "tone at the top" – the former CFO did not appear to have focused on ensuring adequate design and operating effectiveness of internal control over financial reporting. Also the former CFO appeared to lack the willingness to deliver "bad news" to the managing partner. This led to a control environment in which accounting adjustments were viewed at times as an acceptable device to compensate for operational shortfalls which, in certain instances, led to inappropriate accounting decisions and entries that appear to have been largely motivated to achieve desired accounting results, as well as management override of controls; and (3) management override and inadequate antifraud programs and controls. For example, there were various instances of the former CFO performing inappropriate transactions to "manage" liquidity concerns. In some instances, accounting irregularities were brought to his attention and he did not take appropriate action to investigate and correct for them. (Brody Decl. Ex. 188).

**RESPONSE TO NO. 217:**  Objected to on the ground that any alleged material weaknesses are

irrelevant to the issues in this case and are inadmissible hearsay pursuant to Fed.R.Evd. 801.

Further, after concluding its 2006 audit, which included reviewing the funds' financial

statements for 2004 and 2005, PWC did not find any fraud and concluded there was no reason to

restate the financial statements of the LP and LTD for 2004 and 2005.  Ex. CCC at pp. 68-70.

218.    On January 29, 2008 and February 21, 2008, PwC sent letters to DZBCO concerning the Onshore and Offshore Funds respectively. (Brody Dec. Exs. 189-190). The substantively identical letters stated that PwC had identified material control weaknesses at the management company. *Id.* The letters provided that "the investment manager of the fund ... did not maintain effective internal controls related to the Fund's control environment and related information ...." *Id.* "Specifically, the Investment Manager did not maintain and tone and control

consciousness to prevent or detect certain instances of inappropriate conduct, and to maintain sufficient accounting records and other documentation to support the fair presentation of the Fund's consolidated financial statements in accordance with ...GAAP. The lack of an effective control environment allowed the Investment Manager's former Chief Financial Officer ("CFO") to engage in inappropriate conduct that resulted in certain transactions not being properly reflected in the Fund's consolidated financial statements." *Id.* "Further, the Investment Manager's former CFO did not communicate certain financial reporting matters, including the existence of inter-fund transfers, to the Managing Partner of the Investment Manager, the General Partner, senior management of the Investment Manager and the independent auditors." *Id.*

**RESPONSE TO NO. 218**:  Objected to on the ground that any alleged material weaknesses are

irrelevant to the issues in this case and are inadmissible hearsay pursuant to Fed.R.Evd. 801.

Further, after concluding its 2006 audit, which included reviewing the funds' financial

statements for 2004 and 2005, PWC did not find any fraud and concluded there was no reason to

restate the financial statements of the LP and LTD for 2004 and 2005.  Ex. CCC at pp. 68-70.

219.    The letters also provided that the Investment Manager did not maintain effective controls over certain disclosures in the Fund's consolidated financial statements, including the due to/from affiliates, managements fees, expenses and income tax accounts. *Id.* PwC concluded in the letter that the controls were not designed to ensure the prevention or detection of certain issues, including: (1) improper cash and investment transfers among the funds; (2) premature payment of management fees to the Investment Manager;" and (3) the short term use of the Fund's assets for non-Fund related purposes. *Id.* These inadequately designed controls also led to deficiencies with respect to the accounting for income taxes. *Id.* Additionally, the Investment Manager did not maintain effect controls over the Fund's portfolio accounting system and spreadsheets used in the period-end reporting process. *Id.*

**RESPONSE TO NO. 219**:  Objected to on the ground that any alleged material weaknesses are

irrelevant to the issues in this case and are inadmissible hearsay pursuant to Fed.R.Evd. 801.

Further, after concluding its 2006 audit, which included reviewing the funds' financial

statements for 2004 and 2005, PWC did not find any fraud and concluded there was no reason to

restate the financial statements of the LP and LTD for 2004 and 2005.  Ex. CCC at pp. 68-70.

220.    In addition, during the summer of 2007, DBZCO had several meetings with PwC concerning the potential tax liability resulting from the interfund transfers.

**RESPONSE TO NO. 220**:  Denied and objected to.  Any meetings between PWC and DBZCO

concerning the potential tax liability resulting from the inter-fund transfers are irrelevant to any

issues in this case in light of the response to paragraph 222 *infra*.

221.    In June 2007, PwC held a conference call with one of the directors of the Offshore
Fund as well as with several individuals from DBZCO during which they discussed the potential
tax liability to the Offshore Fund because of the interfund transfers. (Brody Decl. Ex. 191).

**RESPONSE TO NO. 221**:  Denied and objected to on the grounds the conference call in

question is irrelevant to the issues in this case in light of the response to paragraph 222 *infra*. and

the discussions referenced in the conference call are inadmissible hearsay pursuant to Fed.R.Evd.

801.

222.    One of the tax partners from PwC expressed that "taxes were 'a significant issue'
and that certain transactions could possibly give rise to making the LTD Fund a 'taxable
business.'" (Brody Decl. Ex. 191 at 463). This partner estimated that the tax liability that would
result would be about $250 million. *Id*. DBZCO's managing director of tax thought that the
amount would be closer to $100 million "but it would still be 'devastating.'" *Id*.

**RESPONSE TO NO. 222**:  Denied and objected to on the grounds that 1) the statements by the

PWC partners are inadmissible hearsay pursuant to Fed.R.Evd. 801, and 2) are contrary to the

subsequent testimony of PWC pursuant to Fed.R.Civ.P 30(b) (6) that PWC ultimately

"recognized" that the taxability of the inter-fund transfers "was an issue" but it "concluded that it

met the accounting criteria for not being recognized in the financial statements based upon all the

work we [PWC] did, which included an opinion of [the law firm of] Clifford Chance."  Ex. CCC

at pp. 235-36.  As a result of the Clifford Chance tax opinion, PWC did not do "anything" "to

change any of the accounting for the LP or LTD for the years 2004 to 2006" or create "any

restatements of the financial statements for the LP or the LTD from 2004 to 2005."  *Id*. at pp.

106-111.  PWC's review of the Clifford Chance opinion did not "have any impact on the

financial statements for the LP or the LTD for 2006."  *Id*. at 110.

223.    In July 2007, PwC held another meeting with personnel from DBZCO, including
Zwirn and other members of senior management. (Brody Decl. Ex. 192). During this meeting, it
was discussed that Schulte Roth & Zabel, DBZCO's main corporate law firm, was not willing to

provide an opinion letter that it was more likely than not that there would not be any tax liability. *Id*. at 467.

**RESPONSE TO NO. 223**:  Denied and objected to on the grounds the meeting in question is irrelevant to the issues in this case in light of PWC's and Clifford Chance's opinions referenced in response to paragraph No. 222 above, the memorandum referencing it is inadmissible hearsay pursuant to Fed.R.Evd. 801 and the memorandum does not state "that Schulte Roth & Zabel, DBZCO's main corporate law firm, was not willing to provide an opinion letter," rather it recites the triple hearsay statement of an individual not present at the meeting "that Schulte "continues to be unwilling to provide a 'more likely than not' written opinion" and speculation that "Schulte may not be willing to provide even an oral 'view' on the ECI tax issue."  It also recites the hearsay statement of an unidentified PWC person who "confirmed that, in our experience, it is not uncommon for corporations to obtain more than one opinion on a significant complex tax matter such as this."

224.    On April 10, 2008, counsel for DBZCO informed the Commission that DBZCO obtained an opinion letter from the law firm Clifford Chance on the issue of whether it was more likely that not that the interfund transfers would cause the Offshore Fund to be treated as engaged in a U.S. federal or state and local trade or business activity. (Brody Decl. Ex. 193). DBZCO, however, asserted the work-product privilege with respect to this opinion letter and withheld it from production. *Id*.

**RESPONSE TO NO. 224**:  The defendant Gruss has no knowledge of the information contained in paragraph 224, but even assuming it is true, object on the grounds that the conversation in question between counsel for DBZCO and the SEC is irrelevant to the issues in this case in light of the response to paragraph 222 above and is inadmissible hearsay pursuant to Fed.R.Evd. 801.

## GRUSS'S COMPENSATION WHILE AT DBZCO

225.    In 2004, Gruss's compensation at DBZCO was either $800,000 or $1.2 million. (Brody Decl. Ex. 9 at 156:9-17). In 2005, his compensation at DBZCO was $1.8 million. *Id*. at 155:14-18.  In 2006, his compensation at DBZCO was $1,657,718.00 (Brody Decl. Ex. 201).

**RESPONSE TO NO. 225**: Admitted.

226.    Gruss's bonus comprised the vast majority of his compensation.  In 2005, his base salary from DBZCO was $160,000.  In 2006, in connection with his promotion to partner, Gruss's base salary was increased to $225,000. (Brody Decl. Ex. 194).

**RESPONSE TO NO. 226**: Admitted.

227.    In 2007, Gruss was hired as a "marketer" for Babcock & Brown, LP, a global merchant/investment bank. (Brody Decl. Ex. 195).[9] As of the date of his deposition in this case, Gruss was still employed by Babcock & Brown. (Brody Decl. Ex. 4 at 27:1-6).

**RESPONSE TO NO. 227**: Admitted in part and denied in part.  Babcock & Brown ("B&B")

did hire Gruss in 2007 as a marketer, but he has never worked in that role at B&B.  B&B has

been in liquidation after being delisted on the Australian Stock Exchange in June 2009.  Since

that time, his responsibility at B&B has been to assist in the company's liquidation.  Gruss has

not worked for an investment advisor since he left DBZCO in September –October 2006 and at

the present time has no plans to work for an investment advisor.

Dated:  New York, New York
        May 2, 2016

                                DORSEY & WHITNEY LLP

                        By:

                                Nathaniel H. Akerman
                                Thomas O. Gorman
                                *Attorneys for Defendant Perry A. Gruss*

---

[9] http://www.bloomberg.com/profiles/companies/173670Z:US-babcock-&-brown-lp).