UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,

                     Plaintiff,             11 Civ. 2420

     -against-                       OPINION

PERRY A. GRUSS,

                     Defendant.

-------------------------------------------X

A P P E A R A N C E S:

### Attorneys for Plaintiff

SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street
New York, NY 10281-1022
By: Todd D. Brody, Esq.
    Peter Altenbach III, Esq.

### Attorneys for Defendant

DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019
By: Nathaniel H. Ackerman, Esq.
    Thomas O. Gorman, Esq.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-28-17

# Table of Contents

Prior Proceedings ............................................... 2

The Facts ...................................................... 3

The Defendant and the Funds Involved........................... 3

The Operating Documents....................................... 11

The U.S. Tax Exemption for the Offshore Fund................. 23

The Offshore Fund Loans to the Onshore Fund................. 33

The Offshore Fund Loans to Pay Revolver Obligations.......... 91

The Payment by the Offshore Fund of Onshore Fund Management
Fees........................................................ 105

The Payment by the Offshore Fund for the Purchase of an
Airplane.................................................... 111

Materiality................................................. 134

CONCLUSIONS OF LAW ........................................... 157

The Applicable Standards.................................... 157

The SEC's Motion for Summary Judgment that Section 206(2) Was
Violated is Granted......................................... 160

Section 206(2) Is Applicable Because DBZCO Was an Investment
Advisor under Section 206(2) of the Advisers Act Owing
Fiduciary Duties to Its Investors and Used Instrumentalities of
Interstate Commerce......................................... 160

DBZCO Violated Its Fiduciary Duty by Transferring Funds from
the Offshore Funds to Meet the Onshore Fund's Obligations...161

The Offshore Fund Was Prohibited from Making Investments in or
Loaning Money to US Companies (Including the Onshore Fund)..162

The Offshore Fund Was Prohibited from Making Payments to the
Onshore Fund (or Directly to Its Creditors) for Its Revolving
Credit Facility............................................. 167

The Breaches of the Fiduciary Duty by Making Loans from the
Offshore Fund to the Onshore Fund for Investments and the
Revolver Were Material...................................... 170

Gruss acted with a Negligent Intent When He Authorized the Offshore Fund Transfers to Fund Onshore Investments and the Revolver.....................................................181

Gruss Aided and Abetted DBZCO's Violation of Section 206(2) of the Advisers Act.............................................184

The Advance Payment of Management Fees Were Appropriate Inter-Company Transfers...........................................186

The Motion for an Injunction Based Upon the Payment by The Offshore Fund to Purchase an Airplane is Denied as Presenting a Contested Issue of Fact....................................186

The Motion for the Imposition of a Civil Penalty is Granted.191

Conclusion ................................................195

The plaintiff the Securities and Exchange Commission ("SEC" or the "Plaintiff") has moved pursuant to Rule 56(a) F. R. Civ. P. for summary judgment enjoining the defendant Perry A. Gruss ("Gruss" or the "Defendant") from violating Sections 206(1) and (2) of the Investment Advisers Act of 1940 (the "Advisers Act") and for disgorgement and civil penalties. Gruss has also moved for summary judgment pursuant to Rule 56(a) to dismiss the SEC complaint against him. Upon the facts and conclusions set forth below, both motions are granted in part and denied in part.

The principal dispute between the parties arises from the interpretation of the documents controlling the operations of the funds involved relative to the actions taken by Gruss. Central to this controversy is the bar against engaging in a U.S. trade or business under which the Offshore Fund was exempted from U.S. taxes and whether or not that bar was breached.

The SEC has advanced four grounds on which it urges the issuance of an injunction based on violations of Sections 206(1) and (2) of the Advisers Act by D.B. Zwirn & Co. ("DBZCO"), aided and abetted by Gruss. The first is based upon the sixty-six interfund transfers from the Offshore Fund to the

1

Onshore Fund to fund Onshore investment between May 2004 and July 2006, fourteen of which were real estate investments. The second ground relates to the four payments of the Onshore revolver credit between June 2005 and May 2006, and the third and fourth grounds arise out of the payment by the Offshore Fund of DBZCO management fees and to purchase an airplane for DBZCO's managing partner. Because the payments for funding the Onshore Fund investment and repaying the Onshore revolving credit facility violate the Advisers Act, the SEC motion for injunctive relief and penalties will be granted, and the Gruss motion for summary judgment denied. Because the intercompany payment of management fees does not violate the Advisers Act, that portion of the SEC motion is denied and that portion of Gruss' summary judgment is granted. Because there is a factual issue as to Gruss' knowledge with respect to the payments to purchase the airplane, the SEC summary judgment motion on that basis is denied.

## Prior Proceedings

The SEC filed this action on April 8, 2011 alleging that Gruss, the Chief Financial Officer of DBZCO, a hedge fund aided and abetted violations of the Advisers Act by using funds of the Offshore Fund to fund investments by the Onshore Fund and

2

to pay Onshore Fund loan commitments as well as a revolving 75-
day credit facility and management fees and payments to purchase
an airplane.

Discovery proceeded, the motion of Gruss to dismiss
the complaint was denied on May 9, 2012 (859 F.Supp.2d 653
(S.D.N.Y. 2012), and the instant motions were heard and marked
fully submitted on October 6, 2016.

**The Facts**

The facts in these fact-rich motions are set forth in
the parties' respective Rule 56.1 Statements of Material Fact
and are not in dispute except as noted below.

The Defendant and the Funds Involved

1.    DBZCO was an investment adviser to and manager of
certain hedge funds and managed accounts.

2.    DBZCO no longer performs any business functions.

3.    At different times, DBZCO had offices in numerous
locations, including New York, London, Hong Kong, Houston,

3

Milan, Frankfurt, Tokyo, Seoul, Beijing, Singapore, Melbourne, and Luxembourg. DBZCO also had offices in Connecticut, Mexico, New Delhi, Warsaw, Tel Aviv, and Taipei.

4.    Daniel B. Zwirn ("Zwirn") was the founder and managing partner of DBZCO.

5.    The Chief Financial Officer ("CFO") and Chief Administrative Officer for DBZCO was Gruss. In January 2006, Gruss became a partner of DBZCO and at various times held the title of Senior Vice President Managing Director. Prior to becoming the CFO of DBZCO, Gruss had never served as a CFO, although he did work in the finance departments at Nomura Holdings America, where he prepared profit and loss statements, and at American International Group.

6.    In 2004, Gruss' compensation at DBZCO was either $800,000 or $1.2 million. In 2005, his compensation at DBZCO was $1.8 million. In 2006, his compensation at DBZCO was $1,657,718.00.

7.    Gruss' bonus comprised the vast majority of his compensation. In 2005, his base salary from DBZCO was $160,000.

4

In 2006, in connection with his promotion to partner, Gruss'
base salary was increased to $225,000.

8.    In 2007, Gruss was hired as a "marketer" for
Babcock & Brown, LP, a global merchant/investment bank. As of
the date of his deposition in this case, Gruss was still
employed by Babcock & Brown.

Gruss admitted the statement in part and denied it in
part, noting Babcock & Brown ("B&B") did hire Gruss in 2007 as a
marketer, but he has never worked in that role at B&B, that B&B
has been in liquidation after being delisted on the Australian
Stock Exchange in June 2009, that since that time his
responsibility at B&B has been to assist in the company's
liquidation, and that he has not worked for an investment
advisor since he left DBZCO in September-October 2006 and at the
present time has no plans to work for an investment advisor.

9.    During the time period of 2002 through 2009,
DBZCO managed several "hedge funds," including the D.B. Zwirn
Special Opportunities Fund, L.P. ("the Onshore Fund") and the
D.B. Zwirn Special Opportunities Fund, Ltd. (the "Offshore
Fund"), and added a third fund in March 2003 and a fourth fund

5

in May 2005, in addition to several separately managed private accounts.

PriceWaterhouseCoopers ("PWC") audited each of these funds annually.

10.   The Onshore Fund was a Delaware limited partnership founded in April 2002 to operate as a private investment fund. The Onshore Fund commenced investment operations in May 2002.

The Offshore Fund was a Cayman Island exempted company incorporated on April 12, 2002 to operate as a private investment fund. The Offshore Fund commenced investment operations in May 2002.

11.   While there was some overlap in the investors in the Onshore and Offshore Funds, the majority of investors in the two funds were different. Gruss knew that the investors in the Onshore Fund were separate and distinct from the investors in the Offshore Fund. The Offshore Fund was open to both non-U.S. investors and permitted U.S. investors, and both groups of investors were required to be accredited investors and qualified purchasers. A significant proportion of the investors in both

6

funds were themselves registered investment advisors. The SEC
has noted that Gruss' only citation for this statement is the
report of Dr. Richard Bergin ("Dr. Bergin"), his expert, and
that Dr. Bergin cannot testify about purely factual information
where the expert has no first-hand knowledge and because Gruss
has not provided an admissible source for this assertion, the
SEC has not responded.

The SEC has cited listings of investors for the
Onshore Fund and the Offshore Fund for the period of January 1,
2006 to March 4, 2008. The relevant period of the inter-fund
transfers alleged in the complaint and claimed on the SEC's
summary judgment motion is March 2004 through July 2006. The
evidence as to the relative proportion of the same investors in
both funds has not been established.

12.   The Offshore Fund was an exempted company under
Cayman Islands law; as such, it had received an undertaking as
to tax concessions that provided that, for a period of 20 years
from the date of issue of the undertaking, no law thereafter
enacted in the Cayman Islands imposing any taxes or duty to be
levied on income or capital assets, gains or appreciation would
apply to any income or property of the Offshore Fund. Gruss
asserts that the next paragraph of the exhibit cited states:

7

"There can be no assurance that the ... Cayman Islands tax laws will not be changed adversely with respect to the Fund ... or that the Funds income tax status will not be successfully challenged."

13. The 2002, 2003 and 2005 Offshore Fund Offering Memoranda disclosed that "these securities [shares in the Offshore Fund] are suitable for sophisticated investors" who "fully understand and are willing to assume the risks involved in the portfolio's investment program." Ex. L at DBZ 0009680; Ex. M at DBZ 0009823; Ex. O at DBZ 0009747.

The Offering Memoranda further disclosed that "Shares will only be offered to non-U.S. or permitted U.S. investors" who had to be "'accredited investors,' as defined in Rule 501(a) under Regulation D of the United States Security Act of 1933," as well as "'qualified purchasers', as defined by Section 2(a) (51) of the United States Investment Company Act of 1940." Ex. L at p. 12 (DBZ 009688); Ex. M at p. 15 (DBZ 0009841); Ex. O at p. 6 (DBZ 0009755).

The investors of the fund 1) were a bank, insurance company or investment company or had investments of at least $5 million, or had a net worth of at least $1 million (as an

8

accredited investor) and 2) owned at least $5 million in investments (as a qualified purchaser).

14.    The Offshore Fund had Assets under Management ("AUM") of (1) $877,000,000; (2) $1,500,000,000; and (3) $2,400,000,000 respectively as of December 31, 2004, December 31, 2005, and December 31, 2006. At the end of February 2006, the Offshore Fund's AUM were $1,500,000,000. The Onshore Fund and Offshore Fund experienced substantial and rapid growth in AUM from inception in May of 2002 to the end of 2006: the Onshore Fund's AUM was approximately $525 million on December 31, 2004.

15.    The DBZCO investment approach yielded for the investors of the Offshore Fund and the Onshore Fund "superior annual returns relative to S&P 500 or other multi-strategy hedge funds" from 2004 to 2006. The SEC denies this statement as based upon the expert report of Dr. Bergin about purely factual information where the expert has no first-hand knowledge. The SEC further notes that the Bergin report provides, in 2006, the Offshore Fund was significantly outperformed by both the CS/Tremont Multi-Strategy sub-index and by the S&P 500. The SEC also has disputed use of the term "superior", which is not defined, noting that when over the three year period identified,

9

the annual difference between the performance of the Offshore
Fund and the CS/Tremont Multi-Strategy sub-index was 34 basis
points and the charts provided by Dr. Bergin demonstrate that in
sixteen of the twenty-four months presented for the period 2004
to 2005, the S&P 500 and/or the CS/Tremont Multi-Strategy sub-
index outperformed the Offshore Fund. In fact the SEC asserts
that over the twenty-nine month period (January 2004 – May 2006)
analyzed in Dr. Bergin's report, a $100 January 2004 investment
in the Offshore Fund would have grown to $125.11 by May 2006,
and the same $100 investment in the C/S Tremont Multi-Strategy
sub-index growing to $124.03 and in the S&P 500 to $122.81.
Finally, the SEC has noted the Bergin report does not provide
any explanation why it would be appropriate to compare the
performance of the Onshore and Offshore Funds to the S&P 500 or
to the CS/Tremont Multi-Strategy sub-index (as opposed to other
funds whose investment strategy was actually similar to that of
the Onshore and Offshore Funds).


        16.   Zwirn made all investment decisions for the funds
managed by DBZCO. Gruss was not authorized to make any
investment decisions. Zwirn has acknowledged that Gruss and
later the DBZCO Chief Operating Officer, Harold Kahn ("Kahn"),
managed the non-investment portion of the firm.


                                10

The Operating Documents

17.   The Offshore Fund and Onshore Fund were governed
by their operating documents. Those include the Offshore Fund
Shareholder Agreement and Onshore Fund Limited Partnership
Agreement (collectively "formation documents"), the Offering
Memoranda for each fund furnished to each investor (Exhs. K, L,
M, O, T, U), and the Management Agreement executed by each fund
with DBZCO. (Exhs. V, W, MM, NN, SS) (the "Operating
Documents"). Collectively the Operating Documents created
essentially the same governance structure, although there were
certain differences.

The SEC has noted that "the Offering Memoranda
explained that the Offshore Fund was subject to regulation and
supervision by the Cayman Island authorities and that it was
obligated to adhere to Cayman Islands law" (*SEC v. Gruss*, 859
F.Supp.2d at 657) and that DBZCO, the investment advisor for
both Offshore and Onshore Funds, was subject to the federal
securities laws even though it was unregistered. See, e.g., *SEC
v. Rabinovich & Assocs., Onshore Fund*, 07 Civ. 104547, 2008 U.S.
Dist. LEXIS 93595 (S.D.N.Y. Nov. 18, 2008).

11

18.   The Onshore Fund Limited Partnership Agreement vested broad powers in the General Partner, DBZCO:

> management, operation and control . . .[vests] exclusively in the General Partner, which shall have the Power by itself on behalf and in the name of the Partnership to carry out any and all of the purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental. Ex. TT at p. 5, §3.1.

The SEC has noted that the agreement does not use the term "broad powers."

19.   Similarly, the Offshore Fund Memorandum of Association specifies the reasons for the formation of the term – "investments":

> The objects for which the company is established are unrestricted and shall include, but without limitation . . . (e) to undertake and carry on and execute all kinds of investment, financial, commercial, mercantile trading and other operations . . . (iii) To purchase or otherwise acquire, to sell, exchange, surrender, lease, mortgage, charge, convert, turn to account dispose of and deal with real and personal property and rights of all kinds . . . (v) To stand surety for or to guarantee, support or secure the performance of all and any of the obligations of any person, firm or company whether or not related or affiliated to the Company in any manner.

12

Ex. S at pp. 1-3 (MAXAM00000929-931). To implement these goals the Offshore Fund could "advance, deposit, or lend money, securities and/or property to or with such [other] persons, and on such terms as may seem expedient." Ex. S at p. 2 (MAXAM00000930), ¶(d).

The SEC has noted the memorandum does not define the term "investments" and, as Gruss concedes in ¶39 of his 56.1 Statement, the Offshore Fund "was prohibited" from participating in certain investments because of tax considerations.

20.    The Offering Memoranda or Private Placement Memoranda for each fund was utilized to solicit investors to purchase the securities of either the Onshore Fund or the Offshore Fund under "Section 4(2) of the Securities Act of 1933", Regulation D, which provided an exemption from the registration provisions of Section 5 of the Securities Act of 1933. See e.g. Ex. K at DBZ 0009448. There were multiple Offering Memoranda, but each was essentially similar including those for the Onshore Fund and Offshore Fund. Each defined the type of investments the fund would make on behalf of its

13

shareholders in broad, general terms which gave the investment adviser or Manager the broadest possible discretion.

The SEC did not deny the first sentence in this statement but noted the lack of citation for the remainder of the statement, and further noted that the Offshore Fund "was prohibited" from participating in certain investments because of tax considerations, that the Offshore Fund was restricted and that consequently the investment adviser or Manager did not have the "broadest possible discretion."

21. The Offshore Fund Memoranda represented that it "focuses on multiple strategies, including but not limited to" corporate debt investments, assets, public equity, and that Onshore Fund and other funds "are managed using strategies generally similar to those the Manager used for the [Offshore Fund] Fund." Ex. M at pp. 18-20 (DBZ 0009844-9846). Compare e.g. Ex. T at pp.14-16 (DBZ 0009601-9603). The SEC has noted that the financial statements for the Offshore Fund demonstrates that the fund overwhelmingly invested in Corporate Bonds (44.13% [Brody Decl. Ex. 96 at p. 4]) and Loans (30.17% [*Id.* at p. 6]).

22. Investments selected by the Manager for both the Onshore Fund and Offshore Fund could be highly speculative. As

14

the Offering Memoranda for the Offshore Fund specified, "The Fund (and including for the avoidance of doubt, any managed accounts or investment vehicles advised or managed by the Manager or any of its affiliates in which a portion of the Fund's assets may be invested) will utilize highly speculative investment techniques." Ex. M at p. 34 (DBZ 0009860). Compare e.g. Ex. T at p. 30 (DBZ 0009617).

23. Co-investments with third parties were specifically authorized by the Offshore Fund Offering Memoranda. Ex. M at p. 42 (DBZ 0009868) ("co-investment with third parties through joint ventures"). Assignments of investments from the Onshore Fund were also specifically authorized for the Offshore Fund. Ex. M at p. 20 (DBZ 0009846). ("[A]n assignment of, or participating in, a loan from the U.S. Fund at a price approved by an independent third party."). The Offshore Fund could also invest directly in other funds managed by DBZCO: Alternatively the investments for the Offshore Fund and others managed by DBZCO could also include investments in affiliated funds.

The SEC has noted that the Offering Memoranda also provided that "the [Offshore] Fund ... will generally not invest in ... other assets such as real estate or make direct loans to or otherwise engage in the active management of a U.S. company."

15

(Brody Decl. Ex. 3 at 19-20.) The SEC also noted that DBZCO and
Gruss repeatedly represented this limitation on the Offshore
Fund's ability to invest to the auditors, investors and
potential investors. Likewise the SEC noted that Gruss has
conceded that the Onshore Fund was a U.S. company, and that he
told lawyers from the law firm Gibson, Dunn & Crutcher, and
Albert Lilienfeld from Deloitte Financial Advisory Services,
which conducted the internal investigation for DBZCO in 2006 and
2007, that money from the Offshore Fund needed to be kept
separate from the money from the Onshore Fund to avoid ECI
issues. The SEC also notes that Gruss conceded it was well-known
that a transfer from the Offshore Fund to the Onshore Fund would
raise Effectively Connected Income ("ECI") and "trade or
business concerns" (Brody Decl. Ex. 182; Ex. 57 at 111:10-24,
113:16-23) and that an arrangement where the Offshore Fund would
loan money to the Onshore Fund to pay its debts, fund its
investments or operate its business would raise ECI issues and
would not be permitted under the funds' offering documents. ECI
is the acronym for "effectively connected income," which is the
income when a foreign person engages in a trade or business in
the United States, connected with the conduct of that trade or
business.

16

Gruss has denied this and objects to this statement
noting that as the interview memoranda state in the beginning
paragraph, "Gruss has not read, reviewed, or adopted the
contents of this memorandum." Brody Decl, Ex. 182 at 1, and that
whoever wrote up Gruss' alleged interview statement did not
understand how the Onshore Fund and Offshore Fund funds worked
and why they were established or that "money from the Offshore
Fund needed to be kept separate from the Onshore Fund to avoid
ECI issues" was the entire purpose of establishing a U.S. fund
and a non-U.S. fund and that the advances were recorded as such
on the books and records of the Onshore Fund and Offshore Fund
and not as interest bearing loans, Ex. BBB at p. 174, so there
would be no ECI issues. Gruss has further noted that in
connection with Gruss' alleged statement, Lilienfeld testified
that Deloitte "never found loan documentation, so when we
referred to the CDC or other transfers of monies being loans,
that is not the proper terminology because a loan implies that
there is a documentation surrounding it. It is more of a
transfer, an advance or something along those lines, but not
raising it to the level of a loan," Ex. UUU at p. 113, and that
this did not mean that the Offshore Fund could not advance funds
to the Onshore Fund that the Onshore Fund could use to buy
investments. Gruss further has noted that he had told Jason
Pecora, DZBCO's Treasurer, that the monies advanced from the

Offshore Fund to the Onshore Fund were not booked as a "loan in
the portfolio accounting system" and "papered as a loan"
precisely to avoid "tax issues," Ex. EEE at pp. 67-69, and that
this practice of the Offshore Fund advancing money to the
Onshore Fund was permitted by the funds' and Operating
Documents.

Gruss has further noted that Dr. Bergin stated that:
"[a]n aspect of DBZCO's strategy, as detailed in the pertinent
fund materials, was for the Offshore Fund and the Onshore Fund
to operate symbiotically in order to enhance investment
opportunities, facilitate largely parallel strategies and
bolster returns for both funds and that the Onshore Fund was
frequently utilized as a sourcing agent to acquire select
investments for the fund complex, and often these investments
were not immediately available to the Offshore Fund and that
this process required a treasury approach which facilitated the
movement of funds among fund complex members." Ex. D at p. 8.
Gruss further has contended that the Onshore Fund located
investments for the Offshore Fund and often restructured them in
a manner that fit within the tax limitations of the Offshore
Fund and that this arrangement benefited both funds – the
Onshore Fund because, although uncompensated for its task, was
able to effectively leverage its assets, which enhanced the

18

Onshore Fund's rate of return; the Offshore Fund because it was able to expand its investments beyond the limitations imposed by the tax code as a result of the sourcing and restructuring efforts of the Onshore Fund.

24.  The Offering Memoranda acknowledged that at times working for a group of funds and making investments for each and for the group not only required the Manager to allocate its time but created potential conflicts that investors had to consider in investing in the Onshore Fund or the Offshore Fund: "inherent or potential conflicts of interest in the structure and operation of the Fund's business should be considered by prospective investors before subscribing for Shares." Ex. M at p. 50 (DBZ 0009876); Ex. O at p. 28 (DBZ 0009777); Ex. L at p. 28 (DBZ 0009704); Ex. T at p. 46 (DBZ 0009633); Ex. U at p. 29 (DBZ 0009561); Ex. K at p. 23 (DBZ 0009473). See also Ex. B at pp. 8-10 (SEC_Gruss 001015-17) (DBZCO also provided a similar conflicts of interest disclosure in due diligence materials for potential investors.) A conflict can arise from the practice of 'cross trading,' i.e., the Manager effects a trade or a loan between the Fund and another investment fund or account that it or its affiliates manage." Ex. M at p. 52 (DBZ 0009878); Ex. L at p. 29 (DBZ 0009705); Ex. T at p. 47 (DBZ 0009634); Ex. U at p. 30 (DBZ 0009562); Ex. K at p. 24 (DBZ 0009474). Thus, the

Offering Memoranda granted DBZCO the right to engage in transactions between the funds, while simultaneously disclosing that such a transaction could create a conflict of interest. The Offering Memoranda also disclosed that "notwithstanding the potential conflicts of interest resulting from these multiple relationships, the Manager is expressly permitted to enter into contracts and transactions with its affiliates on behalf of the Fund." *Id.*; Ex. K at p. 25 (DBZ 0009475). Similar disclosures appeared in the due diligence materials provided to investors.

The SEC has admitted the quoted language appears in the Offering Memorandum, but has noted that this statement is incomplete as the Offering Memorandum also provided that "the [Offshore] Fund ... will generally not invest in ... other assets such as real estate or make direct loans to or otherwise engage in the active management of a U.S. company" (Brody Decl. Ex. 3 at 19-20) and repeatedly represented this limitation on the Offshore Fund's ability to invest to the auditors, investors and potential investors. The SEC did not contest that the Offering Memoranda specifically stated that the Offshore Fund might "accept an assignment of, or participation in, a loan from the [Onshore Fund] at a price approved by an independent third party" [Brody Decl. Ex. 3 at 201), and has noted that Gruss made statements as noted in the Findings of Fact ("FOF") above.

20

25.   In such instances "the Manager and Zwirn may have a conflict of interest between acting in the best interests of the Fund and such other accounts and funds." Ex. M at p. 51 (DBZ 0009877); Ex. O at p. 28 (DBZ 0009777); Ex. L at p. 28 (DBZ 0009704); Ex. T at p. 46 (DBZ 0009633); Ex. U at p. 29 (DBZ 0009561); Ex. K at p. 23 (DBZ 0009473). Those conflicts were to be resolved by the Manager in its sole discretion: "When the Fund and one or more other clients of the manager have available funds for investments, investments . . . will be allocated substantially pro rata on an overall basis ... to the extent possible, unless the Manager believes, in good faith, that another method would be more fair and equitable." Ex. M at pp. 51-52 (DBZ 0009877-78); Ex. O at p. 29 (DBZ 0009778); Ex. L at p. 29 (DBZ 0009705); Ex. T at pp. 46-47 (DBZ 0009633-34); Ex. U at pp. 29-30 (DBZ 0009561-62); Ex. K at p. 24 (DBZ 0009474). The Offering Memoranda stated that the Manager can "engage in investment techniques and strategies not described" in the Offshore Fund's Offering Memoranda "that the Manager considers appropriate under the circumstances" Ex. M at p. 27 (DBZ 0009853) and "to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental" for the Onshore Fund. Ex. K at p. 5 (DBZ 0009502).

21

The SEC has admitted the quoted language appears in the Offering Memoranda, but noted that these statements are incomplete because the Offering Memorandum explicitly provided that "the [Offshore] Fund ... will generally not invest in ... other assets such as real estate or make direct loans to or otherwise engage in the active management of a U.S. company," (Brody Decl. Ex. 3 at 19-20), that DBZCO and Gruss represented this limitation on the Offshore Fund's ability to invest to the auditors, investors and potential investors and that Gruss made statements as notes in the FOF.

26.    The Management Agreements with the Funds, under which DBZCO was retained as investment adviser by each fund, stated authority of the Manager in the Offering Memoranda. The 2005 version of the Offshore Fund Management Agreement stated that:

> The Fund desires to employ its capital by investing and reinvesting in securities and other instruments and investments as specified in the Memorandum [Offering Documents] . . . The Manager is authorized as attorney-in-fact of the Fund to take all such actions . . . on behalf of the Fund that it deems, in its sole discretion, necessary or appropriate to perform its obligations under this Agreement.

22

Ex. V at ¶1 (BS00000220).

The SEC has noted that the Management Agreement specifically states that the Offshore Fund "desires to employ its capital by investing and reinvesting in securities and other instruments as specified in the [Offering Memorandum] ...." (Brody Decl. Ex. 139 at 1), and the Offering Memorandum included the limitation that "the [Offshore] Fund ... will generally not invest in ... other assets such as real estate or make direct loans to or otherwise engage in the active management of a U.S. company." (Brody Decl. Ex. 3 at 19-20).

27.    The agreement for the Onshore Fund is virtually identical. Ex. W at ¶1 (DBZ0040972) see also Exhs. MM, NN, SS at ¶1.

The U.S. Tax Exemption for the Offshore Fund

28.    The purpose of the Offshore Fund, a Cayman Island company, was to create an investment vehicle that would not be subject to U.S. taxes.

29.    A representation letter to the auditors for all of the Offshore Funds managed by DBZCO, signed by Gruss and

Zwirn stated: "[t]he Funds have structured their operation in order that it will not be deemed to be engaged in a trade or business within the U.S. for purposes of U.S. federal tax laws." (Brody Decl. Ex. 21).

30. DBZCO made similar representations to the investors in the Offshore Fund. The Offering Memorandum explained that "[a] non-U.S. corporation engaged in a U.S. trade or business is generally subject to U.S. corporate income tax on income and gain earned in the U.S. which is connected to such trade or business, in the same manner as a U.S. corporation. In addition, a non-U.S. corporation engaged in a U.S. trade or business is subject to a 'branch profits' tax equal to 30% of the amount of its U.S. earning which are not reinvested in U.S. assets." In order to avoid these taxes, "the [Offshore] Fund intends to operate and structure its investments in a manner such that it should not be deemed to be engaged in a U.S. trade or business." (Brody Decl. Ex. 3 at 66; 15 "[t]he manager intends to conduct the business of the [Offshore] Fund (including investments in loans originated by the U.S. Fund or its affiliates) in a manner such that the fund should not be engaged in a U.S. trade or business").

24

The same section of the July 2006 Offering Memoranda

stated:

The Manager intends to conduct the business of the
Fund in a manner so as to meet the requirements of the
Safe Harbor, and believes that the transactions under
its investment program, including investments in loans
originated by the U.S. Fund or its affiliates, should
qualify for the Safe Harbor. There can be no
assurance, however, that the Service will agree that
each of such transactions qualifies for the Safe
Harbor. If certain of the Fund's activities were
determined not to be of the type described in the Safe
Harbor, the Fund's activities may constitute a U.S.
trade or business, in which case the Fund would be
subject to U.S. income and branch profits tax on its
share of the income and gain from those activities and
related activities, if any, and the Fund may have to
file a U.S. tax return. In addition, if any credit
default swap is characterized as a contract of
insurance or a guarantee, payments to the Fund under
such credit default swap may be subject to an excise
tax or a withholding tax.

The Safe Harbor, however, may not apply to the trade
or business of actively originating loans within the
U.S. The Manager believes that the transactions under
its investment program, including investments in
loans, should qualify for the Safe Harbor, although
there can be no assurance that the Service will agree.
Moreover, as indicated above, the Fund may acquire
interests in loans (including leases treated as
financings for U.S. Federal income tax purposes),
revolvers and letters of credit originated by the U.S.
Fund or its affiliates and may make such investments
through subsidiary vehicles. The Fund believes that
these activities should qualify for the Safe Harbor
terms are agreed upon and will not in any event be
obligated to make any purchases until after the loans
are made. Furthermore, the Fund will not be permitted
to purchase interests in loans originated by the U.S.
Fund or its affiliates unless an independent party
approves the purchase. Nevertheless, there can be no
assurance that the Service will not assert that the
Fund is engaged in a trade or business within the U.S.
by virtue of such purchase of interests in loans from

25

the U.S. Fund or its affiliates. If the Service is
successful in such an assertion, the Fund's or its
subsidiary's income from these activities and related
activities, if any, may be subject to U.S. income and
branch profits tax and the Fund or its subsidiary may
have to file a U.S. tax return.

Ex. M at p. 67.

31.   The Offering Memorandum stated that "actively
originating loans within the U.S." might create adverse tax
consequences and that "certain investments by the [Offshore]
Fund could result in the [Offshore] Fund being deemed engaged in
a U.S. trade or business, including direct investments by the
[Offshore]Fund in U.S. real estate." *Id.* at pp. 67, 69. As such,
the offering memorandum noted that "the [Offshore] Fund ... will
generally not invest in leased equipment and other assets such
as real estate or make direct loans to or otherwise engage in
the active management of a U.S. company." *Id.* at pp. 19-20.

The July 2005 Offering Memoranda stated:

The U.S. Fund, the Parallel Cayman Fund and the TE
Fund are managed using strategies generally similar to
those the Manager uses for the Fund. Even though their
strategies are generally similar, performance of the
U.S. Fund, the Parallel Cayman Fund and the TE Fund
will not be the same as the Fund's performance as a
result of, among other things, different legal,
regulatory, tax, liquidity, structuring and investment

26

constraints on the U.S. Fund, the Parallel Cayman Fund and the TE Fund. These constraints include adverse tax consequences to the Fund and the Parallel Cayman Fund of certain investments made by the U.S. Fund as well as differences in the timing of investments, limitations on size of investments, nature of investments, and governmental regulation of investments. For example, the Fund and the Parallel Cayman Fund will generally not invest in leased equipment and other assets such as real estate or make direct loans to or otherwise engage in the active management of U.S. company. The Fund or a subsidiary of the Fund may, however, accept an assignment of, or participation in, a loan from the U.S. Fund at a price approved by an independent third party (see "Conflicts of Interest"). The TE Fund is managed using strategies generally similar to those the Manager uses for the U.S. Fund, except that the TE Fund generally does not engage in investment activities that would generate UBTI for U.S. tax purposes. As a consequence of these and other differences, the Fund's performance will differ from the performance of the U.S. Fund, the Parallel Cayman Fund and the TE Fund. In the future, the Fund may carry out its investment objectives by investing all or a portion of its capital through a master-feeder structure along with other funds and accounts managed by the Manager. The offering memorandum explained that instead of making a direct investment, "[t]he [Offshore] Fund or a subsidiary of the [Offshore] Fund may, however, accept an assignment or, or participation in, a loan from the U.S. Fund at a price approved by an independent third party ...." Id. at pp. 19-20. "The [Offshore] Fund believes that these activities should qualify for the Safe Harbor since it will only be committing to buy the interests in the loans after the loan terms are agreed upon and will not in any event be obligated to make any purchases until after the loans are made. Furthermore, the Fund will not be permitted to purchase interests in loans originated by the U.S. Fund or its affiliates unless an independent party approves the purchase."

Id. at p. 67.

32.   The Offering Memorandum stated that instead of
making a direct investment, "[t]he [Offshore] Fund or a
subsidiary of the [Offshore] Fund may, however, accept an
assignment or, or participation in, a loan from the U.S. Fund at
a price approved by an independent third party." *Id.* at p. 20.
"The [Offshore] Fund believes that these activities should
qualify for the Safe Harbor since it will only be committing to
buy the interests in the loans after the loan terms are agreed
upon and will not in any event be obligated to make any
purchases until after the loans are made. Furthermore, the Fund
will not be permitted to purchase interests in loans originated
by the U.S. Fund or its affiliates unless an independent party
approves the purchase." *Id.* at p. 67.


33.   The Offering Memorandum stated that the inability
for the Offshore Fund to participate in certain transactions for
tax reasons could result in a disparity of performance between
the Offshore Fund and other investment vehicles managed by
Zwirn. In a 2005 internal email, Gruss noted that a recently
disparity in performance was because "there have been several
pops on a few assets that cannot go offshore bc of ECI",
including "Oil/Gas Overides. Resi Platforms." (Brody Decl. Ex.
22).

28

Gruss has noted that Brody Decl. Ex. 22 is an email exchange between Gruss/Kahn and a member of the DBZCO staff in the London office, that there are many different causes for a potential disparity in returns between the Onshore Fund and the Offshore Fund, including most significantly, the leverage attributed to the Onshore Fund's Collateralized Loan Obligations ("CLOs").

34.  As a result of tax laws, the Offshore Fund could not "buy certain investments for itself," and the Onshore Fund would have to buy and "season" the investments for anywhere between 30 to 90 days before it could sell those investments to the Offshore Fund. Ex. Z at pp. 31-33; Ex. R at pp. 97-100, 142-43; Ex. CC at pp. 72-74. The SEC has noted that this was not only because of the tax laws but also because the Offshore Fund Offering Memorandum specifically stated that it would not engage in such investments, and that none of the evidence cited by Gruss states that the investments were "seasoned" for a period of 30 to 90 days and that Gruss told one investor that "[a]ll loans will be seasoned a minimum of 90 days sometimes 110 days." (Brody Decl. Ex. 32); see also (Brody Op. Decl., Ex. J at 24:14-23) (90 days), (Brody Op. Decl., Ex. K at 98:21-24) (90 days).

29

35.   Quarterly investor letters sent from DBZCO to
offshore investors also noted that the offshore entities,
including the Offshore Fund "do not expect to originate loans."
(Brody Decl. Ex. 23 at p. 5). In response to a question from a
prospective investor about this language in the quarterly letter
and "does the offshore [fund] eventually participate via a
seasoning vehicle or does it never participate at all," DBZCO
responded "[w]e are extremely sensitive to trade or business
issues related to our lending and assets business. Yes, while
the onshore fund originates the loans, for the majority of the
loans we can season them and then the Offshore Fund can
participate as well." (Brody Decl. Ex. 24). Likewise, DBZCO said
that "[t]he fund is mindful of [sic.] Offshore Fund can't be in
the business of originating to US companies otherwise it would
be subject to 54.5% US tax rate." (Brody Decl. Ex. 25).

This tax issue was regularly discussed with investors
and potential investors. In 2004, one investor emailed DBZCO as
part of its due diligence and asked "does the manager generate
any Effectively Connected Income." (Brody Decl. Ex. 26).

36.   In 2005, Gruss told one investor doing due
diligence that "DB Zwirn seasons their loans in the onshore
[fund] for 90 days before they contemplate participating in the

loans by the offshore [fund]. ... [W]hen a loan is ready to be sold to the offshore [fund], the loan is priced at fair market value. ... Prior to every sale to the offshore, DB Zwirn utilizes an independent trading manager that determines if a loan is 'offshorable' and the trading manager also opines on the transaction price. The independent trading manager they use is called the Taylor Group and they are based in Chicago." (Brody Decl. Ex. 27).

In another 2005 due diligence meeting with an investor, Gruss said that the tax/ECI issue "is a focus of Perry [Gruss]. They [DBZCO] have structured every deal in order to avoid it. If needed, the offshore does not participate and deals are held for 90 days. The lawyers told him deals should be held 30-60 [days] to avoid it [ECI] but practice may hit 90 days eventually and they use 90 days for all deals going forward." (Brody Decl. Ex. 28). Approximately a month after this meeting, the same investor emailed Gruss and stated "ECI is become a priority issue for us in many of our products and I was telling [our CFO] of your dealings in this area and she would like to speak to you at your convenience." (Brody Decl. Ex. 29).

In a 2006 due diligence meeting between Gruss and a potential investor, Gruss informed the investor that "[b]ecause

31

of tax issues associated with loan origination the Offshore Fund does not participate in all trades" and that "[t]he Offshore Fund historically underperforms the on shore due to tax issues associated with loan origination." (Brody Decl. Ex. 30).

37. In response to an email from one investor about whether offshore investors were involved in loan origination, Gruss responded that they were not involved in loan origination because of ECI issues.

38. One investor had a specific call with Gruss about whether the Offshore Fund was in the domestic lending business. In this call, Gruss stated that "[a]ll loans will be seasoned a minimum of 90 days sometimes 110 days. In addition to the seasoning term all loans purchased by the Offshore Fund from the onshore fund will have an independent 3rd party valuation group price the loan." Gruss also told the investor that he was "confident enough portfolio statistics will be generated to support a strong case that the Offshore Fund is not solely a domestic lender." The investor noted that "[i]f an Offshore Fund was found to be a domestic lender by the IRS the implications would be very serious and could cause a very material impact." (Brody Decl. Ex. 32).

39. Gruss understood that the Offshore Fund could not make certain investments because of "limitations" including that it could not be deemed to be involved in a U.S. trade or business because that would have "adverse tax implications" for the Offshore Fund. (Brody Decl. Ex. 4 at 77:14 - 78:3). Gruss reviewed transactions to try and find ways to allow the Offshore Fund to participate in investments "without incurring ECI." (Brody Decl. Ex. 33)

40. Gruss candidly stated that ECI "scares the [expletive] out of me." (Brody Decl. Ex. 34). Gruss may have been scared about ECI because of its complexity and because it would cause issues for the investors in the Offshore Fund if the Offshore Fund was found to have engaged in a U.S. trade or business. Gruss told Sylvia Wu ("Wu"), the controller for the funds, that because of tax reasons, the Onshore Fund could originate loans while the Offshore Fund could not.

41. Other members of the accounting department also understood that if loan originations would come out of the Offshore Fund, it would open the Offshore Fund to tax liability.

The Offshore Fund Loans to the Onshore Fund

33

42. The individuals in the accounting and finance departments who reported to Gruss included Wu, Li Anne Law ("Law"), Robert Racusin ("Racusin"), Michelle O'Hara ("O'Hara"), and Jason Pecora ("Pecora"). Josh Karotkin ("Karotkin") was also in a line that reported to Gruss.

43. The funds had various bank accounts. The main bank account for the Offshore Fund was account ***600 at ABN Amro. The main account for the Onshore Fund was account ***559 at ABN Amro. The SEC asserts that everyone in the accounting department knew which account was which. When Law spoke with Gruss about the accounts, they would refer to them by their account numbers. Gruss knew that Ltd. Account #***600 was for the Offshore Fund because it was one of the accounts most frequently used at the custodian bank and was the shorthand way the accountants referred to the account.

Gruss, however, asserts that he was not aware of the identity of the account numbers for each account. Law testified that when she spoke to Gruss about the Onshore Fund and Offshore accounts, she used both the account number and the name of the fund. Ex. BBB at p. 142.

34

44.    Each of the funds also had a brokerage account at Bear Stearns. (Brody Decl. Ex. 17 at 52:9-12) The Offshore Fund was referred to in shorthand as "Ltd" and the Onshore Fund was referred to in shorthand as "LP." *Id.* at 53:3-6.

45.    During all relevant time periods, Zwirn and Gruss were the two individuals at DBZCO who were authorized to transfer cash from the funds. (Brody Decl. Ex. 2 at 262:17-21). Only one of their signatures was required to transfer money. (Brody Decl. Ex. 17 at 55:19 – 56:6).

46.    DBZCO had no written manual of accounting policies or procedures during the relevant period of time. Nor were there any written policies at DBZCO concerning the movement of cash, however, the accounting department knew that Gruss was the signatory on all fund accounts.

47.    The procedure for requesting that wires be made from the funds accounts at ABN Amro was that "the accounting team would send out the instructions [to the bank] and say 'Please do this wire' and then [Gruss] would have to send an e-mail reply back to all that says okay to go. And then that wire would go out." (Brody Decl. Ex. 16 at 55:13-18).

35

48. There was a photocopy of Gruss' signature that was used to fax wire requests to Bear Stearns when Gruss was not available. *Id.* at 47:1-3, 48:25 - 49:2. Most of the accounting and operations team had a copy of the signature.

49. Because money needed to be sent quickly and Gruss was sometimes not available, the accountants would "take the signature and take it to a photocopy and take it on the sheet that we created, instruction that we created, and photocopy it and to make it look like it was signed by Perry, and then fax it to Bear Stearns." (Brody Decl. Ex. 16 at 48:20-24).

50. Using Gruss' signature under these circumstances was standard operating procedure at DBZCO. People talked about using the photocopied signature since this was a standard practice.

Gruss' signature was used "when he was out of the office", Ex. ZZ at p. 50, or he "could not be located to sign a wire." Ex. BBB at p. 47.

51. Gruss was aware of this practice, approved the practice, and joked about the practice saying "[h]ey, look, here is my fake signature." (Brody Decl. Ex. 16 at 49:3-13, 50:824;

36

Ex. 17 at 48:1-7 "joking atmosphere"). Gruss never complained that his signature had been used in an unauthorized fashion. Gruss even praised accountants after they used his copied signature to get a wire out. (Brody Decl. Ex. 16 at 49:13-18).

52.     The Onshore Fund consistently suffered from a lack of available cash. (Brody Decl. Ex. 1 at ¶ 14; Ex. 36 "we are extremely tight right now"; Ex. 37 "pls don't tell me we're out of cash"; Ex. 199; Ex. 38; Ex. 39 "we have negative really big $$$$ - Wu is freakin. How do we avoid this in the future?"; Ex. 40 "Wu is losing it over the whole money thing"; Ex. 41 "US =BROKE"; Ex. 42 "we owe at least $11M in cash we don't have right now and that is a very conservative number"; Ex. 43; Ex. 44; Ex. 45; Ex. 46 "Onshore Fund is tight on cash"; Ex. 47 "tight"; Ex. 48; Ex. 49 "we should discuss our current funding availability situation sometime today"; Ex. 50 "we need to start exploring the idea of maintaining a min cash available amount for each fund"; Ex. 51 "Onshore Fund is just about tapped"; Ex. 52 "not good. Onshore Fund is getting extremely tight"; Ex. 53 "we have no cash in Onshore Fund"; Ex. 54 "Do we need the money today ..." "Not today, last Wednesday.") According to Gruss, the use of the adverb "consistently" is an overstatement and that whether the Onshore Fund at times had a lack of cash is irrelevant.

37

53. The Offshore Fund often did not have sufficient cash on hand to fund new investments to which it had committed capital. (Brody Decl. Ex. 1 at ¶ 14; Ex. 55 at 85:4-8; Ex. 17 at 124:1-4 "Not enough subscriptions, investor subscriptions to match the investments that were going out the door"). According to Gruss, "often" is an overstatement.

54. The Offshore Fund, however, "had more cash than investment opportunities due to its inability to make investments or loans directly in a U.S. trade or business without being subject to a U.S. tax liability." (Brody Decl. Ex. 1 at ¶ 15). Gruss has denied this statement.

55. At times the funds had at their disposal many sources of capital available to draw on for investments. These sources included prime brokers, banks, affiliated funds, managed accounts, structured vehicles such as the Offshore Fund and Onshore Fund CLOs and other financing sources. These sources of capital were continually evolving and expanding over time. Depending on the type of investment and cash availability at each of the sources, certain borrowing sources were preferred over others. However, several factors influenced the Manager's decision to use one funding source over another, including

38

investment type, financing vehicle constraints, cash
availability and differing tax consequences. Above all, the
Manager's goal, when determining its funding source, was to
maximize investor returns whenever possible.

The SEC has noted that the Offering Memorandum for the
Offshore Fund further provided that "the [Offshore] Fund ...
will generally not invest in ... other assets such as real
estate or make direct loans to or otherwise engage in the active
management of a U.S. company" (Brody Decl. Ex. 3 at 19-20) and
DBZCO and Gruss represented this limitation on the Offshore
Fund's ability to invest to the auditors, investors and
potential investors, and that Gruss made the statements referred
to in the FOF above.

56.   In 2004, a practice started where Gruss and the
accountants would take cash that was sitting in the Offshore
Fund and use that money to pay for Onshore Fund investments. As
described by Wu, the controller for the funds:

[W]e didn't have the money [in the US Fund]. We
received an email from the analyst, but we didn't have
the money to send the money out from the onshore fund.
And at that time, Bob [Racusin] and I were sitting to
next together and we want to figure out what to do and
we don't know what to do, and we go into Perry's
office and the three of us will have a -- the three of

39

us had a powwow and trying to figure out how to deal
with the situation. Perry asked me how much there is
in the onshore fund, how much there is in the Offshore
Fund, and how much the fund -- the analyst want to
send out, and we will come up with suggestions. I said
to him before that, like, he could -- can we lend the
money that we have excess sitting at the Offshore Fund
and lend it to the onshore fund, and we create like an
intercompany loan and charge interest, and once the
onshore fund has money, it can pay back. And he said
no, you cannot do that because of some tax reason,
that the Offshore Fund cannot lend to the onshore
fund. I didn't remember the exact details of it, but
it's just a "No" answer. And then I also said can we
lend money directly from the Offshore Fund to the
borrower so we have enough money, since we have enough
money in the Offshore Fund. And he said no, the loan
cannot be originated from the Offshore Fund. And then
he said that since we will have money coming in, you
know, next week or so for the new subscriptions of the
onshore fund, we can send the money out from the
Offshore Fund now and then we can repay -- when the
subscription money comes in, we can repay the Offshore
Fund. And since that was the only alternative that we
had, and so that's what we did.

Brody Decl. Ex. 16 at 63:4-64:13.


According to Gruss, on cross-examination in her

deposition, Wu stated that she was confused as to what she was

told by Gruss, did not understand that the tax reason as to why

the Onshore Fund could not lend money to the Offshore Fund with

interest was because the act of lending money with interest

could arguably place the Offshore Fund in engaging in the trade

or business of loaning money. Wu also confused "loan

origination" by the Onshore Fund with the Offshore Fund

advancing funds to the Onshore Fund so it could originate the loans that were the investments that the Onshore Fund would season and later provide to the Offshore Fund.

57. It was Gruss' idea to use the money from the Offshore Fund to fund the U.S. Fund's investments. *Id.* at p. 64:14-18. Wu recalled that the initial conversation was essentially "[b]asically we are screwed; what are we going to do. We have no money. That dude back there wants the money out. What are we going to do." Brody Decl. Ex. 16 at p. 65:10-14.

Gruss has denied this statement asserting that the answer was to a leading question by the SEC that should be suppressed as a violation of Fed. R. Evd. 611(c) because Wu was a witness for the SEC, had entered into a cooperation agreement with the SEC (Ex. AAA), the question was asked on direct examination and the witness was not hostile to the SEC or identified with Gruss and the remaining statements are inadmissible hearsay in which Wu relates a conversation she had with Racusin.

58. Wu was uncomfortable with the practice of moving "money from the Offshore Fund in order to fund the onshore fund obligations," Brody Decl. Ex. 16 at 33:20 - 34:12, because she

41

was "told that we were not supposed to lend money from the Offshore Fund to the onshore fund. So since I was told that, so I thought we had – as a hedge fund manager, you are supposed to have fiduciary duty to your investors, so we're doing something that wasn't beneficial to the investors." *Id.* at 72:25 - 73:5.

Gruss has denied this statement as inadmissible as the operation of Wu's mind, and has noted she did not explain her "reasoning to him [Gruss]," did not know what the funds could or could not legally do under their Offering Memoranda and formation documents, that she had never read any of the fund Offering Memoranda to determine whether the Offshore Fund could advance funds to the Onshore Fund and had the title of "Controller," but stated she was "essentially a bookkeeper at D.B. Zwirn." *Id.* at pp. 21, 232.

59. Wu told Gruss that she was uncomfortable with the practice "and we really need to find some solutions to this ... I asked him if Dan Zwirn knows about what we are doing, and basically tell him that this is causing me a lot of stress." *Id.* at 72:5-13.

Gruss has noted that Law testified that "[n]o one acted like it [the LTD advancing funds to the Onshore Fund] was

42

wrong" and "nobody told . . . [her] that this was illegal" and
that it was "stressful" because it was "an accounting headache
that we needed to clear as soon as we could" and that "it was
creating a lot of accounting work and responsibilities." Ex. BBB
at pp. 174, 198-99. "[T]he monies that went from the Offshore to
the Onshore, this all had to be done the last minute, and the
money had to be moved in and it was extremely stressful." *Id.* at
p. 263. Gruss testified that Wu attempted to resign 5 times
before she actually left because of stress.

        60.    Wu told Gruss numerous times that she was
uncomfortable with the practice because "we're not supposed to
do this, so we need to do something." Brody Decl. Ex. 16 at
73:8-13. Wu even joked with Gruss that they were going to go to
jail because of the interfund transfers. *Id.* at 97:10-17. When
Wu had these conversations with Gruss, at no point did Gruss say
that this practice was allowed under the offering documents. *Id.*
at 75:25 - 76:4.

        According to Gruss, Wu's statement about "going to go
to jail because of the interfund transfers "in fairness ought to
be considered" along with Wu's admission that "she did not know
if it [the LTD advancing funds to the Onshore Fund] could be
legal," Ex. ZZ at p. 122.

61.  Wu threatened to quit numerous times over the
interfund transfers and each time would have discussions with
Gruss about the practice. Brody Decl. Ex. 16 at 74:10-12. The
gist of the conversations was that she felt "very uncomfortable.
We cannot do this, and this thing just keeps snowballing and
it's not getting any smaller and we just cannot do this, it's
not right, and I feel very uncomfortable." *Id.* at 74:17-24.
Gruss' response to Wu's concerns was "we will figure out
something." *Id.* at 74:25 – 76:1.

According to Gruss, Wu's statements must be considered
in light of Gruss' and Law's testimony that the concern was not
about the legality of the practice but rather the stressful
accounting work it created and Gruss' testimony that Wu's
concern was also about the size of the receivable from the
Onshore Fund to the Offshore Fund.

62.  Gruss admitted in words or substance that Law
and Wu both raised concerns to him regarding the interfund
transfers and Pecora raised concerns about the CDC-related
interfund transfers. Gruss admitted that Wu and Law both quit
over the interfund transfer practice. (Brody Decl. Ex. 184).

Gruss admitted the statement in part and denied it in part noting that as referenced above, Law and Wu were concerned not about the legality of the practice but about the stress it placed on them to accomplish the accounting and bookkeeping that resulted from the Offshore Fund advances to the Onshore Fund and that Pecora's concern was that the advances from the Offshore Fund to the Onshore Fund were not booked in the sub-ledger as formal interest bearing loans as opposed to advances, Ex. EEE at pp. 67-69, and that the statement that "Gruss admitted that Wu and Law both quit over the interfund practice" is not accurate. Gruss further notes that while Wu testified that the "burden" of the inter-fund transfers were the main reason she resigned, Ex. ZZ at pp. 74, 117, Law testified that Wu "tried to resign a number of times" because of "stress in general," which did not help her depression for which she was consulting with a physician, Ex. BBB at pp. 302-04, and Law also admitted that one of the reasons she resigned was because of DBZCO's internal investigation into the purchase of the airplane and the early payment of management fees, *Id.* at pp. 212-17, and that it was the investigation of the airplane and management fees that "pushed" her into "action." *Id.* at pp. 212-13. Gruss further notes that Law testified that one of the reasons she explained to Gruss as to why she was resigning "was the aggressive growth of the firm, and . . . [she] basically felt that there was a lot

45

of extra workload coming down to the back office. It was like expanding too much of the top, without giving any thought to whether the back office was structurally ready to accept that increased workload. So it was very crippling and that was very frustrating as well". *Id.* at pp. 172-3.

63.   In 2007, the accounting firm Deloitte Onshore Fund ("Deloitte") reviewed the books and records of DBZCO and determined that in at least the following instances, the Offshore Fund funded an investment for another entity managed by DBZCO (including the Onshore Fund) where the Offshore Fund did not initially participate or where its initial participation was less than the amount it funded:

| Name of Investment | Funding Date | Funding From Offshore Fund | Initial Participation by Offshore Fund | Investment in U.S. Real Estate | Cash Transfer from Offshore Fund Directly to Investment | Transfer Repaid Entirely in Cash |
|---|---|---|---|---|---|---|
| LFG | 26-Mar-04 | $377,715 | 0% | | X | X |
| Suncruz | 9-Apr-04 | $10,000,000 | 0% | | | X |
| Comcap | 9-Jun-04 | $3,266,252 | 0% | | X | X |
| L Group | 9-Jun-04 | $5,400,000 | 0% | X | X | |
| Cornerstone | 14-Jun-04 | $414,417 | 50% ($207,706) | | X | |
| Levitz | 18-Jun-04 | $6,000,000 | 50% ($3,000,000) | | X | |
| SVS First | 28-Jun-04 | $990,000 | 0% | | X | |
| Genutrec | 4-Jul-04 | $3,540,500 | 0% | | X | X |
| Interim Saddleback | 16-Jul-04 | $6,051,500 | 0% | X | X | |
| Northlake | 29-Jul-04 | $17,500,000 | 0% | | X | |
| JPMX X | 16-Aug-04 | $999,990 | 0% | | X | X |
| Priority | 30-Aug-04 | $975,000 | 0% | | X | |
| LFG | 30-Aug-04 | $447,500 | 0% | | X | X |
| LFG | 12-Oct-04 | $268,518 | 0% | | X | X |
| Cornerstone | 14-Oct-04 | $410,022 | 50% ($205,501) | | X | |
| Quantum | 25-Oct-04 | $16,800,000 | 0% | | X | |
| Kimco | 26-Oct-04 | $2,055,290 | 0% | | X | X |
| GPE | 23-Nov-04 | $15,000,000 | 40% ($6,000,000) | | X | |
| NCC | 29-Nov-04 | $14,690,385 | 0% | | X | X |
| Brantley | 20-Dec-04 | $3,107,815 | 0% | | | |
| Schilling | 27-Jan-05 | $999,014 | 0% | | X | X |
| Davidson | 28-Jan-05 | $18,596,150 | 0% | | X | X |
| TLC | 11-Feb-05 | $27,500,000 | 0% | | X | X |
| HeOnshore Fund | 15-Feb-05 | $16,273,485 | 0% | | | X |
| HeOnshore Fund | 18-Feb-05 | $12,805,000 | 0% | | | X |
| Tremont | 4-Mar-05 | $19,000,000 | 0% | X | | X |
| Malara | 8-Mar-05 | $27,918,485 | 0% | | X | X |

47

| | | | | | | |
|---|---|---|---|---|---|---|
| Markley | 22-Mar-05 | $20,920,380 | 0% | X | X | |
| Lifesource | 14-Apr-05 | $1,005,774 | 0% | | X | X |
| Summitbridge | 15-Apr-05 | $4,190,000 | 0% | | X | X |
| LS Reo | 18-Apr-05 | $3,000,000 | 0% | | | X |
| RIH Investment | 19-Apr-05 | $5,000,000 | 0% | X | X | X |
| Hudson Spokane | 27-Apr-05 | $3,358,055 | 0% | X | X | X |
| River Island | 5-May-05 | $25,000,000 | 0% | X | | |
| LLJ Precis | 16-Jun-05 | $7,849,808 | 0% | | X | |
| Marquette | 14-Jul-05 | $14,422,470 | 0% | X | X | X |
| Lotus | 25-Jul-05 | $8,250,000 | 0% | | X | |
| Copper Canyon | 25-Jul-05 | $27,529,057 | 0% | | X | |
| Port Cardig | 23-Aug-05 | $14,850,000 | 0% | | X | |
| Latam | 24-Aug-05 | $2,307,337 | 70% ($1,615,136) | | X | |
| Vision Bozeman | 24-Aug-05 | $4,400,000 | 0% | | X | X |
| Tremont | 25-Aug-05 | $6,192,263 | 0% | X | | X |
| SWB | 9-Sep-05 | $1,177,200 | 65% ($765,180) | | X | |
| Petro Edge | 15-Sep-05 | $330,080 | 76% ($252,294) | | X | |
| Chesapeake/Shelly | 15-Sep-05 | $2,227,500 | 0% | | X | X |
| Extell | 12-Oct-05 | $5,064,006 | 0% | X | X | X |
| Solana | 17-Oct-05 | $26,000,000 | 0% | X | X | |
| Ireo | 21-Oct-05 | $3,212,000 | 25% ($803,000) | | X | |
| Vanguard | 1-Nov-05 | $7,839,393 | 0% | | X | X |
| Project Taka | 10-Nov-05 | $4,783,126 | 0% | | X | X |
| DPH | 21-Nov-05 | $2,500,000 | 53% ($1,325,000) | | X | |
| MBW | 1-Dec-05 | $17,379,295 | 0% | | | X |
| INT Ventana | 1-Dec-05 | $3,349,344 | 95% ($3,181,877) | | X | |
| Longroad HOP | 9-Dec-05 | $5,987,224 | 50% ($2,993,612) | | X | |
| Davidson | 9-Dec-05 | $391,879 | 0% | | X | |
| Summitbridge | 22-Dec-05 | $2,450,000 | 0% | | X | X |
| Kaufman | 11-Jan-06 | $7,692,760 | 0% | X | X | X |
| Plant | 30-Jan-06 | $12,610,000 | 43% ($5,399,414) | | X | |
| Pilot Barrington Broad | 30-Jan-06 | $5,060,556 | 50% ($2,519,948) | | X | |
| Davidson | 31-Jan-06 | $16,600,000 | 0% | | X | |
| Da Vinci | 6-Feb-06 | $25,000,000 | 50% | | X | |

| | | | ($12,500,000) | | | |
|---|---|---|---|---|---|---|
| Interim Apex | 28-Feb-06 | $6,745,000 | 0% | X | X | |
| Vermillion | 10-Mar-06 | $10,000,000 | 80%<br>($8,000,000) | | X | |
| Summitbridge | 13-Apr-06 | $2,930,000 | 0% | | X | X |
| Interim Mt. Lau | 17-Apr-06 | $6,650,000 | 0% | X | X | |
| Ireo | 25-May-06 | $3,400,000 | 82%<br>($2,797,829) | | X | |
| Total Funding | | $559,041,545 | ($51,566,497) | | | |
| Less Initial<br>Participation | | ($51,566,497) | | | | |
| Total Advances | | $507,475,048 | | | | |

Gruss has objected to the chart and its use on the
grounds that this chart changes the SEC's theory and factual
allegations from the amended complaint where it is alleged that
there were "$576 million in [85] transfers between March 2004
and July 2006 . . . to fund Onshore Investments" "for the
benefit of the Onshore Fund." According to Gruss, these factual
allegations were supported by the Deloitte work papers that
showed that the 85 transfers amounting to $576 million was
derived from a chart prepared by Deloitte and represent 66
investments purchased, in whole or in part, from funds advanced
to the Onshore Fund by the Offshore Fund. Ex. AA at pp. 51-52;
Gruss Dec. Ex. A; Gruss Dec. Ex. B and the above chart expands
and changes the allegation beyond the Offshore Fund advancing
funds to the Onshore Fund for investments to any "entity managed
by DBZCO" to those instances where "the Offshore Fund funded an
investment for another entity managed by DBZCO (including the

49

Onshore Fund) where the Offshore Fund did not initially participate or where its initial participation was less than the amount it funded."

According to Gruss, the transactions reflected on this chart representing the advancement of funds from the Offshore Fund to the Onshore Fund and other DBZCO managed funds were permitted by the funds' Offering Memoranda and operating documents. Gruss further has asserted that the chart's emphasis on "Initial Participation by Offshore Fund" is misleading and contrary to the Offshore Fund's Offering Memoranda that provides that "the Fund may acquire interests in loans (including leases treated as financings for U.S. Federal income tax purposes), revolvers and letters of credit originated by the U.S. Fund or its affiliates and may make such investments through subsidiary vehicles," Ex. M at p. 67, and that in certain instances, the Onshore Fund regularly "seasoned" those interests in loans between 30 to 90 days before they were transferred to the Offshore Fund. Ex. CCC at pp. 31-32; Ex. UU at p. 97; Gruss Declaration, ¶ 8. Further, Gruss asserted that the Chart fails to reflect that the Offshore Fund subsequent to its advance of funds to the Onshore Fund was later provided ownership interests in the following investments: Suncruz, Comcap, L Group, SVS First, Interim Saddleback, Northlake, NCC, Copper Canyon, Port

50

Cardig, and Solana. The Onshore Fund also later provided the

Offshore Fund with an ownership interest in Bantley, DT 1892,

1914; Latam, DT 1896-7, 1921 and Interim Apex, DT 1795, 1892,

1854. Gruss further has asserted that the Chart omits to

acknowledge that the Offshore Fund received interests in the

following investments, portions of which were transferred to the

Offshore Fund's CLO, Bernard Global: Priority, Schilling,

Davidson, TLC, HeOnshore Fund, Malara, River Island, LLJ Precis,

Extell, Davidson, and Plant, see Ex. C at B01801, and further

omitted to acknowledge that the Offshore Fund received interests

in the following investments through its mezzanine investment in

the Onshore Fund's CLO: Priority, Quantum, Davidson, TLC,

Malara, and Markley. Ex. FF at p. 50.

64.    In some cases, the Offshore Fund received a

combination of cash and a portion of the investment as

reimbursement for the money that it had advanced. In certain

instances, however, the Offshore Fund did not participate in the

investment at all and only received cash as its reimbursement.

According to Gruss, these advances were permitted by

the Operating Documents and were part of the investment process

among the DBZCO managed funds and that the SEC can only prove in

its allegation of "$576 million" in the amended complaint that

51

"the LTD had not advanced . . . $126,896,039 to the Onshore Fund

for the purchase of investments for which it does not appear the

LTD ever received any participation" and "without the complete

records of DBZCO," Gruss is "unable to identify which portions

of the investments represented by the remaining $126,896,039 out

of the $576,124,932 in cash transfers from the LTD to the

Onshore Fund were ultimately transferred to the LTD." Gruss

Declaration, ¶ 9.

65. As of the time that Deloitte completed its

review, the Offshore Fund had not yet been reimbursed for some

of the advances that it had made. In March 2007 when DBZCO

informed the investors about the interfund transfers, it stated

that the Onshore Fund at that time owed in excess of $100

million to the Offshore Fund and to a managed account.

66. In some cases, the Offshore Fund sent the money

to the Onshore Fund, which then funded the investment (in most

cases a loan). Mostly, however, the Offshore Fund sent the money

directly to the borrower.

According to Gruss, whether the Offshore Fund sent the

advance to the Onshore Fund directly to the investment is

irrelevant because DBZCO had the right under the Operating

Document to arrange for the Offshore Fund to advance cash to the Onshore Fund reflected on the funds' books and records as a receivable and payable on each of the funds' corresponding balance sheets.

67.  Certain of the Onshore Fund's investments that were funded by the Offshore Fund were real estate investments in the United States. According to Gruss, the Chart does not reflect which investments are real estate investments.

68.  The 85 transfers amounting to $576 million was derived from the chart prepared by Deloitte and represent 66 investments purchased, in whole or in part, from funds advanced to the Onshore Fund by the Offshore Fund.

The SEC notes that it used additional detail provided by the Deloitte documents to revise the interfund transfer amount from $576 million to $507 million.

68.  Of those 66 investments, in the regular course of DBZCO's management of its investment process, the Offshore Fund participated in 45 of those investments through direct assignments from the Onshore Fund to the Offshore Fund or indirectly through its subsidiary Le Moyne Avenue Investors,

53

LLC, and/or to the Offshore Fund's CLO [Collateralized Loan Obligation], Bernard Global.

The SEC has noted that the Offshore Fund may have ultimately participated in some fashion was not linked to the initial advancement of cash and in Comcap, the Offshore Fund advanced the money for the Onshore Fund to make its $3,266,252 investment, which was repaid in full by the Onshore Fund more than 5 months before any of the investment was transferred to Le Moyne, and in 32 instances identified by Deloitte, the advance made by the Offshore Fund was repaid in cash.

70.  As a way to invest in other Onshore Fund assets, the Offshore Fund made several direct investments in the Mezzanine Tranche of the Onshore Fund, Bernard National, which totaled $141,000,000 as of December 31, 2006. Approximately $449 million of the approximate $576 million cash from the Offshore Fund alleged in the complaint was not used to make investments for the benefit of the Onshore Fund but was in fact used to make investments for both the Onshore Fund and Offshore Fund, and at most, approximately $127 million of Offshore Fund funds were used only to "fund Onshore Fund investments." Gruss Dec., ¶ 3.

The SEC has disputed the statement and has noted that
in 32 instances identified by Deloitte (including in cases where
the Offshore Fund ultimately participated in the investment),
the Offshore Fund was repaid entirely in cash and that the
Offering Memorandum stated that the Offshore Fund: (1) could not
purchase interests in the loans to United States companies until
after the loans had been made; (2) could not even be obligated
to make purchases until after the loans were made; and (3) could
not purchase interests in such loans until an independent party
approved such purchase. (Brody Decl. Ex. 3 at 20, 67) The SEC
also asserts that Gruss told one investor that "DB Zwirn seasons
their loans in the onshore [fund] for 90 days before they
contemplate participating in the loans by the offshore [fund]."
(Brody Decl. Ex. 36). According to the SEC, the fact that the
Offshore Fund might have participated in the investment at some
later point in time does not make it appropriate for the
Offshore Fund to have advanced the money.

71.   Certain of the investments at issue ultimately
acquired by the Offshore Fund could not initially be assigned to
the Offshore Fund because of the U.S. tax laws that prohibited
the Offshore Fund from engaging in a trade or business in the
U.S. Before any investment was made, DBZCO included in its
investment analysis whether or not an investment was eligible to

be made by the Offshore Fund, whether at the time of initial funding or at a later date, via a transfer from the Onshore Fund to either the Offshore Fund directly or through its subsidiary or CLO. This analysis included making certain it was an investment that fit into the tax parameters spelled out in the Offshore Fund Offering Memorandum.

The SEC did not dispute the first sentence of this statement but disputes the remainder of the statement supported only by the declaration of Gruss, noting that with respect to the Vanguard investment (one of the investments where the Offshore Fund provided the money for the funding and never participated in the investment), there was no discussion in the investment analysis as to whether or not the investment could be made by the Offshore Fund, and Gruss told an investor that "DB Zwirn seasons their loans in the onshore [fund] for 90 days before they contemplate participating in the loans by the offshore [fund]." (Brody Decl. Ex. 36.)

72.  DBZCO invested in a number of joint ventures such as Horizon where the Offshore Fund could not initially participate in the investment because the joint venture was engaged in a U.S. trade or business. However, it was always the intention from the outset of the investment in these joint

56

ventures that DBZCO would restructure these joint ventures so portions of the investments could be assigned to the Offshore Fund. In connection with that intent, DBZCO hired a full-time on staff attorney who was charged with the task of restructuring these joint ventures so portions of these investments would be eligible for assignment to the Offshore Fund.

The SEC did not dispute the first sentence of this statement but denies the remainder of the statement as not supported by the evidence cited since the emails do not state anywhere that it was the intention from the onset that the Horizon joint venture be restructured so that portions could be reassigned, and that DBZCO hired an attorney to restructure the joint ventures. The SEC further has asserted that the declaration of Gruss is contradicted by his statement to an investor that "DB Zwirn seasons their loans in the onshore [fund] for 90 days before they contemplate participating in the loans by the offshore [fund]." (Brody Decl. Ex. 36.) The Gruss declaration is further contradicted by the language in the Offshore Funds' Offering Memorandum that the Offshore Fund: (1) could not purchase interests in the loans to United States companies until after the loans had been made; (2) could not even be obligated to make purchases until after the loans were made; and (3) could not purchase interests in such loans until

57

an independent party approved such purchase. (Brody Decl. Ex. 3 at 20, 67).

73.  Certain joint ventures were restructured and portions of the underlying investments were transferred to the Offshore Fund. However, without the complete records of DBZCO, there is no way to identify which portions of the investments represented by the remaining $126,896,039 out of the $576,124,932 in cash transfers from the Offshore Fund to the Onshore Fund were ultimately transferred to the Offshore Fund. That the Onshore Fund initially purchased the investments and subsequently provided a portion of the investments to the Offshore Fund was consistent with the Onshore Fund's undisputed role as the sourcing agent for investments for the Offshore Fund and other funds managed by DBZCO. See Ex. D at p. 8 (The Onshore Fund "was frequently utilized as a sourcing agent to acquire select investments for the fund complex, and often these investments were not immediately available to the Offshore Fund."), Ex. Z at pp. 22-25, Ex. Y at pp. 121-22, Gruss Dec., ¶ 6.

The SEC did not dispute that in certain instances the Onshore Fund purchased an investment and subsequently sold a portion of that investment to the Offshore Fund but has noted

that with respect to the assertion that the Onshore Fund was the

"sourcing agent" for investments for the Offshore Fund and the

other funds managed by DBZCO, the source for this statement is

the expert report of Dr. Bergin and is not the proper subject

for expert testimony and that the testimony of Scott Sulzberger

("Sulzberger") stated only that "there are occasions" where the

Onshore Fund acted as agent on behalf of the other funds. (Gruss

Ex. Z at 22:24 - 23:3) and that the testimony of Li Anne Tan

("Tan" also known as Li Anne Law or "Law") was that the Onshore

Fund was not acting as an agent with respect to the investments

that were "seasoned" and sold. (Gruss Ex. Y at 121:13-21). The

SEC further notes that the Gruss declaration at ¶6 similarly

does not state that the Onshore Fund was a "sourcing agent."

74.  Even though there is no provision in any of the

Funds' Offering Memoranda to conclude that the Onshore Fund owed

the Offshore Fund interest for the use of its funds for

investments solely for the Onshore Fund or to pay down the

credit line of the Onshore Fund, PWC used the interest not paid

to the Offshore Fund for the use of its money to determine the

materiality of these transactions.

The SEC did not dispute this statement but noted that

such transfers were not allowed and would not have been

59

contemplated and Gruss repeatedly told the attorneys conducting the internal investigation for DBZCO that money from the Offshore Fund needed to be kept separate from the money from the Onshore Fund to avoid ECI issues and that it was well-known that a transfer from the Offshore Fund to the Onshore Fund would raise ECI and "trade or business concerns" (Brody Decl. Ex. 182; Ex. 57 at 111:10-24, 113:16-23) and that an arrangement where the Offshore Fund would loan money to the Onshore Fund to pay its debts, fund its investments or operate its business would raise ECI issues and would not be permitted under the funds' offering documents. (Brody Decl. Ex. 184; Ex. 57 at 117:14-20).

75.   Deloitte did not find any evidence that the Offshore Fund received any interest on the money that it advanced. Deloitte did not find any loan documentation for any of these advances that would show when the money needed to be paid back.

According to Gruss, the money the Offshore Fund advanced to the Onshore Fund "were really more advances than anything else or monies transferred" reflected on the Annual Financial Statements not as loan but as "Due to affiliates" or "Due from affiliates." Ex. E at 2, Ex. F at 2, Ex. G at 2, Ex H at 2, Ex. I at 2, Ex. J at 2 and all the amounts due between and

60

among all of the funds were recorded and tracked on a daily basis in DBZCO's accounting system in an account known as DZPRIV. Ex. BBB at pp. 277-78.

76.    The SEC asserts that Gruss authorized ABN Amro to transfer the money from the Offshore Fund's accounts to fund these investments. (Brody Decl. Ex. 58). According to Gruss, the emails (Brody Decl. Ex. 58) show that Gruss authorized ABN Amro to transfer the money from the Offshore Fund's account to fund the following investments: IREO, Vermillion, Pilot Group, Kaufman, Longroad Hop, Chesapeake, Tremont, Vision-Bozeman, LLJ Precis, River Island, Hudson-Spokane, Barrett, and Markley. Certain of the emails in Brody Decl. Ex. 58 reflect transactions between certain funds managed by DBZCO and unrelated third party funds and were unrelated to any inter-fund transfers and Gruss understood these wires were to fund investments and knew which investments were being funded. (Brody Decl. Ex. 16 at 56:1-4 "he is very well aware of all the deals in the pipeline; Ex. 55 at 37:10-18). He regularly received a "pipeline report" that "showed all of the upcoming ... fundings and repayments that were happening at the firm." (Brody Decl. Ex. 35 at 30:12-16). All private investments appeared on the pipeline report. *Id.* at 30:17-23.

61

77. Gruss also attended a meeting every Monday with Zwirn to discuss "what we called the pipeline of new deals that were coming down. So in that meeting ... we would discuss which deal and that they were loan originations, and in knowing that they were loan originations, that they were to come out of the onshore fund." (Brody Decl. Ex. 18 at 39:3-10; 41:2-4). The pipeline report was reviewed in detail at these meetings. (Brody Decl. Ex. 35 at 35:16-19).

78. While Gruss may not have been aware of subsequent drawdowns if there was a revolving credit facility and the borrower did not immediately draw down the entire amount, "the bigger ones or the initial closing of a deal, he would definitely, obviously know." (Brody Decl. Ex. 16 at 56:5-17).

Without specificity as to the identity of the "bigger ones," Gruss declined to respond to this paragraph.

79. Gruss would regularly receive emails prior to an investment being funded that explained exactly where and how much money was going to be wired.

80. On March 26, 2004, at 1:01 pm, Gruss and Wu received an email stating that $877,744.15 needed to be wired in

62

order to fund the LFG investment. (Brody Decl. Ex. 59). The
email instruction also included the principal amount, the
interest rate, and the loan maturity. The email also stated that
"[t]he loan should be booked as follows –LawFinance 03/04 –
Berry-Microsoft." *Id.* At 1:40 pm, Wu sent an email to the bank
providing wiring instructions, including that $377,714.55 should
come from the "HZLTD #***600 account, i.e. the Offshore Fund
bank account, "upon Perry's approval." (Brody Decl. Ex. 60). At
6:45 pm, Gruss sent an email to the bank approving the
instructions to wire money from the Offshore Fund account. *Id.*
The email in question (Brody Decl. Ex 59) appears to show
Zwirn's approval since prior to the word "approval" is a "Z"
with the previous letters blocked out by a paper punch hole.
(Brody Decl. Ex. 59).


On June 28, 2004, Gruss received an email concerning
the funding for an investment called "Service First." The email
stated: "We are funding Bridge Funding – Service First today.
DZ's approval is attached below, and I have also attached wiring
instructions/escrow letter from Bridge Funding's counsel, along
with signed docs from Bridge Funding. The total loan amount is
$1,100,000 and our loan amount is 90% of the total (10% part to
Bridge) or $990,000." (Brody Decl. Ex. 61). Several hours later,
Law sent an email to the bank instructing "[p]lease wire

63

$990,000 from the Ltd account #***600 to the following instructions. PG's approval to follow. Thanks." (Brody Decl. Ex. 62). Later that evening, Gruss emailed his approval of the wire transfer to the bank.

On July 14, 2004, Gruss, Wu, and Law were emailed instructions concerning a $3,540,500 investment called the "Genutec Funding." (Brody Decl. Ex. 63). The email stated "attached please find the settlement statement and participation agreement for the GenuTec funding. Please send the $3,540,500.00 to the standing wire instructions below." *Id.* Later that day, Law emailed the bankers an email stating: "Please transfer $3,450,500 from the Ltd account # ***600 .... PG's approval to follow. Thanks." (Brody Decl. Ex. 64). Gruss subsequently approved the transfer from the Offshore Fund account.

On February 23, 2005, Gruss received an email concerning an investment called "Tremont/Bloomfield" stating: "PG – reminder that we will be funding this deal early next week (Monday or Tuesday). It's a $35 million deal but we will only be funding approx. $21 million at closing." (Brody Decl. Ex. 65). On March 3, Gruss, Law and Wu received another email providing a closing statement for the Tremont/Bloomfield investment, which was now approximately $24 million. (Brody Decl. Ex. 66). On

64

March 4, Gruss, Law and Wu received the wiring instructions for
the Tremont/Bloomfield investment with the instruction "[w]ill
let you know when to send – will be very soon." (Brody Decl. Ex.
67). Approximately an hour later, Gruss, Law and Wu received the
final approval to send the money as per the instructions. Five
minutes later, Law sent the email to the bank asking it to
process several wires for Tremont/Bloomfield, including to wire
$19 million "from the LTD account # ***600 to the Onshore Fund
acct # ***599." (Brody Decl. Ex. 69). Thirteen minutes later,
Gruss sent an email to the bank approving the wires, including
the wire from the Offshore Fund.

81. After numerous transfers from the Offshore Fund
in order to fund Onshore Fund investments, the accountants who
worked under Gruss expressed their displeasure with this
practice. In April 2005, DBZCO decided to invest money in
certain real estate assets being sold by Hudson Advisors Taiwan
(the "REO portfolio"). (Brody Decl. Ex. 70.) After receiving the
instruction to fund this investment, Law emailed Gruss asking
"should we fund this from Ltd???" *Id.* After Gruss responded
"[y]es pls" Law wrote back "[j]ust curious – is there a game
plan? Or is this something that the DBZ backoffice must 'learn
to accept.'" *Id.* When Gruss responded "what's our alternatives
[sic.]", Law stated: "Get all the partners/top mgmt in the loop

(i.e. REALITY) and then have them make a joint mgmt decision."
*Id.* According to Gruss, mail was sent by Law but at her
deposition, she admitted she was simply trying to solve the
stressful accounting issue.

82.    Notwithstanding the criticism of the practice
from his subordinates, Gruss continued to fund Onshore Fund
investments from the Offshore Fund. At the pipeline meetings,
Gruss did not tell Zwirn that the Offshore Fund was funding an
Onshore Fund investment. (Brody Decl. Ex. 71 at 115:2-6). Gruss
did not tell Zwirn that the Onshore Fund did not have sufficient
cash to make investments, or that the only way that the Onshore
Fund could make an investment would be if Zwirn raised
additional funds for the Onshore Fund. (*Id.* at 111:3 -112:16;
Brody Decl. Ex. 35 at 42:25 - 43:12). Gruss did not review the
cash positions of the Onshore and Offshore Funds at the pipeline
meetings. (Brody Decl. Ex. 71 at 112:19-22).

According to Gruss, the so-called "criticism from his
[Gruss'] subordinates" was not, as stated above, directed at the
legality of the Offshore Fund advancing funds to the Onshore
Fund. Gruss has asserted that none of these subordinates had
read the Offering Memoranda or the fund operating documents, and
that Gruss did review the cash position of the Offshore Fund and

66

Onshore Fund at the pipeline meetings. Ex. FFF at p. 389; see also Ex. YY at p. 129; Ex. XX at pp. 89, 126-27. Further, Gruss asserts that the Pecora testimony relied upon by the SEC only reflects that Pecora did not recall Gruss going "through the cash position of the Onshore Fund and Offshore Fund funds." (Brody Decl. Ex. 71 at 112:19-22).

83.    Indeed, the day after receiving the email from Law concerning the REO portfolio, Gruss received a funding request for RIH Co-Investment Partners concerning "project grand slam." (Brody Decl. Ex. 86). The email to Gruss attaching the instructions to wire $5 million stated: "This is ok to fund. RF sent the capital call request from Colony Capital (lead sponsor). We executed dox several weeks ago." *Id.* At 2:23 pm, a member of the accounting department sent an email to the bank stating "[p]lease wire $5,000,000 from Offshore Fund account #***600 to the following account . . . . PG's approval will follow." (Brody Decl. Ex. 203). Five minutes later, Gruss sent his email to the bank approving the transfer from the Offshore Fund.

84.    In September 2005, Gruss was told that DBZCO was purchasing 270,000 shares of a company called SWB in a PIPE transaction. (Brody Decl. Ex. 72). The investment was for

67

$1,177,200. On September 7, 2005, Gruss decided to allocate this investment between the various funds in the following fashion Offshore Fund (65%), Onshore Fund (15%), LLC (15%), TE (5%). (Brody Decl. Ex. 73). On September 9, 2005, Law emailed the ABN Amro bankers "please wire $1,177,200 from the Offshore Fund account ***600 to the following instructions. PG's approval to follow." (Brody Decl. Ex. 74). Notwithstanding that Gruss only allocated 65% of the investment to the Offshore Fund, Gruss approved the Offshore Fund funding the entire $1,177,200 investment.

According to Gruss, under the firms' Offering Memoranda, the Manager had the right to allocate investments. Per the funds' Offering Memoranda, such conflicts were to be resolved by the Manager in its sole discretion: "When the Fund and one or more other clients of the manager have available funds for investments, investments . . . will be allocated substantially pro rata on an overall basis . . . to the extent possible, unless the Manager believes, in good faith, that another method would be more fair and equitable." Ex. M at pp. 51-52 (DBZ 0009877-78); Ex. O at p. 29 (DBZ 0009778); Ex. L at p. 29 (DBZ 0009705); Ex. T at pp. 46-47 (DBZ 0009633-34); Ex. U at pp. 29-30 (DBZ 0009561-62); Ex. K at p. 24 (DBZ 0009474).

68

85. In June 2005, Wu resigned from DBZCO. (Brody Decl. Ex. 75). It was the interfund transfers "that made me cannot stay at this company anymore. Make me want to disassociate myself with this company." (Brody Decl. Ex. 16 at 117:20 – 118:4). Wu also testified that her issue with the inter-fund transfers was not its legality, but "the burden." Ex. ZZ at p. 117, 24:25.

Gruss asked Law to speak to Wu about why she wanted to leave and to try and persuade her to stay. (Brody Decl. Ex. 17 at 130:17-21). Law reported on her conversation with Wu to Gruss: "Just spoke with her[.] She's v[ery] clear-headed and calm about it[.] She says that the proposed remedies i.e. ltd metis and stopping offshore investor $$ (if that even ever happens) are just remedies for going forward purposes[.] In order to get us out of the current (v[ery] deep) hole, will need at least 2 years' worth of new onshore $$ assuming that no more onshore fundings occur which we all know is not going to happen . . . [a]nd in the meantime there are the audits happening . . . [c]an['t] talk her out of it cos I kinda agree with her." (Brody Decl. Ex. 76).

As noted by Gruss, neither Wu nor Law had any knowledge about what was permitted by the Operating Documents

and their concern, as best expressed by Law, was the accounting burden and stress created by this accounting burden.

86. On October 12, 2005, Gruss received the closing documents for an investment called Extell. (Brody Decl. Ex. 77). The closing documents indicated that this was a real estate deal for a property at 356-366 Tenth Avenue in New York. *Id.* The wiring instructions sent to ABN Amro (which Gruss approved) initially requested that the necessary $5,064,006 come from the Onshore Fund's account. (Brody Decl. Ex. 78). Later that same day, the accountant sent a second email to the bank requesting that the wire come from the Offshore Fund account #***600 – i.e., the Offshore Fund account. *Id.* Gruss approved this second transfer. The clear inference is that there were insufficient funds in the Onshore Fund's account so money was just taken from the Offshore Fund even though the Offshore Fund should not have participated in this loan origination because it was a United States-based real estate transaction.

According to Gruss, there is nothing in Brody Decl. Ex. 77 to reflect that this was a real estate deal and no admissible evidence to support this so-called "clear inference" and that it was always the intention from the outset of the purchase of investments in which the Offshore Fund could not

70

initially be a participant because of ECI issues that DBZCO
would restructure those investments so portions of the
investments could be assigned to the Offshore Fund.

87. On Friday, October 14, 2005, Gruss received an
email concerning an approximate $30 million investment called
Solana. (Brody Decl. Ex. 79). The wiring instructions, which
were to a title company, indicated that this was a Texas real
estate deal. Law, who was also a recipient on the email
responded "Late in the day for such a large funding. So this is
not funding from Bernard? If not when can we assign. Need to be
ASAP." (Brody Decl. Ex. 80). In sum, Law was indicating that the
Onshore Fund did not have sufficient funds in hand to make this
investment and that it needed to be assigned to the other funds
managed by DBZCO as soon as possible. In the response to her
email (which was also sent to Gruss), Law was informed that the
investment "[h]as to fund through Onshore Fund ...." *Id.* That
evening, one of the DBZCO accountants sent an email to the ABN
Amro bankers (cc'ed to Gruss) stating that $3.7 million should
be transferred from the Onshore Fund's account to the Offshore
Fund's account and that $27 million should then be wired from
the Offshore Fund's account in order to fund the investment.
(Brody Decl. Ex. 81). That evening Gruss emailed the DBZCO
employees who were working on the funding "[s]o are we good

71

here." (Brody Decl. Ex. 82). In response, Gruss was informed that the deal had not yet closed but that it would close the following Monday. *Id.* Late that night, Racusin emailed Gruss that "we have no money on Monday once the Solana deal closes." (Brody Decl. Ex. 83). On Monday, one of the DBZCO accountants emailed the ABN Amro bankers "[p]lease wire $29,538,514.72 from the Offshore Fund account #***600 to the following instructions. PG's approval to follow." (Brody Decl. Ex. 84). Notwithstanding that this was a Texas real estate investment, Gruss approved the transfer of Funds from the Offshore Fund Account.

Gruss has noted that the fact that the Wire Instructions, were from a Title Company does not establish this "was a Texas real estate deal" and whether or not it was a real estate deal is irrelevant and this statement omitted "[h]as to fund though Onshore Fund but I assume you can move it post-closing" and that the undisputed evidence shows that the Offshore Fund did receive a share of this investment and there is nothing in Brody Decl. Ex. 80 from which it can be inferred that "Law was indicating that the Onshore Fund did not have sufficient funds in hand to make this investment."

88.  There were "occasions where the Onshore Fund" acted as "the agent on behalf of the other funds ... where it

72

would purchase the entire investment in its name and in turn
provide each of the other funds its percentage participation in
that investment." Ex. Z at pp. 22-23, Ex. Y at pp. 121-22.

The SEC has disputed this statement as unsupported by
the citations and noted that the testimony of Sulzberger,
provides only that there were occasions when the Onshore Fund
would act "as agent on behalf of the other funds" while, the
remainder of this quote does not appear in his testimony and
notes that Law's testimony states that there was an "agenting
process" where the Onshore Fund might make a loan to a private
party but would not want to bear the risk of the entire amount
so they might apportion out bits of the loan to other interested
parties which could include the Offshore Fund or it could
include some other hedge fund that might be interested. Tan
testified that this "agenting process" was different than the
"seasoning" or "tailoring" process and therefore the statement
is not relevant to this litigation.

89.    When the Onshore Fund purchased investments for
the Offshore Fund, "the title to those investments was just in
the Onshore Fund." Ex. Z at p. 28, Ex. Y at p. 122. The SEC
notes that Sulzberger's testimony (Ex. Z) concerns the "agenting
process" which Law testified was different from the "seasoning

73

or "tailoring" process and therefore this statement is not relevant to this litigation.

90.    The cash used to purchase these investments would come from the Onshore Fund or the Offshore Fund or both.

The SEC has disputed this statement as unsupported and notes Law's testimony, cited as Ex. Y did not concern the "agenting process" but it concerned the separate situation where "a lot of the onshore investments ... were being funded by the offshore, because the onshore entity had not enough funds," "there are certain investments that only the Onshore fund can participate in, and – so they would close the deal, and the funds would have to come from the Offshore Fund because that is the entity that's making the investment. But oftentimes, this onshore entity does not have sufficient funds to fund this investment, and so money from the Offshore Fund would be used to finance these purchases." (Gruss Ex. Y at 123:16-23). The SEC further notes Sulzberger's testimony likewise concerned the situation (of which he was previously unaware), where funds from the Offshore Fund were used to pay for the Onshore Fund's investments. (Gruss Ex. Z at 25:3-7).

74

91. The analysis by Deloitte Financial Services LLP ("Deloitte Financial") shows that cash was advanced between and among all of the funds to purchase investments that, for the most part, were provided to all of the funds.

The SEC has disputed this statement as unsupported and noted the cited testimony provides that "it came to our attention that certain of the initial investments made, that is of financing and cash made with respect to certain investments, had come from Offshore Fund on behalf of Onshore Fund." (Gruss Ex. AA at 18:11-15).

92. The status of the funds owed from the Onshore Fund to the Offshore Fund was reported on the annual financials of each of the funds for 2004 through 2006.

The SEC has denied that the "status of the funds owed from the Onshore Fund to the Offshore Fund" was accurately reported in the annual financial report for each of the funds and has noted that the notes to the financial statements, which were an "integral part of the financial statements" did not disclose that the Offshore Fund had advanced money to allow the Onshore Fund to fund its investment obligations or to repay the Onshore Fund's obligations under the loan facility and further

75

noted that Law testified that she did not believe that the notes addressed the fact that money from the Offshore Fund was being used to fund Onshore Fund investments." (Brody Decl. Ex. 17 at 175:20 – 176:16). Further, the SEC disputes that PWC did not understand that the due to affiliates line on the financial statements included money that the Offshore Fund provided to the Onshore Fund to repay the loan facility and to fund investments where the offshore fund was not going to be a participant. (Brody Decl. Ex. 98 at 140:20 – 141:3.) Instead, the SEC believes that was not PWC's understanding of how the funds operated. (Brody Decl. Ex. 98 at 140:17-19).


     93.  All of the outstanding balances from these advances from the Offshore Fund to the Onshore Fund were continuously and accurately tracked such that at any point "you could basically say how much the Onshore Fund owed to the Offshore Fund." Ex. Y at pp. 238-42. The SEC has disputed this statement and noted that Law testified that the "intercompany receivable and payable" was accurately tracked and that she could say how much the Onshore Fund owed to the Offshore Fund and did not testify in the cited testimony about the "advances" (which were a subset of the overall intercompany receivable and payable) from the Offshore Fund.

94. The balances were also contained on the 2004 and 2005 Financial Statements for both the Onshore Fund and Offshore Fund in each funds' Consolidated Statement of Assets and Liabilities that were disclosed to the investors. Ex. Y at p. 238, Ex. F; Ex. Z at pp. 41- 44. The SEC has noted that 2004 and 2005 Financial Statements for the Onshore Fund included a line item on the balance sheet for liabilities called "due to affiliates" and that the 2004 and 2005 Financial Statements for the Offshore Fund included a line item on the balance sheet for assets called "due from affiliates" and that these line items represented monies due to and from all affiliates, not just the balance owed between the Onshore and Offshore Fund. The SEC has further noted that the balances in the Financial Statements do not only concern the monies owed by the Onshore Fund to the Offshore Fund because the Offshore Fund had advanced money to the Onshore Fund and include any monies owed between the two. The SEC also has denied the statement because the Financial Statements provide the balance only as of a given date – December 31, 2004 and 2005 and the money the Offshore Fund advanced in June 2005 to allow the Onshore Fund to repay its credit line was returned by December 23, 2005 and the 2005 financial statements did not disclose that this transfer had taken place at all.

95.    PWC understood at the time that the due to/from
affiliates amounts represented the situation where the Onshore
Fund would loan money and would subsequently transfer of portion
of that loan or other investment to the other funds. (Brody
Decl. Ex. 98 at 139:16-25). No one at PWC had the understanding
that the "related party note" indicated that the Offshore Fund
had provided money to the Onshore Fund to fund investments where
the Offshore Fund was not going to be a participant. *Id.* at
140:20 - 141:3. Indeed, that was not PWC's understanding of how
the funds operated. *Id.* at 140:17-19.

Gruss admitted in part, denied in part and objected to
the statement presuming that PWC was aware of what was permitted
under the Operating Documents asserting that PWC was never asked
to nor did it ever provide to DBZCO any guidance as to what it
could do under the funds' Operating Documents, Ex. CCC at pp.
243-46, and that DBZCO accountants testified that spreadsheets
listing the inter-fund transfers were given to PWC. Ex. ZZ at p.
159, Ex. BBB at pp. 226-227.

96.    In August 2006, after the 2005 audited
Consolidated Financial Statements were issued, one of the
accountants at DBZCO emailed Gruss: "One of the investors asked
me about the due to affiliates...what do you normally tell

78

them...I'm sure you aren't 100% forthcoming on the actual answer. Loans to other funds that have been promptly repaid after year end...is that saying too much?" (Brody Decl. Ex. 99).

Gruss has denied this statement and notes Alisa Butchkowski ("Butchkowski"), the author of the email, had no recollection of the email and no recollection of ever discussing the subject matter with Gruss, Ex. JJJ at pp. 80-89, and Gruss had no recollection of this email and testified he was always "100 percent forthcoming" with investors, Ex. VV at pp. 249-53, and there is no evidence that Gruss ever read or responded to this email.

97. Deloitte confirmed the efficacy of the accounting system and traced the funds from DBZCO's bank statements to the VPM and DZPRIV. The SEC notes that Deloitte identified various errors in the DZ PRIV system.

98. The tax restrictions on the Offshore Fund also meant that the Offshore Fund was dependent on the Onshore Fund to source its investments. The Offering Memoranda for the Offshore Fund stated that because of these tax restrictions, it "will not regularly acquire loans from issuers, although it will acquire loans from the U.S. Fund [the Onshore Fund] after the

loans are acquired from the issuer by the U.S. Fund." Ex. L at

p. 35 (DBZ 0009711), see also, Ex. O at p. 35 (DBZ 0009784), Ex.

M at p. 20 (DBZ 0009846). This practice was consistent with the

representation in the Offshore Fund Offering Memoranda that the

Offshore Fund will be "managed using trading strategies

generally similar to those the Trading Manager [DBZCO] uses for

the U.S. Fund." Ex. L at p. 8 (DBZ 0009684), see also Ex. O at

p. 8 (DBZ 0009757), Ex. M at p. 19 (DBZ 0009845).

The SEC has noted that the Offering Memorandum for the

Offshore Fund does not contain a blanket requirement that the

Onshore Fund source every investment made by the Offshore Fund

and there was no restriction on the Offshore Fund even sourcing

loans in jurisdictions outside of the United States.

99.   In addition to purchasing investments from the

Onshore Fund, the Offshore Fund had what was known as a

"mezzanine investment in the Onshore CLO." Ex. R at pp. 125-27.

As of December 31, 2004, the Offshore Fund had a $25M investment

in the Onshore CLO, Bernard National. Ex. E at p. 16. As of

December 31, 2006, this mezzanine investment had grown to $141

million. Ex. G at p. 30.

100.  Gruss discussed the interfund transfers with other accountants at DBZCO and had several discussions with one of the accountants where they discussed the balance owed by the Onshore Fund to the Offshore Fund and how the Onshore Fund was going to repay that amount. (Brody Decl. Ex. 18 at 61:8 -62:11). When this accountant first raised the issue, Gruss was not surprised. He knew exactly what she was talking about and she did not have to provide any background. *Id.* at 64:21 - 65:10. DBZCO's treasurer also asked Gruss whether the Onshore Fund borrowed money or utilized money from the Offshore Fund to fund deals. Gruss responded yes, but stated that it was disclosed in the financial statements. (Brody Decl. Ex. 35 at 133:16 - 134:14). When the Treasurer asked why he didn't see the transfers from the Offshore Fund booked as a loan, Gruss responded that it couldn't be treated as a loan because of the tax issues around it. *Id.* at 135:1822. Gruss also spoke with Racusin, who reported to Gruss, about the practice. During none of his conversations with Racusin did Gruss say that the transfers were allowed under the funds' offering documents. (Brody Decl. Ex. 55 at 119:4-8).

According to Gruss, the last statement in the statement is misleading because Racusin did not testify that no such conversations occurred, only that he did not recall.

81

101.   Gruss never told Zwirn about the fact that the Offshore Fund was advancing money to fund the investments of the other funds and accounts managed by DBZCO. Gruss has noted that whether or not Gruss had told Zwirn about the Offshore Fund advancing funds to the Onshore Fund is irrelevant to the fact that the practice was permitted under the funds' Operating Documents. Zwirn admitted to an investor, Eric Dillon of Silver Creek Capital Management LLC, that the inter-fund transfers were a "common business practice that is clarified in the offer memo." See Ex. GGG.

102.   Initially Law viewed the interfund transfers as an "operational headache[]." (Brody Decl. Ex. 17 at 132:19-22). After Wu resigned and Law became the controller for the funds, however, "it really hit me that every dollar that ... an offshore investor puts into the Fund, into his Offshore Fund, is not being put to work for his benefit. And – in that instead it was being put to work for another investor's benefit in another fund. And that only became apparent when ... you run the NAV." *Id.* at 135:14:20. Moreover, the investors in the onshore fund were getting a benefit for which they hadn't invested. Law was also concerned that if the monies owed to the Offshore Fund were not repaid by year-end 2005, this would cause red flags for the

auditors that could cause problems for the company and she conveyed this to Gruss. Gruss has admitted that in his meetings with Law, Law expressed her concern that the interfund transfers constituted comingling of funds, were not documented, and did not involve payment of interest to the Offshore Fund for the use of the money at that time.

According to Gruss, the statement that "Gruss admits that in his meetings with Law, Law expressed her concern that the interfund transfers constituted comingling of funds, were not documented, and did not involve payment of interest to the Offshore Fund for the use of the money at that time" is not supported by Brody Decl. Ex. 1 at ¶ 25.

103.    On June 5, 2006, Law resigned from DBZCO. There were several reasons for her resignation, including "the overwhelming frustration ... about the inter-fund transfers, and that nothing was being done about it." (Brody Decl. Ex. 17 at 173:16-18). Law told Gruss at the time about her frustration with the interfund transfers that were "getting too stressful to handle, and the fact that it... didn't seem like it was getting anywhere near getting fixed." *Id.* at 173:11-15. Law also did not want to have to lie to the auditors, PricewaterhouseCoopers ("PWC") about what the interfund transfers were for.

83

Gruss has asserted that the first sentence of this statement about "overwhelming frustration" and the last sentence that "Law also did not want to have to lie to the auditors" are inadmissible and notes that these statements about what she thought some seven years prior to her deposition testimony was not articulated or stated to Gruss or anyone else. Ex. BBB at p. 180, 18:21. 115.

104. Gruss designated Dr. Bergin as his expert witness on these issues. Dr. Bergin is a principal with KPMG's Forensic Services practice and co-head of KPMG's U.S. Economic & Regulation practice, Ex. D at p. 4 and has testified in significant complex matters involving hedge funds on behalf of private parties and the government, including the SEC. The SEC has noted that Dr. Bergin nothing in his testimonial experience suggests that he has any background relevant to the instant matter.

Dr. Bergin "served as a board director for six years for Aquamarine Fund, Inc. (an offshore hedge fund) and Aquamarine Value Fund L.P. (an on-shore hedge fund)." *Id.* The SEC has noted that Dr. Bergin served as board director but that there was nothing in his experience at Aquamarine relevant to

84

his engagement in this action and that the Aquamarine Fund was a

small fund and the investors were largely the portfolio

manager's family and friends. Further, the SEC asserted that

during the time period that Dr. Bergin was a director and Dr.

Bergin could not recall any loans that the Aquamarine Fund made

to small cap companies or to any companies in the United States

-- the only fixed income investments that Dr. Bergin that were

made by the Aquamarine Fund were bonds to support the tunnel

between the UK and France. Finally, the Aquamarine Funds had no

involvement in the seasoning of loans.

105.    Dr. Bergin has Doctorate and MBA degrees with

highest distinction from Harvard Business School.

Dr. Bergin summarized his opinion as follows:

DBZCO operated a rapidly expanding hedge fund complex
which generated above-average investment returns for a
group of sophisticated investors by successfully
implementing a complex, broad, and multi-faceted
investment strategy. The fund complex was largely
unregulated, as was typical of hedge funds at the
time, and thus not subject to many of the constraints
of mutual funds which are highly regulated under the
federal security laws.

DBZCO was given a broad mandate under the pertinent
operating documents to select investments, manage the
funds, and resolve conflicts among the fund complex
members as necessary to facilitate implementation of
its strategy and increase risk-adjusted returns.

85

An aspect of DBZCO's strategy, as detailed in the pertinent fund materials, was for the Offshore Fund and the Onshore Fund to operate symbiotically in order to enhance investment opportunities, facilitate largely parallel strategies and bolster returns for both funds. The Onshore Fund was frequently utilized as a sourcing agent to acquire select investments for the fund complex, and often these investments were not immediately available to the Offshore Fund. This process required a treasury approach which facilitated the movement of funds among fund complex members.

The movement of funds amongst fund complex members 1) was authorized by the offering memoranda and other fund documents; 2) was documented in the funds' books and records that were available for investor review; 3) was reflected in the funds' audited financial statements; and 4) created substantial benefits for investors of both funds.

The SEC's claims that select advances of funds from the Offshore Fund to the Onshore Fund constituted improper activity contradict the investment authority of the manager and the manner in which the fund complex could and did operate. It is thus incorrect to claim that in effecting the transactions to fund the investment selections of the manager that former CFO Gruss did not act in accord with the pertinent fund materials and documents furnished to investors. It is also incorrect to claim that the cash transfers were not disclosed to investors.

Ex. D at p. 8.


The SEC has not disputed that this is a summary of the opinions of Dr. Bergin but has disputed that these opinions are admissible as recitations of facts from the record and as interpretations of the Offshore Fund's Offering Memoranda and Gruss' conduct and has further noted that Dr. Bergin's

conclusion that the interfund transfers did not violate the terms of the Offering Memorandum should be excluded as he is drawing a legal conclusion and are not admissible as contrary to the record, including the statement of Gruss set forth in the FOF above.

106.  Gruss stated in words and substance that an arrangement where the Offshore Fund would loan money to the Onshore Fund to pay its debts, fund its investments, or operate its business would raise ECI issues and would not be permitted under the funds offering documents.

Gruss has denied and objected to this statement asserting as set forth above, there is a significant difference between the Offshore Fund "loaning" money and advancing funds to the Onshore Fund. Gruss has further contended that his statement was with respect to the Offshore Fund formally loaning funds to the Onshore Fund and that the full statement in the interview memorandum is as follows: "When asked, Gruss said he was not aware of any loans between Onshore Fund and Offshore Fund, except to the extent one view any delay in 'settling up' to be 'the essence of a loan.' Offshore Fund did not loan money to Onshore Fund to allow Onshore Fund to pay its debts, fund its investments, or operate its business. Any such arrangement would

87

raise ECI issues and would not be permitted by DBZ's offering documents." Brody Decl., Ex. 183, p. DBZCO_00025.

Gruss further has noted that Lilienfeld on cross-examination admitted that he had no recollection of Gruss saying anything about the "funds' Offering Memoranda," not permitting the inter-fund transfers.

107. Gruss further stated in words or substance that the Onshore Fund and the Offshore Fund were responsible for paying their own borrowings and that there was no mechanism through which one fund could repay another fund's indebtedness directly or indirectly unless either (a) the repayment was a loan which would require documentation; or (b) there was consideration for some other debt/transfer for value.

Gruss has admitted the first portion of the statement and objected to the remainder.

108. Gruss admitted in words or substance that he transferred cash from the Offshore Fund to the Onshore fund because the Onshore Fund otherwise lacked the ability to fund certain investments that had to originate onshore (Brody Decl. Ex. 57 at 115:3-12), and recalled approving interfund transfers

88

to repay the CDC. *Id.* at 116:13-22. Gruss further asserted that
he saw no substantive distinction between these interfund
transfers – all were intended to address the Onshore Fund's
inability to fund investments. (Brody Decl. Ex. 184; Ex. 57 at
116:23-117:3).

109.  Gruss admitted in words or substance that he, Wu
and a junior accountant devised the practice as a temporary
"bandaid" to address the Onshore Fund's liquidity concerns.
(Brody Decl. Ex. 184; Ex. 57 at 117:8-13).

110.  Gruss admitted in words or substance that he
"knew you shouldn't be going there" – that is, should not be
using Offshore Fund cash to fund Onshore Fund obligations given
the tax concerns. (Brody Decl. Ex. 184; Ex. 57 at 117:14-20).

Gruss has admitted this statement in part, has denied
it in part and objected to it noting the objections raised above
and that this statement, like Gruss' other statements recited by
the SEC, does not reference the scope of the Manager's authority
under the funds' operating, offering or management documents,
that Gruss was differentiating between formal loans and advances
from the Offshore Fund to the Onshore Fund, explained above as
well as Gruss' statement allegedly made immediately thereafter

89

that these "transfers . . . 'were not the favored approach' to
funding investments." Brody Decl. Ex. 184, DBZCO_00040. As set
forth above, Gruss explained to the SEC why the advances from
the Offshore Fund to the Onshore Fund were not the favored
approach to fund Onshore Fund's obligations or investments.
According to Gruss, the non-recourse methods of raising capital
for the Onshore Fund to purchase investments were the swing
line, both CLOs, a senior tranche CLO with Deutsch Bank, an
Asian facility with Asian Development Bank, a Euro facility
known as IXIS, an ABS facility and a BA facility with a Belgian
bank.

111.   Gruss admitted in words or substance that he
hoped the loans could be paid down relatively quickly and that
there was always an event on the horizon, such as an upsize of
the Revolver, that Gruss believed might enable him to repay the
loans. (Brody Decl. Ex. 184; Ex. 57 at 118:4-13).

Gruss has admitted the statement in part and denied it
in part noting that the interview report incorrectly refers to
the advances from the Offshore Fund to the Onshore Fund as
"loans," even though at the beginning of the paragraph of the
interview report the advances from the Offshore Fund to the
Onshore Fund are referred to as "transfers." Brody Decl. Ex.

90

184, DBZCO_00039. Gruss noted that the recording of the Gruss interview reflects a misunderstanding between formal loans and the advancing of funds that was part of the investing process.

112.    In a July 31, 2007 telephone call with an investor, Gruss stated that he was truthful in his meetings with Gibson Dunn & Crutcher. (Brody Decl. Ex. 185). Gruss objects to that statement as inadmissible hearsay.

## The Offshore Fund Loans to Pay Revolver Obligations

113. During 2005 and 2006, the Onshore Fund and the Offshore Fund were parties to a Revolving Credit and Security Agreement as amended and restated (collectively "the Revolver").

114.  Under the terms of the Revolver, "Borrower Group" was defined as meaning "either (i) the U.S. Fund, or (ii) the Off-Shore Borrowers." (Brody Decl., Ex. 87 at 938920). The Revolver defined the "U.S. Fund" as the D.B. Zwirn Special Opportunities Fund, L.P. *Id.* at 938937. The Revolver defined "Off-Shore Borrowers" as the "Off-Shore Fund" and the "Off-Shore Subsidiary Fund." *Id.* at 938931. The Revolver defined "Off-Shore Fund" as the D.B. Zwirn Special Opportunities Fund, Offshore

91

Fund and the "Off-Shore Subsidiary Fund" the Lemoyne Avenue Investors, LLC. *Id.*

115.    As stated in the Revolver, the obligations of each "Borrower Group" were several, and not joint and several. (*Id.* at 938917; Brody Decl. Ex. 88 at 5919). The Revolver did not specify the source of the funds used to repay outstanding balances nor did it preclude a third party from paying the amounts due.

116.    The Maturity Date for advances could not be more than seventy-five days after the Borrowing Date. (Brody Decl. Ex. 87 at 938930).

117.    Similar to how the Onshore Fund did not have sufficient cash on hand to fund its investments, it also did not have sufficient cash on hand to repay its obligations under the Revolver as they came due. As Law testified: "Basically the CDC line expires or matures every set amount of time, I can't remember, but maybe, for example, we say every three months. And then at the end of the three months, the whole amount has to be repaid to the CDC, and then CDC would immediately re-lend it back to us again. So there were some times where the Onshore Fund did not have the – enough funds to pay that amount to the

92

... CDC, so the Offshore Fund would pay for the 50 million or whatever was outstanding at the time." (Brody Decl. Ex. 17 at 137:6-19).

Gruss has noted that the SEC cites the testimony of Karotkin, Brody Decl. Ex. 71 at 55:19-56-9, for the proposition that "[s]imilar to how the Onshore Fund did not have sufficient cash on hand to fund its investments (as described above), it also did not have sufficient cash on hand to repay its obligations under the Revolver as they came due" and that Karotkin also testified that he did not remember if "we didn't have money when it was due." Gruss has further noted that while the funds may have come from the Offshore Fund to pay the Onshore Fund's outstanding balance, this amount was reflected on the financial statements of both the Onshore Fund and Offshore Fund as an advance of funds from the Offshore Fund to the Onshore Fund. Ex. BBB at pp. 240-42, Ex. UU at p. 403. According to Gruss, the Offshore Fund was permitted to advance cash to the Onshore Fund pursuant to the Operating Documents.

118.   On June 13, 2005 at 08:20 a.m., Wu sent an email to ABN Amro with the subject line "Wire from #***599 -- CDC." The email contained instructions to ABN Amro to transfer $78,000,000 from "#***600" to "#***599" and then to wire

93

$80,000,0000 from "#***599" to Citibank New York. (Brody Decl. Ex. 89). The subject of the email was "Wire from #***599 –CDC." *Id.* The email referred to Gruss by initials "PAG" and noted that his approval was to follow. *Id.* At 08:21 a.m., Gruss emailed "Ok pag", expressing his approval of the transfer of the money from the Offshore Fund to the Onshore Fund and from the Onshore Fund to CDC. (*Id.*; Brody Decl. Ex. 4 at 392:15-18).

119.     On November 22, 2005, Law emailed Gruss a spreadsheet with the filename "cash consolidation 11-15-05.xls." (Brody Decl. Ex. 90). The spreadsheet contained an entry labeled "CDC" under the column "Onshore Fund to Offshore Fund" in the amount of $77,845,541.65. *Id.*

Gruss has noted that this document was prepared on a daily basis and saved on the share drive and accessible to the entire accounting team and operations team.

120.     This spreadsheet was a "payable and receivable schedule showing all of the cash advances ... at a point in time" made by the Offshore Fund to the Onshore Fund and that as of November 15, 2005, the Onshore Fund owed the Offshore Fund approximately $312 million (Brody Decl. Ex. 4 at 402:11-20). Gruss has noted that the reference to the CDC on this

94

spreadsheet represented money that the Offshore Fund advanced to
the Onshore Fund to allow the Onshore Fund repay the Revolver.
(*Id.* at 403:17-24).

121. The Offshore Fund was not fully reimbursed for
the money it had advanced on June 13, 2005 to repay the Revolver
until December 23, 2005.

Gruss has noted that Wu testified that "it was always
the intention for the Onshore Fund to pay back the Offshore
Fund" for the advances, Ex ZZ at p. 178, that "there was a
continual process of paying back on" the advances from the
Offshore Fund to the Onshore Fund. *Id.* at pp. 128-29 and that
while the Offshore Fund may not have been fully reimbursed for
the money it had advanced on June 13, 2005 to repay the Revolver
until December 23, 2005, PWC always had access to these records
reflecting the advances from the Offshore Fund and the amounts
being paid back by the Onshore Fund. *Id.* at p. 179. Gruss
further notes that the Offshore Fund's Consolidated Financial
Statement for the year ended December 31, 2005, shows the sum of
$220,788,666 "Due from affiliates" and a corresponding entry
"Due to affiliates" on the Onshore Fund's balance sheet. 56.1
Statement, Ex. F, p. 2, Ex. I, p. 2. Gruss further notes that
the Offshore Fund's Consolidated Financial Statement for the

year ended December 31, 2004, shows the sum of $6,383,050 "Due from affiliates" and a corresponding entry "Due to affiliates" on the Onshore Fund's balance sheet, 56.1 Statement, Ex. E, p. 2, Ex. H, p. 2, and Offshore Fund's Consolidated Financial Statement for the year ended December 31, 2006, shows the sum of $189,019,591 "Due from affiliates" and a corresponding entry "Due to affiliates" on the Onshore Fund's balance sheet. 56.1 Statement, Ex. G, p. 2, Ex. J, p. 2. Gruss further notes that if an investor had questions about any of the numbers in either the Offshore Fund's or the Onshore Fund's financial statement, an investor was free to meet with Gruss or anyone else at DBZCO. Ex. UU at p. 81 ("If an investor wanted to meet with the CFO or any other individual they were free to do so"). Thus, "if the investors came in to review the funds, they could see anything they wanted." Ex. ZZ at p. 179.

122. On January 9, 2006 at 4:37 p.m., a DBZCO accountant emailed instructions to ABN Amro to transfer $125,000,000 from "Offshore Fund # ***600" (the Offshore Fund's account) to "Onshore Fund # ***599" (the Onshore Fund's account) and then to wire a total of $125,000,000 from "Onshore Fund #***599" to the accounts of the two banks providing the credit facility – $27,777,777.78 to Citibank and $97,222,222.22 to KBC Bank N.V. New York. (Brody Decl. Ex. 92). The subject of the

email was "CDC repayment." *Id.* The email referred to Gruss by initials "PG" and noted that his approval was to follow. *Id.* at 4:48 p.m., Gruss emailed "Ok pag." *Id.*

123. A few minutes later, DBZCO's treasurer forwarded the emails with the transfer instructions and the "Ok pag" to Gruss and wrote "what is this?" (Brody Decl. Ex. 92). Gruss responded "Repayment of 75day swingline revolver." *Id.* Gruss was, therefore, fully aware that money from the Offshore Fund was going to repay the obligations of the Onshore Fund under the Revolver. The Offshore Fund was not fully reimbursed for the money it had advanced in January to repay the Revolver until November 6, 2006. (Brody Decl. Ex. 91 at 19).

124. On March 3, 2006, a DBZCO accountant emailed instructions to ABN Amro to transfer $50,000,000 from the "Offshore Fund # ***600" (the Offshore Fund's account) to "#***599" (the Onshore Fund's account) and then a total of $50,000,000 from the "Onshore Fund # ***599" (the Onshore Fund's account) to the accounts of the two banks providing the credit facility – $38,888,888.89 to KBC N.V. New York Branch and $11,111,111.11 to Bank of New York. (Brody Decl. Ex. 94). The subject of the email was "CDC Repayment." *Id.* The email referenced Gruss by initials "PG" and noted that his approval

was to follow. Id. Gruss responded "ok pag." *Id.* The Offshore
Fund was not fully reimbursed for the money it had advanced in
March to repay the Revolver until November 27, 2006. (Brody
Decl. Ex. 91 at p.19).

125. On May 26, 2006, at 8:13 a.m., a DBZCO
accountant emailed instructions to ABN Amro to transfer
$20,000,000 from "#***600" (the Offshore Fund's account) to
"#***599" (the Onshore Fund's account). (Brody Decl. Ex. 95).
The subject of the email was "Various." *Id.* The email referred
to Gruss by initials "PG" and noted that his approval was to
follow. *Id.* At 8:15 a.m., Gruss emailed "Ok pag." *Id.*

On May 26, 2006, at 8:41 a.m., a DBZCO accountant
emailed instructions to ABN Amro to transfer a total of
$20,000,000 from "Onshore Fund # ***599" (the Onshore Fund's
account) to the accounts of the two banks providing the credit
facility - $15,555,555.56 to KBC Bank N.V. New York and
$4,444,444.44 to Bank of New York. (Brody Decl. Ex. 200). The
subject of the email was "CDC." *Id.* The email referred to Gruss
by initials "PG" and noted that his approval was to follow. *Id.*
At 1:42 p.m., Gruss emailed "Ok pag." *Id.*

98

The Offshore Fund was not fully reimbursed for the money it had advanced in May to repay the Revolver until November 27, 2006. (Brody Decl. Ex. 91 at 19).

126.   The balance owed to the Offshore Fund by the Onshore Fund because of the transfers to repay the Revolver was $175 million in March 2006.

127.   In total, the Offshore Fund transferred $273 million to the Onshore Fund (in four transfers: $78 million (Brody Decl. Ex. 33); $125 million (Brody Decl. Ex. 92); $50 million (Brody Decl. Ex. 94); $20 million (Brody Decl. Ex. 95)) in order to allow the Onshore Fund to repay its loan obligations under the Revolver.

128.   The SEC asserts that without the transfers from the Offshore Fund, the Onshore Fund would not have been able to make the required periodic repayments of the Revolver.

129.   The interfund transfers continued through at least May 2006.

130.   On April 19, 2006, PWC, the auditors for the Offshore Fund, issued the Consolidated Financial Statements for

the year ended December 31, 2005. (Brody Decl. Ex. 96 at 1). The Financial Statements for the year ended December 31, 2005, listed $220,788,666 under the assets of the Offshore Fund as "[d]ue from affiliates." *Id.* at 2. The Financial Statements state that "[t]he accompanying notes are an integral part of these consolidated financial statements." *Id.*

131.   The notes, which were written by DBZCO, provide in the section captioned "related party transactions," "[i]n connection with certain investments entered into by an affiliate (primarily corporate loans), the Company may purchase a portion of such loans from such affiliates at the current estimated fair value as determined by the Trading Manager. Such transactions are subject to review by an independent third party. At December 31, 2005, the Company is due $223,049,505 from affiliates for certain investment transactions and their related cash flow, and owes $2,260,839 to the Trading Manager for expenses incurred on behalf of the Company. Such amounts are included net in due from affiliates on the consolidated statement of assets and liabilities." *Id.* at 26.

132.   There was no mention in this note or anywhere in the Financial Statements that the "due from affiliates line" included money that the Offshore Fund had advanced on behalf of

100

the Onshore Fund to pay for the Onshore Fund's investments. *Id.*
at 26-27.

Gruss has denied this statement noting that Law stated
that the phrase in the note, "and their related cashflow" could
refer to "the money that flows from the Offshore Fund to the
Onshore Fund for investments that the Onshore Fund might make
for itself" and, that she was unable to provide "any reason" why
such interpretation was not correct, Ex. BBB at pp. 284-86, and
that there was also no statement in the note that states that
the "due from affiliate line" does not include the advancement
of funds from the Offshore Fund to the Onshore Fund for the
purchase of assets that would be used for the Onshore Fund to
purchase investments. (Gruss Rule 56.1, Ex. E, p. 16; Ex. F, p.
26; Ex G, p. 28). Gruss has further stated that the Offshore
Fund's Offering Memoranda that the Offshore Fund "may acquire
interests in loans . . . originated by the U.S. Fund," Ex. M at
p. 67, when coupled with this note, led to the inference by the
Offshore Fund's sophisticated investors that this "related cash
flow" relates to the symbiotic investing process that existed
between and among the DBZCO managed funds. Ex. D at pp. 28-30.

137.   Law, who saw the notes for the 2005 audited
Consolidated Financial Statements, did not believe that the

101

notes address the fact that money from the Offshore Fund was

"being used to fund Onshore Fund investments." (Brody Decl. Ex.

17 at 175:20 - 176:16). Gruss has denied this statement and

noted that Law provided this testimony on direct examination

without being shown the note in the financial statement, that

she was questioned totally on her "recollection," Ex. BBB at p.

176, and that when Law was shown the actual note on cross-

examination and questioned about it, *Id.* at pp. 281-83, she

stated, that the "Due from affiliates" number, would "typically

be items arising from the agenting relationship between the

Onshore, the Offshore and the other Funds, and it would also

include all the funds that were sent by the Offshore for Onshore

investments."   *Id.* at 283:6-10.


138.   In connection with the 2005 audit for the

Onshore and Offshore Funds, no one at DBZCO told PWC that the

amounts shown as due to affiliates and due from affiliates

included money from the Offshore Fund that was being used to

fund Onshore Fund investments. (Brody Decl. Ex. 98 at 137:21 -

138:13; Ex. 17 at 136:9-16).


Gruss has noted that most of the back office staff

knew about the inter-funds transfers and no one was ever told

"to keep quiet about these transfers", Ex. BBB at pp. 274-77,

Ex. ZZ at pp. 186-88, that all of the inter-fund transfers were accounted for in the books and records of DBZCO, that each advance from the Offshore Fund to the Onshore Fund was accurately accounted for with corresponding entries on the records of the Offshore Fund and Onshore Fund and were not "hidden off the books," Ex. BBB at pp. 193-94, 232-42, 273-74, Ex. ZZ at pp. 123-24, 168-80, PWC had "full access to DZPRIV," Ex. BBB at pp. 197, 226-27, and "the DZPRIV schedule [in "spreadsheet format" was] given to PWC to be used as the basis for the presentation of the payable-receivable balances for" the funds, Ex. ZZ at p. 159, Ex. BB at pp. 226-27.

        Gruss further notes that the inter-fund transfers were related party transactions requiring specific disclosures. See, e.g., Financial Accounting Standard No. 57 (related party transactions) ("FAS 57"), and were reflected in the balance sheet, the statement of cash flows and the notes to the financial statements, all of which were prepared by DBZCO and audited by the external audit firm PWC. See, e.g. PCAOB Auditing Standard No. 18 (auditing standards for related party transactions). The audited financial statements for the Onshore Fund for the fiscal year ended December 31, 2005 in the balance sheet disclosed "Due to affiliates: $308,839,745." Ex. I at p. 2. Similarly, the notes to the financial statements fully

103

disclosed the transactions as required by FAS 57 under the
heading "Related Party Transactions":

> In connection with certain investments (primarily
> corporate loans), the Fund may sell or
> participate a portion of such loans to affiliates
> at the current estimated fair value as determined
> by the Trading Manager. Such transactions are
> subject to review by an independent third party.
> At December 31, 2005, the Fund owes $308,839,745
> to affiliates for certain investment transactions
> and their relate cash flows.

> Ex. I at p. 28.

According to Gruss, Investors had full access to the
underlying documents for these transactions and all of the
investments were recorded in DBZCO's Virtual Portfolio
Management ("VPM") system, Ex. ZZ at p. 162, and then reconciled
as to which fund owned which percentage of the investments in
DZPRIV. Ex. CCC at pp. 25-26. DZPRIV "showed how much was owed
between the Funds," Ex. BBB at p. 239, and the VPM contained the
separate accounting records for each of the funds. Ex. ZZ at p.
167. DZPRIV also recorded "every dime that was owed from the
onshore fund to the Offshore Fund," *id.* at p. 186, Ex. BBB at
pp. 273-74, and Law would provide PWC with records reflecting
"subsequent repayment[s]" from the Onshore Fund to the Offshore
Fund. Id. at p. 198.

The Payment by the Offshore Fund of Onshore Fund Management Fees

139.   The Onshore Fund and DBZCO were parties to a
Management Agreement dated May 1, 2002 amended as October 1,
2004, and further amended on January 1, 2006. The management
agreement provides that "[e]ach of the parties hereto shall bear
its own expenses with respect to all matters contemplated
hereunder. (Brody Decl. Ex. 102 at 2).

140.   With respect to who was responsible for which
expenses, the confidential memorandum for the Onshore Fund
states: "The Fund bears its operating expenses, including all
direct expenses of the Fund, investment expenses (e.g. expenses
which the General Partner determines to be related to the
investment of the Fund's assets such as brokerage commissions,
interest expenses, borrowing costs, clearing and settlement
charges, loan servicing fees, custodial fees, bank service fees,
extraordinary expenses and all other transaction costs), legal
expenses, professional fees (including, without limitation,
expense of consultants, experts, and third-party appraisers)
relating to investments, accounting expenses, auditing and tax
preparation expenses, entity level taxes, including New York
City unincorporated business taxes, printing and mailing

105

expenses, and fees and out-of-pocket expenses of any service company retained to provide certain accounting, bookkeeping, asset management, appraisal and administrative services. The Fund also pays its ongoing offering, legal, filing, accounting and reporting fees as well as other operating expenses and expenses incurred in connection with the sale of Interests." (Brody Decl. Ex. 6 at 27).

141.   The Onshore Fund and DBZCO were parties to a Management Agreement dated May 1, 2002, amended as October 1, 2004, and further amended on January 1, 2006. (Brody Decl. Exs. 100-102). Pursuant to this agreement, DBZCO was to be paid a monthly management fee which was to be "accrued monthly and payable quarterly."

142.   The Offshore Fund and DBZCO similarly were parties to a Management Agreement dated May 1, 2002, amended as of August 19, 2005, and further amended on January 6, 2006. (Brody Decl. Exs. 138-140). Pursuant to this agreement, DBZCO was to be paid a monthly management fee which was to be "accrued monthly and payable quarterly."

143.   D.B. Zwirn Special Opportunities Fund (TE), L.P. (the "TE Fund") and DBZCO were parties to a Management Agreement

106

dated May 29, 2003, amended as of October 1, 2004, and further amended as of January 1, 2006. (Brody Decl. Exs. 141-143). Pursuant to this agreement, DBZCO was to be paid a monthly management fee which was to be "accrued monthly and payable quarterly."

144. D.B. Zwirn Special Opportunities Fund II, Offshore Fund. (the "Offshore Fund II Fund") and DBZCO were parties to a Management Agreement as of June 1, 2005. (Brody Decl. Ex. 144). Pursuant to this agreement, DBZCO was to be paid a monthly management fee which was to be "accrued monthly and payable quarterly."

145. The meaning of the "accrued monthly and payable quarterly" language was that the fee was calculated on a monthly basis, but it would not be paid until the end of the quarter. (Brody Decl. Ex. 17 at 60:4-11).

146. DBZCO was "always short on cash." (Brody Decl. Ex. 17 at 63:9-11). As Gruss explained: "The management company was always tight on cash. . . . It was always tight on cash because ... Dan Zwirn grew the firm way too quickly. Way too quickly. The growth exceeded the amount of operational expenses a firm of that size could bear." (Brody Decl. Ex. 4 at 267:817).

During most of 2005, DBZCO had little liquidity and had invoices coming down that were close to or exceeding the amount of cash available to it. By the end of each quarter it was hard for DBZCO to pay invoices. (Brody Decl. Ex. 104 at 29:24 - 31:5).

147. In order to pay DBZCO's expenses, a practice developed where management fees were collected early. (Brody Decl. Ex. 145 at 66:25 - 67:6). Because DBZCO needed to pay rent or salary, "it collected the management fees earned by the Fund but not yet payable." *Id.* at 67:23 - 68:4. Gruss was aware of this practice as of the summer of 2004, knew and approved for management fees to be paid early without any authority to do so. (Brody Decl. Ex. 9 at 256:25 - 257:18).

Gruss objected to this statement noting that on June 21, 2004, when Wu first asked Gruss to approve the early payment of management fees via an email, Gruss sought Wu's guidance, and in the email response from Gruss to Wu, Gruss specifically asked Wu whether a loan had to be documented, stating "We need to paper a loan to mgmt co don't we?" to which Wu replied, "no... just prepaying mgmt fee ahead of schedule." Ex. YY at pp. 201-09, Ex. ZZ at pp. 21,113-14, 219-20; Ex. SSS.

108

148.    The process was on a "needs basis." (Brody Decl. Ex. 17 at 86:10). The trigger point for sending management fees from the funds to DBZCO "was always when Michelle O'Hara came to us saying 'Look, we have a cash crunch.'" *Id.* at 86:12-15.

149.    DBZCO would not have been able to pay its bills if the management fees had not been paid early by the Funds. (Brody Decl. Ex. 17 at 94:14-18; Ex. 105 at 20:24 – 21:6 "We didn't have enough cash to stay current on our bills. So during that period I would talk to Perry [Gruss] regularly about cash issues"). As Gruss admits, "[i]f we didn't collect the management fees, people would not have been paid, period." (Brody Decl. Ex. 145 at 74:23 – 75:11).

Zwirn was not aware of this practice while it was going on. (Brody Decl. Ex. 145 at 75:14-15; Affidavit of Daniel B. Zwirn at ¶ 9).

150.    The SEC asserts that Gruss knew that the early collection of management fees would violate the agreements between the funds and the management company and also understood that taking investor funds in ways not permitted by the legal agreements was a serious matter.

151.   As demonstrated in the chart below, there were twenty-three instances where DBZCO withdrew accrued monthly management fees before the end of the quarter.

| No. | Date of Withdrawal | Amount | Fee Accrued For Month Ended | End of Quarter | Number of Days Withdrawn Before End of Quarter |
|---|---|---|---|---|---|
| 1 | 5/26/04 | $450,595 | 4/30/04 | 6'30/04 | 35 |
| 2 | 6/21/04 | 394,710 | 5/31/04 | 6/30/04 | 9 |
| 3 | 6/25/04 | 497,178 | 5/31/04 | 6/30/04 | 5 |
| 4 | 8/23/04 | 557,557 | 7/31/04 | 9/30/04 | 38 |
| 5 | 9/7/04 | 91,945 | 7/31/04 | 9/30/04 | 23 |
| 6 | 9/7/04 | 484,935 | 7/31/04 | 9/30/04 | 23 |
| 7 | 8/5/05 | 1,183,786 | 7/31/05 | 9/30/05 | 56 |
| 8 | 9/1/05 | 304,114 | 7/31/05 | 9/30/05 | 29 |
| 9 | 9/1/05 | 379,257 | 7/31/05 | 9/30/05 | 29 |
| 10 | 9/14/05 | 1,265,424 | 8/31/05 | 9/30/05 | 16 |
| 11 | 9/14/05 | 323,932 | 8/31/05 | 9/30/05 | 16 |
| 12 | 11/22/05 | 1,440,254 | 10/31/05 | 12/31/05 | 39 |
| 13 | 11/30/05 | 427,498 | 10/31/05 | 12/31/05 | 31 |
| 14 | 12/14/05 | 355,648 | 10/31/05 | 12/31/05 | 17 |
| 15 | 12/19/05 | 1,506,720 | 11/30/05 | 12/31/05 | 12 |
| 16 | 12/19/05 | 433,373 | 11/30/05 | 12/31/05 | 12 |
| 17 | 12/20/05 | 357,844 | 11/30/05 | 12/31/05 | 11 |
| 18 | 12/29/05 | 1,500,000 | 12/31/05 | 12/31/05 | 2 |
| 19 | 12/30/05 | 450,000 | 12/31/05 | 12/31/05 | 1 |
| 20 | 3/1/06 | 5,200,000 | 1/30&2/28/06 | 3/31/06 | 30 |
| 21 | 3/1/06 | 3,400,000 | 1/30&2/28/06 | 3/31/06 | 30 |
| 22 | 3/1/06 | 770,000 | 1/30&2/28/06 | 3/31/06 | 30 |
| 23 | 3/7/06 | 760,000 | 1/30&2/28/06 | 3/31/06 | 24 |
| | | $22,534,770 | | | |

Gruss has denied this statement.

110

152. These early withdrawals of management fees were memorialized in emails and requests for wire transfers, each showing that Gruss approved the early withdrawal of management fees. On May 26, 2004 at 3:16 p.m., DBZCO's controller emailed the Onshore Fund's bank instructions to "wire $450,595 from the Onshore Fund's account to DBZCO's operating account at Citibank. (Brody Decl. Ex. 146). The subject of the email referenced "wire from #***599 – Mgmt Fee." *Id.* Gruss was copied on the email. *Id.* At 4:48 p.m., Gruss emailed the Onshore Fund's bank stating "[o]nce again, pls take this email as authorization for [DBZCO's controller] to sign on my behalf through Friday the 28th of May." (Brody Decl. Ex. 147).

153. DBZCO's auditors PWC, did not test the timing of management fee payments as part of its audit.

## The Payment by the Offshore Fund for the Purchase of an Airplane

154. As early as March 2005, Zwirn began discussing with Gruss and others at the company, including its Chief Operating Officer, Harold Kahn ("Kahn"), and the purchase of a private plane for his business travel. Zwirn wanted the management company to purchase the airplane.

111

155.  Gruss was against the purchase of the plane because the management company "was always short on cash, constantly," (Brody Decl. Ex. 9 at 420:10-13), and when people in the accounting department found out about the plane purchase, they were surprised because "[t]he management company had at that time been having ... liquidity issues. Our payments of regular invoices for the management company was becoming an issue. And then to find out that we were also going to be funding the purchase of a plane, it really -- it didn't make sense to some of us." (Brody Decl. Ex. 104 at 29:2-11). Gruss admits the statement in part and objected to on the grounds that other people were inadmissible hearsay.

156.  From April through July 2005, Gruss met with an airplane broker, PrivatAir, as well as with an aviation attorney and an accountant who would be involved in structuring the plane purchase.

Gruss has denied this statement stating there is no admissible evidence that Gruss actually ever met with an airplane broker, PrivatAir, an aviation attorney or an attorney regarding the purchase of an airplane.

112

157. In response to a June 14 email from Zwirn stating that he was "even more convinced that I need a solution" to his travel issues, Gruss stated: "[a]t this stage it's really about whether or not you want to deal with $. Tax folks are finalizing structure for holding Plane to maximize cost savings for DZ." (Brody Decl. Ex. 111).

158. On July 1, 2005, Kahn reported to Gruss that PrivatAir had just provided an initial list of acceptable planes so there was a "need to get our structuring ready to go." Gruss responded "Ok good. Let's review." (Brody Decl. Ex. 110).

Gruss has denied this statement in part noting that Zwirn had tasked Kahn, not Gruss, with the job of "find[ing] out what potential options were available and to the Onshore Fund identify sources of financing for such a purchase." Ex. KKK at p. 19. As such, Kahn identified "[t]ypes of planes, who were sellers of planes, [and] who were intermediaries that would be involved in the purchase process." Id. at 19. "Gruss had a role in the purchase of the plane simply based on his position as CFO of the company." Id. at 27.

159. On August 25, 2005, PrivatAir informed Kahn that they had a "verbal confirmation" from the seller of a Gulfstream

G-IV that he would accept $19.95 million for the plane. (Brody Decl. Ex. 112). Kahn forwarded that information to Gruss and stated "[u]pon offer acceptance we need to be prepared to wire $250K as a deposit ... could be as soon as tomorrow. Upon closing (say around 9/30), we will need to structure a loan from the mgmt co to ZH for about $2MM until DZ gets 4th qtr. Mgmt fees payment and thus may have to be prepared to borrow as you noted the other day." *Id.* Gruss responded "[n]o problem re tomorrow. I'll spark some interest in the working capital loan for 9/30." *Id.*

160. On August 31, 2005, Kahn emailed Law and O'Hara details to wire $250,000 to an escrow account with instructions that the "[a]mount should be treated as a mgmt co. prepaid expense . . . . [a]pproved per PG and me." (Brody Dec. Ex. 198). Gruss responded "[c]orrect. Ok pag." *Id.* Consistent with the emails from Kahn and Gruss, the $250,000 was paid out of the management company's operating account on August 31, 2005. (Brody Decl. Ex. 114).

Gruss has denied that the email, Brody Dec. Ex. 198, contains a response from Gruss, "[c]orrect. Ok pag."

114

161.   Kahn and Gruss sought financing for the plane purchase. On September 2, Merrill Lynch sent a financing proposal to Kahn for the 1991 Gulfstream G-IV. (Brody Decl. Ex. 115). The proposal was based on a purchase price of $17.9 million. *Id.* at 4. In order to offer nonrecourse financing (as Zwirn had requested), the bank required additional collateral in the form of a $1.9 million letter of credit. Id. Kahn provided the letter to Gruss and Zwirn and stated "so far this is the only one [proposal] that is truly non-recourse and gives us decent flexibility re use of cash of LC or combination thereof." *Id.*

Gruss has denied that he sought financing for the plane purchase.

162.   On September 9, Kahn emailed Gruss saying "the LC [letter of credit] we've talked about ... probably around $2 MM plus or minus representing 10% of the purchase price... who do you think would be the best guys to set it up? ... Think we can get away w/not having it fully cash collateralized." (Brody Decl. Ex. 116). Gruss responded: "[w]e should do citi. Timings perfect. I had them in earlier this week and [expletive] slapped them." *Id.*

115

163.   Shortly thereafter, Gruss and Kahn contacted Citigroup about providing a letter of credit for the airplane purchase as well as a working capital loan for the management company. On September 19, after not receiving a term sheet, Gruss again reached out to Citigroup asking that the term sheet be provided "asap. You now have more than enough information. I want to review quickly as we are in the process of reviewing other 3rd Party term sheets." (Brody Decl. Ex. 117). That same day, Citigroup sent the term sheet to Gruss for a $10 million loan facility, which included the $2 million letter of credit.

According to Gruss, the admissible evidence only shows that Kahn, not Kahn and Gruss, contacted Citigroup about providing a letter of credit for the airplane purchase as well as a working capital loan for the management company and the term sheet was sent to Kahn, and Gruss was copied on the email.

164.   In order to obtain the letter of credit from Citigroup, the management company was required to wire $1.9 million in cash collateral to Citigroup.

165.   On September 26, 2005, Gruss wrote Citigroup asking where they stood with respect to the management company loan. (Brody Decl., Ex. 120 at 731856). Citgroup responded that

116

the letter of credit would be ready for issuance most likely by September 27. *Id.* at 731855. When Gruss forwarded this information to one of the internal accountants for the management company who was involved in the transfer of funds, she asked "[a]ny eta on the cash." *Id.* at 731854. Gruss responded "possibly on Friday." *Id.*

166.   In addition to the $1.9 million that needed to be transferred to Citigroup, the company needed to wire $1,681,350 to the seller, $112,575 to PrivatAir (the broker) and $80,250 in closing costs to Merrill Lynch. As such, including the cash collateral for the letter of credit, DBZCO needed to come up with $3,774,175 to close the airplane purchase.

167.   While the initial intention may have been to use money from the Citigroup loan facility to pay the $3,774,175 to close on the airplane purchase, that loan facility did not become available until November. In October, 2005, one of the accountants asked Gruss to approve wiring $163,267.50 for airplane expenses. (Brody Decl. Ex. 121) The accountant also wrote: "FYI, I am now completely out of cash. Is the Citibank loan ever actually happening? I have about 2MM of invoices holding on my desk waiting to be paid." *Id.* Gruss approved the

expenses and wrote "Pls move $ from Offshore Fund. [the Offshore Fund]". *Id.*

Gruss has denied in part and objected in part to the statement, noting that the initial sentence is inadmissible speculation and that there is no admissible evidence that Gruss was ever aware of how much money the management company had at any one time, Ex. UU at pp. 223-25, or that there was any intention to use the money from the Citigroup loan facility to pay the $3,774,175 to close on the airplane purchase. Gruss further notes that O'Hara, the accountant in charge of the Management Company account, testified that the purpose of the Citibank loan was "to normalize processes" in paying Management Company expenses on a monthly basis as opposed to paying expenses on an ad hoc basis by withdrawing money from the funds to reimburse fund expenses, whenever the Management Company had to pay such expenses. "[T]he Citibank loan would have alleviated the need to pay expenses and be reimbursed immediately from the funds," Ex. LLL at pp. 161-63, and that Gruss also testified that the Citibank revolver was not needed "in order to effect the purchase of the plane," but for "operating expenses." Ex. VV at pp. 107-8. According to Gruss, the statement in the October 25, 2005 email, "Pls move $ from Offshore Fund" is misleading and improperly implies that Gruss approved $163,267.50 for

118

airplane expenses to be paid by the Offshore Fund and that the $163,267.50 was taken from the Offshore Fund as a reimbursement to the DBZCO, the management company, for expenses, which the Offshore Fund owed to DBZCO, Ex. LLL at pp. 156-62; Ex. UU at pp. 361-65, and that in the normal course of operations of the funds, the management company paid expenses on behalf of the funds, and the funds in turn reimbursed the management company at various times. Ex. LLL at pp. 157-58.

168.   On October 25, 2005, Gruss wrote Citigroup asking for the status of the loan facility. "What is the holdup? We're now going on the 4th week of the 'we'll turn this around in a week' loan." (Brody Decl. Ex. 122). In fact, the money from the Citigroup loan was not credited to the company's account until November 4, 2005 - more than a month after the money was necessary to pay for the closing costs for the airplane purchase. (Brody Decl. Ex. 123). As one accountant testified: "it was supposed to be a quick process and it turned out to be much longer than I expected." (Brody Decl. Ex. 105 at 41:18-20). "My expectation was that it was coming when they told me it was coming. In a week, in two weeks, in three days. So, every time that deadline passed, I would again be, 'What's going on? Where is the loan?' I -- at some point, in my recollection, I stopped assuming knowing when the loan was coming." *Id.* at 58:17-24.

Gruss denied the statement in part noting the phrase "More than a month after the money was necessary to pay for the closing costs for the airplane" is contrary to O'Hara's testimony that the purpose of the Citibank loan was "to normalize processes" in paying Management Company expenses on a monthly basis as opposed to paying expenses on an ad hoc basis by withdrawing money from the funds to reimburse fund expenses, whenever the Management Company had to pay such expenses. "[T]he Citibank loan would have alleviated the need to pay expenses and be reimbursed immediately from the funds." Ex. LLL at pp. 161- 63.

169.    Without the money from the Citigroup loan facility, a decision was made to take the money from the investors' funds to pay the closing costs. The SEC asserts that Law participated in a meeting in Gruss' office with Kahn where it was decided to use investor money to pay the closing costs since the loan had not come through. (Brody Decl. Ex. 17 at 97:20 – 98:10). Law recalled that during the meeting, Gruss was bouncing a ball off the wall of his office.

Gruss has denied the statement in part and stated that the Citigroup loan had nothing to do with the closing costs for

120

the airplane, that there is no admissible evidence that at the meeting in Gruss' office with Kahn and Law it was decided to use investor money to pay the closing costs for the plane, that Law testified in her deposition that she has no recollection what anybody said at that meeting, and she "had no recollection of any discussions about the transfers from the Onshore Fund or HCMZ for plane related expenses," Ex. BBB at pp. 258-59, and that the only direction she received from anybody about using fund money to pay for the airplane expenses was an email she received from Kahn asking her to fund the airplane expenses and that "was an indication of moving the money from the Funds." *Id.* at p. 258. Gruss further stated that the email in question from Kahn to Law stated, "Can you pls arrange to have the $1.9MM wired to Citi asap for the issuance of the LC. This will only be a short-term deposit in that once the Citi revolver is in place (should be w/n a week) we will credit the amount against the line. Thx." *Id.* at pp. 289-90, Ex. MMM. Gruss has denied that he ever authorized or had knowledge of these payments being made from the Funds.

170.   Law was only involved in this meeting, because she was the accountant for the funds and the money was coming from the funds. If the money had come from the management company's account, she would not have been involved at all. Law

121

was the person "responsible for fund expenses so if there were any expenses directly related to the fund or for deals, they would have gone to [Law]." (Brody Decl. Ex. 104 at 33:2-5).

Gruss has denied and objected to this statement noting that the Law testimony cited at 97:20 - 98:2 is inadmissible speculation about an unidentified conversation, that the statement about "any expense directly related to the fund . . . would have gone to [Law]" is directly refuted by Law who testified she could approve the expenditure of funds from the Management Company, Ex. BBB at p. 55, and Kahn who testified that even though Law "was more responsible for the fund accounting" and "O'Hara was more responsible for the management company accounting," this split in responsibilities was "not exclusive." Ex. KKK at pp. 38-9 and that as Controller of DBZCO, Law had responsibility for paying management company expenses. Ex. VV at p. 87.

171. At the time, Law was "very used to this kind of situation whereby if something needed to get funded and there was not enough money, then we would take it from an entity that had the money." In this case, the management company was in a "very tight cash situation" and could not pay for the plane. Law

122

understood that Gruss knew that the money was going to come from the fund. (Brody Decl. Ex. 17 at 110:6-11).

Gruss has denied and objected to this statement noting that the statement that Law was "very used to this kind of situation whereby if something needed to get funded and there was not enough money, then we would take from an entity that had the money," was elicited improperly over Gruss' objection as a leading question in violation of Fed.R.Evd.611(c). Gruss believes that the statement was a leading question because Law was a witness for the SEC, had entered into a cooperation agreement with the SEC, the question was asked on direct examination by the SEC, and the witness was not hostile or identified with Gruss. Gruss further notes that the second statement that "Law understood that Gruss knew that the money was going to come from the fund" is inadmissible and not based on any statement made to her by Gruss. Finally, Law admitted that prior to the fund money being used to pay for the airplane, she could not recall any specific conversation with Gruss about the airplane being paid with the fund money. Ex. BBB at pp. 305-07.

According to Gruss, as to the two September 28, 2005 payments for the airplane closing costs, Law testified that she

123

had created two approval forms for the two payments using wire requests with photocopies of Gruss' signature at the bottom of the wire requests, Ex. BBB at pp. 253-54; Exhs. PP-QQ, and Law took "one of" the "old wire approvals" and "fold[ed] it at the part where the signature is shown up, put it on the blank that we just printed out and then photocopied it." *Id.* at p. 253. Further, Gruss notes that Law has no recollection of speaking to Gruss to obtain his approval for these two wires prior to sending out these two wires on September 28th, *id.* at pp. 255-56, and that Law stated that what prompted her to pay the amounts from the two managed accounts was an email she had received from Kahn requesting her to fund the two amounts -- to her "it was an indication of moving the money from the Funds." *Id.* at pp. 258, 289-90; Ex. MMM.

According to Gruss, both the September 29th and 30th payments for the airplane closing costs were sent from the funds after Gruss had emailed his approvals "Ok pag" in response to emails from Law. Exhs. RR, KK. Law stated that DBZCO did a number of "investments that related to airplanes including Priority Air, that "she "wouldn't know" whether Gruss actually knew he was approving payments from the funds for Zwirn's airplane and that she could not "recall" any such conversations with Gruss about these payments. Ex. BBB at pp. 294-300.

124

172. At the time Gruss was very cognizant of keeping track, or seeing every payment related to the plane so all invoices specifically required Gruss' separate approval.

Gruss has denied this statement noting that O'Hara did not testify that Gruss was very cognizant of keeping track, or seeing every payment related to the plane and testified that "I don't have a specific recollection of him actually approving any particular invoice," Ex. LLL at p. 150, and that there is no evidence that "Gruss was very cognizant of keeping track," or seeing every payment related to the plane.

173. Gruss knew that the use of investor funds to purchase an airplane for the management company would be a violation of the agreements between the funds and the management company.

174. On September 27, 2005, Kahn sent Law and email with a copy to Gruss requesting that Law "arrange to have the $1.9MM wired to Citi asap for the [i]ssuance of the LC [letter of credit]." (Brody Decl. Ex. 124).

175.   A wire transfer instruction to Bear Stearns
dated September 28, 2005 requested the transfer of $1,900,000
from the HCM/Z Account to DBZCO's cash collateral account at
Citibank. (Brody Decl. Ex 125). A signature appeared on the
Perry Gruss signature line.

Gruss denied the statement in part noting that Law
stated, as set forth above, that she had created the signature
on the wire approval by photocopying Gruss' signature on to the
wire instructions without Gruss' knowledge.

176.   On September 27, 2005, Kahn sent Gruss and Law
an email stating that a "facility fee" in the amount of $80,250
needed to be paid to Merrill Lynch. (Brody Decl. Ex. 126).
According to Gruss, Kahn sent the email to Law and copied Gruss
on the email.

177.   A wire transfer instruction to Bear Stearns
dated September 28, 2005 requested the transfer of $80,250 from
the HCM/Z Account to Merrill Lynch. (Brody Decl. Ex. 127). A
signature appeared on the Perry Gruss signature line.

126

According to Gruss, Law admits that she created the signature on the wire approval by photocopying Gruss' signature on to the wire instructions without Gruss' knowledge.

178.   On September 28, 2005, Kahn forwarded to Law and copied to Gruss the wire instructions for the plane deposit to be sent to the escrow agent, Insured Aircraft Title Service ("IATS"). (Brody Decl. Ex. 128). On September 29, Kahn sent Law and copied to Gruss the final amount for the wire that needed to be paid to IATS. (Brody Decl. Ex. 129). On that same date, the accountant sent an email -- cc'ed to Gruss -- stating: "Please wire $1,681,350 from the L.P. acct # ***599 to the following instructions. PG's [Perry Gruss'] approval to follow. Thanks." (Brody Decl. Ex. 130).

179.   Gruss approved the transfer from the Onshore Fund's account to pay the deposit on the airplane.

Gruss has denied the statement in part noting that as to the September 29th and 30th payments for closing costs for the airplane for which Gruss approved the email requests for the transfer of the funds, these approvals were a "protocol for LaSalle" bank, which Gruss was required to perform in order to release funds from the bank, Ex. VV at p. 17, and Gruss' purpose

127

in approving the transfer was "[t]o make sure the wire was actually sent" because "[w]ithout an authorization that wire does not get sent," *Id.* at 27, that Gruss received "hundreds of e-mail approval requests," *Id.* at 17, that in the month of "September alone" he "had received over 250 such requests" and that on September 29th and 30th Gruss received numerous email requests for authorizations to send moneys from the funds and approved the two emails at issue at the same time he approved other email requests for approval. Ex. BBB at pp. 293-94, 299-300; Exhs. NNN-OOO. "[T]he control that made sure that the wire was for an appropriate purpose" was the "Finance [personnel] who were actually authorizing the wires and . . . [the] people in the back office the next day that were reconciling the wires." *Id.* at Exhs. RR, KK.

According to Gruss, at the time he approved the September 29th and 30th email requests, he did not know he was approving payments for Zwirn's airplane. Ex. VV at p. 17. As a general practice Gruss "would read the "To" line and the "From" line and most likely the subject." *Id.* The subject on the September 29th and 30th emails was "RE: IATS." By itself this subject did not reference the purchase of Zwirn's airplane. If Gruss had read further into the email, he would have seen on the September 29th email the phrase "CREDIT: INSURED AIRCRAFT TITLE

128

SERVICES, INC.," Ex. RR, and on the September 30th email the
phrase, "Acct: FSG Privatair, Inc." Ex. KK. Prior to September
30th the Zwirn funds had been investing in aircraft, one of
which investments was known as "Priority Air," "quite similar to
Private Air." Ex. BBB at p. 295; Ex. UU at pp. 344-46, Ex. PPP.
Gruss further notes as recently as September 6th, Gruss had
approved an email relating to "Priority Air." *Id.*, and because
the airplane was supposed to be paid out of the Management
Company, Gruss was not expecting to be given an approval for
payment from any of the funds. Ex. UU at pp. 232, 355; Ex. XX at
pp. 204-05.

Gruss further noted that he sent an email to DBZCO
partner Christopher Suan ("Suan") about a week after the
completion of the four airplane transactions in which Suan asked
Gruss if Zwirn had bought "Glenn's [Dubin] plane." Gruss
replied, "No his own" and that the funds to pay for the plane
came out of the "Mgmt co bc its 95pct mgmt. co related." Ex.
QQQ. The remaining 5% of the 95% of the plane that would be used
for the management company was for Zwirn's personal use of the
plane. Ex. VV at pp. 95-96.

180.    On September 28, PrivatAir sent Kahn its invoice
for the balance of the acquisition fee. (Brody Decl. Ex. 131).

129

On September 30, Kahn forwarded the invoice to Gruss and the accountants, stating: "[o]ne more wire to go this am as per attached -- $112,575." *Id.* According to Gruss, the September 30 email was sent to the accountants and copied to Gruss.

181.  On September 30, the accountant sent an email -- cc'ed to Gruss -- stating: "Please wire $112,575 from the L.P. acct #***599 to the following instructions. PG's approval to follow. Thanks." (Brody Decl. Ex. 132).

182.  On that same day, Gruss approved the transfer from the Onshore Fund's account to pay PrivatAir for its brokerage services for the plane acquisition. (Brody Decl. Ex. 132). Gruss has denied the statement it in part as set forth above.

183.  During this entire time, Gruss was aware that the management company did not have sufficient funds to pay the $3,774,175 required to close the airplane purchase. Indeed, the tone of the discussion in the office was that it was "odd" that the company was purchasing the plane while it was going through liquidity issues. (Brody Decl. Ex. 105 at 69:13-17).

Gruss has denied and objected to this statement and testified that he was not aware that the management company did not have sufficient funds to pay the $3,774,175. Ex. VV at pp. 107-08, Ex. UU at pp. 274, 278-79, and the statement about the "tone of the discussion" is inadmissible hearsay pursuant to Fed. R. Evd. 801 and that O'Hara testified in regard to the "general tone" that she did "not recall any specific conversations." Ex. RRR at p. 69.

184.    During the period from September 28, 2005 through September 30, 2005, the management company did not have more than $827,000 in its operating account.

185.    On September 23, 2005, one of the accountants sent Gruss an email stating that the management company was "scraping the barrel" (Brody Decl. Ex. 202), meaning that the funds were very low in the management company's account. (Brody Decl. Ex. 105 at 37:17-19). On September 23, the management company's operating account balance declined from $207,000 to just below $178,000. (Brody Decl. Ex. 133 at 66)

Gruss denied the statement in part and objected in part noting the additional testimony of O'Hara that the SEC does not cite or include is her testimony that the funds would

131

reimburse expenses to the Management Company "on an as-needed basis," Ex. RRR at pp. 38-41, as well her immediately subsequent testimony about how the Management Company would meet upcoming expenses by obtaining reimbursement from the funds for expenses the Management Company had spent on behalf of the funds.

186.  On October 26, 2005 after the airplane deal closed, one of the accountants sent Gruss a spreadsheet specifically stating that the money to the seller ($1,681,350), to Citgroup ($1,900,000), to Merrill Lynch ($80,250), and to PrivatAir ($112,575) had not come from DBZCO. (Brody Decl. Ex. 135). The term "FUND" was used in the "Bank" column of the spreadsheet to indicate that payment "was made by somebody from the fund account, from one of the fund accounts" as distinguished from DBZCO's operating account at Citibank. (Brody Decl. 105 at 64:19 - 65:4).

Gruss has denied the statement in part noting that there is no evidence he ever reviewed the chart or responded to the October 26 email.

187.  On November 9, 2005, one of the accountants sent Gruss an email describing how much cash was available to the management company. (Brody Decl. Ex. 136). The first liability

132

listed was $3.8 million to "repay Onshore Fund for airplane wires." *Id.* On November 10, the accountant sent Gruss a second email stating: "PG — we need to send $3.77mm from the new account where we received the 8.1 mm loan back to the Onshore Fund for reimbursement of the airplane wires." (Brody Decl. Ex. 137).

188. After the plane purchase was completed, Gruss and Law continuously talked about when the Citigroup loan was going to come through so that the funds could be repaid for the money that had been used for the plane. (Brody Decl. Ex. 17 at 96:13 — 97:7).

Gruss has denied the statement in part noting the only conversations Law recalls with Gruss were "after the fact" of the payments from the funds about repaying the two managed accounts and the funds from a loan from Citibank. Law did not recall any conversation with Gruss "prior to November 9th [2005], where . . . [she] actually spoke to him about the fact that the monies had to be repaid for the . . . airplane wires." Ex. BBB at pp. 305-07. Further, Gruss deined that that on November 9, 2005, Gruss was in Hong Kong. Ex. UU at pp. 373-74, and that on cross-examination Law testified that she talked to Gruss "[s]everal times, (as opposed to "continuously talked")

133

but nothing specific," and she could not say if those
conversations occurred in "October or November." Ex. BBB at p.
307.

## Materiality

189.    Sulzberger of PWC, testified that the "impact
on the financial statements" for 2004 and 2005 of the inter-fund
transfers, the early payment of management fees, the use of fund
money for the purchase of the airplane, "certain operational
expenses overcharged by the investment manager to the fund" and
other items "were quantitatively and qualitatively immaterial
both individually and in aggregate with respect to all impacted
periods," and that DBZCO was "not required to restate the 2004
or 2005 financial statements" for the funds. (Ex. Z at pp. 8-11,
72-73, 75, 92, 103, 127, Ex. GG and HH).

The SEC has disputed this statement noting that no
analysis was done to determine whether or not the monthly or
quarterly information provided to investors was materially
impacted by the interfund transfers or any of Gruss' acts, that
PWC's analysis was limited to the annual financial statements,
and that DBZCO's analysis did not only concern the adjustments
relating to the interest due to the Offshore Fund for amounts

134

advanced for the purchases of investments for other funds, the
money advanced for repayment of the credit facility and the
early management fee withdrawals but concerned "all adjustments
the Company is aware of as of the date of this memorandum"
(Gruss Ex. HH at p. 1) and the "all adjustments" included the
net effect of some seventeen individual adjustments, which
included many issues unrelated. (Brody Op. Decl. Ex. E) While
the adjustments for 2005 relating to the interest due to the
Offshore Fund for amounts advanced for the purchases of
investments for other funds, the money advanced for repayment of
the credit facility and the early management fee withdrawals
exceeded $8 million. Further, the net of all of seventeen
adjustments was approximately $6 million and that there was no
separate consideration of the materiality of the adjustments
related to interest due to the Offshore Fund for amounts
advanced for purchases of investments for other funds nor for
the money advanced for repayment of the credit facility and the
early management fee withdrawals. The SEC further noted that
Sulzberger also testified that PWC did not analyze, and did not
have the capability to analyze, whether the Offshore Fund was
materially harmed by the fact that its cash was being used for
the benefit of another fund and, as such, did not have the
ability to use that money to fund its own investments. (Brody
Op. Decl., Ex. F at 186:8-23) Further, in connection with the

135

2006 audit, PWC sent SAS 112 letters to DBZCO for both the
Onshore and Offshore Fund identifying material control
weaknesses. (Brody Decl. Exs. 189-90).

190.    Sulzberger testified that none of the financial
statements for 2004 and 2005 for the Onshore Fund and Offshore
Fund were restated.

The SEC notes that in addition to the issues
identified above, Sulzberger conceded that PWC determined that
there were quantitatively large misstatements in the 2005
financial statements (concerning the transfers between the
Offshore and Onshore Funds), but in light of the fact that
remediation had taken place and in light of the fact that
significant disclosures had been made by the company as to what
misstatements had taken place, no restatement of the financial
statements was necessary.

191.    PWC determined that the inter-fund transfers,
the early payment of management fees and the use of fund money
to purchase the airplane, even when aggregated with other
operational expenses that were allegedly overcharged, were not
material.

The SEC has disputed the statement that many of the "other operational expenses" that PWC considered, in fact, reduced the overall impact to the Fund; as described above, that while the adjustments for 2005 relating to the interest due to the Offshore Fund for amounts advanced for the purchases of investments for other funds, the money advanced for repayment of the credit facility and the early management fee withdrawals exceeded $8 million, the net of all of seventeen adjustments was approximately $6 million. (Brody Op. Decl. Ex. E). The SEC further noted in connection with the 2006 audit, PWC sent SAS 112 letters to DZBCO identifying material control weaknesses at the management company (Brody Dec. Exs. 189-190) stating that:

> the Investment Manager did not maintain and tone and control consciousness to prevent or detect certain instances of inappropriate conduct, and to maintain sufficient accounting records and other documentation to support the fair presentation of the Fund's consolidated financial statements in accordance with ... GAAP and that the letters described how the Investment Manager did not maintain effective controls over certain disclosures in the Fund's consolidated financial statements, including the due to/from affiliates, managements fees, expenses and income tax accounts and PWC concluded that the controls were not designed to ensure the prevention or detection of certain issues, including: (1) improper cash and investment transfers among the funds; (2) premature payment of management fees to the Investment Manager; and (3) the short term use of the Fund's assets for non-Fund related purposes.

192.   PWC reviewed DBZCO's analyses of the Onshore Fund and Offshore Fund funds in accordance with the SEC's Staff

137

Accounting Bulletin "No. 99-Materiality" ("SAB 99") and agreed with DBZCO that the adjustments made to the financial statements for 2004 and 2005 were not quantitatively or qualitatively material and that the financial statements for 2004 and 2005 did not have to be restated. Ex. Z at pp. 68-69 and 103-105.

The SEC has noted that the materiality analysis concerned seventeen separate adjustments, including many unrelated adjustments and there was no separate consideration of the impact to the Offshore Fund relating solely to the interfund transfers, the management fees, and the airplane purchase and with respect to the interfund transfers, which totaled approximately $775 million. Further, the SEC asserted that the only issue that PWC looked at with respect to quantitative materiality was whether the interest that DBZCO determined should have been paid on the interfund transfers would have had a material impact on the Offshore or Onshore Fund. (Brody Op. Decl., Ex. F at 183:9-184:15). The SEC further noted that Sulzberger testified that PWC did not analyze (and did not have the capability to analyze) whether the Offshore Fund was materially harmed by the fact that its cash was being used for the benefit of another fund and, as such, did not have the ability to use that money to fund its own investments (*Id.* at 186:8-23), and the SAB 99 analysis concerned the 2004 and 2005

138

audits; in connection with the 2006 audits, PWC sent SAS 112

letters to DBZCO identifying material control weaknesses at the

management company (Brody Dec. Exs. 189-190), which referred to

the "inappropriate conduct" that took place at the funds, and

containing the statements referred to above and the letters

stated that these were "material weaknesses," which were defined

in the letter as "a control deficiency, or combination of

control deficiencies, that results in more than a remote

likelihood that a material misstatement of the financial

statements will not be prevented or detected." The SEC further

noted investors requested the SAS 112 letters as support for

potential redemption actions. (Brody Decl. Ex. 187).


193.    Sulzberger testified, "SAB 99 represents the

best authoritative literature available for addressing the issue

of materiality and prior period adjustment." Ex. Z at pp. 76-77.


The SEC noted that on its face, SAB 99 relates to

misstatements in financial statements, and provides that the

factors listed therein are "not an exhaustive list of the

circumstances that may affect the materiality of a

quantitatively small misstatement. Among other factors, the

demonstrated volatility of the price of a registrant's

securities in response to certain types of disclosures may

provide guidance as to whether investors regard quantitatively small misstatements as material." (SAB 99, Topic 1: Financial Statements, Section M. Materiality, Subsection 1. Assessing Materiality.) Further, from September 2007 to November 2007, as a result of the disclosures made to the SEC, the investors, and the auditors by DBZCO and the delay in the audit that resulted, there were $1.4 billion in investor redemptions from the funds.

194.    Sulzberger also agreed with DBZCO "that its investors are primarily focused on bottom line fund performance," (Ex. Z at pp. 72-89; 220; Ex. HH at p. 2) and that the threshold of "5 to 10 percent was in line with industry standards and norms for evaluating the quantitative impact on net income and total return" of each fund. (Ex. Z at pp. 80-81, 217, see Ex. GG.) Dr. Bergin compared the funds' returns to standard industry indices - and showed that the DBZCO "hedge fund complex ... generated above-average investment returns for a group of sophisticated investors." Ex. D at p. 8, see also, pp. 30-32 and Bergin stated that "one reason that the flow of funds was so strong into the offshore account" "year after year" was because the Offshore Fund repeatedly earned these above average returns. Exhibit II at p. 294.

140

The SEC noted that Sulzberger testified that he agreed
with DBZCO's view that its investors were focused on bottom-line
performance but also testified that he would not be surprised if
other entities or accounting groups used different thresholds
for hedge funds to determine the materiality of adjustments to
net income and total return. The SEC also noted Dr. Bergin's
report contradicts his assertion that the Offshore fund
"repeatedly earned these above average returns" in that sixteen
of the twenty-four months presented for the period 2004 to 2005,
the S&P 500 and/or the CS/Tremont Multi-Strategy sub-index
outperformed the Offshore Fund (Gruss Ex. D at 33), and over the
twenty-seven month period (January 2004 – May 2006) analyzed in
Dr. Bergin's report, a $100 investment in the Offshore Fund
would have grown to $125.11 and that the same $100 investment
growing to $124.03 in the C/S Tremont Multi-Strategy sub-index
and $122.81 in the S&P 500 (Gruss Ex. D at 40), and that Dr.
Bergin's report stated the Offshore Fund returned only 1% more
than the CS/Tremont Multi-Strategy sub-index and 2% more than
the S&P 500.

195.    As to the qualitative analysis using the
standards of SAB 99, PWC agreed with DBZCO that (1) "most of the
errors are subject to reasonably precise measurement," (2) "the
errors in question had virtually no impact on the trend of any

141

of the relevant measures," (3) "the errors in question do not impact whether the fund's performance was greater than or less than the performance' of various [market] indices that "certain of its investors could" have used, (4) "none of the misstatements individually or in aggregate changes a loss into income or vice versa for any annual period," (5) each "fund has been assessed on a standalone basis and that there are no segments within the fund," (6) the "adjustments are not concentrated in any individual significant strategies utilized by the management company," (7) "there are no regulatory thresholds that were affected by the recording of these misstatements and the fund's financial statements," (8) "the misstatements in question do not affect the company's compliance with loan covenants or other contractual requirements," (9) "the impact on the management incentive fees overall is a \$233,000 decrease in compensation," (10) "insufficient evidence exists to conclude that these matters and the errors in question were the result of an attempt to conceal unlawful transactions," (11) "the related party elements of these adjustments [did not] result in any of these adjustments being qualitatively material," and (12) that "there are no other qualitative aspects of these adjustments that would make them material in any of the financial statements for any of the periods in questions." Ex. Z at pp. 89-102; Ex. GG and HH.

The SEC has noted that SAB 99 relates to misstatements in financial statements and provides that the factors listed therein are "not an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement" and that, among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material." The SEC further noted that from September 2007 to November 2007, as a result of the disclosures made to the SEC, the investors, and the auditors by DBZCO (concerning the issues alleged in the SEC's complaint), and the delay in the audit that resulted, there would be $1.4 billion in investor redemptions from the funds (Zwirn Affiavit at ¶14) and that in connection with the 2006 audits, PWC sent SAS 112 letters to DBZCO identifying material control weaknesses at the management company and the letters repeatedly referred to the "inappropriate conduct" that took place at the funds, explicitly stating that "the lack of an effective control environment allowed the Investment Manager's former Chief Financial Officer [Gruss] to engage in inappropriate conduct that resulted in certain transactions not being properly reflected on the Fund's consolidated financial statements." (Brody Decl. Ex. 189-190).

143

196.    PWC's worksheets identified numerous material weaknesses, including: (1) controls, policies and procedures may not have been sufficiently designed or in operation regarding the movement/use of cash between the funds and the proper accounting treatment for these transactions; (2) "tone at the top" – the former CFO did not appear to have focused on ensuring adequate design and operating effectiveness of internal control over financial reporting. Also the former CFO appeared to lack the willingness to deliver "bad news" to the managing partner. This led to a control environment in which accounting adjustments were viewed at times as an acceptable device to compensate for operational shortfalls which, in certain instances, led to inappropriate accounting decisions and entries that appear to have been largely motivated to achieve desired accounting results, as well as management override of controls; and (3) management override and inadequate antifraud programs and controls, there were various instances of the former CFO performing inappropriate transactions to "manage" liquidity concerns and, in some instances, accounting irregularities were brought to his attention and he did not take appropriate action to investigate and correct for them. (Brody Decl. Ex. 188).

144

Gruss has objected to the statement noting that any alleged material weaknesses are irrelevant and inadmissible hearsay and that after concluding its 2006 audit, which included reviewing the funds' financial statements for 2004 and 2005, PWC did not find any fraud and concluded there was no reason to restate the financial statements of the Onshore Fund and Offshore Fund for 2004 and 2005. Ex. CCC at pp. 68-70.

197.   Using the interest rate relied upon by Deloitte ("Greater of (i) short term monthly applicable funds rate or (ii) the fed fund rate plus 25 basis points" Ex. JJ at p. 11), Gruss asserted that if the Offshore Fund had not advanced the $126,896,039 to the Onshore Fund for the purchase of investments for which it does not appear the Offshore Fund ever received any participation, the Offshore Fund's Net Profit in 2004 would have increased by 0.01%, the Offshore Fund's Net Profit in 2005 would have increased by 0.43%, and the Offshore Fund's net profit in 2006 would have increased by 0.18%. Annexed as Gruss Dec. Ex. F is a spreadsheet showing the interest calculated for the 27 cash transfers from the Offshore Fund to the Onshore Fund amounting to $126,896,039 and representing transfers for the purchase of 21 investments for which there is no evidence of Offshore Fund participation in the 21 investments associated with those 27

145

cash transfers. Gruss Dec., ¶¶ 12 -14; Gruss Dec. Ex. G; Gruss
Dec. Ex. H.

The SEC has noted that the underlying assumption that
it is correct to limit the interfund transfers to approximately
$127 million is baseless. The SEC does not claim that the
"interest" that was not paid on the interfund transfers is not
in and of itself why the interfund transfers were material.
Instead, the SEC noted that the Interfund Transfers were
material for numerous reasons, including: the total volume of
the interfund transfers relating to the funding of the Onshore
Fund's investments exceeded $500 million, and the transfers to
allow the Onshore Fund to repay its credit facility totaled $273
million so that amounts outstanding at various dates were
material (as an example, the Offshore Fund had AUM of $1.6
billion in March 2006 (Brody Decl., Ex. 10), and the $175
million balance owed to the Offshore Fund for transfers related
to the credit facility (Brody Decl. Ex. 91 at 19) amounted to
more than 10% of AUM.

The money that was transferred to the Onshore Fund or
directly to the investment could have been used for the direct
benefit of the Offshore Fund; the transfer of this money to the
Onshore Fund or directly to the investment (which included US

146

real estate investments and other US businesses) exposed the
Offshore Fund investors to US tax liability which PWC estimated
would be approximately $250 million and while DBZCO's managing
director of tax believed that the amount would be closer to $100
million even he thought that "it would still be devastating"
(Brody Decl. Ex. 191 at 463); PWC believed that these transfers
resulted from material control weaknesses at the management
company (Brody Decl. Exs. 189-190); and (5) investor reaction,
including mass redemption requests demonstrated the materiality
of these transfers, $1.4 billion in investor redemptions between
September 2006 and November 2007 and eventually redemptions in
excess of $2 billion. (Affidavit of Daniel Zwirn at ¶14).

        198.    The second group of inter-fund transfers
charged in the complaint were the "$273 million in transfers
between March 2004 and July 2006 from the Offshore Fund to repay
the revolving credit facility of the Onshore Fund." Ex. N at ¶3.
Applying the same interest rate used by Deloitte to the funds
the Offshore Fund advanced to the Onshore Fund for the payment
of Onshore Fund's obligation to the revolving credit account, if
the Offshore Fund had not advanced those funds to the Onshore
Fund to repay the revolving credit facility, the net profit in
2005 for the Offshore Fund would have increased by 0.92%, and
the net profit in 2006 would have increased by 1.83%.

The SEC has noted that the Interfund Transfers were material for numerous reasons, including: (1) the total volume of the interfund transfers relating to the repayment of the revolving credit facility was more than $270 million, which was a material amount; (2) the money that was transferred to the Onshore Fund to repay the revolving credit facility could have been used for the direct benefit of the Offshore Fund; (3) the transfer of this money to the Onshore Fund exposed the Offshore Fund investors to US tax liability which PWC estimated would be approximately $250 million and while DBZCO's managing director of tax believed that the amount would be closer to $100 million even he thought that "it would still be devastating" (Brody Decl. Ex. 191 at 463); (4) PWC believed that these transfers resulted from material control weaknesses at the management company (Brody Decl. Exs. 189-190); (5) in the absence of this money being transferred to the Onshore Fund, the Onshore Fund would not have been able to repay the revolving credit facility (Brody Op. Decl., Ex. C at 147:4-9); and (6) investor reaction, including mass redemption requests after DBZCO's disclosures to the investors, the SEC, and the auditors as well as the delay in the audit which resulted from such disclosures.

199. At the end of October 2006, DBZCO reached out to investors to inform them of certain of the improper actions that had taken place at the funds. These calls were followed up with a November 3, 2006 memorandum to investors that explained that DBZCO was conducting an internal review. Gruss has objected to the statement on the ground that the November 3, 2006, memo from DBZCO to investors is inadmissible hearsay and the results of DBZCO's internal investigation consist of hearsay upon hearsay and are inadmissible, *U.S. Reyes*, 239 F.R.D. 591, 600 (N.D. Ca. 2006), and what the investors were told is irrelevant.

200. In its Q4 2006 letters to the Offshore and Onshore Fund investors, DBZCO stated "[a]s you know, we communicated with you in Q4 2006 regarding certain issues affecting our Firm. At that time, we informed you that we were taking significant, carefully-coordinated steps to resolve these issues, including an internal review in consultation with external lawyers and an external review by independent lawyers and accountants ('the Independent Review'). We also informed you that we took the additional step of informing the S.E.C. of these issues, as well as the actions the Firm was taking to address them, including the Independent Review." (Brody Decl. Ex. 175 at 8865; Ex. 176 at 86). Gruss has objected to the statement noting that the Q4 2006 letters to the Offshore and

149

Onshore investors are inadmissible hearsay and what the investors were told is irrelevant to any of the issues in this case.

201.  On March 27, 2007, DBZCO sent a memorandum to investors reporting the completion of the independent review. Gruss has objected to the statement on the ground that the March 27, 2007 memorandum to investors is inadmissible and what the investors were told is irrelevant to any of the issues in this case.

202.  The memorandum explained that the "exhaustive" review had cost the management company over $20 million in professional fees to date. (Brody Decl. Ex. 177). Gruss has objected to this statement as the March 27, 2007 memorandum to investors is inadmissible hearsay, and on the ground that what the investors were told are irrelevant.

203.  The memorandum reported that there were "numerous inter-fund transfers" where the Offshore Fund and another managed account "frequently made advances" to the other funds and managed accounts "and those advances were used to fund investments. These inter-fund transfers were not properly accounted for and documented." (Brody Decl. Ex. 177). Gruss has

objected to the statement asserting that the March 27, 2007
memorandum to investors as inadmissible hearsay, that the
advances from the Offshore Fund to the Onshore Fund were
accounted for to the penny in DZPRIV and the funds' balance
sheets, see ¶¶ 41-46 of Defendant Gruss' Statement of Undisputed
Material Facts Pursuant to Local Civil Rule 56.1, and that what
the investors were told is irrelevant.

204.   The memorandum further reported that the amounts
currently due from the Onshore Fund to the Offshore Fund and a
managed account "are in excess of $100 million." (Brody Decl.
Ex. 177). Gruss has objected to the statement on the ground that
the March 27, 2007 memorandum to investors as inadmissible
hearsay and that what the investors were told is irrelevant to
any of the issues in this case.

205.   Investors believed that these disclosures were
material. One investor wrote following a November 7, 2006
conference call with DBZCO: "DB Zwirn have verbally advised us
... of a number of accounting errors that they have identified
prior & subsequent to the departure of their CFO in early
October 2006. The errors involve the transfer of an asset from
one fund to another without $8 million of associated interest, a
management fee drawn down before its due date and some expenses

151

incorrectly booked. . . . This disclosure does, of course, raise questions as to the overall integrity of their accounting. . . . Given the circumstances, we have reduced our Competence operational rating to a D, and would recommend that clients do not consider new or additional investments until these issues are resolved." (Brody Decl. Ex. 178).

Gruss has denied and has objected asserting that the investor documents are irrelevant and are inadmissible hearsay and that as to redemption, the full statement in Zwirn's Affidavit is that "[a]s a result of the disclosure that the DBZCO made to the SEC, investors in the funds, and auditors, as well as the significant delay in the audit, there were $1.4 billion in investor redemptions from the Funds between September 2006 and November 2007." Zwirn Affidavit, ¶ 14. Gruss further has noted that in a press report from the Financial Times of February 22, 2008, Zwirn is reported as saying that only "the delayed audit drove the redemptions," Ex. TTT, further confirmed by his statement reported in a July 9, 2007, DZBCO Memo of a Status Meeting with Dan Zwirn, Senator Rudman, and Other Members of Senior Management that "DZ [Daniel Zwirn] has heard from several investors who have stated their wish to invest more money once the 2006 financial statements are issued." Brody Decl, Ex. 192 at p. 6.

152

206.   On January 26, 2007, DBZCO received a letter from HCM/Z terminating the advisory agreement for its managed account. An April 11, 2007 follow-up letter confirmed that HCM/Z "had terminated [DBZCO] for improper activities . . . ." (Brody Decl. Ex. 180). Gruss has objected to the statement noting that the investor letters are irrelevant and inadmissible hearsay.

207.   On November 3, 2006, DBZCO received a letter from an investor stating that a $5 million investment made on October 1, 2006 should be immediately rescinded. "[S]imply stated, [the investor] would not have made the $5 million investment in the Fund on October 1, 2006 had the Fund disclosed to [the investor] (i) the recent termination of the Chief Financial Officer and the reasons therefor, as expressed to me during my telephone conversation with a representative of the Fund on Sunday evening, October 29, 2006 ...." (Brody Decl. Ex. 181). Gruss has objected to the statement as inadmissible hearsay and irrelevant.

208.   During the summer of 2007, DBZCO had several meetings with PWC concerning the potential tax liability resulting from the interfund transfers.

153

Gruss has denied this statement and objected to it noting that any meetings between PWC and DBZCO concerning the potential tax liability resulting from the inter-fund transfers are irrelevant.

209.   In June 2007, PWC held a conference call with one of the directors of the Offshore Fund as well as with several individuals from DBZCO during which they discussed the potential tax liability to the Offshore Fund because of the interfund transfers.

Gruss has denied this statement and objected to it noting that the conference call in question is irrelevant and the discussions referenced in the conference call are inadmissible hearsay.

210.   One of the tax partners from PWC expressed that "taxes were 'a significant issue' and that certain transactions could possibly give rise to making the Offshore Fund a 'taxable business.'" (Brody Decl. Ex. 191 at 463). This partner estimated that the tax liability that would result would be about $250 million. DBZCO's managing director of tax thought that the amount would be closer to $100 million "but it would still be 'devastating.'" *Id.*

154

Gruss has denied this statement and objected to it noting that the statements by the PWC partners are inadmissible hearsay, and are contrary to the subsequent testimony of PWC. Further Gruss asserted that PWC ultimately "recognized" that the taxability of the inter-fund transfers "was an issue" but it "concluded that it met the accounting criteria for not being recognized in the financial statements based upon all the work we [PWC] did, which included an opinion of [the law firm of] Clifford Chance." (Ex. CCC at pp. 235-36.) As a result of the Clifford Chance tax opinion, Gruss asserted that PWC did not do "anything" "to change any of the accounting for the Onshore Fund or Offshore Fund for the years 2004 to 2006" or create "any restatements of the financial statements for the Onshore Fund or the Offshore Fund from 2004 to 2005," *Id.* at pp. 106-111, and that PWC's review of the Clifford Chance opinion did not "have any impact on the financial statements for the Onshore Fund or the Offshore Fund for 2006." *Id.* at 110.

211.  In July 2007, PWC held another meeting with personnel from DBZCO, including Zwirn and other members of senior management, during which it was discussed that Schulte Roth & Zabel, DBZCO's main corporate law firm, was not willing

155

to provide an opinion letter that it was more likely than not that there would not be any tax liability.

Gruss has denied this statement and objected to it noting that the meeting in question is irrelevant in light of PWC's that Clifford Chance's opinions referenced in the memorandum and it is inadmissible hearsay and the memorandum does not state "that Schulte Roth & Zabel, DBZCO's main corporate law firm, was not willing to provide an opinion letter," rather it recites the triple hearsay statement of an individual not present at the meeting that Schulte "continues to be unwilling to provide a 'more likely than not' written opinion" and speculation that "Schulte may not be willing to provide even an oral 'view' on the ECI tax issue" and recites the hearsay statement of an unidentified PWC person who "confirmed that, in our experience, it is not uncommon for corporations to obtain more than one opinion on a significant complex tax matter such as this."

212. On April 10, 2008, counsel for DBZCO informed the Commission that DBZCO obtained an opinion letter from the law firm Clifford Chance on the issue of whether it was more likely that not that the interfund transfers would cause the Offshore Fund to be treated as engaged in a U.S. federal or

state and local trade or business activity. DBZCO, however,
asserted the work-product privilege with respect to this opinion
letter and withheld it from production.

Gruss has objected to the statement on the grounds
that the conversation in question between counsel for DBZCO and
the SEC is irrelevant to the issues in this case and is
inadmissible.

**CONCLUSIONS OF LAW**

The Applicable Standards

Summary judgment is appropriate only where "there is
no genuine issue as to any material fact and ... the moving
party is entitled to a judgment as a matter of law." Fed. R.
Civ. P. 56(c). A dispute is "genuine" if "the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986). The relevant inquiry on application for summary
judgment is "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of law." *Id.*
at 251-52. A court is not charged with weighing the evidence

and determining its truth, but with determining whether there is

a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y.*

*City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990)

(quoting *Anderson*, 477 U.S. at 249). "[T]he mere existence of

some alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine issue of material fact*."

*Anderson*, 477 U.S. at 247-48 (emphasis in original).


        Section 206(1) of the Advisers Act makes it unlawful

for an investment adviser to employ "any device, scheme, or

artifice to defraud any client or prospective client," and

Section 206(2) further prohibits an investment adviser from

engaging in any "transaction, practice, or course of business

which operates as a fraud or deceit upon any client or

prospective client." U.S.C. §§ 80b-6(1), (2). These provisions

"establish[] federal fiduciary standards to govern the conduct

of investment advisers." *Transamerica Mortg. Advisers, Inc. v.*

*Lewis*, 444 U.S. 11, 17 (1979). Given the "delicate fiduciary

nature of ... [the] investment advisory relationship," Section

206 places "an affirmative duty" on advisers to act with the

"utmost good faith, and [with] full and fair disclosure of all

material facts, as well as an affirmative obligation to employ

reasonable care to avoid misleading." *SEC v. Capital Gains*

*Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Bullmore v. Bank of Am. Sec., LLC*, 485 F. Supp. 2d 464, 470-71 (S.D.N.Y. 2007) ("[I]nvestment advisers owe fiduciary duties to their clients" arising from "discretion to manage the client's investment"). Thus, under Section 206 "it is not necessary ... to establish all the elements of fraud that would be required in a suit against a party to an arm's length transaction." *Aaron v. SEC*, 446 U.S. 680, 693 (1980); see also Capital Gains, 375 U.S. at 194 ("Congress ... did not intend to require proof of ... actual injury to the client.").

　　　　The elements of a primary violation of Section 206(1) and (2) "have been interpreted as substantively indistinguishable from Section 17(a) of the Securities Act." *SEC v. Meltzewrco Advisers Fund Mgmt. LLC*, 341 F.Supp.2d 454, 470 (S.D.N.Y. 2004) (citing *SEC v. Moran*, 922 F. Supp. 867, 896-97 (S.D.N.Y. 1996)), with one exception. While Section 206(1) requires proof of fraudulent intent, negligence is sufficient to establish a violation of Section 206(2). *Aaron v. SEC*, 446 U.S. 680, 691-93, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *SEC v. DiBella*, 587 F.3d 553, 569 (2d Cir. 2009).

The SEC's Motion for Summary Judgment that Section 206(2) Was
Violated is Granted

Section 206(2) Is Applicable Because DBZCO Was an Investment
Advisor under Section 206(2) of the Advisers Act Owing Fiduciary
Duties to Its Investors and Used Instrumentalities of Interstate
Commerce

Section 206 applies "to all investment advisers,
whether or not such advisers were required to register under
§ 203 of the Act." *Transamerica Mortg. Advisers, Inc. (TAMA) v.
Lewis*, 444 U.S. 11 (1979); *SEC v. Gruss*, 859 F. Supp. 2d 653,
663 (S.D.N.Y. 2012). Section 202(a)(11) of the Investment
Advisers Act defines an "Investment Adviser" as "any person who,
for compensation, engaged in the business of advising others ...
as to the value of securities or as to the advisability of
investing in, purchasing, or selling securities ...."

Gruss admits in his answer to the SEC's complaint that
DBZCO was an investment advisor. (56.1 at ¶ 1). DBZCO was an
investment advisor because it received fees from the Offshore
and Onshore Fund pursuant to the management agreement. The
management agreements between the funds and DBZCO explicitly
appointed DBZCO as the "investment adviser" to make all
investment decisions in exchange for the management fee. (56.1
at ¶¶ 56-59).

160

Second, DBZCO "used the mails or any other means or instrumentality of interstate commerce, directly or indirectly." *S.E.C. v. Bolla*, 401 F.Supp.2d 43, 67 (D.D.C. 2005). DBZCO used instrumentalities of interstate commerce when making investments, paying the revolver, and communicating with investors. For example, some investments owned by the Onshore Fund, but ultimately paid for by the Offshore Fund were loans that included 11 U.S. real estate deals. Purchasing these properties involved instrumentalities of interstate commerce, as was communication with Offshore investors about loan origination and tax issues.

## DBZCO Violated Its Fiduciary Duty by Transferring Funds from the Offshore Funds to Meet the Onshore Fund's Obligations

Section 206(2) "establishes federal fiduciary standards to govern the conduct of investment advisers." *Transamerica Mortg. Advisers, Inc. v. Lewis*, 444 U.S. 11, 17 (1979). Given the "delicate fiduciary nature of ... [the] investment advisory relationship," Section 206 places "an affirmative duty" on advisers to act with the "utmost good faith, and [with] full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable

161

care to avoid misleading." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Bullmore v. Bank of Am. Sec., LLC*, 485 F. Supp. 2d 464, 470-71 (S.D.N.Y. 2007) ("[I]nvestment advisers owe fiduciary duties to their clients" arising from "discretion to manage the client's investment").

While DBZCO had wide discretion and great authority in making invest decisions, it was not permitted to loan material sums in excess of 5% of Assets Under Management from the Offshore Fund to the Onshore Fund absent approval of an independent third party. Gruss does not argue that 66 transfers he authorized from the Offshore to the Onshore Fund were proper loans with the required approvals. Instead, Gruss argues that these transactions were not loans because they were inter-fund transfers. Despite this attempt to re-characterize the transactions, they were loans and therefore violated the Offering Documents and DBZCO's fiduciary duties.

1) The Offshore Fund Was Prohibited from Making Investments in or Loaning Money to US Companies (Including the Onshore Fund)

The Offering Memorandum stated that "the [Offshore] Fund intends to operate and structure its investments in a manner such that it should not be deemed to be engaged in a U.S.

162

trade or business" that "actively originating loans within the
U.S." might create adverse tax consequences and that "certain
investments by the [Offshore] Fund could result in the
[Offshore] Fund being deemed engaged in a U.S. trade or
business, including direct investments by the [Offshore] Fund in
U.S. real estate" and that "the [Offshore] Fund ... will
generally not invest in leased equipment and other assets such
as real estate or make direct loans to or otherwise engage in
the active management of a U.S. company." (FOF at ¶23.)


        The Offshore Fund could not invest in or make direct
loans to a US company because the purpose of the Offshore Fund
was to create an investment vehicle that would not be subject to
U.S. taxes. A representation letter to the auditors for all of
the Offshore Funds managed by DBZCO, signed by Gruss and Zwirn
stated: "[t]he Funds have structured their operation in order
that it will not be deemed to be engaged in a trade or business
within the U.S. for purposes of U.S. federal tax laws." (FOF at
¶29.) Further, the Offering Memorandum explained "a non-U.S.
corporation engaged in a U.S. trade or business is subject to a
'branch profits' tax equal to 30% of the amount of its U.S.
earning which are not reinvested in U.S. assets." (FOF at ¶30.)
In order to avoid these taxes, "the [Offshore] Fund intends to
operate and structure its investments in a manner such that it

163

should not be deemed to be engaged in a U.S. trade or business."
*Id.*

Gruss conceded it was well-known that a transfer from the Offshore Fund to the Onshore Fund would raise ECI and "trade or business concerns" because they could be construed as a foreign entity engaging in a trade or business in the US. (FOF at ¶23.)

The Operating Documents presented a conflict: while inter-company transfers were permitted, loans to U.S. companies were not permitted. Gruss seeks to avoid liability by characterizing the transfers as permitted inter-company transfers rather than loans to the Onshore Fund. Yet in 14 instances these transfers included commitments for direct investment in U.S. real estate investments and the other transactions also put the Offshore Fund at risk for ECI consequences in violation of the Offering Memorandum. Despite Gruss' attempt to characterize these transactions as interfund transfers, the reality of the practice was that they were loans from the Offshore Fund to the Onshore Fund to be paid back at a later date in violation of DBZCO's fiduciary duties to its investors.

164

Gruss has cited the Offering Memorandum that described certain conflicts that can arise from the practice of cross trading – "i.e. the Manager effects a trade or a loan between the Fund and another investment fund or account that it or its affiliates manage" (FOF at ¶24) but omits the remainder of the paragraph, which continues: "The U.S. Fund may assign or participate out certain of the loans that it makes, or portions thereof, to other entities, including to the Fund or to its affiliates. Assignments of participations to the Fund or its affiliates will be at fair market value and will be subject to approval by an independent third party, and will be made sometime after the initial date of the debt investment." (Ex. M at p. 52 (DBZ 0009878).) Gruss also cited language from the Management Agreement to show that the DBZCO had broad discretion concerning what investments it would make for the Offshore Fund. The Management Agreement specifically states, however, that the Offshore Fund "desires to employ its capital by investing and reinvesting in securities and other instruments as specified in the [Offering Memorandum]." (FOF at ¶26.) The provisions with respect to conflicts and investment discretion do not overcome the bar against investment in a U.S. company.

Since the Offshore Fund was prohibited from engaging in a specific type of transaction – lending money to a U.S.

company – Gruss' inter-company transfer characterization renders this prohibition meaningless. As a general rule, an interpretation should be avoided that would result in an inconsistency between provisions or that would render a particular provision superfluous. See *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 102 (2d Cir. 2007), cert. den., 522 U.S. 1295 (2008) ("no provision of a contract should be left without force and effect"). Moreover, a basic principle of construction is that particular language prevails over general language in determining the meaning of a provision. See *Sompo Japan Ins. Co. of Am., v. Norfolk S. Ry. Co.*, 762 F.3d 165, 179 (2d Cir. 2014) ("a specific contract provision should prevail over a general one"); *United States v. Local 6A, Cement & Concrete Works, Laborers Int'l Union of N. America*, 832 F. Supp. 674, 679-80 (S.D.NY. 1993). The specific limitation that the Offshore Fund would not loan money to a U.S. company prevails over the general provisions that the funds might transact with each other.

In the Gruss motion for summary judgment, he relies on expert opinions of Dr. Bergin. However, "the question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony." *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d

166

505 (2d Cir.), cert. den. 434 U.S. 861 (1977). Dr. Bergin's opinion that the interfund transfers did not violate the Operating Documents is a legal conclusion and is excluded. *U.S. v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("this Court requires the exclusion of testimony which states a legal conclusion").

## 2) The Offshore Fund Was Prohibited from Making Payments to the Onshore Fund (or Directly to Its Creditors) for Its Revolving Credit Facility

As set forth in the facts above, the Offshore Fund transferred money to the Onshore Fund so that the Onshore Fund could repay its obligations under a 75-day revolving credit line (the "Revolver"). (FOF at ¶116.) The four transfers to pay the Revolver violated the prohibition in the Offering Documents against making loans to US companies.

On four occasions (June 13, 2005, January 9, 2006, March 3, 2006, and May 26, 2006), Gruss caused money from the Offshore Fund to be transferred to the Onshore Fund to repay the Onshore Fund's Revolver. (SEC's Rule 56.1 Statement at ¶¶88, 93, 96, 98.) The June 13, 2005 transfer was not fully repaid until December 23, 2005. (SEC 56.1 at ¶92.) The January 9, 2006 transfer was not fully repaid until November 6, 2006. (SEC 56.1

at ¶95.) The March 3 and May 26, 2006 transfers were not fully
repaid until November 27, 2006. (SEC 56.1 at ¶¶97, 100.)

DBZCO witnesses testified that the Offshore Fund
transferred money to the Onshore Fund for the Revolver because
of the cash problems described above. As Law testified:
"Basically the CDC line expires or matures every set amount of
time, I can't remember, but maybe, for example, we say every
three months. And then at the end of the three months, the whole
amount has to be repaid to the CDC, and then CDC would
immediately re-lend it back to us again. So there were some
times where the Onshore Fund did not have the – enough funds to
pay that amount to the ... CDC, so the Offshore Fund would pay
for the 50 million or whatever was outstanding at the time."
(FOF at ¶117.)

Each of these transactions violated the Offering
Documents because they provided that "the [Offshore] Fund ...
will generally not invest in ... other assets such as real
estate or make direct loans to or otherwise engage in the active
management of a U.S. company." (FOF at ¶23.) Yet on June 13,
2005 at 08:20 a.m., Wu sent an email to ABN Amro with the
subject line "Wire from #***599 -- CDC." (FOF at ¶118.) The
email contained instructions to ABN Amro to transfer $78,000,000

168

from "#***600" to "#***599" and then to wire $80,000,0000 from

"#***599" to Citibank New York. (FOF at ¶118.) When Gruss

approved this transaction, he authorized making a direct loan

from the Offshore Fund to the Onshore Fund for $78,000,000. Law

sent Gruss a spreadsheet on November 22, 2005 showing that the

Onshore Fund owed the Offshore Fund $77,845,541.65, which is

further evidence that functionally this was a loan, particularly

because these "transfers" were not repaid for many months. (FOF

at ¶119.)


        Further, treating these four loans from the Offshore

Fund to the Onshore Fund to pay down the Revolver as loans, they

were not approved by a third party as required by the Offering

Documents. The Offering Memorandum provided that "the Fund will

not be permitted to purchase interests in loans originated by

the U.S. Fund or its affiliates unless an independent party

approves the purchase." (FOF at ¶32.) Yet Gruss did not obtain

third party approval for these four loans in violation of this

requirement.

3) The Breaches of the Fiduciary Duty by Making Loans from the Offshore Fund to the Onshore Fund for Investments and the Revolver Were Material

To be material, "information need not be such that a reasonable investor would necessarily change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering to total mix of information available." *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (internal citations omitted). From at least March 2004 through May 2006, Gruss authorized the Offshore Fund to transfer money to the Onshore Fund to fund sixty-six of the Onshore Fund's investment commitments and four transfers to fund required payments for the Onshore Fund's Revolver loan without disclosing these loans to the Offshore Fund's investors.

The investors in the Offshore Fund were in a fiduciary relationship with DBZCO, which places "an affirmative duty" on advisers to act with the "utmost good faith, and [with] full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Bullmore v. Bank of Am. Sec., LLC*, 485 F. Supp. 2d 464, 470-71 (S.D.N.Y. 2007). Under 206(2), "an investment advisor can avoid committing fraud on its clients by disclosing material

information to them." *SEC v. DiBella*, 587 F.3d 553, 568 (2d Cir. 2009). Here, DBZCO violated those fiduciary duties when they did not make full and fair disclosure of the material fact that Offshore funds were being used to fund Onshore investment commitments and the Revolver to compensate for the cash flow issues the Onshore fund was experiencing. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. at 194.  Obviously such disclosure would have been problematic.

DBZCO's disclosures were not full and fair about how the Onshore Fund investments were funded. In some cases, the money went from the Offshore Fund to the Onshore Fund, which then sent the money to the investment and more often, however, the money went directly from the Offshore Fund to the investment. The practice started when Wu, the controller for the funds, met with Gruss to discuss how to address the inability of the Onshore Fund to meets its commitments. (FOF at ¶56.) Gruss told Wu that since the Onshore Fund would have new subscriptions coming in over the following weeks, they could take the money from the Offshore Fund and repay the Offshore Fund when the new investor money came in. *Id.*

The SEC has established that DBZCO's failure to disclose to the investors that using the Offshore account to

171

fund Onshore investments and the Revolver would be a material fact to a reasonable investor. Other courts have found that "a reasonable factfinder could conclude that it is material that the advisors of the Fund used Fund assets for purposes other than for the benefit of the Fund." *SEC v. Mannion*, 789 F. Supp.2d 1321, 1341 (N.D. Ga. 2011). Here, Gruss was using Offshore Funds for purposes other than the benefit of the Offshore Fund and did not disclose it to the investors. In fact, DBZCO represented to investors in the offering memorandum, in quarterly investor letters, in due diligence meetings with investors and potential investors, and in management representation letters to its auditor, that the Offshore Fund was not going to lend money to any U.S. company in order to avoid the potential of being found to have engaged in a U.S. trade or business, which would result in it being subject to U.S. taxes. Had the investors known about these loans both for investments and the Revolver, it would have had the effect of "significantly altering to total mix of information available" to the investors. *SEC v. Mayhew*, 121 F.3d at 52.

Although Gruss notes that PWC, the auditors for the funds, concluded that the impact of the loans were not material, PWC did determine that there were material control weaknesses at DBZCO and sent SAS 112 letters to DBZCO for each of the funds.

172

The SAS 112 letters repeatedly referred to the "inappropriate conduct" that took place at the funds, explicitly stating that "the lack of an effective control environment allowed the Investment Manager's former Chief Financial Officer [Gruss] to engage in inappropriate conduct that resulted in certain transactions not being properly reflected on the Fund's consolidated financial statements." (FOF at ¶195.) The SAS 112 letters further stated that the controls "were not designed or operating effectively to ensure the protection of or detection of (i) improper cash and investment transfers among the Fund and the Other Accounts, ... (iii) the premature payment of management fees to the Investment Manager, (iv) the short term use of an affiliated fund's assets for non-fund related purposes, ... and (iv) the improper reconciliation of cash, brokerage and inter-company accounts." (FOF at ¶191.) The letters stated that these were "material weaknesses," which were defined in the letters as "a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the financial statements will not be prevented or detected." (FOF at ¶192.) Investors requested the SAS 112 letters as support for potential redemption actions. (FOF at ¶192.) PWC did not opine on the issue presented here, the effect of the loans on the prohibition against investment in U.S. companies.

173

Therefore the loans from the Offshore to the Onshore Fund for investments and the Revolver were material because they exposed the Offshore Fund and its investors to increased U.S. tax risk. As one commentator has recently described: "[s]hort of a tornado or cataclysmic earthquake obliterating midtown Manhattan or Greenwich, CT, there is little that offshore fund managers fear more than the specter of their funds being treated as engaged in a United States trade or business. This fear is well-grounded; the incremental tax that results from this treatment may exceed 50 percent." John Kaufmann, Effectively Connected Income: A Close Look At The Rules, Law 360 (September 11, 2015, 11:45 AM), https://www.law360.com/articles/701645/effectively-connected-income-a-close-look-at-the-rules. In fact, DBZCO understood this fact well when it said that: "[t]he fund is mindful of [sic.] Offshore Fund can't be in the business of originating to US companies otherwise it would be subject to 54.5% US tax rate." (FOF at ¶35.)

In a June 22, 2007 meeting between DBZCO, its auditor PWC, and a director for the Offshore Fund, Gina Biondo ("Biondo") (PWC's leader of its New York Asset Management Tax Practice) provided a summary of the tax issues, telling the

174

Offshore Fund Director "that taxes were a 'significant issue' and that certain transactions could possibly give rise to making the [Offshore Fund] a 'taxable business.' [Biondo] explained that historically the Fund has not been subject to tax and this issue could subject the Fund to an exposure of a 55% tax rate." (Brody Decl., Ex. 191 at PwC-DBZSAS112-00463.) PWC estimated this tax liability to be $250 million. (FOF at ¶197.) While DBZCO's own tax director suggested that the liability might only be $100 million, even he concluded that the lower amount would be "devastating" to the Offshore Fund. (FOF at ¶197.)

These potential consequences to investors explain why DBZCO emphasized in the offering materials for the Offshore Fund (as well as in other communications with investors) that the Offshore Fund would not engage in a U.S. trade or business also demonstrates the materiality of the interfund transfers. These transactions were material because a reasonable investor would have thought their risk of adding a 54.5% tax liability would have "significantly alter[ed the] total mix of information available" to investors. *SEC v. Mayhew*, 121 F.3d at 52.

The general rule is that materiality in the context of a Section 206(2) claim is a fact-intensive inquiry that will be left for the jury to determine. However, "the ultimate issue of

175

materiality [may be] appropriately resolved as a matter of law"
when "the established omissions are so obviously important to an
investor that reasonable minds cannot differ on the question of
materiality...." *TSC Industries, Inc. v. Northway, Inc.*, 426
U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); see also
*Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). For the
reasons that follow, the omissions in this case were obviously
material to a reasonable investor.

DBZCO utilized Offshore Fund money at least sixty-six
times to pay for commitments of the Onshore Fund to pay for
other funds managed by DBZCO and four times to pay down the
Onshore Fund's commitments through its Revolver. A reasonable
factfinder would find it material that "fund assets were being
used to purchase stock for others at the fund's expense, even if
that money was later repaid." *I-Enterprise Co. LLC v. Draper
Fisher Jurvetson Management Co. V, LLC*, No. C-03-1561 MMC, 2005
WL 3590984, at *22, (N.D.Cal. Dec. 30, 2005). Similarly here,
Gruss argues that the Onshore Fund later repaid the Offshore
Fund negating any materiality of the transactions. However, it
would have been material to the Offshore Investors because any
of the commitments of Offshore Fund money to pay for Onshore
Fund investments could have subjected the Offshore Fund to US

176

taxes. This was "obviously important" to the investors because of the substantial potential tax consequences discussed above.

In addition to the nature of the transactions being material to investors, the quantity of the loans also would have been material to investors. The total amount of the sixty-six loans for investments exceeded $500 million. This may have been a material fact to the investors because, "Any money used to purchase assets for others is money that is not available for the fund to invest on behalf of its own partners." *I-Enterprise Co. LLC v. Draper Fisher Jurvetson Management Co. V, LLC*, 2005 WL 3590984, at *22. During this time period, the Offshore Fund's assets under management ("AUM") ranged from $877 million to $2.3 billion. (Ex. E at p. 2; Ex. G at p. 2.)

Amounts in excess of 5% of AUM are generally considered material. See, e.g., *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009); *Strougo v. Barclays PLC*, 105 F. Supp.3d 330, 348 (S.D.N.Y. 2015) ("The 'use of a percentage as a numerical threshold, such as 5% may provide the basis for determining whether an alleged misstatement could be material); *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp.2d 645, 654 (S.D.N.Y. 2012) (same).

177

The loans for investments and to pay down the Revolver obligations both exceeded 5% of AUM in 2005 and 2006 and would have been material to a reasonable investor. The Offshore Fund transferred a total of $273 million to the Onshore Fund to allow the Onshore Fund to repay its loan obligations under the revolving credit agreement. The snapshot of outstanding balances as of November 15, 2005, shows a balance of more than $77 million concerning the CDC - i.e. the revolving credit agreement - and $120 million for the transfers for Onshore Fund investments. In fact, as of November 15, 2005, approximately 5.5% of the fund's AUM had been sent to the Onshore Fund to repay the revolving credit agreement and 8.5% of the AUM had been sent to the Onshore Fund to pay for Onshore Fund investments. By March 2006, the balance owed to the Offshore Fund with respect to the Revolver was $175 million. In March 2006, the Offshore Fund's AUM was $1.6 billion. Consequently, at this time, the balance owed by the Onshore Fund as a result of the Offshore Fund repaying its obligations under the revolving credit agreement was more than 10% of the Offshore Fund's AUM. (SEC Rule 56.1 Statement at ¶¶11, 101.)

Gruss disputes this calculation method arguing that the 5% threshold should be calculated as the interest that would

178

have been paid to the Offshore Fund if it had not transferred the money to the Onshore Fund. Gruss argues that this interest should have been calculated as the greater of the short term monthly applicable funds rate or the fed fund rate plus 25 basis points.  Ex. JJ at p. 11; Gruss Rule 56.1 Statement at ¶ 71. However, that is not how this calculation has been envisioned by SAB 99 and the Courts.  SAB 99 provides an example when describing its 5% guideline for materiality. The example involves whether a misstatement of net income of 4% could still be material. SAB at Topic 1: Financial Statements, M. Materiality, 1. Assessing Materiality. The SEC's calculation method finding that the loans from the Offshore Fund to the Onshore Fund exceeded 5% is a more reasonable interpretation than whether the interest on that amount of money would exceed 5% of AUM. SAB at Topic 1: Financial Statements, M. Materiality, 1. Assessing Materiality; see also *Strougo v. Barclays PLC*, 105 F. Supp.3d at 348 (calculating the 5% threshold as the total revenue of a potentially fraudulent risk program as a percentage of Barclays total revenue); *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d at 204 (calculating the 5% threshold as the amount of the potentially fraudulent trade/loans over total assets under management).

        Gruss argues that some of the investment amounts do
not take into account the amount of the loans that were used to
"season" assets that later were purchased as CLOs by the
Offshore Fund from the Onshore Fund. This was required,
according to Gruss, because tax laws prohibited the Offshore
Fund could from "buy[ing] certain investments for itself," and
the Onshore Fund would have to buy and "season" the investments
for anywhere between 30 to 90 days before it could sell those
investments to the Offshore Fund. (FOF at ¶34.) One investor was
skeptical that this process would insulate the Offshore Fund
from US tax liability. The investor noted that "[i]f an Offshore
Fund was found to be a domestic lender by the IRS the
implications would be very serious and could cause a very
material impact." (FOF at ¶38.) Further, Gruss represented that
the law firm Schulte, Roth, and Zabel approved of this seasoning
plan. However, the investor said that they "would be surprised
if Schulte approved of the seasoning process." (Brody Decl. Ex.
32.)


        Even if the seasoning process would successfully
season the loans from US tax liability, that would not shield
the initial transfer from the Offshore Fund to the Onshore fund
to purchase the original loans. Under the seasoning plan, the
Offshore Fund would later purchase the CLOs from the Onshore

                              180

Fund. The Offshore Fund did not need to transfer money to the Onshore Fund before the seasoning process had even taken place. All transfers from the Offshore Fund to the Onshore Fund to pay for loans associated with the seasoning practice are appropriately included in any violations of Section 206(2).

## 4) Gruss acted with a Negligent Intent When He Authorized the Offshore Fund Transfers to Fund Onshore Investments and the Revolver

While Section 206(1) requires proof of fraudulent intent, negligence is sufficient to establish a violation of Section 206(2). *Aaron*, 446 U.S. at 691-93, 697. Gruss' state of mind was at least negligent because Gruss knew the terms of the Offshore Fund's Offering Memorandum and acknowledged that the Offshore Fund would not loan money to U.S. companies in order to avoid being deemed to have engaged in a U.S. trade or business. (FOF at ¶40.) Gruss knew that if the Offshore Fund engaged in a U.S. trade, it could potentially subject the Offshore Fund to adverse tax consequences. (FOF at 39.)

Gruss stated to the attorneys conducting an internal investigation for DBZCO that money from the Offshore Fund needed to be kept separate from money from the Onshore Fund to avoid ECI issues and that it was well known that a transfer from the

Offshore Fund to the Onshore Fund would raise ECI and "trade or business" concerns. Gruss told investors that the Offshore Fund was not involved in loan origination because of tax issues and he knew that it was important that the Offshore Fund not make certain investments because of adverse tax implications. He also told the attorneys conducting the internal investigation that he "knew you shouldn't be going there." (FOF at ¶110.)

Negligence is also established by the concern expressed by other DBZCO employees about the impact of these transactions on the status of the Offshore Fund. For example, Wu told Gruss that she was uncomfortable with the practice "we're not supposed to do this, so we need to do something." (FOF at ¶60.) Wu even joked with Gruss that they were going to go to jail because of the interfund transfers. *Id.* In April 2005, when Gruss instructed Law to fund an investment from the Offshore Fund, Law responded "is there a game plan? Or is this something that the DBZ backoffice must learn to accept." (FOF at ¶81.) When Gruss responded "what are the alternatives", Law told him to "get all of the partners and top management in the loop (i.e. REALITY) and have them make a joint management decision." *Id.*

Wu and Law both resigned over the interfund transfers. A factual issue is presented as to whether the resignations

resulted from the practice of interfund transfers or simply the pressures of accommodating the process at the last minute. No matter the ultimate reason for their resignations, they each expressed reservations about the interfund transfers to Gruss (FOF at ¶¶60-62.), and it was negligent to not at least seek a legal opinion about the propriety of the practice after two members of the team left DBZCO at least in part over this issue.

Gruss argues that the operating documents allowed for interfund transfers, making his conduct permissible and not negligent. However, even if interfund transfers were permitted as concluded above, these provisions did not nullify the bar to investment in a U.S. company since a purpose of the Offshore Fund was to create an investment vehicle that would not be subject to U.S. taxes.

As the facts above establish, Gruss was responsible for sixty-six inter-company transfers granting loans from the Offshore Fund to fund the Onshore Fund commitment to invest by granting loans and four loans to repay the Onshore loans arising out of the revolving credit facility. These violations were negligent. There is no evidence that at the time of these transfers Gruss considered the provisions of the Operating Documents on which he now relies, or sought an opinion on the

183

legality of his acts. With full knowledge that the Offshore Fund

was prohibited from investing in a U.S. company, it was

negligent not to review these transactions in light of

prohibition, particularly given the concerns expressed by those

involved in the transfer process. Presumably, an opinion of

counsel would have reached the same conclusions as are set forth

above. In view of the importance of the prohibition against U.S.

investment to the Offshore Fund and its investors, Gruss'

conduct as Chief Financial Officer, though not fraudulent, was

negligent.

   5) Gruss Aided and Abetted DBZCO's Violation of Section 206(2)
      of the Advisers Act

          In addition to the conduct attributed to the company

for the Section 206(2) claims regarding both the transfers to

support Onshore investments and the four Revolver payments, the

SEC has established that Gruss aided and abetted these

violations.  To prove Gruss' liability under an aiding and

abetting theory, "the SEC must establish: (1) a primary or

independent securities violation committed by another party; (2)

awareness or knowledge by the alleged aider and abettor that his

role was part of an overall activity that was improper; and (3)

the alleged aider and abetter knowingly and substantially

184

assisted the conduct that constitutes the primary violation."
*S.E.C. v. Bolla*, 401 F.Supp.2d at 58 (internal citations
omitted); see also *Investors Research Corp. v. Sec. & Exch.
Comm'n*, 628 F.2d 168, 178 (D.C.Cir. 1980), cert. denied, 449
U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980). Further, "The
SEC has the burden of proving each element of the aiding and
abetting claims by a preponderance of the evidence." *S.E.C. v.
Bolla*, 401 F.Supp.2d at 59; *Decker v. Sec. & Exch. Comm'n*, 631
F.2d 1380, 1388 (10th Cir. 1980).

Here, the SEC has proven by a preponderance of the
evidence that DBZCO committed securities violations as discussed
above and Gruss was the one who authorized the transfers and was
responsible for the violations of securities laws. Finally, the
emails and testimony establish that Gruss "knowingly and
substantially assisted" the primary violation. Law and Wu's
emails serve as a caution that this conduct would be material to
reasonable investors and that Gruss understood the great risks
this conduct posed to the Offshore Fund. (FOF at ¶¶60-62, 81.)
Yet Gruss continued to engage in this conduct after the
resignations knowing at this point the risks of this conduct.

The Advance Payment of Management Fees Were Appropriate Inter-
Company Transfers

Each of the funds was obligated to pay DBCZO a
management fee that, according to their Management Agreements
with DBZCO, was to "be accrued monthly and payable quarterly."
The undisputed facts show that from May 2004 through March 2006,
DBZCO withdrew the management fees owed under the Management
Agreements from the Onshore Fund, the Offshore Fund, the TE Fund
and the Offshore Fund accounts anywhere between 1 to 31 days
before the fees were due to DBZCO at the end of the appropriate
quarters. There were also instances where the management fees
were paid after the end of the quarter when they were due.

The payment of management is not characterized as a
loan by the SEC nor has an impropriety been claimed with respect
to this inter-company transfer relating to cash flow, nor has it
been contended by the SEC that the amounts involved are
material. The motion for an injunction based on payment of
management fees is denied.

The Motion for an Injunction Based Upon the Payment by The
Offshore Fund to Purchase an Airplane is Denied as Presenting a
Contested Issue of Fact

186

According to Gruss, there is no admissible proof that Gruss ever approved or had advance knowledge of the two September 28th payments for the airplane closing costs funded by the Offshore Fund or that Gruss knowingly or negligently approved the September 29th and 30th payments. Gruss has categorically denied that he had ever authorized or had knowledge of these payments being made from the Funds:

> Whatever expenses related to the airplane were management company expenses. At no time then, or ever, did I ever authorize anybody to send it out of a fund or a managed account.

Ex. UU at p. 327; Response ¶ 136.

Zwirn had tasked Harold Kahn ("Kahn"), the Chief Operating Officer for DBZCO, not Gruss, with the job of "find[ing] out what potential options were available and to help identify sources of financing for such a purchase." Similarly, according to Gruss, there is no admissible evidence that Gruss actually ever met with an airplane broker, PrivatAir, an aviation attorney or an attorney regarding the purchase of an airplane. (FOF at ¶156.) The issue is not whether Gruss was involved in some fashion in events leading up to the purchase of the airplane but whether or not Gruss knowingly approved the use of fund money to pay for the closing costs for the airplane.

187

As to the two September 28, 2005 payments, Law testified that she had created two approval forms for the two payments using wire requests with photocopies of Gruss' signature at the bottom of the wire requests. Law took "one of" the "old wire approvals" and "fold[ed] it at the part where the signature is shown up, put it on the blank that we just printed out and then photocopied it." (FOF at ¶171.) Law has no recollection of speaking to Gruss to obtain his approval for these two wires prior to sending them for payment on September 28th.

The SEC relies on "a meeting in Gruss' office where this decision was made [to use investor money for the airplane]." (SEC Memo in Support at p. 10.) However, Law testified in her deposition that she has no recollection what anybody said at that meeting, and she "had no recollection of any discussions [with Gruss] about the transfers from the LP or HCMZ for plane-related expenses." (Ex. BBB at pp. 258-59.)

Law testified that the only "indication" she received from anybody about using fund money to pay for the airplane expenses was an email she received from Kahn asking her to fund the airplane closing costs. To her, that email "was an indication of moving the money from the Funds." The email in

question from Kahn to Law stated, "Can you pls arrange to have the $1.9MM wired to Citi asap for the issuance of the LC. This will only be a short-term deposit in that once the Citi revolver is in place (should be win a week) we will credit the amount against the line. Thx." (FOF at ¶169.)

Both payments, the September 29th and 30th payments for closing costs, were sent from the funds after Gruss had emailed his approvals "Ok pag" in response to emails from Law. Law admitted that she "wouldn't know" whether Gruss actually knew he was approving payments from the funds for Zwirn's airplane, and she could not "recall" any such conversations with Gruss about these payments. Law cannot recall any conversation with Gruss "prior to November 9th [2005], where ... [she] actually spoke to him about the fact that the monies had to be repaid for the ... airplane wires." (FOF at 188.)

According to Gruss, his approvals of the September 29th and 30th email requests for the transfer of the funds were in furtherance of a "protocol for LaSalle" bank, which Gruss was required to perform in order to release funds from the bank. Gruss' purpose in approving the transfer was "[t]o make sure the wire was actually sent" because "[w]ithout an authorization that wire does not get sent." (FOF at ¶179.) Gruss received "hundreds

189

of e-mail approval requests." (FOF at ¶179.) In the month of "September alone" he "had received over 250 such requests." (FOF at ¶179.) On September 29th and 30th Gruss received numerous email requests for authorizations to send moneys from the funds and approved the two emails at issue at the same time he approved other email requests for approval. "[T]he control that made sure that the wire was for an appropriate purpose" was the "Finance [personnel] who were actually authorizing the wires and ... [the] people in the back office the next day that were reconciling the wires." (FOF at ¶179.)

At the time Gruss approved the September 29th and 30th email requests, he maintains that he did not know he was approving payments for Zwirn's airplane. As a general practice, Gruss "would read the "To" line and the "From" line and most likely the subject." The subject on the September 29th and 30th emails was "RE: IATS." By itself, this subject did not reference the purchase of Zwirn's airplane. If Gruss had read further into the email, he would have seen on the September 29th email the phrase "CREDIT: INSURED AIRCRAFT TITLE SERVICES, INC. Prior to September 30th, the Zwirn funds had been investing in aircraft related assets, one of which investments was known as "Priority Air," "quite similar to PrivatAir." As recently as September

190

6th, Gruss had approved an email relating to the "Priority Air" fund investment asset. (FOF at ¶179.)

The SEC has referred to Gruss' effort to obtain a loan from Citibank and the fact that "[f]rom September 28 through September 30, 2005, ... DBZCO did not have more than $827,000 in its accounts" to impute to Gruss that he knew fund money was to be used to pay for the airplane closing costs. (Memo in Support at pp. 9-10.) However, no evidence has been established that Gruss was ever aware of how much money the management company had at any one time or that there was any intention to use the money from the Citigroup loan facility to pay the $3,774,175 to close on the airplane purchase. Gruss also testified that the Citibank revolver was not needed "in order to effect the purchase of the plane," but for "operating expenses." (FOF at ¶167.)

Gruss' denial of knowledge concerning the aircraft purchase has created a factual issue. The motion for an injunction against Gruss on the basis of Offshore payments for the airplane is therefore denied.

The Motion for the Imposition of a Civil Penalty is Granted

191

The federal securities laws provide for the imposition of civil penalties for violations of the securities laws. 15 U.S.C. §§ 77t(d), 78u(d), 80b-9(e). Civil penalties serve the dual purpose of penalizing the defendant for past violations and deterring him from future misconduct. *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006); *SEC v. Ramoil Mgmt., Ltd.*, No. 01-cv-9057(SC), 2007 WL 3146943, at *13 (S.D.N.Y. Oct. 25, 2007) (civil penalties "fulfill a number of other [nonpunitive] purposes such as ... deterrence, fostering public confidence in the securities system, and promoting stability in the securities market").

The securities laws provide for three tiers of penalties to be "determined by the court in light of the facts and circumstances." Under each tier, the Court is authorized to impose a penalty that is the greater of the defendant's "pecuniary gain" from the violation or the applicable tiered amount. 15 U.S.C. §§ 77t(d)(2)(A)-(C), 78u(d)(3)(B)(i)-(iii), 80b-9(e)(2)(A)-(C). The penalty tiers for individuals are as follows:

First tier: $6,500 for an individual per violation;

192

Second tier: $65,000 for an individual per violation
that "involved fraud, deceit, manipulation, or deliberate
or reckless disregard of a regulatory requirement"; or

Third tier: $130,000 for an individual per violation
that occurred through March 3, 2009, that "involved fraud,
deceit, manipulation, or deliberate or reckless disregard
of a regulatory requirement" and "directly or indirectly
resulted in substantial losses or created a significant
risk of substantial losses to other persons."

*Id.;* See 17 C.F.R §§ 201.1003, 201.1004, Table III.

In weighing the penalty amount, courts consider: (1)
the egregiousness of defendant's conduct; (2) the degree of
defendant's scienter; (3) whether defendant's conduct created
substantial losses or the risk of substantial losses to other
persons; (4) whether defendant's conduct was isolated or
recurrent; and (5) whether the penalty should be reduced due to
defendant's demonstrated current and future financial condition.
*SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).

Gruss' negligence warrants First Tier penalties and
not "willful and intentional" conduct, which would result in

Second Tier or Third Tier penalties. *S.E.C. v. Moran*, 944 F.Supp. 286, 297 (S.D.N.Y. 1996). Second or Third Tier penalties would be inappropriate because no evidence has been presented to establish that Gruss received any personal financial benefit from his conduct, an important consideration when determining civil penalties. *SEC v. Haligiannis*, 470 F. Supp. 2d at 386.

In attempting to determine the amount of civil penalties, the loss of investment opportunity for the Offshore Fund has not been quantified by the SEC, although Gruss' conduct was recurrent. Under the circumstances presented here, the $6,500 penalty for the seventy violative transfers will be reduced by 50% to provide sufficient deterrence in addition to the injunctive relief, which is also granted.

**Conclusion**

        Based upon the findings and conclusions set forth above, Defendant's motion for summary judgment is granted in part and denied in part, and Plaintiff's motion for summary judgment is granted in part and denied in part.

        It is so ordered.

**New York, NY**
**March 2͞8͞, 2017**

                                 **ROBERT W. SWEET**
                                     **U.S.D.J.**

195